# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

DARETHA BRAZIEL, individually and as
Next Friend for minors, RB-minor 1, DB-
minor 2, DR-minor 3;
KEESHA JONES, individually and as Next
Friend for minors, KJ-minor-4; DJ-minor 5,
TC-minor 6, TC-minor 7, and KB-minor 8;
IEASHA JONES, individually;
MICHAEL D. BRIGHAM, individually;
REBECCA BRANSCUMB, individually;
STACEY BRANSCUMB, individually;
EMMA KINNARD, individually;
on behalf of themselves and all other similarly
situated Plaintiff Residents of the City of
Benton Harbor, Michigan.

              Plaintiffs,

v.

GOVERNOR GRETCHEN WHITMER,
Individually and in her official capacity;
STATE OF MICHIGAN - ENVIRONMENT,
GREAT LAKES & ENERGY; and
DIRECTOR LIESL CLARK, Individually and
in her official capacity; and DRINKING
WATER UNIT DIRECTOR ERIC OSWALD,
Individually and in his official capacity;
MICHIGAN DEPARTMENT OF HEALTH
AND HUMAN SERVICES and its
DIRECTORS ROBERT GORDON and
ELIZABETH HERTEL; in their individual
and official capacities; MAYOR MARCUS
MUHAMMAD, Individually and in his
official capacity; and MICHAEL
O'MALLEY, Individually and in his official
capacity as Water Plant Operator; and CITY
MANAGER DARWIN WATSON and CITY

Case No.: 1:21-cv-960

Hon. Janet T. Neff

MANAGER ELLIS MITCHELL, Individually
and in their official capacities; CITY OF
BENTON HARBOR, a Municipal
Corporation, through the BENTON HARBOR
WATER DEPARTMENT; ELHORN
ENGINEERING COMPANY; and F&V
OPERATIONS AND RESOURCE
MANAGEMENT, INC.,

                    Defendants.

Alice B. Jennings (P29064)
Carl R. Edwards (P24952)
**EDWARDS & JENNINGS, P.C.**
Attorneys for Plaintiffs
3031 West Grand Blvd., Ste. 435
Detroit, MI  48202
(313) 961-5000
ajennings@edwardjennings.com
cedwards@edwardsjennings.com

Kevin S. Hannon
Jessica Meeder
Attorneys for Plaintiffs
**MORGAN & MORGAN**
**COMPLEX LITIGATION**
1641 North Downing Street
Denver, Colorado  80218
(303) 861-8800, ext. 323
khannon@forthepeople.com
jmeeder@forthepeople.com

## CLASS ACTION FIRST AMENDED VERIFIED COMPLAINT FOR DECLARATORY RELIEF, INJUNCTIVE RELIEF, EQUITABLE RELIEF AND DAMAGES; AND RELIANCE UPON JURY DEMAND

### INTRODUCTION

"Every Michigander deserves to trust the water coming out of their tap, which is why I made protecting and delivering clean water and rebuilding trust in state government a priority from day one," Whitmer said. "This new tool is yet another example of this administration's

commitment to make clean water a reality for all Michiganders."

> Governor Gretchen Whitmer
> Statement after establishing Michigan
> Department Great Lakes and Energy
> (EGLE), October 26, 2020

1.      This class action is brought on behalf of thousands of residents ("Class") of the City of Benton Harbor ("Benton Harbor"), who from at least, 2018 to the present, have experienced and will continue to experience devasting health effects from their **Benton Harbor public water supply having been contaminated with lead, bacteria and other contaminants**. The contaminated water supply has caused, and continues to cause, a violation of each Plaintiff's clearly established fundamental right under the Due Process clause of the 14th Amendment to the United States Constitution to bodily integrity and unharmed property interests by Defendant State of Michigan and each and every Defendant State of Michigan government official; Defendant Benton Harbor, and each and every Defendant Benton Harbor government officials' deliberate indifference, deliberate and active decision making that created, maintained and covered up the harm to each Plaintiff. Further, each State and Benton Harbor Defendant's deliberate indifference has caused a public health emergency and crisis in Benton Harbor.

2.      Private Defendants Elhorn Engineering and F&V Operations and Resource Management, Inc. contracted with Defendant Benton Harbor to install

anti-corrosion and other measures which would permit Benton Harbor to meet their legal obligations under federal and State of Michigan Safe Drinking Water Acts and the federal and State Lead and Copper rules to provide clean safe water to each Plaintiff and Benton Harbor resident. However, both Engineering Defendants were professionally negligent and made the contamination and lead exceedances worse.

3.      Lead, one of the known and principal contaminants in this case, is a neurotoxin. It is known to cause severe injury and death[1]. Equally significant, medical science has known for years that there is no safe level for lead, therefore exposure should be zero (0)[2].

4.      The June-September 2018, testing results proved that the lead in Benton Harbor's water supply exceeded the action level established by the United States Environmental Protection Agency's (EPA) Lead and Copper rule under the federal Safe Drinking Water Act and Michigan Lead and Copper Rule under the Michigan Safe Drinking Water Act. These extraordinary lead exceedances rocketed above the

---

[1] The United States Environmental Protection Agency recently noted when issuing its Emergency Administrative Order under SDWA section 1431 in Clarksburg, West Virginia that excessive lead in drinking water poses an imminent and substantial endangerment. The agency pointed out:

> Health effects associated with exposure to inorganic lead and compounds include, but are not limited to: neurotoxicity, developmental delays, hypertension, impaired hearing acuity, impaired hemoglobin synthesis, and male reproductive impairment. Importantly, many of lead's health effects may occur without overt signs of toxicity. Lead has particularly significant effects in children, well before the usual term of chronic exposure can take place. (https://iris.epa.gov/static/pdfs/0277_summary.pdf - IRIS Chemical Assessment Summary for Lead).[64] See Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. §300(i) and 42 U.S.C. §300(j)(7)(b) to Abate the Imminent and Substantial Endangerment to Benton Harbor Residents from Lead Contamination in Drinking Water, pp. 12-13 (September 9, 2021)

[2] Centers for Disease Control and Prevention, Blood Lead Levels in Children, http://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last reviewed April 5, 2021.)

**15 ppb** (parts per billion) legal limit for lead exposure and steadily increased over a three (3) year period. In the January-June 2021 testing period, Plaintiff Class Representative Daretha Braziel's Benton Harbor home revealed that lead in the tap water was **889 ppb**.

5.     This extraordinary amount of lead contamination in Benton Harbor's water supply triggered provisions under the federal and State of Michigan Safe Drinking Water Acts and Lead and Copper rules. These statutes required State and Benton Harbor government Defendants to mitigate the harm to each Plaintiff, including the provisions that require anti-corrosion measures be taken to eliminate lead leaching into the water supply from lead service lines or pipes.

6.     Additionally, these federal and state statutes required that the Benton Harbor public be warned that there was lead in their tap water supply that was far above the legal limit for lead and that their tap water contained poison that they should not drink; further, that federal and state law specified persons and organizations be notified and warned of the public health endangerment by the lead poisoning of the Benton Harbor water supply.

7.     However, each government Defendant deliberately ignored and covered up these statutory requirements, causing substantial injury and damage to each Plaintiff Class Representative and to each Plaintiff Class Member's constitutional and legal rights.

8.     On October 22, 2018, in addition to the public health emergency that was created when Benton Harbor water's supply testing, from June-September 2018, revealed substantial amounts of lead in the water supply, measuring 22 ppb, on October 3, 2018 Defendant State of Michigan Department of Environment Great Lakes and Energy's (EGLE) Sanitary Survey report also demonstrated "New Significant Deficiencies Identified", including **E. coli bacteria in the water supply**.

9.     However, rather than enforce the Administrative Order and require compliance with federal and State of Michigan Safe Drinking Act requirements, Defendant State of Michigan EGLE, repeatedly extended the deadlines for Defendant Benton Harbor to come into statutory compliance.

10.    Defendant EGLE's legal responsibility and liability for its conscious affirmative and knowing violation of each Plaintiff's constitutional rights and violations of federal and State of Michigan Safe Drinking Water laws was openly discussed by EGLE employees. In a email dated **December 18, 2019** from EGLE Supervisor Michael Bolf to Defendant EGLE Director of Drinking Water and Environmental Health Division, Defendant Eric Oswald, Supervisor Bolf in pertinent part, said the following:

> **"…[I]f we continue the pattern of allowing them to miss deadlines and requests for extensions, then the water system remains vulnerable and we are potentially culpable if a problem occurs."** (Emphasis added.)

6

11.    Further, Defendant EGLE Director Eric Oswald's knowing and conscious deliberate indifference to each Plaintiff's constitutional rights is evidenced by his flat out lying in his responses when asked about the lead in Benton Harbor's water supply, on at least two (2) occasions.

12.    On **November 14, 2018**, United States Environmental Protection Agency (EPA) Region 5 Chief Thomas Poy wrote a letter to Defendant EGLE Director Eric Oswald requesting "…updates on non-compliant drinking water systems in Michigan".

13.    On January 11, 2019, EGLE (formerly Department of Environmental Quality (DEQ)) Director Oswald knowingly provided a **false response** to EPA Chief Thomas Poy. In this regard Defendant EGLE Director Oswald stated that:

> "Of the two CWSs (Community Water Systems):
> - 1 water system has returned to compliance
> - 1 water system is in compliance and a requested clarification has been provided…"

14.    On or about **November 6, 2019**, Great Lakes Environmental Law Center Executive Director Nicholas Leonard sent an email to Defendant EGLE Director Eric Oswald stating his concern and alarm regarding the anti-corrosion treatment that EGLE had directed Defendant Elhorn Engineering use to eliminate lead in Benton Harbor's water supply.

15.     Defendant Eric Oswald sent an email reply stating that the anti-corrosion treatment "was working" to eliminate the lead leaching from the lead pipes into Benton Harbor's water supply.

16.     However, this statement by Eric Oswald was a flat out "untruth" and a coverup. In truth, lead testing in Benton Harbor's water supply, from July to December 2019, demonstrated that lead in Benton Harbor's water was **32 ppb**, the highest lead in water registered as of that time; equally significant one home had lead results at **72 ppb**.

17.     In knowingly providing false answers to United States EPA Region 5 Chief Thomas Poy and Nicholas Leonard, Executive Director, Great Lakes Environmental Law Center and covering up the fact that Benton Harbor's water supply was poison, not fit to ingest, and was a public health emergency, Defendant EGLE Director Oswald was further deliberately indifferent to the constitutional rights of each Plaintiff.

18.     Similarly, Defendants Elhorn Engineering and F&V Operations and Resource Management, Inc. also failed to follow federal and state statutes with respect to the provisions concerning anti-corrosion measures that should be taken to prevent lead leaching from lead service pipes into the Benton Harbor drinking water and the notification requirements to the Benton Harbor community.

19. Tragically, from **2011 to June 2021, Benton Harbor was the only Michigan city to have six (6) consecutive monitoring periods where lead was above the legal limit for lead in a public drinking water supply**[3].

20. Not until **October 14, 2021**, when Defendant Michigan Governor Gretchen Whitmer issued an executive declaration order declaring the water unsafe to drink and authorizing a bottled water emergency use, did the residents of the City of Benton Harbor, Plaintiff Class Representatives, and Plaintiff Class Members learn that the water was unsafe to drink, cook, wash, bathe, and/or brush one's teeth with.

21. On **October 20, 2021**, at a Michigan State Legislative hearing, the Director of EGLE, Defendant Liesl Clark, admitted that the Benton Harbor drinking water is **not**, after three (3) years of known statutory exceedances, safe to drink. In response to the question posed by a State Representative, **"Is it safe to drink the water in Benton Harbor right now, or not?"** Defendant Clark responded, **"No, it's not. People should be drinking bottled water."**

22. Thus, each State of Michigan Defendant and each City of Benton Harbor Defendant "...knew of the facts from which they could infer a substantial risk of serious harm, they did infer it and they acted with indifference towards

---

[3] See Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. §300(i) and 42 U.S.C. §300(j)(7)(b) to Abate the Imminent and Substantial Endangerment to Benton Harbor Residents from Lead Contamination in Drinking Water, p. 12 (September 9, 2021).

Plaintiffs' rights." *Waid v Earley,* (In Re Flint Water cases), 960 F.3d 303 (6th Cir.

2020) J. Murphy concurring citing *Guertin v Michigan,* 912 F3d 907 (Cir. 2019).

23.    The conduct of each Defendant **shocks the conscience**.

## JURISDICTION AND VENUE

24.    This is a civil action brought pursuant to 42 U.S.C. §1983, seeking

injunctive and declaratory relief, together with monetary damages against the State

of Michigan, Governor Gretchen Whitmer and other State Defendants; and

Defendant City of Benton Harbor and its City Defendants for violation of the Due

Process clause, 14th Amendment of the United States Constitution.

25.    The court also has jurisdiction over each Plaintiff's *Monell* claim

against each Benton Harbor Defendant.

26.    The Court has jurisdiction over the government Defendants, pursuant

to 28 U.S.C. §1331, which authorizes federal courts to decide cases concerning

federal questions; 28 U.S.C. §1343(a)(3) and (4) and 28 U.S.C. §2201, the

Declaratory Judgment Act. The Court has personal jurisdiction over Defendants

named herein as public officials and employees of the State of Michigan, sued in

their official and individual capacities; and public officials, employees of the City of

Benton Harbor, sued in their official and individual capacities; and the City of

Benton Harbor, for violations of Plaintiffs' constitutional rights. The Court has

jurisdiction over the Governor of the State of Michigan, in her official capacity, for prospective relief, only.

27.    The Court has supplemental jurisdiction over both Engineering Defendants because each Plaintiff's negligence claim is so related to Plaintiff's federal constitutional claims "…that they form a part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S. C. §1367.

28.    The amount in controversy in this suit exceeds $5,000,000, exclusive of interest and costs.

29.    Venue is proper in this Court as all Defendants conduct their business in the Western District of Michigan.

30.    Pursuant to MCL §600.6401(2)(b), Plaintiffs provide this Complaint as their detailed statement of notice regarding the nature of their claims and, to the extent possible under the extenuating circumstances, the items of damages alleged to be sustained as the result of the State's actions.

31.    Plaintiffs certify that this Complaint is signed and verified by Plaintiffs before an officer authorized to administer oaths pursuant to MCL §600.6432(1). (**Ex. 1,** Notarized Sworn Statements by Plaintiffs.)

32.     Pursuant to MCL §600.6431(1), Plaintiffs designate the following institutions, "departments or officers" of the State "involved in connection" with this claim: Governor Gretchen Whitmer; The Michigan Department of Environment, Great Lakes and Energy (EGLE); Director Liesl Clark; Director Eric Oswald, Drinking Water and Environmental Health Division (DWEHD); Michigan Department Health and Human Services Director Robert Gordon and, after January 2021, Director Elizabeth Hertel, all acting in their official capacity and within the scope of their authority.

33.     This notice is filed within six (6) months of the accrual of Plaintiffs' claim and satisfies all timeliness requirements of MCL §§ 600.6431 and 600.6452, to the extent that they may apply to Plaintiffs' claims, and Plaintiffs' claims arose in the City of Benton Harbor.

## PARTIES

## PLAINTIFF CLASS REPRESENTATIVES

### Plaintiff Daretha Braziel

34.     Plaintiff Class Representative, Daretha Braziel, has lived in the City of Benton Harbor, Michigan, her entire life. Plaintiff Braziel has lived in her present rented home since February 2021; prior to that time Plaintiff lived for over eight (8) years in a Benton Harbor home with her mother. Plaintiff lives in her home with

minor children, age 15, (minor 1); 17, (minor 2); and grandson, age four (4) months, (minor 3).

35.     Plaintiff Braziel and her minor children, and minor grandson, utilized the tap water until late October 2021, when the massive publicity exposed that the water was not safe for all purposes. At no time prior to late October 2021was Plaintiff Braziel ever notified by any of the Defendants that the water she used was unsafe to drink or utilize in food preparation and for oral hygiene. Plaintiff's minor grandson, born on June 15, 2021, was fed his formula with tap water right up until Governor Whitmer declared a state of emergency on or about **October 14, 2021**, and the "news got out".

36.     In 2021, Plaintiff Daretha Braziel had her water tested, which showed a lead level of **889 parts per billion (ppb)**. The legal limit at the time for both the federal and State of Michigan, under the Lead and Cooper Rule, was **15 ppb**.

37.     Plaintiff Class Representative Braziel, and her minor children and grandson, have sustained a 14th Amendment constitutional violation of their bodily integrity and property interest, a *Monell* claim and a violation of the Michigan Government Tort Liability Act. As a direct and proximate cause of these constitutional and statutory violations, Plaintiffs have suffered physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated

13

tap water caused by each State and Benton Harbor Defendants' actions, and customary decision making. Additionally State Defendants and Benton Harbor Defendants provided no notice to Plaintiff Class Representatives and Plaintiff Class Members to stop ingesting the water from 2018 to 2021, as is required by federal and state Safe Drinking Water Act laws. The harm to Plaintiffs is continuing.

38.     Plaintiff Class Representative Braziel has also been caused injuries and damages because of the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

39.     Plaintiff Class Representative Braziel, and her minor children and grandson, are all African American.

40.     Plaintiff Class Representative Keesha and Iesha Jones have lived in the City of Benton Harbor, Michigan, her entire life. Plaintiff rented her present home for over three (3) years. She has utilized tap water from the Benton Harbor water system for drinking, cooking, bathing, sanitation and hygiene. Plaintiff Jones lives with four (4) children, ages four (4) to eighteen (18), (minors 4, 5, 6 and 7); and one minor grandchild, (minor 8), born in June 2021. Plaintiff Iesha Jones is an adult who has lived with her mother, Keesha Jones, at all times pertinent.

41.     Plaintiff Class Representative Jones, her children and grandchild, including Plaintiff Iesha Jones, have sustained a 14th Amendment constitutional violation of their bodily integrity and property interest, a *Monell* claim and a

violation of the Michigan Government Tort Liability Act. As a direct and proximate cause of these constitutional and statutory violations, Plaintiffs have suffered physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water caused by each State and Benton Harbor Defendants' actions, and customary decision making. Additionally State Defendants and Benton Harbor Defendants provided no notice to Plaintiff Class Representatives and Plaintiff Class Members to stop ingesting the water from 2018 to 2021, as is required by federal and state Safe Drinking Water Act laws. The harm to Plaintiffs is continuing.

42.     Plaintiff Class Representative Jones has also been caused injuries and damages caused by the professional negligence of Defendant Elhorn Engineering and Defendant F&V Operations and Resource Management.

43.     Plaintiff Class Representative Jones and all of her children living with her are African American.

### Plaintiff Emma Kinnard

44.     Plaintiff Class Representative Emma Kinnard is a homeowner living at the same address in Benton Harbor, Michigan, since 1976. Plaintiff Kinnard asked Defendant Mayor Muhammad to test her water, approximately two (2) years ago,

because of the smell and look. Defendant, Mayor Muhammad, told Ms. Kinnard he would "get back to you," but he never did.

45.    Plaintiff Class Representative Kinnard states she is outraged and sad that her community, which she loves, is being hurt by the water crisis. As a former educator and a Benton Harbor business owner, Plaintiff Kinnard is most concerned for the children, who she states will suffer in their loss of cognition, intellect and development.

Plaintiff Kinnard, as a Benton Harbor business owner, states she and other businesses have suffered as a result of the contaminations and lead in the water.

46.    Plaintiff Class Representative Kinnard has sustained a 14th Amendment constitutional violation of her bodily integrity and property interest, a *Monell* claim and a violation of the Michigan Government Tort Liability Act. As a direct and proximate cause of these constitutional and statutory violations, Plaintiff has suffered physical and emotional injuries,  annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water caused by each State and Benton Harbor Defendants' actions, and customary decision making. Additionally State Defendants and Benton Harbor Defendants provided no notice to Plaintiff Class Representatives and Plaintiff Class Members to stop ingesting the water from 2018 to 2021, as is

required by federal and state Safe Drinking Water Act laws. The harm to Plaintiff is continuing.

47.    Plaintiff Class Representative Kinnard has also been caused injuries and damages by the professional negligence of Defendant Elhorn Engineering and F&V Operations Resource Management.

48.    Plaintiff Class Representative Kinnard is an African American.

### Plaintiff Michael Duane Brigham

49.    Plaintiff Representative Michael Duane Brigham is a sixty-one (61) year old African American male. He has lived at his current address in Benton Harbor, Michigan for eleven (11) years.

50.    Up until October 2021, when the Governor issued her Emergency Order not to drink the Benton Harbor water, he utilized the water coming from his tap for all purposes.

51.    Plaintiff Class Representative Brigham has sustained a 14th Amendment constitutional violation of his bodily integrity and property interest, a *Monell* claim and a violation of the Michigan Government Tort Liability Act. As a direct and proximate cause of these constitutional and statutory violations, Plaintiff has suffered   physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water caused by each State and Benton

17

Harbor Defendants' actions, and customary decision making. Additionally State Defendants and Benton Harbor Defendants provided no notice to Plaintiff Class Representative Brigham to stop ingesting the water from 2018 to 2021, as is required by federal and state Safe Drinking Water Act laws. The harm to Plaintiff is continuing.

52.     On October 28, 2021, Plaintiff Class Representative Brigham was administered a blood lead test and found to have lead in his blood, even though he had not ingested the water for approximately two weeks.

53.     Plaintiff Class Representative Michael Brigham has also suffered injuries and damages that were caused by the negligence of Engineering Defendants Elhorn Engineering and F&V Operations and Resource Management, Inc.

**Plaintiffs Rebecca and Stacey Branscumb**

54.     Plaintiff Class Representatives Rebecca Branscumb and Stacey, have lived in their home for over twelve (12) years, in Benton Harbor, Michigan.

55.     Test results in the Branscumb tap water show a lead level of **496 ppb** in 2021. At the time of the water test, the legal limit for lead in tap was **15 ppb**.

56.     Not until October 2021, when Defendant Governor Whitmer issued her Emergency Order not to drink the Benton Harbor water, did Plaintiffs Branscumb stop using their tap water. None of the Defendants advised Plaintiffs Branscumb to stop using the water prior to that time.

18

57.     Plaintiffs Class Representatives Branscumb's family pet, a Great Dane, died after ingesting tap water in their home when his stomach became bloated and flipped, resulting in his death.

58.     Plaintiffs Rebecca Branscumb and Stacey Branscumb have sustained a 14th Amendment constitutional violation of their bodily integrity and property interest, a *Monell* claim and a violation of the Michigan Government Tort Liability Act. As a direct and proximate cause of these constitutional and statutory violations, Plaintiffs have suffered physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water caused by each State and Benton Harbor Defendants' actions, and customary decision making. Additionally State Defendants and Benton Harbor Defendants provided no notice to Plaintiff Class Representatives Rebecca Branscumb and Stacey Branscumb to stop ingesting the water from 2018 to 2021, as is required by federal and state Safe Drinking Water Act laws. The harm to Plaintiffs is continuing.

59.     Plaintiff Class Representatives Stacey Branscumb and Rebecca Branscumb have also suffered injuries and damages that were caused by the professional negligence of each Engineering Defendant, Elhorn Engineering and F&V Operations and Resource Management.

60.    Each Plaintiff Class Representatives are citizens of the United States and at all relevant times are residents of Benton Harbor, individuals, and Next Friends for minors, homeowners, renters, and a business owner who, since at least 2018, were and continue to be, exposed to highly dangerous lead, bacteria and other contaminants in their tap water.

61.    Each Plaintiff Class Representative and Plaintiff Class Member shall require medical monitoring in the future because of their exposure and contamination to lead in Defendant Benton Harbor's water supply.

## DEFENDANTS

62.    All individual State Defendants are sued in their individual and/or official capacities as indicated below.

### Defendant Governor Gretchen Whitmer

63.    Defendant Gretchen Whitmer is the Governor of the State of Michigan and is vested with executive power pursuant to Art. V, Section 1, of the Michigan Constitution. Governor Whitmer, since January 2019, has been and is responsible for the management of state government for the health and welfare of its citizens and residents and is sued by each Plaintiff Class Representative and each Plaintiff Class Member in her official capacity, exclusively for prospective equitable relief only to correct the harm that was created, maintained and covered up in violation of each Plaintiff's constitutional right to bodily integrity  and property interest, and the

resulting injuries and damages caused to each Plaintiff Class Representative and Class Member, by the Governor's deliberate indifference to each Plaintiff's constitutional rights of bodily integrity and property interest.

64.     Governor Whitmer does not deny that she has knowledge of the catastrophic health effects the ingestion of contaminated water can cause. On October 26, 2020, Defendant Governor Whitmer and Defendant Director Clark of EGLE created:

> "The Office of the Clean Water Public Advocate was created through Governor Gretchen Witmer's Executive Order 2010-06. The Office operates as a type 1 agency within the Michigan Department of Environment, Great Lakes, and Energy, **while having a connection to the Governor's Office to elevate concerns**. The Office of the Clean Water Public Advocate ensures that drinking water concerns are investigated and that trends are analyzed. Based on trend analysis, recommendations to laws, rules, regulations, and procedures will be made to ensure that community concerns are addressed."

Yet, though Defendant knew of the profound harm caused by contaminated drinking water she did not declare a State of Emergency until a year later.

**Defendant State of Michigan**

65.     Defendant State of Michigan (the State) operates its Department of Environmental Great Lakes Energy ("EGLE"), which is responsible for overall management of the state department that is responsible for the environmental safety and health of Michigan citizens and residents. The State is sued because, acting through EGLE, it made the decisions that deliberately created, maintained and

covered up the public health emergency and crisis caused by lead and other contamination in the Benton Harbor water supply in violation of each Plaintiff's 14th Amendment constitutional right to bodily integrity and property interest.

The Defendant State of Michigan operates its Department of Health and Human Services, and such Department is responsible for overseeing the health policy for all residents.

### Defendant Liesl Clark

66.    Defendant Liesl Clark currently is, and at all relevant times after January 2019, Director of EGLE. She is sued by Plaintiff Class Representatives and Plaintiff Class Members in her individual and official capacity. Defendant Clark was aware of and participated in, the decisions and actions that deliberately created, maintained and covered up the public health emergency and crisis that was caused by lead, bacteria and other contaminants in Benton Harbor's water supply, in violation of each Plaintiff's constitutional right of bodily integrity and property interest.

67.    On January 11, 2019, Defendant Director Clark, was asked by Jay Rising, Cabinet Secretary for Governor Whitmer of Benton Harbor, if Clark was aware of the "Benton Harbor Lead – Cooper Rule exceedance". Defendant Clark responded "Yes, glad to discuss."

68.     On January 21, 2019, Defendant Clark reviewed the joint press

regarding Benton Harbor which was drafted jointly by members of Defendant EGLE

and MDHHS. At no time did the press release advise residents of Benton Harbor

that the water was unsafe to drink because of lead and other contaminants. The press

release was approved without change by Defendant Clark.

69.     On or about January 27, 2019, Defendant Clark instructed Defendant

Oswald and Aaron Keating, Chief Deputy Director of EGLE to notify Governor

Whitmer of the escalating lead exceedances in Benton Harbor's water supply that

triggered action to protect the Benton Harbor public under the federal and State Safe

Drinking Water Acts as follows::

> "Hi Aaron and Eric,
>
> We need to provide this information to the Governor's office. It needs
> to be put in the context, however. Eric, can you write up a few
> paragraphs (no more than a page) explaining what this means and how
> it relates to Benton Harbor?
>
> Thanks,
> Liesl"

### Defendant Eric Oswald

70.     Defendant Eric Oswald is being sued individually and in his official

capacity, at all times pertinent, he was and is, the Drinking Water and Environmental

Health Division Director of EGLE, both during the tenure of former Michigan

Governor Richard D. Snyder and Defendant Governor Gretchen Whitmer, through

present. Defendant Oswald was aware of and participated in, the decisions and

actions that deliberately created, maintained and covered up the public health emergency and crisis that was caused by lead, bacteria and other contaminants in Benton Harbor's water supply in violation of each Plaintiff's constitutional right of bodily integrity and property interest.

### Defendant Robert Gordon

71.     Defendant Robert Gordon is being sued individually and in his official capacity. From January 2019 through January 2021, he was Director of Michigan Department of Health and Human Services, at all relevant times. Defendant Gordon was aware of and participated in, the decisions and actions that deliberately created, maintained and covered up the public health emergency and crisis that was caused by lead and other contaminants in Benton Harbor's water supply in violation of each of Plaintiff's constitutional right of bodily integrity and property interest.

72.     As early as the second week of January 2019, Defendant Robert Gordon, Director of Michigan Department of Health and Human Resources, was made aware that Benton Harbor had "multiple high lead results". Joint conference calls were conducted between EGLE and DHHS.

73.     On January 10, 2019, Dr. Eden Wells, the Cabinet Level Chief Medical Executive for MDHHS, sent an email to numerous MDHHS executives and administrators stating an inconclusive ambiguous opinion on what plan of action should be taken to protect the Benton Harbor citizens:

"An update to the Benton Harbor issue. Two + months ago Benton Harbor was one of two municipalities that were noted to have lead and copper rule exceedances. Benton Harbor expanded its sampling after their initial lead and copper rule testing.

As a result: It is our understanding that there may be over 40 homes that exceed the 15 ppb level – which is considered elevated. The residents were advised by the city to flush their water taps for 3 to 5 minutes in the thought that this lead was likely coming from their own home's lead service lines.

The local health department health officer and her team met on a call this afternoon with DEQ and DHHS. There will be an in-person meeting with the city of Benton Harbor Monday morning as well as the beginning of serial sampling next week which means taking multiple liters from a faucet in order to determine if lead is coming from the faucet fixtures, the led service line, or the water-main or further into the system.

Because we do not have this serial sampling data now <u>we do not know of any further public health threat at this time</u>. However we will work with the city and the local health department to assure that homes have adequate protective measures to protect their health, whether it involves simply flushing faucets, obtaining alternate water sources, or obtaining water filters.

DEQ and DHHS will continue to work in a coordinated fashion to assist Berrien County Health Department in this matter to assure public health protections and ongoing monitoring and management."

The plan of action was not subsequently updated to state there was a public health threat until October 14, 2021, when Governor Whitmer made her announcement.

74.     Director Gordon's DHHS employees performed sequential lead and copper sampling of the same Benton Harbor homes that, in 2018, had lead exceedances. The testing confirmed the presence of lead in the service line.

75.     Defendant Director Gordon, despite knowing of the lead and other contaminants in Benton Harbor's tap water, approved the use of "free filters" for the homes of only some Benton Harbor residents, in a random, non-urgent fashion, without performing an appropriate filter study to determine if such filters had efficacy to filter out the nanoparticles of lead, or the large amounts found in the Benton Harbor 2018 sampling. Defendant Gordon continued the free filter handout without knowing if it worked. In 2019, 2020 and 2021, Defendant Gordon continued his "free filter" giveaways without confirming who received the filters, how the filters were installed and not advising that the water was unsafe to ingest.

76.     In January 2021, Defendant Gordon was asked by Governor Whitmer to resign, as she wanted to go in a different direction.

### Defendant Elizabeth Hertel

77.     Defendant Elizabeth Hertel became Director of Michigan Health and Human Services in January 2021, and continuing. She is being sued individually and in her official capacity. Defendant Hertel was aware of and participated in, the decisions and actions that deliberately created, maintained and covered up the public health emergency and crisis that was caused by lead and other contaminants in Benton Harbor's water supply in violation of each of Plaintiff's constitutional right of bodily integrity and property interest.

78.     On March 26, 2021, the Benton Harbor Water Outreach Task Force was created.

79.     At the time the Task Force was supported by Defendant EGLE and the MDHHS.

80.     The MDHHS was involved in providing "free filters" to residents through the Berrien County Health Department. The "free filters" given to Benton Harbor residents were not properly installed by a plumber or technician, and no scientific study had been performed by Director Hertel to know that lead and other contaminants coming out of the tap was effectively being captured by the "free filters." Only since the filing of the EPA Petition by community members and organizations did MDHHS begin a water filter "study" to determine the efficiency of a properly installed "free filter."

81.     It was not until October 7, 2021, that Elizabeth Hertel, Director of DHHS advised the residents of Benton Harbor to stop drinking, or ingesting, the water:

> "Protecting the health and safety of Benton Harbor residents is a top priority" said Elizabeth Hertel, Michigan Department of Health and Human Services (DHHS) director. "We've listened to the community's concerns and **out of an abundance of caution,** we are recommending that residents use bottled water for cooking, drinking and brushing teeth." (ABC-57, posted October 6, 2021 by Maura Johnson.)

This "abundance of caution" statement was not what the State and federal SDWA required.

## Defendant City of Benton Harbor

82.     The City of Benton Harbor is a municipal corporation, authorized by the laws of the State of Michigan. The city, through its executives and contractors, owns and operates the Benton Harbor Public Water System and provides tap water, and sanitary services to its residents and property owners as part of its responsibilities and operation. The City of Benton Harbor is liable because the municipal corporation itself, through its policymakers, deliberately created, maintained, covered up and were deliberately indifferent to the violations of each Plaintiff's constitutional rights as a result of lead and other contamination in Benton Harbor's water supply.

83.     Defendant City of Benton Harbor violated each Plaintiff Class Representative's and Class Member's constitutional right of bodily integrity and property interest. Defendant City of Benton Harbor is also liable to each Plaintiff under the *Monell* legal doctrine because its Defendants Mayor's and City Managers' actions constituted customs, policies and practices that violated each Plaintiff's legal rights.

## Defendant Mayor Marcus Muhammad

84.     Marcus Muhammad was, at all relevant times from 2018 to present, and continuing, the Mayor of Benton Harbor. Mayor Muhammad is officially and individually liable because, from 2018-2021 as Mayor, he approved of, and

participated in, the decisions that deliberately created, maintained, and covered up the public health emergency and crisis of the lead, bacteria, and other contaminants in the Benton Harbor water supply that violated each Plaintiff's constitutional right to bodily integrity and property interest. Further, from 2018-2021, Defendant Mayor Muhammad failed to notify and warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the state and national Lead and Copper Rule under the respective Safe Drinking Water Acts. Although Defendant Mayor Muhammad was fully aware of the high lead levels he did not follow the notice and public education required by federal and State Safe Drinking Water laws.

In addition, as Mayor, Defendant Muhammad was chief policymaker for Benton Harbor. Therefore, his actions constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

### Defendant City Manager Darwin Watson

85.    Darwin Watson was, at all relevant times from 2014-2020, a City Manager for Benton Harbor. As City Manager he approved of, and participated in, the decisions that deliberately created, maintained, and covered up the public health emergency and crisis of the lead, bacteria, and other contaminants in the Benton Harbor water supply and violated each Plaintiff's constitutional right to bodily integrity and property interest. Further, from 2018-2020, Defendant City Manager

Darwin Watson failed to notify and/or warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the State and national Lead and Copper Rule under the respective Safe Drinking Water Acts. Although Defendant Darwin Watson was aware of the high lead levels he did not follow the notice and public education required by State and federal Safe Drinking Water laws.

In addition, as City Manager, Defendant Watson was chief policymaker for Benton Harbor. Therefore, his actions constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

### Defendant City Manager Ellis Mitchell

86.    Ellis Mitchell was, at all relevant times from 2020 to present, a City Manager for Benton Harbor. As City Manager he approved of, and participated in, the decisions that deliberately created, maintained, and covered up the public health emergency and crisis of the lead, bacteria and other contaminants in the Benton Harbor water supply and violated each Plaintiff's constitutional right to bodily integrity and property interest. Further, from 2018-2021, Defendant City Manager Ellis Mitchell failed to notify and/or warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the State and national Lead and Copper Rule under the respective Safe Drinking Water Acts. Though Defendant Ellis Mitchell was aware of the high lead levels he did not follow

the notice and public education required by State and federal Safe Drinking Water laws.

In addition, as City Manager, Defendant Mitchell was chief policymaker for Benton Harbor. Therefore, his actions constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

### Defendant Michael O'Malley

87.    Defendant Michael O'Malley is sued in his official capacity and individual capacity. As Water Plant Director, City of Benton Harbor Public Water System, O'Malley was charged with ensuring that the water services provided to Benton Harbor customers were safe and did not jeopardize their health and safety. Defendant O'Malley took a leave of absence in 2020, and his license was revoked in 2021 by the State of Michigan. Defendant O'Malley's actions deliberately created, maintained and covered up the lead, bacteria and other contamination in the Benton Harbor water supply and was deliberately indifferent to each Plaintiff's constitutional right of bodily integrity and property interest. Additionally, Defendant O'Malley failed to follow the notice and public education requirements of the State and federal Safe Drinking Water Acts. His actions also violated the Michigan Government Tort Liability Act in that he was grossly negligent and his actions were the proximate cause of the injuries and damages to each Plaintiff.

88.     Additionally, Defendant O'Malley's actions violated each Plaintiff's bodily integrity and property interest under the  14th Amendment, a constitutional right.

## Defendant Elhorn Engineering

89.     Defendant Elhorn Engineering Company, is a Michigan corporation with its principle place of business in Mason, Michigan. Defendant was an agent contractor for the City of Benton Harbor and was negligent in its acts and omissions related to its selection of anti-corrosive chemicals, and implementation of use, which did not provide a solution to Defendant Benton Harbor's lead in its water pipes. The use of a series of different anti-corrosive chemicals added more toxicity to the residents' water. As a result, lead contamination continued to increase since the anti-corrosive chemicals were not successful. Further, Defendant Elhorn did not perform a corrosion study prior to starting the use of an anti-corrosive, or propose an optimal corrosion control system, or evaluate the overall stability of the Benton Harbor Water Plant as required by the federal Safe Drinking Water Act.

Defendant Elhorn's actions caused foreseeable injuries and damages to each Plaintiff.

## Defendant F&V Operations and Resource Management, Inc.

90.     Defendant  F&V  Operations  and  Resource  Management,  Inc. (hereinafter "F&V"), is a Michigan corporation with its principal place of business

in Grand Rapids, Michigan. This Defendant was and is an agent contractor for Defendant City of Benton Harbor. Defendant F&V, an operator of the Benton Harbor Water Plant since mid-2020, was negligent in its acts and omissions related to its involvement in the Benton Harbor Public Water System. Through its employees F&V failed to follow "best practices" to remove the lead in Defendant Benton Harbor's lead service lines. As operator of Benton Harbor's Water Plant, it has failed to provide competent staff or direction to Benton Harbor employees.

In addition, F&V, failed to follow the requirements of the State and federal Safe Drinking Water Acts (SDWA), including but not limited to CRF 40 §141.85 Public Notice and its anti-corrosion practices.

91.     Defendant F&V's negligence caused foreseeable injuries and damages to each Plaintiff.

## STATEMENT OF FACTS

92.     This litigation arises out of the public health emergency and crisis in the City of Benton Harbor arising from lead, bacteria and other contamination in the water supply. From 2016 to 2020 there were approximately Nine Thousand Six Hundred Fifteen (9,615) residents in Benton Harbor, many are children[4]. At least since 2018, Benton Harbor residents have been exposed through the ingestion and

---

[4] United States Census, Quick Facts, Benton Harbor, www.census.gov/quickfacts/bentonharbormich.

33

other uses of water with high levels of lead and other contaminants that exceed the state and national Lead and Copper rule of the Safe Drinking Water Act (SDWA) 40 CFR §141 and the Michigan Safe Drinking Water Act 399 of 1976.

93.   From 2010 to 2014, Defendant State of Michigan placed Defendant Benton Harbor under the authority of two (2) consecutive Emergency Managers. Thereafter, from 2014 to July 2016, Defendant State of Michigan placed Defendant Benton Harbor under the control of the Benton Harbor Receivership Transition Advisory Board. The members were selected by then Governor Richard Snyder.

94.   During the years that Benton Harbor was under the legal control of State appointed Emergency Managers, and the Advisory Board, State of Michigan Emergency Managers ordered drastic layoffs that involved half of the in Benton Harbor's Water Department employees, the Advisory Board continued the layoffs. These State ordered layoffs severely compromised Benton Harbor's Water Department's ability to deliver clean, safe water to its residents, including each Plaintiff as is required by federal and State of Michigan Safe Drinking Water Acts.

95.   Since at least 2018, Defendant State, its Defendant agencies, Directors and employees; Defendant  Benton Harbor, its Defendant officials and employees were publicly silent and denied that Benton Harbor's water supply was poisoned with high levels of lead and other contaminants. Further, each State Defendant ignored the information that they knew was being partially disseminated to the

public by Benton Harbor Defendants that the water supply was not poison and was safe to drink.

Plaintiff Class Representatives and Plaintiff Class Members, many of whom are children and babies, have been and continue to be exposed to the extreme toxicity of lead and other contaminants, causing an "imminent and substantial endangerment to their "health." The acute, destructive health effects on children under age six (6) has been widely known for many years[5].

96.     Benton Harbor is an environmental justice community. There are approximately 85% African American and 5% Hispanic residents[6]. The adverse social determinates of health for communities of color have long been publicly known to create disproportionate harm, a fact known, or should have been known, by each Defendant.

97.     On or about **October 3, 2018,** Defendant State of Michigan issued a citation against Defendant Benton Harbor for, among other things, its failures to both properly operate its water supply system, properly treat Benton Harbor's water supply to maintain safe drinking water and numerous failures in the equipment and

---

[5] Centers for Disease Control and Prevention, *Blood Lead Levels in Children,* https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm.

[6] United States Census Bureau, *QuickFacts: Benton Harbor, Michigan,* https://www.census.gov/quickfacts/fact/table/bentonharborcitymichigan/PST045219.

inadequate staffing; all in violation of the Michigan Safe Drinking Water Act 399 of 1976.

98.    However, each Defendant State government official since at least the year 2018, knowingly made the decision to continue to extend the deadline for various violations of federal and State Safe Drinking Water Act laws, including not requiring Defendant Benton Harbor officials to notify and warn Benton Harbor residents and each Plaintiff that the water supply was poison and unsafe to drink, all while the lead levels continued to climb above the legal limit 15 ppb, and further violated the bodily integrity and property interest 14th Amendment constitutional rights of Plaintiff Class Representatives and Plaintiff Class Members.

99.    Plaintiff Class Representative Emma Kinnard has described her tap water as having a cloudy appearance and a "foul smell" for the past two (2) years.

100.  "Benton Harbor has stated that it has 5877 total service lines; 51% of its service lines are either known to contain lead, are known to contain galvanized lines previously connected to lead, or are of unknown material but likely to contain lead; 47% of the service lines are of unknown material with no information, which should be assumed to contain lead until proven otherwise; and only 2% of the service lines have been confirmed as containing no lead and not being galvanized lines previously connected to lead". See **Ex. 2**, Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. §300(i) and 42 U.S.C. §300(j)(7)(b) to Abate

the Imminent and Substantial Endangerment to Benton Harbor Residents from Lead Contamination in Drinking Water, p. 1, footnote 64, (September 9, 2021).

101.   Defendant EGLE and its individual Defendant Department officials and employees, from at least September 2018 to September 2021 after taking over effective control of Benton Harbor's Water Department, among other things decided not to cite the Defendant City of Benton Harbor under the Safe Drinking Water Act (SDWA) 40 CFR §141 and State Safe Drinking Water Act, 399 of 1976, for many of its violations or seek enforcement. Instead, State Defendants repeatedly extended Benton Harbor Defendants' deadlines for compliance with federal and State laws.

102.   In an email dated December 8, 2019 from Defendant EGLE's supervisor, Michael Bolf, to Defendant Eric Oswald, EGLE Director, Drinking Water and Environmental Health Division, Supervisor Bolf stated as follows:

> **"…if we continue the pattern of allowing them (Benton Harbor) to miss deadlines and request extensions (for compliance of the Safe Drinking Water Act), then the water system remain vulnerable and we are potentially culpable if a problem occurs."** (Emphasis added.)

103.   On September 9, 2021, because Defendant EGLE and Defendant City of Benton Harbor were not following the mandatory requirements of the federal and State of Michigan Safe Drinking Water Act to eliminate the public health emergency caused by lead, bacteria and other contaminants in Benton Harbor's water supply, a coalition of community and environmental groups and citizens urgently submitted

an Emergency Petition to the United States Environmental Protection Agency

(EPA), which cover page reads, in pertinent part, as follows (hereinafter "Petition"):

> "Petition for Emergency Action under the Safe Drinking Water Act,
> 42 U.S.C. §300i and 42 U.S.C. §300j-l(b), to Abate the Imminent and
> Substantial Endangerment to Benton Harbor, Michigan Residents
> from Lead Contamination in Drinking Water
>
> Submitted on Behalf of Petitioners Benton Harbor Community Water
> Council, Great Lakes Environmental Law Center, NRDC, Flint
> Rising, People's Water Board Coalition, Michigan Welfare Rights
> Coalition, Water You Fighting For, Safe Water Engineering, LLC,
> Highland Park Human Rights Coalition, Michigan Environmental
> Justice Coalition, Sierra Club Michigan Chapter, Dr. Mona Hanna-
> Attisha, Clean Water Action, Ecology Center, Freshwater Future, East
> Michigan Environmental Action Council, Detroit People's Platform,
> Campaign for Lead Free Water, For Love of Water, Environmental
> Transformation Movement of Flint." (hereinafter "Petition")." (**Ex. 1.**)

104.   At least since 2018 to present, testing performed by Defendants DEQ

and EGLE, the predecessor of DEQ, reveal that water samples in Defendant Benton

Harbor's water system show violations  of the Lead and Copper Rule with lead

exceedances as high as **889**. *Id.*, p. 11.

105.   Tragic for Benton Harbor residents, **"Benton Harbor is the only water**

**system in a Michigan city to have six (6) lead action level exceedances according**

**to data beginning in 2011".** *Id.*, p. 12.

106.   Table 1 in the Petition  filed by the Benton Harbor Community and

other supporters to the EPA, outlined the highly alarming lead contamination that

was found in Benton Harbor water supply as follows:

| Table 1 – Reported Results of Lead Tap Samples in Benton Harbor by Sampling Period | | | |
|---|---|---|---|
| Sampling Period | 90th Percentile (in parts per billion) | Number of Sites Above Action Level | Range of Sample Results (in parts per billion) |
| 6/1/2018 – 9/30/2018 | 22 | 8 | 0 – 60 |
| 1/1/2019 – 6/30/2019 | 27 | 12 | 0 – 59 |
| 7/1/2019 – 12/31/2019 | 32 | 10 | 0 – 72 |
| 1/1/2020 – 6/30/2020 | 26 | 9 | 0 – 440 |
| 7/1/2020 – 12/31/2020 | 24 | 11 | 0 – 240 |
| 1/1/2021 – 6/30/2021 | 24 | 11 | 0 - 889 |

*Id.*, p. 11.

107.   Importantly also, since 2012, Benton Harbor's own website publicly reported that the City's lead levels since 2012 have increased incrementally[7].

108.   Adverse and devasting health effects from lead exposure are well documented. "Lead has been demonstrated to exert a broad array of deleterious effects on  multiple organ systems." *Id.*, p. 12.

109.   "Effects of lead exposure are particularly serious for children. As noted by the Centers for Disease Control and Protection:

'Even low levels of blood in lead have been shown to effect IQ, ability to pay attention, and academic achievement' in a manner that is irreversible'". (Emphasis added.)

---

[7] Defendant City of Benton Harbor website, in its "Consumer Confidence Report" show in 2012, a 5 ppb, and by 2015, a 12 ppb lead increase.

"The scientific community has not identified **any** threshold of blood below which there are no adverse health effects." *Id.*, p. 13.

110.   The federal Safe Drinking Water Act has set a goal for the maximum containment level of lead at zero. *Id.*, p. 13.

111.   In addition to lead being identified as a public health emergency and crisis in the Benton Harbor water system, there has developed a parallel problem with corrosion in its lead service pipes.

112.   The federal and State Safe Drinking Water Acts require corrosion control to prevent lead leaching into the water supply from lead pipes or pipes that contain lead fixtures. *Id.*, p. 4, after a lead exceedance.

113.   **In 2018, at the time that the lead in the Benton Harbor water supply first reported lead that exceeded the Lead and Copper rule 15ppb ceiling, Defendant Benton Harbor was not following an anti-corrosion treatment**. (Emphasis added.) *Id.*

114.   Both Defendant State of Michigan and each Defendant State official and employees, as well as each Defendant Benton Harbor and Defendant Benton Harbor official and employees, were aware of the federal and Michigan Safe Drinking Water Act mandatory requirements for the Benton Harbor water supply pipes to be properly treated  with anti-corrosion processes to prevent lead leaching into the water supply from corrosion after a lead exceedance occurred. *Id.*

115.   The Michigan Administrative Code provides two (2) ways that a water supply such as Defendant Benton Harbor must follow when, as here, there are lead exceedances and anti-corrosion treatment is necessary. *Id.*, pp. 18-21.

116.   EGLE is required to have the water supplier perform a corrosion control study within 12 months after the end of the monitoring or sampling period during which a water supply exceeds the lead or cooper action level (15 ppb). In this case, June-September 2018. Mich. Admin. Code R 325.10604f(2)(e)(ii). Further, the Mich. Admin. Code section requires that the water supply shall evaluate the effectiveness of its treatments. Subdivision (c)(i). *Id.*

117.   The State (EGLE) "must specify optimal corrosion control treatment within 12 months after the end of the monitoring period during which the supply exceeds the lead and copper action level". Mich. Admin. Code R 325.10604f(2)(e)(ii). This section requires EGLE designate and approve "optimal control treatment," under subsection 3(d). *Id.*

118.   EGLE consciously, knowingly and deliberately refused to follow both Mich. Admin. Codes in ¶s 117-118, herein and above.

119.   Defendant State of Michigan EGLE selected the engineering firm to perform corrosion control, Defendant Elhorn Engineering, and directly paid them.

120.  Defendant State of Michigan, EGLE directed Defendant Elhorn Engineering use the corrosion control chemical, polyphosphate blend Carus 600, which was Elhorn's propriety product.

121.  Defendant EGLE knowingly and deliberately directed Defendant Elhorn Engineering perform the Benton Harbor water supply, corrosion control procedures, in violation of Mich. Admin. Code R. 325.10604f(3)(d) and (c)(i).

122.  When Great Lakes Environmental Law Center Executive Director Nicholas Leonard sent Eric Oswald, State of Michigan EGLE Drinking Water and Environmental Health Division Director an email dated **November 6, 2019**, pointing out the fact that the corrosion control that EGLE directed Elhorn Engineering use in Benton Harbor to remove lead from the water supply did not follow Mich. Admin. Code R, 325.10604(f)(3)(c), in an email response dated **November 26, 2019**, Director Oswald **"covered up"** the fact that Elhorn Engineering's proprietary product, Carus 600, was not working and falsely asserted in his reply to Nicholas Leonard that the Carus 600 was working to reduce the documented lead contamination. However, the **July to December 2019** sampling period recorded **32 ppb**; this was the **highest** 90th percentile for lead samples for  any Benton Harbor sampling period up to that time. *Id.*, p. 20.

123.  From September 2018 to October 14, 2021, each Defendant knew that the City of Benton Harbor water supply had exceeded the 15 ppb Lead and Copper

rule mandatory threshold, and as a result required immediate action under State and federal law because the water was poison and unsafe to drink or ingest. Yet, all Defendants "covered up" these significant findings and violations of both federal and State Safe Drinking Water statutes and the Lead and Copper rules.

124.  It was not until October 14, 2021, after a period of lead in Benton Harbor's tap water supply for over three (3) years, that Defendant Governor Whitmer announced a State of Emergency, through the issuance of an Emergency Declaration. This was the first time that any of the Defendants provided any public notice, including notice to each Plaintiff that there was a public health emergency lead in tap water crisis, and advised Benton Harbor residents that the water should not be ingested because it exceeded the Lead and Copper Rule 15 ppb and was unsafe.

125.  On **October 27, 2021**, as a result of the Emergency Petition by the environmental and community organization and individuals the EPA conducted a joint inspection with Defendant EGLE of Benton Harbor's water system and issued an inspection report to Defendant Benton Harbor City Manager Ellis Mitchell and copied EGLE State employees, Ernest Sarkipalo and Michael Bolf, which read in pertinent part as follows:

> "On September 20, 2021 through the 27th United States Environmental Protection Agency (EPA) conducted a compliance evaluation inspection of the Benton Harbor community water system (PWS ID MI0000600) Public Water System located in (Berrien County,

Michigan). The purpose of the inspection was to make observations about the site conditions, operation, and monitoring of the System to evaluate compliance with the Safe Drinking Water Act (SDWA) and regulatory requirements. The inspection was conducted in coordination with the Michigan Department of Environmental, Great Lakes, and Energy (EGLE) and a copy is enclosed with this letter." [8] (*Id.*, p. 1.)

126.   The extensive report, covering an inspection period last year, September 20-27, 2021, found **numerous violations** in the Benton Harbor Public Water System, including but not limited to deficiencies, many of these deficiencies had existed since at least 2018, and several prior to that time.

127.   The 2021 EPA Report, in its Summary of Previous Sanitary Survey (of year 2018), shows numerous and comprehensive failures at Defendant Benton Harbor's Public Water System, many of which had been previously inspected or evaluated for violation by the State government Defendants in January 2018. The EPA report found the following Benton Harbor water system violations from 2018 had not been "corrected" or report states "unknown":

Summary of Previous Sanitary Survey 2018 Sanitation Survey Findings

|  | 2018 Inspection | 2021 Inspection | Corrected |
|---|---|---|---|
| Source | Deficiency; need to inspect intake and restart mussel control | The intake was inspected July 2021. Repairs to the intake structure were made, but the mussel control system was not functional at the time of the inspection. | No |
| Treatment | Significant Deficiency: Coagulant feed needs ample mixing energy to be effective | Coagulate feed location was relocated to a mixing | Yes |

[8] US EPA, October 27, 2021 Letter and Report "Region 5 Enforcement and Compliance Assurance Division SDWA Drinking Water Inspection Report, City of Benton Harbor, Berrien County, Michigan".

| | | chamber at the plate settler basins. | |
|---|---|---|---|
| Treatment | Deficiency: Finished water meters not functioning, can't determine CT (Concentration Time) | Finish water meter is installed but is not being maintained Finish water meter is not being used for compliance monitoring | No |
| Distribution System | Significant Deficiency: Formalize program to turn valves & flush hydrants. | Not Evaluated | Unknown |
| Distribution System | Significant Deficiency: Cross Connection Program needs complete overhaul | A new cross connection program was developed in 2020, but at the time of the inspection no actions had been taken to implement the 2020 plan. | No |
| Distribution System | Significant Deficiency: Many areas of low flow/no flow | Not Evaluated | Unknown |
| Distribution System | Deficiency: Aging water main replace is lacking | Not Evaluated | Unknown |
| Finished Water Storage | Deficiency: Reinspection of the elevated storage tank is overdue | At the time of the inspection, the tank was nearing a completion of a substantial rehabilitation. The underground storage at the water treatment plant had several missing screens on vent pipes, and could not be accessed to evaluate sanitary conditions. | Partial |
| Monitoring and Reporting | Significant Deficiency: Fix continuous chlorine analyzer | The continuous chlorine analyzer was offline at the time of the inspection | No |
| Monitoring and Reporting | Deficiency: MOR inaccurate information on treated water | The flow measurement method was inaccurate and based on a combination of uncalibrated depth sensors. | No |
| System Management & Operations | Significant Deficiency: Must commit to timeline for compliance | Benton Harbor is in the process of developing plans under an EGLE administrative order. Aspects of that order were addressed during the inspection | Ongoing |

| System Management & Operations | Significant Deficiency: Financial & Managerial Capacity is not met | System was unable to provide financial information at the time of the inspection | Ongoing |
|---|---|---|---|
| System Management & Operations | Significant Deficiency: Hydraulic model calibration indicated areas of low flow | Not Evaluated | Unknown |
| Operator Compliance | Recommendation: Distribution & Treatment need more certified operators | Benton Harbor must determine the appropriate staffing level as a requirement of the EGLE administrative order. This item cannot be addressed until the staffing analysis is completed. | Ongoing |
| Financial | Significant Deficiency: Collection of rates is inefficient and ineffective | No records could be provided at the time of the inspection to evaluate this item. Bill collection is handled by a third-party contractor. | Unknown |
| Financial | Significant Deficiency: Rates insufficient to cover capital improvements | No records could be provided at the time of the inspection to evaluate this item. Benton Harbor was unable to provide a budget for water treatment activities. | Unknown |
| Other | Significant Deficiency: SCADA system needs additional functionality | Many continuous monitoring components and system automation functions were not working at the time of the inspection. The SCADA system was collecting inaccurate data. Alarm functions were unknown. | No |

128. Further, the EPA inspection report, under "Section 4, Areas of Concerns and Observations" show numerous Defendant Benton Harbor Water

46

System violations under 40 CFR 141, Lead and Copper Rule, of the Safe Drinking

Water Act as follows:

1.    Records Maintenance;

2.    Requirements when making a significant change in disinfection practice;

3.    Disinfection

4.    Emergency Response Plan, "During the inspection the Emergency Response Plan was not available since it had not yet been completed."

5.    Revised Total Coliform Rule – General monitoring requirements for all public water systems. Plan is outdated (40 C.F.R. 141.853)

6.    Monitoring and Analytical Requirements (40 C.F.R. 141 Subpart C)

7.    Enhanced Filtration and Disinfection – Systems Serving Fewer Than 10,000 People (40 C.F.R. 141 Subpart T)

8.    Treatment
9.    Potential Deficiencies

10.   A number of potential cross connections were identified throughout the treatment system

11.   Monitoring Equipment Issues."[9]

129.   Of further significance, the EPA inspection report, under Section 4.2

Additional Observations, found the following deficiencies:

---

[9] *Id.*, pp. 21-23.

"1.   The room above the raw water wet well had severe paint flaking on the ceiling.

2.   The fluoride saturator was located outside of the containment for the day tanks.

3.   A lack of automation has led to overflowing chemical tanks and operating chemical injections to the treated water when the treatment system was not in operation.

4.   At the time of the inspection, the system was unable to identify which alarms had call out capability for the SCADA system.

5.   Operation of the treatment plant is being conducted with both contract staff and employees of the City of Benton Harbor. It is unclear how the treatment plant operations staff is organized or supervised. A copy of the operations contact was not made available.

6.   There are no formal written agreements for the supply of emergency water through the system interconnects. The status of the valves to control those interconnects is also unknown.

7.   Benton Harbor was unable to provide a copy of the budget for the water treatment plant operations.

8.   Benton Harbor did not have records of customer complaints." *Id.*, pp. 23-24.

130.   Thereafter, on **November 2, 2021**, the EPA, Region 5 issued a Unilateral Administrative Order, Proceeding under Section 1414(g) of the Safe Drinking Water Act, 42 U.S.C. §300g-3(g), In the Matter of: City of Benton Harbor Public Water Supply, PWS ID MI0000600, Benton Harbor, Michigan, effectively immediately. (**Ex. 3,** US EPA Unilateral Administrative Order –

Proceeding Under Section 1414(g) of the Safe Drinking Water Act, 42 U.S.C.

§300g-3(g), November 2, 2021.)

. In relevant part the EPA Administrative Order reads as follows:

> "II.    FINDINGS OF FACT AND CONCLUSIONS OF LAW
>
> 4.    The City ("Respondent") is the owner and/or operator of the System located at 200 East Wall Street, Benton Harbor, Michigan 49022.
>
> 5.    Respondent is a "person," as defined by Section 1401(12) of the SDWA, 42 U.S.C. §300f(12), and 40 C.F.R. §141.2.
>
> 6.    The System is a "public water system" ("PWS") within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. §141.2 that provides water from a surface water source.
>
> 7.    The system regularly serves at least twenty-five (25) year-round residents and is therefore a "community water system" ("CWS") within the meaning of Section 1401(15) of the SDWA, 42 U.S.C. §300f(15), and 40 C.F.R. §141.3.
>
> 8.    The System serves approximately 9,970 persons and has 3,335 active service connections.
>
> 9.    The System has an intake in Lake Michigan as its source of drinking water.
>
> 10.   Respondent's ownership and/or operation of the System makes it a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C. §300f(5), and 40 C.F.R. §141.2, and subject to the requirements of Part B of the SDWA, 42 U.S.C. §300g, and the NPDWRs at 40 C.F.R. Part 141.

11.  **Pursuant to SDWA Section 1413, 42 U.S.C. §300g-2, EGLE has primary responsibility for the implementation and enforcement of the public water supply program in Michigan**.

12.  Between September 20-27, 2021, EPA and EGLE conducted a joint compliance inspection of the System pursuant to Section 1445(b) of the SDWA, 42 U.S.C. §300j-4(b), and **identified numerous violations of the NPDWRs identified in Paragraph 15-104 below, including NPDWR violations related to the System's technical, managerial, and financial capacity**.

13.  On October 29, 2021, EGLE referred the identified violations to EPA to require the System to comply with the associated applicable requirements under SDWA.

14.  On October 26, 2021, EPA met with EGLE to confer on this Order in conformance with Section 1414(g)(2) of the SDWA, 42 U.S.C. §303g-3(g)(2)." *Id.*, pp. 3-21.

131.  Further, the **November 2, 2021** EPA Unilateral Order shows the deliberate indifference to the residents of the City of Benton Harbor, going back at least to **January 2018; under an "Action Level Exceedance" (ALE) trigger of 15 ppb** as follows:

"Lead and Copper Public Education

15.  The System is classified as a medium-sized PWS (3,301 to 50,000 people served) under the Lead and Copper Rule ("LCR"), as defined at 40 C.F.R. §§141.81(a)(2), and as such, **was required to conduct sampling, beginning with two (2) consecutive six-month monitoring periods during July 1 to December 31, 1992 and January 1 to June 30, 1993 to determine compliance with the LCR at 40 C.F.R. §141.86(d).**

50

16. After meeting lead and copper action levels during the two (2) consecutive six-month monitoring periods, a medium-sized water system may reduce monitoring frequency to once per year. 40 C.F.R. §141.86(d)(1)(ii)(B); 141.86(d)(4).

17. **After three (3) consecutive years of monitoring, a medium-sized water system in compliance may further reduce the frequency of monitoring from annually to once every three (3) years. 40 C.F.R. §§141.81(d)(4)(iii).**

18. An LCR compliance sample is a sample that has been collected and analyzed for lead and copper according to the requirements of the LCR at 40 C.F.R. §141.86. The **lead action level is exceeded if the concentration of lead in more than ten (10) percent of tap water samples collected during any monitoring period conducted in accordance with 40 C.F.R. §141.86 is greater than 0.015 mg/L (i.e., if the "90th percentile" lead level is greater than 0.015 mg/L or 15 parts per billion ("ppb")).**

19. **Between January 2016 and December 2018, the 90th percentile of the samples collected during this period was 22 ppb, which is a lead action level exceedance ("ALE") pursuant to the LCR at 40 C.F.R. §141.80(c).**

20. **Between January 2019 and June 2019, the 90th percentile of the samples collected during this sampling period was 27 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. §141.80(c).**

21. **Between July 2019 and December 2019, the 90th percentile of the samples collected during this sampling period was 32 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. §141.80(c).**

22. **Between January 2020 and June 2020, the 90th percentile of the samples collected during this**

sampling period was 23 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. §141.80(c).

23.   Between July 2020 and December 2020, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. §141.80(c).

24.   Between January 2021 and June 2021, the 90th percentile of the samples collected during this sampling period was 24 ppb[10], which is a lead ALE pursuant to the LCR at 40 C.F.R. §141.80(c)." (Emphasis added.) *Id.*, pp. 4-5.

132.   The EPA also found that the public education requirements under SWDA, were violated and were not met by any of the Defendants at anytime from January 2018 to present, under 40 CFR §141.85. In this regard, the EPA's Order states the following failures of public education:

"25.   A PWS (Public Water System) that exceeds the lead action level based on tap water samples collected in accordance with 40 C.F.R. §141.86 must comply with certain public education requirements at 40 C.F.R. §141.85.

26.   40 C.F.R. §141.85(a) regulates the content of written public education materials (e.g., brochures and pamphlets), while 40 C.F.R. §141.85(b) regulates the delivery of such public education materials.

27.   Pursuant to 40 C.F.R. §141.85(b)(2)(ii)(A), a CWS that exceeds the lead action level must contact the local health department and deliver education materials that meet the content requirements of 40 C.F.R.

---

[10] This test must be scrutinized and is suspect. The initial result using the standard 63 samples was 33 ppb, but additional water samples were taken in homes to bring the ppb number down to 24.

§141.85(a) to local public health agencies even if they are not located within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users.

28.    40 C.F.R. §141.85(b)(3) requires contact with the local health department at least every twelve (12) months as long as the CWS exceeds the lead action level.

29.    According to the System's February 2021 and August 2021 public education certifications, the System did not contact the local health department in the 12-month period between August 2020 and August 2021.

30.    Respondent's failure to contact the local health department in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§141.85(b)(2)(ii)(A) and 141.85(b)(3).

31.    Pursuant to 40 C.F.R. §141.85(b)(2)(ii)(B), a CWS (Community Water System) that exceeds the lead action level must contact customers who are most at risk by delivering materials that meet the content requirements of 40 C.F.R. §141.85(a) to the following organizations within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users: public and private schools or school boards, Women, Infants and Children (WIC) and Head Start programs, public and private hospitals and medical clinics, pediatricians, family planning clinics, and local welfare agencies.

32.    40 C.F.R. §141.85(b)(3) requires contact with the organizations identified in 40 C.F.R. §141.85(b)(2)(ii)(B) at least every twelve (12) months as long as the CWS exceeds the lead action level.

33.     According to the System's February and August 2021 public education certifications, the System did not contact public and private hospitals, pediatricians, family planning clinics, community centers, or adult foster care facilities in the 12-month period between August 2020 and August 2021.

34.     During the September 2021 Inspection, the inspectors asked the System to produce a distribution list confirming that organizations identified in 40 C.F.R. §141.85(b)(2)(ii)(B) within the System's service area were contacted and delivered materials.

35.     During and after the September 2021 Inspection, the System did not produce the requested distribution list.

36.     Respondent's failure to contact certain organizations identified in 40 C.F.R. 40 C.F.R. §141.85(b)(2)(ii)(B) in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. 40 C.F.R. §§141.85(b)(2)(ii)(B) and 141.85(b)(3).

37.     Pursuant to 40 C.F.R. §141.85(b)(2)(ii)(C), a CWS that exceeds the lead action level must make a good faith effort to locate the following organizations within the service area and deliver materials that meet the content requirements of 40 C.F.R. §141.85(a) to them, along with an informational notice that encourages distribution to all potentially affected customers or users: licensed childcare centers, public and private preschools, and obstetricians-gynecologists and midwives.

38.     40 C.F.R. §141.85(b)(3) requires good faith effort to locate such organizations identified in 40 C.F.R. §141.85(b)(2)(ii)(C) at least every twelve (12) months as long as the CWS exceeds the lead action level.

39.     According to the System's February and August 2021 public education certifications, the System did not

make a good faith effort to locate and contact obstetricians-gynecologists in the 12-month period between August 2020 and August 2021.

40.  **Respondent's failure to make a good faith effort to locate organizations identified in 40 C.F.R. §141.85(b)(2)(ii)(C) in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§141.85(b)(2)(ii)(C ) and 141.85(b)(3).**

41.  **Pursuant to 40 C.F.R. §141.85(b)(2)(iii), a CWS that exceeds the lead action level must provide, no less often than quarterly, information on or in each water bill, including verbatim text, notifying customers that the system has found high levels of lead, as long as the system exceeds the lead action level.**

42.  40 C.F.R. §141.85(b)(3) requires provision of the information required under 40 C.F.R. §141.85(b)(2)(iii) in each billing cycle.

43.  **According to the System's February and August 2021 public education certifications, the System did not provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021.**

44.  During the September 2021 Inspection, the System stated to the inspectors **that no public education materials are sent with water bills delivered through the mail**.

45.  **Respondent's failure to provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§141.85(b)(2)(iii) and 141.85(b)(3)."** (Emphasis added.) *Id.*, pp. 5-7.

133.   Plaintiff Class Representatives and Class Members never received any notice that their water was poisoned with lead exceedances and other contaminants nor whether ingestion of the water was harmful as required by the Safe Drinking Water Act.

134.   The Required Elements of Public Notice for Public Water Systems under the EPA are specific:

There are 10 required elements in a public notice. Notices must contain the following:

- "A description of the violation that occurred;
- The potential health effects (including standard required language);
- The population at risk, including subpopulations vulnerable if exposed to the contaminant in their drinking water;
- Whether alternate water supplies need to be used;
- What the water system is doing to correct the problem;
- Actions consumers can take;
- When the system expects a resolution to the problem;
- How to contact the water system for more information; and
- Language encouraging broader distribution of the notice."

135.   Although on or about **January 13, 2019**, Defendant City of Benton Harbor and Berrien County Health Department did issue a joint press release announcing a scheduled Town Hall public meeting to discuss the **October 2018** drinking water samples that had exceeded the **15 ppb Lead and Copper rule limit**, residents were never informed that their tap water was poison and unsafe to drink or ingest. Instead, residents were advised that the recommended flushing/running time before using the water was increased from 3 to 5 minutes and to place water filters

on their faucets. It is unknown who attended the Town Hall of the almost 10,000 residents of the City. (See Joint Press Release, Benton Harbor and Berrien County Health Department, January 23, 2019.)

136.   On or about **January 9, 2019**, State of Michigan Department of Environmental Quality (formerly DEQ, now Environment Great Lakes Energy (EGLE) Director Eric Oswald was notified in an email from Isabel (Izzy) Marrah that Defendant Benton Harbor Water Plant and Distribution Director Mike O'Malley, Defendant herein, had stated to her, even in the homes that tested above the 15 ppb limit for lead, that after the **"first flush it was okay to drink and cook" the tap water because "they (Benton Harbor water supply) provide clean water right to their spout"**. (Emphasis added.) This was a conscious and deliberate false statement by O'Malley.

137.   However, despite having knowledge that, from 2018-2021, Benton Harbor officials and employees, including Defendants Director Michael O'Malley, and Mayor Marcus Muhammad, were falsely telling the public and Benton Harbor water supply users, and each Plaintiff, that the tap water was safe to drink, EGLE Director Eric Oswald took no action to correct this knowingly false information by Defendant O'Malley, and Mayor Muhammad, and comply with the requirements of the Safe Drinking Water Act.

138.   Over the course of more than three (3) years Defendants, each and every one of them, were aware of the progressively worsening water lead exceedances and the public health water crisis and emergency it created. Yet, all State Defendants and each Benton Harbor Defendant deliberately failed and were deliberately indifferent in their responsibilities, under the Constitution of the United States, to protect the bodily integrity and property interest of each Plaintiff herein and Benton Harbor citizens and residents, and to adhere to Safe Drinking Water Act statutory requirements, including notifying them promptly in 2018, to cease the use of the water for drinking, cooking, and mouth hygiene. Instead, each Defendant falsely denied and covered up the public health emergency.

139.   Not until **October 14, 2021**, approximately three (3) months ago, did State Defendants, including Governor Gretchen Whitmer issue an Executive Declaration and begin to address the Defendants' constitutional bodily integrity and property interest violations and other legal violations to the harm that lead, bacteria and other contaminants were causing Benton Harbor residents, and each Plaintiff, as follows:

> "WHEREAS, on October 14, 2021, Michigan Governor Gretchen Whitmer issued Executive Directive No. 2021-6 ('Executive Directive') that requires, among other actions, a whole-of-government response **that directs Michigan departments and agencies to expeditiously take all appropriate action to ensure residents of Benton Harbor have immediate access to free bottled water for consumption** through distribution sites and drop-off delivery until further notice.

WHEREAS, the Executive Directive also requires, among other actions, that Michigan departments and agencies expeditiously take all appropriate action to leverage available state resources to support the City in replacing lead service lines." (Emphasis added.)

140.  Plaintiffs will continue to be harmed as a result of State and Benton Harbor Defendants' constitutional bodily integrity and property interest violations and the other violations of law and each Defendant Engineering company's violations of federal and State Safe Drinking Water statutes and negligence law, which started at least in 2018, and continuing.

## CLASS ALLEGATIONS

141.  Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-140, as though fully set forth herein

142.  Plaintiffs bring this case as a proposed class action under Federal Rules of Civil Procedure Rule 23; and 28 U.S.C.A. §1332(d). The amount in controversy exceeds Five ($5,000,000.00) Million Dollars.

143.  This action is brought by the named Plaintiffs on behalf of individuals who from, at least June to September 2018 to present, were exposed to lead, bacteria and other harmful contaminants in Defendant Benton Harbor water supply system and have experienced a constitutional violation of their bodily integrity and property interest and other violations of law, causing physical and emotional injury, a loss of

each Plaintiff's enjoyment of a comfortable life, whether as an owner or renter, and economic loss and property loss.

144.   Each Plaintiff has suffered injuries and damages because of each engineering Defendants' violations of statutes and common law negligence. Future violation of Plaintiffs' rights will cause damages and harm and are ongoing as the harm has not been abated.

145.   Excluded from these classes are (1) the Defendants in this action (and their officers, directors, agents, employees, and members of their immediate families), and any entity in which the defendants have a controlling interest, and the legal representatives, heirs, successors and assigns of defendants, and (2) the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

146.   Benton Harbor is a city with approximately 10,000 residents. The number of individuals who have been exposed to lead in the  Benton Harbor water is in the thousands. The number of class members is sufficiently numerous to make class action status the most practical method for each Plaintiff to secure redress for violations of their constitutional rights, statutory rights and common law violations, for injuries sustained, including to their bodily integrity and property interest, and class wide equitable relief.

147.   There are questions of law and fact raised by the named Plaintiff Class Representatives' claims common to, and typical of, those raised by the Plaintiff Class Members they seek to represent against all the Defendants.

148.   The violations of law including constitutional violations and resulting harm stated by the named Plaintiff Class Representatives are typical of the legal violations and harm suffered by all Class members, including but not limited to, non-economic injury and economic injury.

149.   Plaintiff Class Representatives will fairly and adequately protect the interests of the Plaintiff Class Members. Plaintiffs' counsel are not aware of any conflicts of interest between the class representatives and absent class members with respect to the matters at issue in this litigation; the Class Representatives will vigorously prosecute the suit on behalf of the Class; and the Class Representatives are represented by counsel with experience in class actions and experience in cases with environmental contamination, including lead. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation involving constitutional violations of bodily integrity and property interest, resulting in physical injury and property damage.

150.   Plaintiffs' attorneys have identified and thoroughly investigated all claims in this action, and have committed sufficient resources to represent the Plaintiff Class Representatives and Plaintiff Class Members.

151.   The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent, or varying adjudications, with respect to individual members of the Class and/or one or more of the Defendants.

152.   Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating a remedy which is overarching in its scope for declaratory, equitable and injunctive relief for the Plaintiff Class Representatives and Plaintiff Class Members.

## COUNT I
## CAUSE OF ACTION: VIOLATION OF 42 U.S.C. §1983
## – 14th AMENDMENT SUBSTATIVE DUE PROCESS –
## BODILY INTEGRITY AND PROPERTY INTEREST
## BY ALL STATE OF MICHIGAN AND
## CITY OF BENTON HARBOR GOVERNMENT DEFENDANTS

153.   Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-152, as fully though set forth herein.

154.   The due process clause of the 14th Amendment includes a clearly established implied right to bodily integrity and property interest. In the present case each individual Plaintiff has a clearly established fundamental right under the substantive Due Process Clause of the 14th Amendment to the United States Constitution to bodily integrity and property interest.

155.   Each and every State and Benton Harbor Defendant and Defendant government official, all while acting under color of law, violated Plaintiffs' liberty interest to bodily integrity and property interest that is guaranteed by the Due Process clause of the 14th Amendment to the United States Constitution.

156.   Defendant State and Benton Harbor and State and Benton Harbor government officials, and each of them, deliberately and knowingly violated Plaintiff Class Representatives' and Plaintiff Class members' right to bodily integrity and property interest, insofar as:

a.   Defendants deliberately and knowingly created, maintained and covered up the Benton Harbor water supply system that contained lead, bacteria and other contaminants in the water supply that greatly exceeded the 15ppb federal and state Lead and Copper Rule from at least 2018 to 2021, and was and is an "imminent and substantial endangerment" to each Plaintiff and Benton Harbor resident;

b.   Defendants knew, and were aware, of the serious medical risks associated with exposure to contaminated water containing high levels of lead, bacteria and other contaminants when ingested into the human body, including brain regional damage, cognitive loss and development impairments to children and babies;

c.   Defendants failed to take reasonable actions to protect Plaintiff Class Representatives and Plaintiff Class Members from the known risks associated with exposure to water contaminated by lead, bacteria and other contaminants from at least 2018 to 2021;

d.   On **October 2, 2019**, Michigan Lieutenant Governor Garlin Gilchrist attended a community meeting in Benton Harbor where he was told by the Reverend Edward Pinkney, and other community leaders about the lead poisoned, contaminated Benton Harbor water supply. Reverend Edward Pinkney, president of the Benton Harbor Community Water Council, and the other leaders, requested that Lieutenant Governor

Gilchrist promptly notify Governor Whitmer "do something about the lead poisoned water supply, including the State of Michigan providing bottled water until local and state officials could get the lead out of Benton Harbor's tap water."

At this **October 2, 2019** community meeting Michigan Lieutenant Governor Gilchrist promised Benton Harbor's community leaders that he would promptly deliver their message to Governor Whitmer so that the extraordinary high lead level exceedances that created the public health emergency could be resolved.

However, water testing demonstrated that lead levels in the water supply continued their horrific rise. It took over two (2) years after the meeting with Michigan's Lieutenant Governor Gilchrist for Governor Gretchen Whitmer to issue the Emergency Declaration on **October 14, 2021**, directing each Plaintiff and Benton Harbor residents not to ingest the poisoned tap water.

e.   Defendants knew and were aware that their conduct would result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity and property interest;

f.   Plaintiff Class Representatives and Plaintiff Class Members suffered bodily and emotional harm and property damages as a result of their exposure to lead, bacteria and other harmful contaminants in their water entering their bodies.

157.   Each government Defendant's conduct in exposing Benton Harbor residents to water, containing substantial lead, bacteria and other contaminants, was so egregious and so outrageous, that it "shocks the conscience." For more than three (3) years of deliberation, and decision making, State of Michigan and Benton Harbor Defendants "…knew of the facts which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the

individual's rights". *Waid v. Earley,* 960 F.3d, 303 (6th Cir. 2020), J. Murphy, concurring, citing *Guertin v Michigan,* 912 F3d 907 (6th Cir. 2019).

158.   Further, the State of Michigan and EGLE Defendants, knowingly and consciously made the repeated decision not to cite Defendant Benton Harbor's water system with  violations for not complying with the Safe Drinking Water Act (SDWA) CRF 40 §141 and the State of Michigan Safe Drinking Water Act, 399 of 1976; instead, Defendant EGLE repeatedly extended deadlines for compliance. To date, Benton Harbor is not in compliance with the statutory federal and State Safe Drinking Water Acts.

159.   In addition each and all State of Michigan Defendants and City of Benton Harbor Defendants knowingly violated federal and State of Michigan Safe Drinking Water provisions concerning the use of anti-corrosion processes and chemicals. Each Defendant further violated the respective federal and State of Michigan statutes regarding notifying and warning each Plaintiff and the Benton Harbor public of the lead poison, bacteria and other contaminants in their water, and each Defendant's decision, not to provide a warning that there had been six (6) consecutive tests of Benton Harbor's water supply and each test was above the 15 ppb limit for lead endangerment in the water supply, as a result **Benton Harbor is the only Michigan city water system to have six (6) consecutive lead exceedances beginning in 2011-2021**. (**Ex. 1,** Petition, p. 12.)

160. In 2019 Defendant EGLE had taken effective control and the direction of the Benton Harbor water system, including corrosion control to remediate the significantly high, dangerous lead levels in Benton Harbor's water supply. However, rather than follow the Safe Drinking Water Act requirements and direction for proper corrosion control EGLE directed that each Engineering Defendant experiment with formulas in search of a solution. When Nicholas Leonard, Executive Director, Great Lakes Environmental Law Center, wrote Defendant Eric Oswald of Defendant EGLE, asking why EGLE was departing from federal Safe Drinking Water statutory requirements and EPA guidelines concerning the use of anti-corrosive chemicals, Defendant EGLE Director, Drinking Water and Environmental Health Division, Eric Oswald knowingly and untruthfully stated that the chemicals were working. However, Oswald knew that the most recent water test for the **July to December 2019** period had the highest 90 percentile for lead samples for any Benton Harbor sampling period, 32 ppb up until that time. (*Id.*, p. 20.)

161. As a direct and proximate result of the unconstitutional acts of each State of Michigan and City of Benton Harbor government Defendants, as set forth herein and above, which violated Plaintiff Class Representatives' and Class Members' liberty interest of bodily integrity and property interest, Plaintiffs suffered damages, including but not limited to:

- Medical Expenses

- Life threatening and irreversible bodily injury;

- Economic losses from lost wages, lost income, lost earning capacity, lost business profits, and reduced property values, among others;

- Required to pay water bills for contaminated water;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

162.  Plaintiff Class Representatives and Plaintiff Class Members are also entitled to an award of all non-economic damages provided by and law for pain and suffering, embarrassment, outrage, mental anguish, fear, stress and mortification, denial of social pleasures.

- Each Plaintiff requires medical monitoring.

163.  Plaintiff Class Representatives and Plaintiff Class Members are further entitled to an award costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

164.  The conduct of State of Michigan Defendants, and Defendant State officials, Defendant Benton Harbor and each Benton Harbor Defendant official demonstrates deliberate indifference that shocks the conscience.

165.  The State of Michigan and each State Defendant's conduct, knowing and deliberate decisions not to enforce federal and State law, including but not limited to, the federal and state Safe Water Drinking Acts (SDWA), specifically

§141 public notice provision, the federal and state Lead and Cooper rules and the anti-corrosion provisions, from minimally September 2018 through September 2021, evidences conduct that was outrageous and reckless in the extreme, entitling Plaintiff Class Representatives and Plaintiff Class Members to an award of punitive damages.

166.   On or about **November 2, 2021**, the United States Environmental Protection Agency (EPA) issued an Unilateral Administrative Order against Defendant City of Benton Harbor for multiple statutory violations. (**Ex. 3.**)

**COUNT II**
**CAUSE OF ACTION**
**_MONELL_ CLAIM: BY ALL PLAINTIFFS**
**AGAINST THE CITY OF BENTON HARBOR**

167.   Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-166, as though fully set forth herein.

168.   At all times herein, Defendant City of Benton Harbor, acting through its official policymakers, Defendant Mayor Marcus Muhammad, Defendant City Manager Darwin Watson and Defendant City Manager Ellis Mitchell, established and/or maintained the following customs, usages, policies and/or practices:

- Undertaking, making and/or approving decisions with regard to the public water system in the City of Benton Harbor, while at all times knowing that these decisions would likely result in the creation and maintenance of a public health crisis to its residents, including the infliction of harm and injury to each Plaintiff;

- Participating in the concealment of the above-described acts, injuries, and harms of which it was aware, through its supervisors and official policymakers;

- Approving, encouraging, authorizing, condoning, and acquiescing in the decisions and acts of concealment that were committed by its employees, agents, supervisors and policymakers, all under color of law and all in violation of Plaintiffs' rights under the Constitution;

- Failure to train, supervise, and/or discipline agents, employees, and officials of the City of Benton Harbor to:

  i.    Determine whether the water supplied to the public has received adequate corrosion control;

  ii.   If not, do not provide the Plaintiffs, residents and/or users of public water in Benton Harbor with water which had not received proper and sufficient corrosion control;

  iii.  To warn each Plaintiff and the public that the public water supply is unsafe and not to drink the water when, as here, the water supply samples far exceeded the 15ppb federal and state Lead and Cooper rules for the record setting six (6) consecutive monitoring   periods.

169.   Each of the aforementioned customs, policies, and/or practices were affirmative decisions that were made by Defendant Benton Harbor officials policymakers, the failure to train, supervise, and/or discipline the individually named Defendants, was known to Benton Harbor, as highly likely and probable to cause violations of the constitutional rights of each Plaintiff and residents of Benton Harbor and members of the public.

170.   The conduct of the individually named Defendants Mayor Marcus Muhammad, Benton Harbor City Manager Darwin Watson and City Manager Ellis

Mitchell, was committed pursuant to the customs, policies, and/or practices of Defendant City of Benton Harbor.

171.  Each such custom, policy and/or practice, referenced above, was a driving force in the violations of each Plaintiff's constitutional rights, as set forth herein and above.

172.  As a direct and proximate result of the aforementioned violations of Plaintiff Class Representatives' and Plaintiff Class Members' constitutional rights pursuant to Defendant City of Benton Harbor's customs, policies and practices, as stated herein and above, Plaintiff Class Representatives and Plaintiff Class Members have suffered damages, including, but not limited to:

- Medical Expenses

- Life threatening and irreversible bodily injury;

- Economic losses from lost wages, lost income, lost earning capacity, lost business profits, and reduced property values, among others;

- Required to pay water bills for contaminated water;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

- Each Plaintiff requires medical monitoring.

173.   Plaintiff Class Representatives and Plaintiff Class Members are further entitled to an award costs and reasonable attorney fees, pursuant to 42 U.S.C. §1988.

174.   Plaintiff Class Representatives and Plaintiff Class Members are also entitled to an award of all non-economic damages provided by and law for pain and suffering, embarrassment, outrage, mental anguish, fear, stress and mortification, denial of social pleasures.

## COUNT III
## PROFESSIONAL NEGLIGENCE -
## DEFENDANT ELHORN ENGINEERING

175.   Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-174, as though fully set forth herein.

176.   Defendant Elhorn Engineering Company, through its contract relation with the City of Benton Harbor, owed Plaintiff Class Representatives and Plaintiff Class Members, as third parties to its contract with Defendant Benton Harbor, a duty of ordinary care to avoid physical harm to foreseeable persons and property in performance of a contract.

177.   Defendant Elhorn Engineering failed to exercise the degree of care which a reasonable and prudent person would use under similar circumstances to protect the Plaintiff Class Representatives and Plaintiff Class Members from injury and damages.

178.   That duty included fully understanding the toxicity of the anti-corrosive chemicals used to abate and sequester the high levels of lead in the water service lines and eliminating releases of toxic chemicals, identifying alternatives to toxic chemicals released while attempting to abate the lead, or understanding the mechanisms of release and transport of toxic chemicals through the water, and to investigate, mitigate and remediate the impacts of the chemicals released that were added to the water by this Defendant.

179.   Defendant Elhorn Engineering had a duty, in particular, to: (1) identify the potentially harmful anti-corrosive chemicals used by their operations to attempt to abate the lead in the Plaintiff Class Representatives' and Plaintiff Class Members' water; (2) investigate and understand the characteristics of the chemical byproducts of their operations before releasing those byproducts into the water; (3) conduct their operations in a manner that would not unreasonably endanger human health and the environment; (4) control, minimize, and eliminate releases of the corrosive materials so as not to further create a risk of harm to the Plaintiff Class Representatives and Plaintiff Class Members; (5) investigate and remediate environmental releases that they knew posed a potential risk to human health and the environment; (6) follow the provisions of the Safe Drinking Water Act statute with regard to corrosion control; and (7) warn Plaintiff Class Representatives and Plaintiff Class Members of the use of the anti-corrosive chemicals that created a probable risk to human health

and contamination of Plaintiff Class Representatives' and Plaintiff Class Members'
property including, but not limited to, Plaintiff Class Representatives' and Plaintiff
Class Members' water, groundwater, and/or water systems, due to the persistence
and toxicity of these substances; in addition to the high lead levels in the water.

180.   Defendant Elhorn Engineering failed to exercise ordinary care in the
use of substances including, but not limited to anti-corrosive chemicals, which did
not correct the problem of excessive lead in the water, but instead made the problem
worse.

181.   Defendant Elhorn Engineering failed to provide a warning to Plaintiff
Class Representatives and Plaintiff Class Members that their tap water was unsafe
to drink or ingest.

182.   Defendant Elhorn Engineering breached its duty of ordinary care to
Plaintiff  Class Representatives and Class Members, as identified above, including
but not limited to releasing and allowing the release of known toxic chemicals into
Defendant Benton Harbor's service lines, resulting in a devasting increase of lead in
the water supply, which continues to this day.

183.   As a direct cause and consequence of Defendant Elhorn Engineering's
professional negligence, each Plaintiff Class Representative and each Plaintiff Class
Member has been exposed to and more likely than not has been contaminated with
lead, bacteria and other harmful contaminants. Further,    Plaintiff  Class

Representatives' and Class Members' properties have been exposed and more likely than not has been contaminated by lead and other harmful contaminants.

184.   The harm to Plaintiff Class Representatives and Plaintiff Class Members was reasonably foreseeable.

185.   Plaintiff Class Representatives and Plaintiff Class Members require medical monitoring for their lifetime.

186.   As a direct and proximate result of Defendant Elhorn Engineering's negligence, Plaintiff Class Representatives and Plaintiff Class Members have suffered injuries, damages and losses, including but not limited to, economic and non-economic damages. Defendant Elhorn Engineering is liable for compensatory and punitive damages to the Plaintiff Class Representatives and Plaintiff Class Members for their negligent acts.

**COUNT IV**
**PROFESSIONAL NEGLIGENCE –**
**DEFENDANT F&V OPERATIONS**
**AND RESOURCE MANAGEMENT, INC.**

187.   Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-186, as though fully set forth herein.

188.   Defendant F&V Operations and Resource Management, Inc., through its contract relation with Defendant City of Benton Harbor, owed Plaintiff Class Representatives and Plaintiff Class Members, as third parties to each Defendants'

contract with Defendant Benton Harbor, a duty of ordinary care to avoid physical harm to foreseeable persons and property in performance of a contract.

189. Defendant F&V Operations and Resource Management, Inc., failed to exercise the degree of care which a reasonable and prudent person would use under similar circumstances to protect the Plaintiff Class Representatives and Plaintiff Class Members from injury and damages.

190. That duty included fully understanding the toxicity of the anti-corrosive chemicals used to abate and sequester the high levels of lead in the water service lines and eliminating releases of toxic chemicals, identifying alternatives to toxic chemicals released while attempting to abate the lead, or understanding the mechanisms of release and transport of toxic chemicals through the water, and to investigate, mitigate and remediate the impacts of the chemicals released that were added to the water by this Defendant.

191. Defendant F&V Operations and Resource Management, Inc. had a duty, in particular, to: (1) identify the potentially harmful anti-corrosive chemicals used by their operations to attempt to abate the lead in the Plaintiff Class Representatives' and Plaintiff Class Members' water; (2) investigate and understand the characteristics of the chemical byproducts of their operations before releasing those byproducts into the water; (3) conduct their operations in a manner that would not unreasonably endanger human health and the environment; (4) control,

minimize, and eliminate releases of the corrosive materials so as to not further create a risk of harm to the Plaintiff Class Representatives and Plaintiff Class Members; (5) investigate and remediate environmental releases that they knew posed a potential risk to human health and the environment; (6) follow the provisions of the Safe Drinking Water statute with regard to corrosion control; and (7) warn Plaintiff Class Representatives and Plaintiff Class Members of the use of the anti-corrosive chemicals that created a probable risk to human health and contamination of Plaintiff Class Representatives' and Plaintiff Class Members' property including, but not limited to, Plaintiff Class Representatives' and Plaintiff Class Members' water, groundwater, and/or water systems, due to the persistence and toxicity of these substances; in addition to the high lead levels in the water.

192.   Defendant F&V Operations and Resource Management, Inc., by contract in 2020, managed Defendant Benton Harbor's Water Plant through its employees and agents.

193.   The EPA's Unilateral Report in 2021 shows F&V Operations and Resource Management, Inc. employees were not competent to manage the Public Water System and, upon inspection by the EPA, were unable to respond to basic questions of procedure and substance.

194.   Defendant F&V Operations and Resource Management, Inc. failed to exercise ordinary care in the use of substances including, but not limited to anti-

corrosive chemicals, which did not correct the problem of excessive lead in the water, but instead made the problem worse.

195. Defendant F&V Operations and Resource Management, Inc. failed to provide a warning to Plaintiff Class Representatives and Plaintiff Class Members that their tap water was unsafe to drink or ingest.

196. Defendant F&V Operations and Resource Management, Inc. breached its duty of ordinary care to Plaintiff Class Representatives and Class Members, as identified above, including but not limited to releasing and allowing the release of known toxic chemicals into Defendant Benton Harbor's service lines, resulting in a devasting increase of lead, bacteria and other contaminants in the water supply, which continues to this day.

197. As a direct cause and consequence of Defendant F&V Operations and Resource Management, Inc.'s professional negligence, each Plaintiff Class Representative and each Plaintiff Class Member has been exposed to and more likely than not has been contaminated with lead, bacteria and other harmful contaminants. Further, Plaintiff Class Representatives' and Class Members' properties have been exposed and more likely than not has been contaminated by lead and other harmful contaminants.

198. The harm to Plaintiff Class Representatives and Plaintiff Class Members was reasonably foreseeable.

199.   Plaintiff Class Representatives and Plaintiff Class Members require medical monitoring for their lifetime.

200.   As a direct and proximate result of Defendant F&V Operations and Resource Management, Inc.'s negligence, Plaintiff Class Representatives and Plaintiff Class Members have suffered damages and losses, including but not limited to, economic and non-economic damages. Defendant F&V Operations and Resource Management, Inc. is liable for compensatory and punitive damages to the Plaintiff Class Representatives and Plaintiff Class Members for each of their negligent acts.

### COUNT V
### VIOLATION OF MICHIGAN GOVERNMENT TORT LIABILITY ACT
### DEFENDANT MICHAEL O'MALLEY

201.   Plaintiff Class Representatives and Class Members repeat, reallege and incorporate paragraphs 1-200, as though fully set forth herein.

202.   From 2018-2020 Defendant Michael O'Malley was Manager of Defendant Benton Harbor's Water Department.

203.   During this period Benton Harbor's water supply contained lead that exceeded federal and State of Michigan Safe Drinking Water Act 15ppb and the Lead and Copper rule requirements.

204.   The lead in Benton Harbor's water supply created a public health emergency and crisis for the approximately 10,000 Benton Harbor residents.

205.    In 2018, Defendant O'Malley did not attempt to stop the exceedingly high lead action level exceedances.

206.    Defendant O'Malley had a duty to protect the health of the Benton Harbor residents and each Plaintiff herein.

207.    From 2018-2020 Defendant Michael O'Malley failed to follow and violated the federal and State of Michigan Safe Drinking Water Acts requirements and guidelines for both selection and use of anti-corrosion measures to eliminate substantial lead leaching from the water pipes into the Benton Harbor water supply in levels that triggered action under the Safe Drinking Water Act.

208.    From 2018-2020, although Benton Harbor's water supply was contaminated with lead, bacteria and other contaminants and each testing and monitoring sample period revealed lead levels violated federal and State Safe Drinking Water Acts and the Lead and Copper rule. Although the water supply was unsafe to ingest, Defendant O'Malley repeatedly denied, lied and covered up this public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink.

209.    Defendant O'Malley was fired from his position in 2020 for intentionally falsifying Water Department documents.

210.    Defendant Michael O'Malley's actions were grossly negligent.

211.   Defendant Michael O'Malley's actions were the proximate cause of each Plaintiff being harmed by lead contamination in their tap water from Benton Harbor's water supply.

212.   Each Plaintiff suffered non-economic and economic injuries and damages because of the gross negligence of Defendant Michael O'Malley.

## RELIEF REQUESTED

Plaintiff Class Representatives and Plaintiff Class Members request the following relief from the court:

a.   An Order certifying this case as a class action;

b.   An Order declaring the conduct of Defendants unconstitutional;

c.   An Order of equitable and/or injunctive relief to remediate the harm caused by

    (a)   repairs and compensation of property damage;

    (b)   an immediate abatement of the lead service lines with replacement lines;

    (c)   a water supply delivered to each home of adequate water until new lead service lines are replaced;

    (d)   establishment of a medical monitoring process, including funds and periodic medical testing;

    (e)   appointing a monitor to oversee the water operations of Benton Harbor, for a period of time deemed appropriate by the court;

    (f)   A Community Medical Center for the coordination of care for children who were exposed to the water with high levels of lead, who have learning impairments and/or other cognitive, educational or developmental injuries, requiring medical and for psychological expertise;

    (g)   ongoing water lead testing for each home; and

(h)     Identifying diagnostic tools which can evaluate the presence of lead in the body organs and/or bones;

(i)     Forgiveness of all Benton Harbor loans provided through the state and federal statutes for replacement of lead water pipes and other related structural infrastructure work;

(j)     an immediate injunction entered to stop all Benton Harbor residents, Plaintiff Class Representatives and Plaintiff Class Members from paying for the contaminated water; and

(k)     Disgorgement, by the City of Benton Harbor, of all Defendant's payments received from Plaintiff Class Representatives and Plaintiff Class Members, from January 2019 to present.

d.      An Order for an award of compensatory damages, economic and non-economic, past and future;

e.      An Order for an award of punitive damages, past and future;

f.      An Order for an award of actual reasonable attorney fees and litigation expenses;

g.      An Order for all such other relief as the court deems equitable;

h.      An order for reasonable attorney fees and costs.


Respectfully submitted,                     Respectfully submitted,
**EDWARDS & JENNINGS, P.C.**                 **MORGAN and MORGAN COMPLEX LITIGATION**


By: /s/ Alice B. Jennings                    By: /s/ Kevin S. Hannon
    Alice B. Jennings (P29064)                   Kevin S. Hannon
    Attorney for Plaintiff                       Attorney for Plaintiff
    ajennings@edwardsjennings.com                khannon@forthepeople.com

By: /s/ Carl R. Edwards
    Carl R. Edwards (P24952)
    Attorney for Plaintiff
    ajennings@edwardsjennings.com

By: /s/ Jessica Meeder
    Jessica Meeder
    Attorney for Plaintiff
    jmeeder@forthepeople.com

Dated: January 28, 2022

**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

DARETHA BRAZIEL, individually and as
Next Friend for minors, et. al.,

            Plaintiffs,

v.

GOVERNOR GRETCHEN WHITMER,      Case No.: 1:21-cv-960
Individually and in her official capacity;
STATE OF MICHIGAN - ENVIRONMENT,   Hon. Janet T. Neff
GREAT LAKES & ENERGY; et. al.

           Defendants.

                                                 /

| | |
|---|---|
| Alice B. Jennings (P29064) | Kevin S. Hannon |
| Carl R. Edwards (P24952) | Jessica Meeder |
| **EDWARDS & JENNINGS, P.C.** | Attorneys for Plaintiffs |
| Attorneys for Plaintiffs | **MORGAN and MORGAN** |
| ajennings@edwardjennings.com | **COMPLEX LITIGATION** |
| cedwards@edwardsjennings.com | khannon@forthepeople.com |
| | jmeeder@forthepeople.com |

                                               /

**RELIANCE ON JURY DEMAND**

      Plaintiffs hereby rely on their Jury Demand previously filed in this matter.
right.

Respectfully submitted,                Respectfully submitted,
**EDWARDS & JENNINGS, P.C.**       **MORGAN and MORGAN**
                                    **COMPLEX LITIGATION**

By: /s/ Alice B. Jennings          By: /s/ Kevin S. Hannon
     Alice B. Jennings (P29064)         Kevin S. Hannon
     Attorney for Plaintiff              Attorney for Plaintiff
     ajennings@edwardsjennings.com     khannon@forthepeople.com

By: /s/ Carl R. Edwards              By: /s/ Jessica Meeder

    Carl R. Edwards (P24952)            Jessica Meeder

    Attorney for Plaintiff                Attorney for Plaintiff

    ajennings@edwardsjennings.com      jmeeder@forthepeople.com

Dated: January 28, 2022

EXHIBIT 1

EXHIBIT 1

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF DARETHA BRAZIEL

STATE OF MICHIGAN )
                           )SS
COUNTY OF BERRIEN)

Pursuant to MCL §600.6431, Plaintiff Daretha Braziel, 1046 Broadway, Benton Harbor, Michigan, 49022, hereby signs and verifies this First Amended Complaint before an office authorized to administer oaths.

_____
Daretha Braziel, Individually
and As Next Friend for
RB-minor 1; DB-minor 2,
and DR-minor 3

## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

The foregoing was signed and verified before me this 28 day of January, 2022.

_____
Notary Public
_____, County, MI
My Commission Expires: _____

VANESSA GRAY
Notary Public - State of Michigan
County of Oakland
My Commission Expires Dec. 8, 2027
Acting in the County of _____

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF KEESHA JONES

STATE OF MICHIGAN )
                    )SS
COUNTY OF BERRIEN)

    Pursuant to MCL §600.6431, Plaintiff Keesha Jones, 416 Britain, Benton

Harbor, Michigan, 49022, hereby signs and verifies this First Amended Complaint

before an office authorized to administer oaths.

                             _Keesha Jones_

                             Keesha Jones, Individually
                             and As Next Friend for
                             KJ-minor 4; DJ-minor 5,
                             TC-minor 6, TC-minor 7,
                             and KB-minor 8

## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

    The foregoing was signed and verified before me this 25 day of January,

2022.

_Linda Allen_

Notary Public

_Berrien_, County, MI

My Commission Expires: 8/27/2025

LINDA ALLEN
Notary Public, State of Michigan
County of Berrien
My Commission Expires Aug. 27, 2025
Acting in the County of _Berrien_

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF IESHA JONES

STATE OF MICHIGAN )
                  )SS
COUNTY OF BERRIEN)

Pursuant to MCL §600.6431, Plaintiff Iesha Jones, 416 Britain, Benton

Harbor, Michigan, 49022, hereby signs and verifies this First Amended Complaint

before an office authorized to administer oaths.

_____
Iesha Jones

## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

The foregoing was signed and verified before me this *25* day of January,

2022.

_____
Notary Public
*Berrien*_____, County, MI
My Commission Expires: *8/27/2025*

LINDA ALLEN
Notary Public, State of Michigan
County of Berrien
My Commission Expires Aug. 27, 2025
Acting in the County of *Berrien*

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF MICHAEL D. BRIGHAM

STATE OF MICHIGAN )
                     )SS
COUNTY OF BERRIEN)

      Pursuant to MCL §600.6431, Plaintiff Michael D. Brigham, 300 River

Terrace Dr., Apt. 1016, Benton Harbor, Michigan, 49022, hereby signs and verifies

this First Amended Complaint before an office authorized to administer oaths.

Michael D. Brigham

## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

      The foregoing was signed and verified before me this _25_ day of January,

2022.

_____
Notary Public
_Berrien_____, County, MI
My Commission Expires: _8-25-2025_

LINDA ALLEN
Notary Public, State of Michigan
County of Berrien
My Commission Expires Aug. 27, 2025
Acting in the County of _Berrien_

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF REBECCA BRANSCUMB

STATE OF MICHIGAN )
                            )SS
COUNTY OF BERRIEN)

       Pursuant to MCL §600.6431, Plaintiff Rebecca Branscumb, 552 Buena Vista

Rd., Benton Harbor, Michigan, 49022, hereby signs and verifies this First Amended

Complaint before an office authorized to administer oaths.

                                        _Rebecca Branscumb_
                                        Rebecca Branscumb


## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

       The foregoing was signed and verified before me this _25_ day of January,

2022.

_Linda Allen_
Notary Public
_Berrien_    , County, MI
My Commission Expires: _8/27/2025_

LINDA ALLEN
Notary Public, State of Michigan
County of Berrien
My Commission expires Aug. 27, 2025
Acting in the County _Berrien_

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF STACEY BRANSCUMB

STATE OF MICHIGAN )
                                      )SS
COUNTY OF BERRIEN)

Pursuant to MCL §600.6431, Plaintiff Stacey Branscumb, 552 Buena Vista

Rd., Benton Harbor, Michigan, 49022, hereby signs and verifies this First Amended

Complaint before an office authorized to administer oaths.

Stacey Branscumb

Subscribed and sworn to before me
this 25 day of January, 2022.

Notary Public
Berrien                , County, MI,
My Commission Expires: 8/27/2025

LINDA ALLEN
Notary Public. State of Michigan
County of Berrien
My Commission Expires Aug. 27, 2025
Acting in the County of Berrien

## SIGNATURE AND VERIFICATION OF
## BY PLAINTIFF EMMA KINNARD

STATE OF MICHIGAN )

                       )SS

COUNTY OF BERRIEN)

Pursuant to MCL §600.6431, Plaintiff Emma Kinnard, 270 East May St

Benton Harbor, Michigan, 49022, hereby signs and verifies this First Amended

Complaint before an office authorized to administer oaths.

*Emma Kinnard*

Emma Kinnard

## CERTIFICATION OF ACKNOWLEDGMENT BY NOTARY PUBLIC

The foregoing was signed and verified before me this _24_ day of January,

2022.

*Linda Allen*

Notary Public

LINDA ALLEN
Notary Public, State of Michigan
County of Berrien
My Commission Expires Aug. 27, 2025
Acting in the County of _Berrien_

_Berrien_ , County, MI

My Commission Expires: _8-27-2025_

# EXHIBIT 2

# EXHIBIT 2

**Submitted to the**
**United States Environmental Protection Agency**

Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. § 300i and 42
U.S.C. § 300j-1(b), to Abate the Imminent and Substantial Endangerment to Benton Harbor,
Michigan Residents from Lead Contamination in Drinking Water

**Submitted on Behalf of Petitioners Benton Harbor Community Water Council, Great
Lakes Environmental Law Center, NRDC, Flint Rising, People's Water Board Coalition,
Michigan Welfare Rights Coalition, Water You Fighting For, Safe Water Engineering,
LLC, Highland Park Human Rights Coalition, Michigan Environmental Justice Coalition,
Sierra Club Michigan Chapter, Dr. Mona Hanna-Attisha, Clean Water Action, Ecology
Center, Freshwater Future, East Michigan Environmental Action Council, Detroit People's
Platform, Campaign for Lead Free Water, For Love of Water, Environmental
Transformation Movement of Flint**

**September 9, 2021**

**Petition Submitted Via Email and Regular Mail**

Michael Regan
Administrator
U.S. Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 1101A
Washington, DC 20460
VIA EMAIL: Regan.Michael@epa.gov

Cheryl L. Newton
Acting Regional Administrator
U.S. Environmental Protection Agency, Region 5
77 West Jackson Boulevard
Mail Code: R-19J
Chicago, IL 60604
VIA EMAIL: Newton.Cheryl@epa.gov

Radhika Fox
Assistant Administrator for Water
U.S. Environmental Protection Agency
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Mail Code: 4101M
Washington, DC 20460

VIA EMAIL: Fox.Radhika@epa.gov

Lawrence Starfield
Acting Assistant Administrator for Enforcement and Compliance Monitoring
U.S. Environmental Protection Agency
Environmental Protection Agency
1200 Pennsylvania Avenue, N.W.
Washington, DC 20460
VIA EMAIL: starfield.lawrence@epa.gov

Table of Contents

I.      Introduction....................................................................................................................................1

II.     Interest of Petitioners ...................................................................................................................3

III.    Background ....................................................................................................................................3

    A.    *June - September 2018 Sampling Period: Discovery of Elevated Lead Levels* ..............................3

    B.    *January - June 2019 Sampling Period: The Initial Response* ......................................................4

    C.    *July - December 2019 Sampling Period: High lead levels continue in spite of corrosion control treatment* .6

    D.    *January - June 2020 Sampling Period: EGLE Requires Another Corrosion Control Study and Treatment Changes*.................................................................................................................................................7

    E.    *July - December 2020 Sampling Period: Benton Harbor Submits Another Corrosion Control Study Proposal* ..........................................................................................................................................................8

    F.    *January - June 2021 Sampling Period: Benton Harbor Releases a Request for Proposals for a Corrosion Control Study that is Fully Compliant with the Lead and Copper Rule* ...................................................9

IV.    Lead in the Benton Harbor public water system presents an imminent and substantial endangerment to public health .....................................................................................................................................10

    A.    *High levels of lead are present and are likely to continue to enter Benton harbor drinking water* ...............10

V.     EGLE and Benton Harbor's actions to address the high lead levels in drinking water have been grossly inadequate and have been in violation of the federal and Michigan lead and copper rule...........................................17

    A.    *Corrosion Control Treatment Steps* .............................................................................................18

    B.    *Lead Service Line Replacement Requirement* ..............................................................................21

    C.    *Tap Monitoring Requirement* .......................................................................................................22

VI.    EPA should take immediate action to address the public health emergency created by high lead levels in the Benton Harbor public water system...................................................................................................22

VII.   Conclusion .................................................................................................................................27

EGLE_0019788

## I.    Introduction

For at least the past three years, Benton Harbor residents have been subjected to levels of lead contamination from their public water system that presents an imminent and substantial endangerment to their health. Levels of lead contamination have significantly exceeded the lead action level set by the EPA's lead and copper rule continually since at least the fall of 2018. While the lead action level is not a health-based threshold (as discussed in more detail below, there is no safe level of lead in drinking water) both the federal and Michigan lead and copper rule establish detailed, mandatory actions with specified deadlines that both the Benton Harbor and the Michigan Department of Environment, Great Lakes, and Energy (EGLE) must undertake to reduce levels of lead contamination after a lead action level exceedance. Both the City of Benton Harbor and EGLE have failed to undertake these actions in a timely manner as required by both the federal and Michigan lead and copper rules. We request that EPA issue an emergency administrative order under section 1431 of the Safe Drinking Water Act (SDWA), 42 U.S.C. §300i, and provide assistance and grants under SDWA §1442(b), 42 U.S.C. §300j-1(b), irrespective of whether the agency finds that there has been a violation of the Act, since the lead levels continue to present "an imminent and substantial endangerment to the health of persons" and no finding of a violation is required. Residents continue to live with significant and dangerous levels of lead contamination three years after the contamination was first discovered with no immediate solution in sight. Our presumption that the lead contamination problem was discovered three years ago is based upon currently publicly available data, though it is possible that the lead problem predated this time and was discovered earlier.

Benton Harbor can be characterized as an environmental justice community. Approximately 9,700 people live in Benton Harbor. Of those people, 85% are Black and 5% are Hispanic.[1] It is also a low-income community, with approximately 45% of the population having an income below the federal poverty line.[2] Benton Harbor has stated that it has 5,877 total service lines; 51% of its service lines either are known to contain lead, are known to be galvanized lines previously connected to lead, or are of unknown material but likely to contain lead; 47% of the service lines are of unknown material with no information, which should be assumed to contain lead until proven otherwise; and only 2% of the service lines have been confirmed as containing no lead and not being galvanized lines previously connected to lead.[3] As an environmental justice community, Benton Harbor's residents are not only subjected to a disproportionately high level of lead exposure from a variety of sources beyond their drinking water, but also often lack access to high quality health care and are exposed to a wide array of other threats that can exacerbate the negative health effects associated with lead exposure.

[1] United States Census Bureau, *QuickFacts: Benton Harbor, Michigan*, https://www.census.gov/quickfacts/fact/table/bentonharborcitymichigan/PST045219 (last visited Aug. 24, 2021).
[2] *Id.*
[3] Michigan Department of Environment, Great Lakes, and Energy, *Michigan Service Line Materials Estimates Preliminary Distribution System Materials Inventories*, last updated Dec. 2020, (attached as Exhibit 1), *available at* https://www.michigan.gov/documents/egle/egle-dwehd-PDSMISummaryData_682673_7.pdf

1

EGLE_0019789

The shortcomings of the existing federal Lead & Copper Rule (LCR) has also played no small part in perpetuating this lead emergency faced by the people of Benton Harbor. Most notably, the lack of a Maximum Contaminant Level (MCL) for lead in drinking water has served as a significant impediment to adequate enforcement. The Safe Drinking Water Act (SDWA) requires the EPA to set a health-based MCL for each contaminant that it regulates and the MCL should be set as close to the maximum contaminant level goal at which no known adverse health effects will occur.[4] For lead, that level is zero. Under an MCL, when that level is exceeded and a violation occurs, there is immediate and straightforward legal recourse for that violation.

In 1991, when the EPA created the federal LCR it did not create an MCL - claiming that an MCL was not feasible at the time. Instead, it set a treatment technique that EPA has since acknowledged is one of the most complicated drinking water regulations for states and drinking water utilities to implement and enforce.[5] EPA is allowed to set a treatment technique instead of an MCL only when it determines that ascertaining the level of contaminant in drinking water is either technologically or economically infeasible. However, a treatment technique must "prevent known or anticipated adverse effects on the health of persons to the extent feasible."[6] Under the treatment technique for lead, an action level of 15 ppb was set and when sampling exceeds that action level it is supposed to trigger requirements for corrosion control treatment, source water treatment, lead service line replacement, and public education.[7] Yet, as we have seen here in Benton Harbor, and in communities around the county, this treatment technique has failed to meet its preventative health standards and has exposed countless people to lead-contaminated drinking water. And while circumstances have changed since 1991 and an MCL is now feasible, EPA did not consider an MCL in its recently revised federal LCR undermining the likelihood of meaningful action on lead in drinking water in places like Benton Harbor.

The persistently high levels of lead in Benton Harbor's public water system, the City's status as an environmental justice community, the City of Benton Harbor and EGLE's failure to address these issues in a timely manner, and the failure of authorities to adopt any immediate solution to reduce levels of lead contamination in the water system have created an imminent and substantial endangerment to public health that warrants emergency EPA action under the Safe Drinking Water Act, 42 U.S.C. § 300i and 42 U.S.C. § 300j-1(b). A discussed in this petition, while we believe that there have been numerous violations of the state and federal lead and copper rule treatment technique requirements, we again note that EPA can and must take emergency action for Benton Harbor due to the imminent and substantial health threat, irrespective of whether the agency finds that a violation of the lead and copper rule has occurred.

The Benton Harbor Community Water Council, Great Lakes Environmental Law Center, NRDC, Flint Rising, People's Water Board Coalition, Michigan Welfare Rights Coalition, Water You Fighting For, Safe Water Engineering, LLC, Highland Park Human Rights Coalition, Michigan Environmental Justice Coalition, Sierra Club Michigan Chapter, Dr. Mona Hanna-Attisha, Clean Water Action, Ecology Center, Freshwater Future, East Michigan Environmental Action Council, Detroit People's Platform, Campaign for Lead Free Water, For Love of Water,

---

[4] U.S.C § 300g-1(b)(4)(B)
[5] 84 Fed. Reg. 61,684 (Nov. 13, 2019).
[6] U.S.C § 300g-1(b)(7)(A)
[7] 40 CFR § 141.80

2

Environmental Transformation Movement of Flint (collectively, "Petitioners") urge the EPA to take the actions described in section VI of this petition to abate this present and ongoing public health emergency.

## II.      Interest of Petitioners

The Petitioners are community groups, nonprofit corporations, and other organizations that believe immediate EPA action is needed in order to provide safe and clean drinking water to all Benton Harbor residents as quickly as possible. Many have regularly engaged with both EGLE and the EPA to advocate for the protection of residents from lead contamination in drinking water. In November 2019, numerous Petitioners sent a letter to EGLE expressing specific concerns about lead contamination in the Benton Harbor water system as well as EGLE's inadequate response.

Among the Petitioners are also local organizations that have long advocated for a more urgent response to the ongoing crisis in Benton Harbor. The Benton Harbor Community Water Council (BHCWC) is a community-based grassroots organization that aims to inform, educate, and empower Benton Harbor residents about land, water, education, and the democratic process. The group was formed in 2018 in response to the City of Benton Harbor's lead in drinking water contamination. In 2019 and 2020, BHCWC volunteers distributed 10,000 cases of water each year along with educational literature to help protect local residents from lead in drinking water. BHCWC has hosted five filter distribution events for the Berrien County Health Department (BCHD), and the group's volunteers have assisted with filter installations for Benton Harbor residents who received filters at these distribution events. Unfortunately, BCHD was unwilling to provide filters to BHCWC so they could visit homes to educate residents about filter use/maintenance and install water filters, but they have continued distributing emergency water to residents while working to fix the lead in drinking water problem.

## III.     Background

Since high levels of lead were first discovered in Benton Harbor's drinking water, both Benton Harbor and EGLE have failed to address this public health crisis with the urgency it requires. Further, both have failed to follow key requirements of the federal and Michigan lead and copper rule that were triggered upon the initial exceedance of the lead action level and meant to minimize lead contamination as soon as possible.

### A.      *June - September 2018 Sampling Period: Discovery of Elevated Lead Levels*

Lead contamination in the Benton Harbor public water system first came to the fore, as far as we are aware based upon publicly available information, in the summer of 2018. At the time, Benton Harbor only monitored for lead in drinking water every three years. In tap samples collected between June 1, 2018 and September 30, 2018, the 90th percentile was 22 parts per

EGLE_0019791

billion, well above the action level of a 90th percentile of 15 parts per billion.[8] At the time of its lead action level exceedance in 2018, Benton Harbor was not implementing any corrosion control treatment pursuant to the federal or Michigan lead and copper rule. The lead action level exceedance triggered a number of requirements under the federal and Michigan lead and copper rule, including to increase its tap monitoring frequency to two sampling periods per year and to implement the corrosion control treatment steps.[9] Lead service line replacement requirements are also required for systems that exceed the lead action level and have installed corrosion control treatment.[10]

The corrosion control treatment steps describe specific actions that both the Benton Harbor public water system and EGLE were required to undertake by specified deadlines. The clock for the corrosion control treatment steps begins to run at the end of the monitoring period during which a water system exceeds the lead action level. In general, monitoring periods for water systems on semi-annual monitoring schedules end on December 31st.[11] As such, the clock for the corrosion control treatment steps described in both the federal and Michigan lead and copper rules began to run on January 1, 2019, three full months after the end of the sampling period in which both Benton Harbor and EGLE discovered (to the best of our knowledge) that Benton Harbor's public water system had high levels of lead contamination.

### B.    January - June 2019 Sampling Period: The Initial Response

On January 9, 2019, EGLE staff noted that it had received a call from a local resident stating that she had received a letter from the City of Benton Harbor asserting that the "water is safe to drink after first flush."[12] The resident also recounted a conversation with the Benton Harbor drinking water superintendent, who reportedly advised her that Benton Harbor is delivering "clean water right to the tap and you should have no trouble drinking it."[13]

In the meantime, both EGLE and Benton Harbor quickly decided that the best course of action was to have Benton Harbor begin to implement corrosion control treatment prior to studying or testing it on Benton Harbor infrastructure in hopes that it would work to reduce lead contamination. In January 2019, Benton Harbor submitted a permit application to install a

---

[8] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environmental Quality, to Darwin Watson, City of Benton Harbor, *Re: Lead and Copper Monitoring - Action Level (AL) Exceedance* (Oct. 22, 2018), (attached as Exhibit 2).

[9] 40 C.F.R. § 141.81(c) (2020) (stating that the "requirement for any small- or medium-size system to implement corrosion control treatment steps in accordance with paragraph (e) of this section (including systems deemed to have optimized corrosion control under paragraph (b)(1) of this section) is triggered whenever any small- or medium-size system exceeds the lead or copper action level."); Mich. Admin. Code R. 325.10604f(2)(c) (language largely mirrors 40 CFR 141.81(c) described above).

[10] 40 C.F.R. §141.84 (2020); Mich. Admin. Code R. 325.10604f(5).

[11] *See* 40 C.F.R. § 141.2 (2020) (defining "tap sampling monitoring period" and noting that in general new tap sampling monitoring periods begin on January 1 except for systems required to conduct semi-annual monitoring).

[12] Email from Ernest Sarkipato to EGLE Staff, *Re: Benton Harbor Follow Up Call* (Jan. 9, 2019), (attached as Exhibit 3) *available at* https://drive.google.com/file/d/1OvRRrLYqesmh7ZDbccOIwtg5oBlkJ542/view?usp=sharing.

[13] *Id.*

4

EGLE 0019792

polyphosphate blend recommended by Elhorn Engineering Company.[14] Specifically, Benton Harbor proposed to utilize a proprietary polyphosphate blend referred to as Carus 8600, which consisted of 70% orthophosphate and 30% polyphosphate with a target dose of 1.5 mg/L.[15]

At least one EGLE staff expert expressed skepticism that this corrosion control treatment would effectively reduce lead contamination in the Benton Harbor public water system. In an email dated February 21, 2019, Brian Thurston, EGLE's Community Water Supply Section Manager, noted that the "attached permit does not show how the consultant is planning to reach OCCT" and that in his opinion a "higher initial dose of orthophosphate is needed to quickly establish a protective film in the Pb service lines."[16] He also stated he did not support the permit application as submitted.[17] Nonetheless, EGLE approved the permit at the end of February 2019 on the condition that Benton Harbor study the effectiveness of the inhibitor after treatment began.[18] On March 8, 2019, Benton Harbor and EGLE executed an administrative consent order that, among other things, required Benton Harbor to either submit a proposal for optimal corrosion control treatment or a corrosion control study no later than May 1, 2019.[19] Benton Harbor began feeding the polyphosphate blend to the public water system on March 21, 2019.[20]

In April 2019, Benton Harbor, through its consultant Elhorn Engineering, provided EGLE with a corrosion control treatment plan and study proposal apparently intended as a response to the requirements of the administrative consent order.[21] It stated that Elhorn would conduct water quality parameter monitoring and install a minimum of two coupon racks containing mild steel, copper, and lead to test the effectiveness of the Carus 8600 inhibitor.[22] Based on the results of this study, Elhorn was to create a final draft for an EGLE permit application for an optimal corrosion control treatment designation.[23] Similar to the study required as a condition to the March 2019 permit, this corrosion control study proposed by Elhorn Engineering did not meet the requirements of the federal or Michigan lead and copper

---

[14] Permit Application for Water Supply Systems, Received Jan. 24, 2019, (attached as Exhibit 4) available at, https://drive.google.com/file/d/1goQmiYBu3uqIs3wYPLqyfRBBLqn1s6K2/view?usp=sharing; Letter from Mike Enlow, Elhorn Engineering, to Mike O'Malley, Benton Harbor Water Superintendent (Nov. 21, 2018), (attached as Exhibit 5), *available at* https://drive.google.com/file/d/16dw-jN5n6Kg4Hpamcgxj9AQUXpp2yFYV/view?usp=sharing.

[15] Permit Application for Water Supply Systems, Received Jan. 24, 2019, (attached as Exhibit 4) available at, https://drive.google.com/file/d/1goQmiYBu3uqIs3wYPLqyfRBBLqn1s6K2/view?usp=sharing.

[16] Email from Brian Thurston, EGLE Community Water Supply Section Manager, to EGLE Staff (Feb. 21, 2019), (attached as Exhibit 6), *available at*
https://drive.google.com/file/d/1TlkEfR1TSBGsebG7W4nucGS0BKYEbc0x/view?usp=sharing.

[17] *Id.*

[18] Email from Brandon Onan, EGLE Corrosion Control Engineer, to Ernest Sarkipato, EGLE, (Feb. 25, 2019), (attached as Exhibit 7), *available at* https://drive.google.com/file/d/1dGEn45Ez_NMHrVW5EfWtSj_8TJIMJn4-/view?usp=sharing.

[19] Administrative Consent Order: City of Benton Harbor; WSSN: 00600 (Mar. 8, 2019), (attached as Exhibit 8), *available at* https://drive.google.com/file/d/1N9WlI9Ffx7FtAkinI_qX7ih6A8tEGDjmn/view?usp=sharing.

[20] Email from Mike O'Malley, Benton Harbor Water Superintendent, to EGLE Staff (Mar. 27, 2019), (attached as Exhibit 9), *available at*
https://drive.google.com/file/d/1UhLGzBWwZuTEgWlScnJ5nxBPL8yQVRcP/view?usp=sharing.

[21] Elhorn Company, *Corrosion Control Treatment Plan and Study Proposal* (April 23, 2019), (attached as Exhibit 10), *available at* https://drive.google.com/file/d/1T8xPSSgdeJ9yWRC4MBqNNl0WcHbK72IC/view?usp=sharing.

[22] *Id.*

[23] *Id.*

EGLE_0019793

rule in that it only proposed to analyze a single corrosion control treatment—the Carus 8600 blended poly phosphate blend—at a single dose.[24] Nonetheless, EGLE staff deemed that the corrosion control study plan was acceptable.[25]

In summary, immediately following Benton Harbor's lead action level exceedance, EGLE did not formally designate the Carus 8600 blended polyphosphate inhibitor as optimal corrosion control treatment, nor did it require a corrosion control study that was compliant with the federal and Michigan lead and copper rule. It also did not establish water quality parameters. All of these are requirements of the federal and Michigan lead and copper rule. Instead, it approved a permit that allowed Benton Harbor to begin to introduce a polyphosphate blend without prior study and required minimal follow-up analysis to assess the effectiveness of the inhibitor after it was introduced.

Despite these efforts, Benton Harbor exceeded the lead action level in the January to June 2019 sampling period. Its 90th percentile for this sampling period was 27 parts per billion with a range of results from 0 to 59 parts per billion.[26]

      *C.     July - December 2019 Sampling Period: High lead levels continue in spite of corrosion control treatment*

In November of 2019, the Great Lakes Environmental Law Center sent a letter to EGLE expressing concerns regarding corrosion control in Benton Harbor. The letter raised three specific issues: (1) Elhorn and EGLE did not follow EPA guidance in selecting the Carus 8600 inhibitor as corrosion control; (2) the corrosion control treatment plan and study proposal provided by Elhorn did not comply with the requirements of the federal or Michigan LCR, and; (3) according to EPA guidance, utilizing coupon test racks to determine the efficacy of the Carus 8600 inhibitor would be insufficient for predicting the concentration of lead in drinking water.[27] In its response, EGLE stated that it made the determination to approve the use of the Carus 8600 inhibitor with consultation from Benton Harbor, the Carus Corporation, Elhorn Engineering, and EPA Region 5, and that the initial coupon study results showed the inhibitor was "effectively reducing corrosion rates."[28]

In reality, Benton Harbor's water system not only continued to exceed the lead action level in the July to December 2019 sampling period, but its 90th percentile had increased. Its

---

[24] *Id.*

[25] Email from Ernest Sarkipato, EGLE Surface Water Treatment Specialist to Mike O'Malley, Benton Harbor Drinking Water Superintendent (April 30, 2019), (attached as Exhibit 11), *available at* https://drive.google.com/file/d/1vYM2D1yxx_Zu4fLT7epgM7QTAK161wAT/view?usp=sharing.

[26] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Darwin Watson, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (July 24, 2019), (attached as Exhibit 12), *available at* https://drive.google.com/file/d/12OMWdlpRHVF68ngBw6ljP25UOTqBPusu/view?usp=sharing.

[27] Letter from Great Lakes Environmental Law Center to Eric Oswald, Drinking Water and Environmental Health Division Director (Nov. 6, 2019), (attached as Exhibit 13), *available at* https://drive.google.com/file/d/1jp4ut6cl3nWEPLguUtIIVEK1p4A_sCcuG/view?usp=sharing.

[28] Letter from Eric Oswald to Nick Leonard, 2 (Nov. 26, 2019), (attached as Exhibit 14), *available at* https://drive.google.com/file/d/1uatPdd9bSq-bGQ5dCOyqDLNLtgA9ofC0/view?usp=sharing.

6

90th percentile for this sampling period was 32 parts per billion, up from 27 parts per billion in the January to June 2019 sampling period.[29] The range of reported samples was from 0 to 72 parts per billion.[30]

> D.   *January - June 2020 Sampling Period: EGLE Requires Another Corrosion Control Study and Treatment Changes*

In early February, EGLE staff began to internally circulate a draft letter to be sent to Benton Harbor requiring additional measures to control the ongoing, high levels of lead contamination in the drinking water system. Sent to Benton Harbor on February 13, 2020, it stated that the Carus 8600 inhibitor "is not achieving desired results quickly enough."[31] It required Benton Harbor to change its blended phosphate chemical from the 70/30 ortho/polyphosphate blend it had been using to a product with a minimum of 90% orthophosphate no later than February 28, 2020.[32] It instructed Benton Harbor to increase its treatment rate such that a minimum of 3.0 mg/L orthophosphate residual is maintained throughout the distribution system.[33] Lastly, the letter instructed Benton Harbor to have a third-party consultant submit a corrosion control study proposal in compliance with the lead and copper rule within six months of the treatment change to identify the optimum corrosion control treatment for Benton Harbor.[34]

Initially, while the letter described in the paragraph above was still in draft form, Bob London, an EGLE Surface Water Treatment Specialist, noted that while the letter directed Benton Harbor to conduct a corrosion control study in compliance with the Michigan lead and copper rule, it also steered Benton Harbor towards the use of a phosphate-based inhibitor. Mr. London stated that the lead and copper rule requires a corrosion control study to investigate a number of corrosion control techniques, and that EGLE should not bias the direction of the study and should require full compliance with the lead and copper rule.[35] In response, Brandon Onan, the Lead and Copper Unit Supervisor, stated that he is "not comfortable with entertaining the idea of pH/alkalinity adjustments as an options [sic] for CCT" in light of Benton Harbor's "TMF" issues.[36]

---

[29] Lead and Copper Monitoring – Action Level (AL) Exceedance (Jan. 16, 2020), (attached as Exhibit 15), *available at* https://drive.google.com/file/d/1dWnbv7XQT8uPgDH8VTUcrU9XsLFqgcxi/view?usp=sharing.
[30] *Id.*
[31] Letter from Brandon Onan, EGLE Supervisor of Lead and Copper Unit, to Ellis Mitchell, Benton Harbor City Manager, 1 (Feb. 13, 2020), (attached as Exhibit 16), *available at* https://drive.google.com/file/d/1udLZOI48XpJSnqbxfnJ7e5KVNfzSldQ-/view?usp=sharing.
[32] *Id.* at 1-2.
[33] *Id.* at 1.
[34] *Id.* at 2.
[35] Email from Bob London, EGLE Surface Water Treatment Specialist, to EGLE Staff (Feb. 3, 2020), (attached as Exhibit 17), *available at* https://drive.google.com/file/d/1jtvC5sjx0pclqdJi83JmkW8u7hXKTLaN/view?usp=sharing.
[36] *Id.*

EGLE 0019795

On May 19, 2020, Benton Harbor provided a corrosion control study proposal. The study, which was to be performed by Elhorn Engineering, was to rely on loop tests from materials taken from the Benton Harbor water supply and would cost $1,600.[37]

In an email on April 17, 2020, EGLE staff stated that while Benton Harbor had changed its blended polyphosphate chemical treatment in compliance with the February 13 letter, the distribution residual had not yet reached 3.0 mg/L.[38] Additionally, in a letter dated June 17, 2020, EGLE noted numerous concerns regarding Benton Harbor's corrosion control study  it proposed on May 19th.[39]

Benton Harbor again exceeded the lead action level in the January to June 2020 sampling period. Its reported 90th percentile for this sampling period was 23 parts per billion with a reported range of results from 0 to 440 parts per billion.[40]

   E.     *July - December 2020 Sampling Period: Benton Harbor Submits Another Corrosion Control Study Proposal*

A document dated July 28, 2020 seemingly provides another corrosion control study proposed by Benton Harbor to EGLE.[41] It states the study will utilize lead and galvanized service line material from Benton Harbor's distribution system as well as new copper in order to replicate lead service line replacement activities, that Benton Harbor staff shall provide daily oversight of the study, that it will be run for a minimum of 12 months, and will study the following products/feed rates:

- SK-7661 Blended 10% polyphosphate/90% orthophosphate at current feed rate (3.0 mg/L)
- SK-7661 Blended 10% polyphosphate/90% orthophosphate at feed rate of 1.0-1.5 ppm PO4
- Carus 8600 Blend 30% polyphosphate/70% orthophosphate at 1.0-1.5 ppm PO4
- Carus 8600 Blend 30% polyphosphate/70% orthophosphate at 2.5-3.0 ppm PO4
- Carus 4105 36% phosphoric acid at 2.5-3.0 ppm PO4[42]

---

[37] Letter from Mike O'Malley, Benton Harbor Drinking Water Superintendent, to EGLE Staff (May 19, 2020), (attached as Exhibit 18), *available at*
https://drive.google.com/file/d/1SwC3ihppjjAFqdR7rGMaQdkItNL43Qyj/view?usp=sharing.
[38] Email from Ernie Sarkipato, EGLE Surface Water Treatment Specialist, to Ellis Mitchell, Benton Harbor City Manager (Apr. 17, 2020), (attached as Exhibit 19), available at
https://drive.google.com/file/d/1b8nv0A5WczxmFtJf_yZVsn3AzMcguG3S/view?usp=sharing
[39] Letter from Ernie Sarkipato, EGLE Surface Water Treatment Specialist, to Mike O'Malley, Benton Harbor Drinking Water Superintendent (June 17, 2020), (attached as Exhibit 20), *available at*
https://drive.google.com/file/d/1WDLP2WUiphDj7IIccUn396Ckpg0MUj8UG/view?usp=sharing.
[40] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (July 15, 2020), (attached as Exhibit 21), available at
https://drive.google.com/file/d/1YncWJQr0n8griDIztiqIjG6Qp9nGj107/view?usp=sharing.
[41] *City of Benton Harbor Corrosion Study Plan* (July 28, 2020), (available as Exhibit 22), *available at*
https://drive.google.com/file/d/1OW32gEanojNF-1PqS-VLm54UKLCGyryU/view?usp=sharing.
[42] *Id.*

EGLE_0019796

On August 7, 2020, Benton Harbor and EGLE agreed to amend the original administrative consent order. The amended order required Benton Harbor to have a qualified third-party consultant submit a corrosion control optimization study to EGLE by September 30, 2020.[43]

Benton Harbor again exceeded the lead action level in the July to December 2020 sampling period. Its reported 90th percentile for this sampling period was 24 parts per billion with a reported range of results from 0 to 240 parts per billion.[44] In addition, on November 6, 2020 Benton Harbor issued a boil water advisory due to a chemical feed interruption in the treatment process.[45]

> F.     *January - June 2021 Sampling Period: Benton Harbor Releases a Request for Proposals for a Corrosion Control Study that is Fully Compliant with the Lead and Copper Rule*

At some point in early 2021, it became apparent that Benton Harbor would be issuing a request for proposals for a corrosion control study to determine the optimal corrosion control treatment for its water system. An email from David Koch of Black and Veatch expressed concerns regarding the request for proposals.[46] Specifically, he noted that the revised federal lead and copper rule would require corrosion control studies for systems with lead service lines to include pipe loop testing with harvested lead service lines, and that such tests would be the best means of addressing Benton Harbor's lead issues.[47] He stated that a study involving pipe loop tests could not be performed on a budget of $50,000, which was the apparent budget for the study provided by the proposal.[48]

On April 19, 2021, Benton Harbor formally issued its request for proposals. The proposal noted that the study is expected to be completed within 18 months of the award and that it must comply with the requirements for corrosion control studies described in Mich. Admin. Code R.

---

[43] State of Michigan Department of Environment, Great Lakes, and Energy, Drinking Water and Environmental Health Division, *First Amended Administrative Consent Order* (Aug. 7, 2020), (attached as Exhibit 23), *available at* https://drive.google.com/file/d/1CdYXFQwXkoYF1FxiW-OfoPPlfDB5omkx/view?usp=sharing.

[44] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (Feb. 4, 2021), (attached as Exhibit 24), *available at* https://drive.google.com/file/d/1yBOFxpWnoIc3vSdsRKor5h009EmyPf-0/view?usp=sharing.

[45] Joel Bissell, *Benton Harbor residents advised to boil water due to possible contamination,* MLive, Nov. 6, 2020, *available at* https://www.mlive.com/news/kalamazoo/2020/11/benton-harbor-residents-advised-to-boil-water-due-to-possible-contamination.html

[46] Email from David Koch, Black & Veatch, to Ernest Sarkipato, EGLE Surface Water Treatment Specialist (Mar. 24, 2021), (attached as Exhibit 25), *available at* https://drive.google.com/file/d/1MtVV4OKc_GXjD1LIfIvmgOMRL2_2mvrP/view?usp=sharing.

[47] *Id.*

[48] *Id.*

EGLE_0019797

325.10604f(3)(c).[49] Benton Harbor received three proposals from Cornwell Engineering, Metro Consulting Associates, and Black & Veatch.[50] A letter dated June 28, 2021 from Abonmarche to the Benton Harbor city manager noted that a team had reviewed the three proposals and made a recommendation to select the proposal from Cornwell Engineering.[51]

Benton Harbor again exceeded the lead action level in the January to June 2021 sampling period. Its reported 90th percentile for this sampling period was 24 parts per billion with a reported range of results from 0 to 889 parts per billion.[52] On May 18, 2021, Benton Harbor issued another boil water advisory due to a chemical feed interruption in the water treatment process.[53]

## IV.   Lead in the Benton Harbor public water system presents an imminent and substantial endangerment to public health

### A.  *High levels of lead are present and are likely to continue to enter Benton harbor drinking water*

Since originally discovered in 2018, Benton Harbor has continuously detected levels of lead in drinking water well above the federal action level of 15 parts per billion in every sampling period.

//

//

//

//

//

---

[49] City of Benton Harbor Request for Proposal, Benton Harbor Corrosion Optimization Study (April 19, 2021), (attached as Exhibit 26), *available at* https://drive.google.com/file/d/1HU6CtFIY2G-HhjHcYfUdYPmN0Rpc8Pjt/view?usp=sharing.
[50] Email from Jason Marquardt, Abonmarche on behalf of Benton Harbor, to Benton Harbor and EGLE Staff (May 13, 2021), (attached as Exhibit 27), *available at* https://drive.google.com/file/d/18k9mXVDG5AkQ_iRxy94Ba_Xc8IIkTxuk3/view?usp=sharing.
[51] Letter from Jason Marquardt, Abonmarche, to Ellis Mitchell, Benton Harbor City Manager (Jun. 28, 2021), (attached as Exhibit 28), *available at* https://drive.google.com/file/d/1CC6_HzaW0quhtROrCmXD_IAcFmovhlq_/view?usp=sharing.
[52] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (Aug. 3, 2021), (attached as Exhibit 29), *available at* https://drive.google.com/file/d/1HZfC-97KsJUQveQl0HZsxs97Ps1I90aII/view?usp=sharing.
[53] Benton-Michiana Spirit News, Attention: Boil Your Water Before Using, May 18, 2021, *available at* https://bentonspiritnews.com/attention-boil-your-water-before-using-p6704-164.htm

10

| Table 1 - Reported Results of Lead Tap Samples in Benton Harbor by Sampling Period | | | |
|---|---|---|---|
| **Sampling Period** | **90th Percentile (in parts per billion)** | **Number of Sites Above Action Level** | **Range of Sample Results (in parts per billion)** |
| 6/1/2018 – 9/30/2018 | 22 | 8 | 0 - 60 |
| 1/1/2019 - 6/30/2019 | 27 | 12 | 0 - 59 |
| 7/1/2019 - 12/31/2019 | 32 | 10 | 0 - 72 |
| 1/1/2020 - 6/30/2020 | 23 | 9 | 0 - 440 |
| 7/1/2020 - 12/31/2020 | 24 | 11 | 0 - 240 |
| 1/1/2021 - 6/30/2021 | 24 | 11 | 0 - 889 |

Notably, high levels of lead in drinking water have continuously been present in the water system despite Benton Harbor introducing the Carus 8600 polyphosphate inhibitor in March 2019 and then changing its inhibitor and increasing the dosage in February 2020. While Benton Harbor may have selected a contractor to perform a corrosion control study by the date of this Petition, doubts have been expressed about whether or not the $50,000 budget for that study is adequate to confidently determine what the optimal corrosion control treatment for the water system is.[54] Even if the study is able to confidently determine optimal corrosion control treatment, it may take as many as 18 months to complete. Once the study is completed, EGLE will need time to review the study and make a determination regarding its optimal corrosion control treatment designation. Benton Harbor would then be required to install the control treatment within 12 months of EGLE's designation.[55] Assuming the corrosion control study began on August 1, 2021, the corrosion control study may not be completed until the end of January 2023. Subsequently, EGLE will be required to designate optimal corrosion control treatment by July 2023 and Benton Harbor will be required to install the designated treatment no later than July 2024. And of course, lead levels may not be substantially reduced for some time after corrosion control is installed. As such, under the timeline envisioned by EGLE, Benton Harbor residents are likely to live with elevated lead contamination in their tap water for over six years.

---

[54] Email from David Koch, Black & Veatch, to Ernest Sarkipato, EGLE Surface Water Treatment Specialist (Mar. 24, 2021), (attached as Exhibit 25).
[55] Mich. Admin. Code R, 325.10604f(2)(e)(iv).

EGLE_0019799

*B.  Lead in drinking water presents an imminent and substantial endangerment to Benton Harbor residents*

The endangerment to Benton Harbor residents from lead in drinking water is both "imminent" and "substantial."[56] The endangerment to residents' health is imminent because the threat "is present *now*."[57] Lead service lines are pervasive throughout Benton Harbor. For the past three years, both the City of Benton Harbor and EGLE have been unable to identify an adequate solution to effectively minimize lead contamination in the water system. Instead, as shown in Table 1 above, the 90th percentile of lead tap samples for the most recent sampling period was *higher* than the 90th percentile that first exceeded the action level in 2018. There is also no reasonable assurance that lead levels will decrease anytime in the near future. EGLE has required Benton Harbor to conduct a corrosion control study that is compliant with the lead and copper rule. However, as discussed in more detail in section V, the process for Benton Harbor to complete the study, for EGLE to review the study and designate optimal corrosion control treatment, and for Benton Harbor to install the designated treatment could take up to 36 months per the Michigan lead and copper rule.

The situation in Benton Harbor is at least as extreme, and could be more extreme, than the case of Clarksburg, West Virginia, where EPA recently issued an Emergency Administrative Order on July 14, 2021 under section 1431 of the Safe Drinking Water Act. In the Clarksburg case, EPA noted water sampling at about 3 sites showed very high lead levels and a lack of data on how widespread lead service lines are in the community. The Agency appropriately found that "[t]aken together, the known presence of lead in samples and in the lead service lines and the unknown extent of lead service lines within the system that could be impacting other residences presents an imminent and substantial endangerment to the health of all consumers of water provided by the System."[58] Benton Harbor is the only water system in Michigan to have 6 consecutive lead action level exceedances according to data beginning in 2011. There are at least 61 samples to date which are well in excess of the EPA lead action level, including some over 100 ppb, and there are hundreds of known or suspected lead service lines. We note that Clarksburg has a 92 percent white population,[59] while Benton Harbor has a population of about 90 percent people of color.[60]

The seriousness of the potential harms from lead exposure renders the endangerment "substantial" for purposes of the Safe Drinking Water Act, 42 U.S.C. § 300i and 42 U.S.C. § 300j-1(b). The serious effects of lead exposure have been well documented.[61] Effects of lead exposure are particularly serious for children. As noted by the Centers for Disease Control and

---

[56] 42 U.S.C. § 300i; 42 U.S.C. § 300j-1(b).
[57] *Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 486 (1996) (interpreting substantial-and-imminent-endangerment provision in RCRA).
[58] EPA Region III, Emergency Administrative Order. In the Matter of Clarksburg Water Board, Respondent. Docket No. CWA-03-2021-0110DS, July 14, 2021, paragraph 31 (attached as Exhibit 47).
[59] U.S. Census Bureau, "Quick Facts: Clarksburg, WV," https://www.census.gov/quickfacts/clarksburgcitywestvirginia
[60] U.S. Census Bureau, "Quick Facts: Benton Harbor, MI." https://www.census.gov/quickfacts/fact/table/bentonharborcitymichigan/PST045219
[61] 80 Fed. Reg. 278, 290 (Jan. 5, 2015) ("Lead has been demonstrated to exert a broad array of deleterious effects on multiple organ systems.").

12

EGLE_0019800

Prevention, "[e]ven low levels of lead in blood have been shown to affect IQ, ability to pay attention, and academic achievement" in a manner that is irreversible.[62] The scientific community has not identified *any* threshold of lead in blood below which there are no adverse health effects.[63]

Indeed, EPA itself recently noted when issuing its Emergency Administrative Order under SDWA section 1431 in Clarksburg, West Virginia that excessive lead in drinking water poses an imminent and substantial endangerment. The agency pointed out,

> EPA has established a Maximum Contaminant Level Goal (MCLG) of zero for lead because: (1) there is no clear threshold for some noncarcinogenic lead health effects; and (2) a substantial portion of the sensitive population already exceeds acceptable blood lead levels. (56 Fed. Reg. 26467).

> Health effects associated with exposure to inorganic lead and compounds include, but are not limited to: neurotoxicity, developmental delays, hypertension, impaired hearing acuity, impaired hemoglobin synthesis, and male reproductive impairment. Importantly, many of lead's health effects may occur without overt signs of toxicity. Lead has particularly significant effects in children, well before the usual term of chronic exposure can take place. (https://iris.epa.gov/static/pdfs/0277_summary.pdf -- IRIS Chemical Assessment Summary for Lead).[64]

Increased lead exposure from drinking water is a "substantial" endangerment because drinking water can make up 20 percent or more of a person's total exposure to lead.[65] For infants whose diet consists of baby formula made with tap water, lead in drinking water can make up 40 to 60 percent of total lead exposure.[66] In drinking water systems where lead levels exceed the lead action level, such as Benton Harbor, researchers have identified a correlating increase in the rate of individuals with elevated blood lead levels.[67] However, consuming water with lead contamination at levels below the federal lead action level may still cause adverse health effects. This is particularly true for children. The EPA has concluded that even low levels of lead in the blood of children can result in behavior and learning problems, lower IQ and hyperactivity, slowed growth, hearing problems, and anemia.[68]

There are a number of reasons to be concerned about the health impacts associated with the long-term and continuing exposure of Benton Harbor residents to high levels of lead in

---

[62] Centers for Disease Control and Prevention, *Blood Lead Levels in Children*, https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last viewed April 5, 2021) (attached as Exhibit 30).
[63] *Id.*
[64] EPA Clarksburg AO, *supra* note 54, paragraphs 21-22 (paragraph numbers omitted).
[65] U.S. EPA, Basic Information about Lead in Drinking Water, https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last viewed Aug. 24, 2021) (attached as Exhibit 31).
[66] *Id.*
[67] Ronnie Levin, et al., *Lead Exposures in U.S. Children, 2008: Implications for Prevention,* 116(10) Environ. Health Perspect. 1285 (2008), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2569084/ (attached as Exhibit 32).
[68] U.S. EPA, *Basic Information about Lead in Drinking Water,* https://www.epa.gov/ground-water-and-drinking-water/basic-information-about-lead-drinking-water (last visited Aug. 24, 2021) (attached as Exhibit 31).

13

drinking water. As noted in Table 1, Benton Harbor's water system significantly exceeded the lead action level in each of the previous six sampling periods dating back to the summer of 2018. Further, the maximum levels of lead detected through tap monitoring have been disturbingly high. In the most recent sampling period, one tap sample found lead at a concentration of 889 parts per billion, nearly 60 times the federal action level. The available documents indicate that lead contamination in Benton Harbor's drinking water is a persistent, widespread, and severe public health crisis that rises to the level of "substantial" endangerment.

While the presence of the high levels of lead found in the Benton Harbor water system since the summer of 2018 would amount to a "substantial" endangerment in any community, Benton Harbor's status as an environmental justice community is a compounding factor that increases the severity of this present public health crisis. This is particularly true for children. One study has noted that "[c]hildhood lead exposure is a reflection of community predictors, such as poverty rates and age of housing."[69]

Regarding poverty rates, it has been found that children from low-income families are at greater risk of the negative health effects associated with lead exposure, such as lower cognitive test scores, smaller cortical volumes, and smaller cortical surface areas, when compared to children from high-income families.[70] Benton Harbor's poverty rate is 45%, making a substantial portion of its population particularly vulnerable to the negative health effects associated with lead exposure. Regarding age of housing, lead paint was not banned in the United States until 1978. People living in housing built before this date are at increased risk of lead exposure from deteriorating lead paint. Of the 4,143 occupied housing units in Benton Harbor, approximately 71% were constructed in 1979 or earlier.[71] Housing built before 1960 has "five to eight times the prevalence of hazards compared with units built between 1960 and 1978."[72] Approximately 50% of Benton Harbor's housing was constructed in 1959 or earlier.[73] Housing and income are interconnected factors regarding the prevalence of lead-based paint hazards. Low-income households are generally subjected to higher rates of lead-based paint hazards compared to middle and upper income households.[74] Rental units also have a higher prevalence of lead-based paint hazards compared to owner-occupied units; 64% of Benton Harbor's housing units are renter-occupied.[75]

---

[69] Andrew Marshall, et al., *Association of lead-exposure risk and family income with childhood brain outcomes*, 26 Nature Medicine 91 (Jan. 2020) (attached as Exhibit 33).

[70] *Id.*

[71] United States Census Bureau, *Year Structure Built, Table B25034, Benton Harbor, Michigan, American Community Survey 5-Year Estimates 2015-2019* (attached as Exhibit 34).

[72] David E. Jacobs, et al., *The Prevalence of Lead-Based Paint Hazards in U.S. Housing*, 110 (10) Environmental Health Perspectives A599, A601-A602 (Oct. 2002). (attached as Exhibit 35), *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/ehp.021100599.

[73] United States Census Bureau, *Year Structure Built, Table B25034, Benton Harbor, Michigan* (attached as Exhibit 34).

[74] David E. Jacobs, et al., *The Prevalence of Lead-Based Paint Hazards in U.S. Housing*, 110 (10) Environmental Health Perspectives A599, A601-A602 (Oct. 2002). (attached as Exhibit 35), *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/ehp.021100599.

[75] United States Census Bureau, *Selected Housing Characteristics, Table DP04, Benton Harbor, Michigan, American Community Survey 5-Year Estimates 2015-2019*, (attached as Exhibit 36); David E. Jacobs, et al., *The Prevalence of Lead-Based Paint Hazards in U.S. Housing*, 110 (10) Environmental Health Perspectives A599, A602 (Oct. 2002), (attached as Exhibit 35), *available at* https://ehp.niehs.nih.gov/doi/pdf/10.1289/ehp.021100599.

14

EGLE_0019802

Benton Harbor's water quality and public health concerns are not limited to lead in paint and water. In July 2021, Benton Harbor initiated an elevated water storage tank rehabilitation project that included sandblasting the tank surface, with encapsulation to prevent particulate matter release in the community. The need for tank rehabilitation and replacement was identified in a 2008 inspection, and the rehabilitation was not initiated until 13 years later. The inspection report is clear about the need to replace the tank. Not only is Benton Harbor sinking its very limited funding into an outdated tank that is likely contributing to ongoing poor water quality in the community, these funds are no longer available for the tank replacement that was already needed years ago. Although EGLE states that any lead paint on the tank surface was remediated in the 1990s and that current air quality monitoring indicates no concerns of lead release from the sandblasting work, no data have been provided to substantiate these statements.

Additionally, Benton Harbor's public water system has experienced a high amount of turnover among key management personnel. Four different individuals have served as the Operator-In-Charge during the past year. The Operator-In-Charge as of June only holds the F-1 certification, and does not hold the necessary certification to operate Benton Harbor's distribution system. The lack of expertise, training, mentorship, and longevity means that Benton Harbor must overcome even greater barriers than most water utilities as it works to address the lead emergency and provide for basic operations and water quality maintenance.

In summary, Benton Harbor community members are not only living with high levels of lead in their drinking water. They have also very likely experienced high levels of lead exposure from lead paint in older, primarily renter-occupied housing units, and lead from the water tower project. The persistent discovery of high levels of lead in their drinking water adds another layer of lead exposure. Further, Benton Harbor's low-income residents, which make up 45% of the population, may be uniquely vulnerable to the negative health effects associated with lead exposure.

Benton Harbor is not just a low-income community. It is a majority Black city, with 90% of its residents being people of color. The story of Benton Harbor's Black population is a familiar one throughout the Midwest. In the 1960's, as Benton Harbor's Black population rapidly grew, its White population declined just as rapidly. In that decade, Benton Harbor's White population decreased from 14,290 in 1960 to 6,707 in 1970, a more than 50 percent decrease; during the same time, Benton Harbor's Black population increased from 4,846 to 9,774.[76]

Black residents coming to Benton Harbor faced discrimination in multiple facets of life. In housing, the Benton Harbor Housing Commission segregated public housing by operating one housing project for Black residents and another for White residents. It also refused admission to Black veterans to its veterans housing project solely on the basis of race.[77] Racial segregation in schools was also very prevalent throughout Benton Harbor and the surrounding region. In 1952,

---

[76] Tiffany Anne Loftus Butzbaugh, *A Socio-Historical Analysis of the Benton Harbor, Michigan Desegregation Case between 1967 and 1981*, 60 (Aug 2003). (attached as Exhibit 37), *available at* https://scholarworks.wmich.edu/cgi/viewcontent.cgi?article=2215&context=dissertations
[77] *Berry v. School Dist.*, 442 F. Supp. 1280, fn. 32 (1977) (attached as Exhibit 38).

EGLE  0019803

65 Black students were refused entry to two primarily White public schools.[78] In 1960, a 200 unit low-rent housing project in the Bard School District was approved despite the fact that the Bard School was already significantly overcrowded.[79]

In response to pervasive discrimination in public schools, in 1967 a group of Black Benton Harbor children brought a class action lawsuit against the Benton Harbor Area School District alleging that there right to equal protection under the 14th Amendment of the United States Constitution had been violated by a series of decisions by the school district meant to segregate students based on their race. The court found that the school district was guilty of intentionally acting to segregate public schools on the basis of race through a number of actions. The District assigned Black teachers to identifiably Black schools and allowed White teachers to freely transfer out of such schools. As a result, Black students were taught by a higher percentage of teachers without degrees or without prior teaching experience. Teachers in Black schools were also paid "significantly lower" salaries than teachers in White schools.[80] Black schools also suffered from overcrowding, severe physical dilapidation, and a complete lack of library facilities.[81]

Based on these actions, a federal court stated that it was "left with the firm impression that there was pervasive and purposeful segregation" in the Benton Harbor Area School District and its predecessors.[82] As such, the court found the Benton Harbor Area School District guilty of "acts of de jure segregation" concluding that there were actions by the school district that "cannot be explained except by ascribing to them a deliberate, conscious intent on the part of the Board to segregate public school pupils on the basis of race."[83] The court also concluded that this discrimination "set the stage for the exodus of White families from the district to the extent that the district is nearly 75 percent Black at this time."[84]   In the end, the court concurred with the education director of the Southern Christian Leadership Conference in that the racial discrimination and segregation in Benton Harbor's schools was "only paralleled by some school disctricts...in...Southern communities, which are looked upon as being depressing for black children."

Benton Harbor did not become a majority Black city by happenstance. It is a product of longstanding, pervasive, and intentional racial discrimination and segregation meant to restrict where Black residents could live and go to school. This racial discrimination has had numerous cascading effects, both for Benton Harbor as a community and for its residents. Through government action, Benton Harbor's Black residents were forced into segregated, dilapidated housing and into overcrowded schools. The history of segregation in the Benton Harbor region persists to this day. The Niles-Benton Harbor metro area has been ranked as the fifth most

---

[78] *Id*. at 1298.
[79] *Id*.
[80] *Id*. at 1302.
[81] *Id*. at 1300-1307.
[82] *Id*. at 1299.
[83] *Id*. at 1335.
[84] *Id*.

16

segregated metro area in the country.[85] The region continues to have one of most segregated public school systems in the country.[86] It has one of the worst disparities regarding high school attainment, with an attainment rate of 92.1% for majority-White neighborhoods and only 72.4% for majority-Black neighborhoods.

Now, the history of racial discrimination and segregation in the Benton Harbor metro-area is manifesting itself with its majority Black population being subjected to high levels of lead in drinking water for a prolonged period of time. At least partially due to historical race-based discrimination and segregation, Black and Hispanic neighborhoods such as those in Benton Harbor and throughout the United States have exhibited "extraordinarily high rates of lead toxicity compared to White neighborhoods."[87] Such lead toxicity is "a source of ecological inequity by race and a pathway through which racial inequity literally gets into the body."[88]

Benton Harbor's status as an environmental justice community is not simply a fact to be noted. It means its residents, many of whom are people of color and lower income, are uniquely at risk of being exposed to high levels of lead in their neighborhoods as well as uniquely vulnerable to the serious health consequences of lead exposure. The elevated levels of lead exposure and health vulnerabilities for people of color are not accidental. Instead, they are present byproducts of intentional racial discrimination and segregation that persist to this day. Given the high levels of lead that continue to exist in Benton Harbor's drinking water and Benton Harbor's status as an environmental justice community, the Petitioners believe there is more than ample evidence for the EPA to conclude that the lead present in the City's drinking water presents an imminent and substantial endangerment to the health of its residents. The predominantly Black Benton Harbor residents deserve at least as much EPA protection from this lead threat in their tap water as do the predominantly white residents of Clarksburg, West Virginia.

## V.     EGLE and Benton Harbor's actions to address the high lead levels in drinking water have been grossly inadequate and have been in violation of the federal and Michigan lead and copper rule

Federal emergency action is necessary to protect Benton Harbor residents from imminent and substantial endangerment because neither the City nor EGLE have adequately addressed the danger to residents from lead in their drinking water. What actions the City and EGLE have taken to date have been ineffective. Further, both Benton Harbor and EGLE have failed to comply with requirements of both the federal and state lead and copper rule, including the

---

[85] Evan Comen, *Detroit, Chicago, Memphis: The 25 most segregated cities in America*, USA Today (July 20, 2019), (attached as Exhibit 39), *available at* https://www.usatoday.com/story/money/2019/07/20/detroit-chicago-memphis-most-segregated-cities-america-housing-policy/39703787/
[86] *Id.*
[87] Robert J. Sampson and Alix S. Winter, *The Racial Ecology of Lead Poisoning: Toxic Inequality in Chicago Neighborhoods, 1995-2013*, Du Bois Review: Social Science Research on Race, 19 (Winter 2016), (attached as Appendix 40), *available at* https://scholar.harvard.edu/files/alixwinter/files/sampson_winter_2016.pdf.
[88] *Id.*

17

requirement to implement the corrosion control treatment steps, the lead service line replacement requirement, and the tap monitoring requirement.


A.      *Corrosion Control Treatment Steps*


As a medium-sized water system with no corrosion control prior to its first lead action level exceedance, Benton Harbor's lead action level exceedance triggered the corrosion control treatment steps described in Michigan's lead and copper rule, Mich. Admin. Code, R 325.10604f(2)(e). The corrosion control treatment steps establish actions that both Benton Harbor and EGLE must take, as well as specific deadlines to ensure lead contamination in the drinking water system is reduced in a timely fashion. Notably, Michigan amended its lead and copper rule, including the corrosion control treatment step provisions, to require water systems to implement the steps on a faster timeline than required by the federal lead and copper rule. Table 2 describes the corrosion control steps as well as the deadlines for each step, as provided in both the federal and Michigan lead and copper rule.

| Table 2 - Corrosion Control Treatment Steps | | | |
|---|---|---|---|
| **Michigan LCR** | | **Federal LCR (2020)** | |
| Step 1 - Supply shall recommend optimal corrosion control treatment<br><br>Deadline - Within 6 months of end of monitoring period with LALE (6/30/19) | | Step 1 - Supply shall recommend optimal corrosion control treatment<br><br>Deadline - Within 6 months of end of monitoring period with LALE (6/30/19) | |
| Step 2a. EGLE may require system to perform corrosion control study<br><br>Deadline: Within 12 months of end of monitoring period with LALE (1/1/20) | Step 2b. EGLE may designate optimal corrosion control treatment<br><br>Deadline: Within 12 months of end of monitoring period with LALE exceedance (1/1/20) | Step 2a. EGLE may require system to perform corrosion control study<br><br>Deadline: Within 12 months of end of monitoring period with LALE (1/1/20) | Step 2b. EGLE may designate optimal corrosion control treatment<br><br>Deadline: Within 18 months of end of monitoring period with LALE exceedance (6/30/20) |
| Step 3 - If required, water system must perform corrosion control study | Skip to Step 5 | Step 3 - If required, water system must perform corrosion control study | Skip to Step 5 |

18

| | | | |
|---|---|---|---|
| Deadline: Within 12 months Step 2a (1/1/21)<br><br>Step 4 - EGLE shall designate optimal corrosion control treatment<br><br>Deadline: Within 6 months of completion of study (6/30/21) | | Deadline: Within 18 months Step 2a (6/30/21)<br><br>Step 4 - EGLE shall designate optimal corrosion control treatment<br><br>Deadline: Within 6 months of completion of study (1/1/22) | |
| Step 5a - Supply shall install corrosion control treatment<br><br>Deadline: Within 12 months after designation in step 4 (1/1/22) | Step 5b - Supply shall install corrosion control treatment<br><br>Deadline: Within 12 months of designation in Step 2b (1/1/21) | Step 5a - Supply shall install corrosion control treatment<br><br>Deadline: Within 24 months after designation in step 4 (1/1/24) | Step 5b - Supply shall install corrosion control treatment<br><br>Deadline: Within 24 months of designation in Step 2b (6/30/22) |
| Step 6a - Supply shall complete follow up sampling<br><br>Within 24 months after designation in Step 4 (1/1/23) | Step 6b - Supply shall complete follow up sampling<br><br>Deadline: Within 24 months after designation in Step 2b (1/1/22) | Step 6a - Supply shall complete follow up sampling<br><br>Within 36 months after designation in Step 4 (1/1/27) | Step 6b - Supply shall complete follow up sampling<br><br>Deadline: Within 36 months after designation in Step 2b (6/30/25) |
| Step 7a - EGLE shall designate WQP for system<br><br>Deadline: Within 6 months of completion of follow up sampling in 6a (6/30/23) | Step 7b - EGLE shall designate WQP for system<br><br>Deadline: Within 6 months of completion of follow up sampling in 6b (6/30/22) | Step 7a - EGLE shall designate WQP for system<br><br>Deadline: Within 6 months of completion of follow up sampling in 6a (6/30/27) | Step 7b - EGLE shall designate WQP for system<br><br>Deadline: Within 6 months of completion of follow up sampling in 6b (1/1/26) |

EGLE has not implemented the corrosion control steps in compliance with the deadlines required by Michigan's lead and copper rule and has made several decisions that go against EPA guidance.

19

EGLE_0019807

EGLE impermissibly delayed requiring Benton Harbor to conduct a fully compliant corrosion control study. Michigan's corrosion control treatment steps gave EGLE two options: either require Benton Harbor to perform a corrosion control study or designate optimal corrosion control treatment for the water system.[89] The EPA has provided guidance to assist states in determining whether a corrosion control study is warranted or not. That guidance recommends that a state agency require all systems with lead service lines to conduct a corrosion control study.[90] If a corrosion control study is required, it must comply with the requirements described in Mich. Admin. Code R, 325.10604f(3)(c).[91]

In regards to Benton Harbor, EGLE neither designated optimal corrosion control treatment nor did it require a fully compliant corrosion control study. While EGLE did approve Benton Harbor to implement corrosion control treatment in February 2019, and later ordered Benton Harbor to change its corrosion control treatment in February 2020, there is no indication that these treatments were formally designated as the "optimal corrosion control treatment." Further, neither treatment was studied by EGLE or Benton Harbor before being introduced to the water system. This is in direct contravention with EPA guidance, which states that blended phosphates, such as that used in Benton Harbor's water system, "should be used with caution."[92] This is because the "lead corrosion scale may not be as robust as the scale created by orthophosphate and, thus, may be more susceptible to physical disturbances and low water use conditions."[93] As such, the EPA recommends a demonstration study, additional monitoring, or both for systems that recommend blended phosphates to control lead release.[94] These concerns were expressly raised by the Great Lakes Environmental Law Center in a November 2019 letter sent to EGLE.[95] In response, EGLE stated that monitoring data showed the blended phosphate was working to reduce lead contamination. In fact, the July to December 2019 sampling period had the highest 90th percentile for lead samples for any of Benton Harbor's sampling periods.

EGLE also did not require Benton Harbor to conduct a fully compliant corrosion control study until February 2020. In its February 13, 2020 letter, EGLE noted that Benton Harbor was required to have a third-party consultant submit a corrosion control study proposal in compliance with the LCR within 6 months of its change in treatment. However, Benton Harbor's submission of a corrosion control study has been delayed numerous times. A request for proposals for the study was not issued until April 2021 with the winning bid to be selected in the summer of 2021.

There are two concerning issues regarding Benton Harbor's corrosion control study. First, concerns have been raised about the scope of the corrosion control study. As noted by one

---

[89] Mich. Admin. Code R, 325.10604f(2)(e)(ii).
[90] U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems, 53 (March 2016), (attached as Exhibit 41), *available at* https://www.epa.gov/sites/default/files/2019-07/documents/occtmarch2016updated.pdf.
[91] Mich. Admin. Code R. 325.10604f(3)(b).
[92] U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems, 4 (March 2016), (attached as Exhibit 41), *available at* https://www.epa.gov/sites/default/files/2019-07/documents/occtmarch2016updated.pdf
[93] *Id.* at 48.
[94] *Id.* at 49.
[95] Letter from Great Lakes Environmental Law Center to Eric Oswald, Drinking Water and Environmental Health Division Director (Nov. 6, 2019), (attached as Exhibit 13), *available at* https://drive.google.com/file/d/1jp4ut6cl3nWEPLguUtIIVEK1p4A_sCcuG/view?usp=sharing.

EGLE 0019808

of the bidders, the $50,000 budget is not enough to perform an adequate study.[96] Second, EGLE impermissibly delayed requiring a fully compliant corrosion control study in violation of the Michigan and federal lead and copper rule. The corrosion control treatment steps each have specific deadlines associated with them to ensure that timely action is being taken to lower lead contamination in drinking water. Michigan's lead and copper rule, promulgated after the Flint water crisis, established shorter deadlines than those found in the federal lead and copper rule. Under the Michigan rule, Benton Harbor was to complete a fully compliant corrosion control study no later than January 1, 2021; under the federal rule, no later than June 30, 2021.[97] Instead, Benton Harbor is *just beginning* to conduct a corrosion control study that may not be in full compliance with the lead and copper rule in August 2021.[98] By the terms of the request for proposals, the study may take 18 months to complete.[99] EGLE will then have to review the results of the study and designate optimal corrosion control treatment.[100] Benton Harbor then would have 12 months to install the optimal corrosion control treatment.[101] Assuming there are no other delays, it is reasonable to expect Benton Harbor's high levels of lead contamination to continue for at least the next *36 months.*

EPA guidance recommends that water systems with lead service lines be required to complete a corrosion control study that is fully compliant with the lead and copper rule. Rather than do this, EGLE authorized Benton Harbor to introduce an untested blended polyphosphate inhibitor, which EPA guidance also cautions against. EGLE never designated optimal corrosion control treatment and only required a corrosion control study compliant with the Michigan lead and copper rule nearly three years after high levels of lead contamination were discovered. Per the plain language of Michigan's lead and copper rule and EPA guidance, EGLE should have quickly required Benton Harbor to conduct a fully compliant corrosion control study, and Benton Harbor should have completed that study by the beginning of 2021. Instead, Benton Harbor is just beginning its study, and its residents are enduring their fourth year of documented high lead contamination in their drinking water with no end in sight.

### B.      Lead Service Line Replacement Requirement

In addition, there are concerns that Benton Harbor has not complied with the requirement to annually replace 7 percent of its lead service lines. According to both the federal and

---

[96] *Supra,* note 46, Email from David Koch, Black & Veatch, to Ernest Sarkipato, EGLE Surface Water Treatment Specialist (Mar. 24, 2021), (attached as Exhibit 25).

[97] *Supra,* Table 2.

[98] In its February 13, 2020 letter to Ellis Mitchell, EGLE did require Benton Harbor to conduct a corrosion control study that is fully compliant with the Michigan lead and copper rule. *See,* Letter from Brandon Onan, EGLE Supervisor of Lead and Copper Unit, to Ellis Mitchell, Benton Harbor City Manager, 1 (Feb. 13, 2020) (attached as Exhibit 16). However, to date the Petitioners have not received a copy of the corrosion control study proposal that was selected by the City of Benton Harbor pursuant to its Request for Proposals issued April 19, 2021 and therefore we cannot assess whether or not any corrosion control study proposal that may have been selected complies with the federal and Michigan lead and copper rule.

[99] City of Benton Harbor Request for Proposal, Benton Harbor Corrosion Optimization Study (April 19, 2021) (attached as Exhibit 26).

[100] Mich. Admin. Code R, 325.10604f(2)(e)(iii).

[101] Mich. Admin. Code R, 325.10604f(2)(e)(iv).

EGLE_0019809

Michigan lead and copper rule, a water system that has installed corrosion control and exceeds the lead action level must annually replace 7 percent of its lead service lines.[102] Benton Harbor installed corrosion control in March 2019 and then exceeded the lead action level during the sampling period concluding at the end of June 2019. Therefore, beginning on July 1, 2019, Benton Harbor was required to annually replace 7 percent of its lead service lines. For the purposes of this requirement, a lead service line is considered not only any lead service line, but also any galvanized service line previously connected to lead.[103] In its preliminary distribution system materials inventory, Benton Harbor has stated that its water system includes 3,011 service lines that are either known lead service lines, known galvanized lines previously connected to lead, or service lines of unknown material that likely contain lead.[104] To date, Benton Harbor has only replaced 186 service lines since its first lead action level exceedance.[105] Benton Harbor should be replacing 210 service lines *per year* in accordance with the federal and Michigan lead and copper rule meaning at least 420 lead service lines should have been replaced by July 1, 2021.

### C.   *Tap Monitoring Requirement*

In conducting tap sampling in the January – June 2021 monitoring period, Benton Harbor took actions that lowered the 90th percentile of lead samples collected during the sampling period. In general, EGLE has required Benton Harbor to collect tap samples from 60 sites per each sampling period since it first exceeded the lead action level. Benton Harbor finished collecting samples at 64 sites by May 18, 2021, meeting its regulatory required number of samples. The 90th percentile of data collected at the first 64 sample sites was 33 ppb. Samples were collected at an additional 14 sites after that date. When all 78 samples are used for the compliance calculation, the 90th percentile of sample results was 24 ppb. We have substantial questions about whether Benton Harbor's sampling, and the dilution of the initial compliance samples with these additional samples, comply with state and federal lead and copper rule monitoring requirements.

## VI.   **EPA should take immediate action to address the public health emergency created by high lead levels in the Benton Harbor public water system.**

On July 19, 2021 the Benton Harbor Community Water Council (BHCWC) reached out to the EPA Region 5 Acting Regional Administrator and other EPA staff seeking their help in solving Benton Harbor's immediate water infrastructure concerns and ongoing lead in drinking water emergency.[106] The Acting Regional Administrator and other Region 5 and EGLE staff met virtually with BHCWC and other petitioners on August 4, 2021 to hear the concerns about

---

[102] 40 C.F.R. 141.84(b) (2020).

[103] Mich. Admin. Code R. 325.10604f

[104] Michigan Department of Environment, Great Lakes, and Energy, *Michigan Service Line Materials Estimates Preliminary Distribution System Materials Inventories*, last updated Dec. 2020, (attached as Exhibit 1), *available at* https://www.michigan.gov/documents/egle/egle-dwehd-PDSMISummaryData_682673_7.pdf

[105] Email from Francie Kline, EGLE DWEHD FOIA Liaison, to Nicholas Leonard (Aug. 25, 2021), (attached as Exhibit 42).

[106] Letter from Benton Harbor Community Water Council to Eric Oswald, EGLE (Jul. 19, 2021), (attached as Exhibit 48).

EGLE_0019810

EGLE's oversight of infrastructure programs and their response to the lead in drinking water emergency. On August 3, 2021, EGLE issued the City of Benton Harbor a notice that its water system had exceeded the lead action level for a sixth consecutive monitoring period with a 90th percentile value of 24 ppb.[107]

Despite the news about the sixth consecutive lead action level exceedance, neither EGLE staff nor Region 5 staff informed the August 4, 2021 meeting participants of this information. Further, Benton Harbor petitioners have been unable to determine how this notification was disseminated to residents and, more importantly, why there hasn't been an escalating emergency response from the city, the state, and EPA after more than three years of high lead levels found in the city's compliance sampling in a city where most residences are believed to have lead service lines. Instead, as lead levels have persisted in Benton Harbor, the urgency of the governments' response has decreased.

On August 9, 2021 BHCWC sent a follow-up letter to Region 5 reiterating the specific actions necessary to protect Benton Harbor residents that were discussed with the agency during the August 4 meeting.[108]

On August 30, nearly a month after the residents' meeting with EPA and EGLE and after two urgent follow-up emails from BHCWC, EPA responded to BHCWC's plea for emergency action. Shockingly, Region 5's response endorsed the State of Michigan's grossly inadequate response to this environmental justice community's ongoing exposure to high levels of lead in its drinking water. Instead of waging a public health campaign they waged a public relations campaign.[109]

Among other concerns with Region 5's response to BHCWC's letter was this statement:

*Berrien County Health Department (BCHD), with funding from the Michigan Department of Health and Human Services, is leading the effort to distribute water filters in Benton Harbor. Based upon a conversation with Mr. Jeffrey Sims of BCHD, a sufficient supply of water filters and replacement cartridges are available at no cost to all residents of Benton Harbor. BCHD provides several options for obtaining water filters and replacement cartridges as explained on BCHD's website, as well as distribution and outreach at the weekly Farmers Market in downtown Benton Harbor (Wednesdays mid-June to mid-September, 10 am to 3 pm). Mr. Sims also noted appreciation for your previous assistance with lead in drinking water outreach, and an openness to future partnerships. EPA encourages the Benton Harbor Community Water Council and other organizations to contact BCHS on a partnership to facilitate water filter distribution to Benton Harbor residents. EPA remains committed to protecting public health and*

---

[107] Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (Aug. 3, 2021), (attached as Exhibit 29), *available at* https://drive.google.com/file/d/1HZfC-97KsJUQveQl0HZsxs97Ps1l90aH/view?usp=sharing.

[108] Letter from Benton Harbor Community Water Council to Cheryl Newton, U.S. EPA Region 5 Acting Regional Administrator (Aug. 9, 2021), (attached as Exhibit 49).

[109] Letter from Alan Walts, U.S. EPA, Region 5, Director of Tribal and Multi-media Programs Office, to Reverend Edward Pinkney, President, Benton Harbor Community Water Council (Aug. 30, 2021), (attached as Exhibit 50).

EGLE_0019811

*assuring compliance with the SDWA. We will continue to monitor this situation and stay in communication with our state partners at EGLE, and encourage as a next step for you to reach out to BCHD to explore ways to encourage and promote the existing programs for filter distribution in your community.*

Highlighted below are some of the problems with Region 5's relying upon BCHD to characterize the filter program:

1) Benton Harbor residents are not fully aware of the community's drinking water emergency because there has not been a proactive and comprehensive effort to inform residents of the high levels of lead in their water. News coverage of the seriousness of this problem has appeared behind a paywall in the Detroit News.[110]

2) Volunteers with BHCWC have gone door-to-door to inform residents of the emergency, which has helped spread the word about the drinking water emergency. However, given the ongoing lead exposure, this effort warrants official mobilization to help residents protect themselves from the high levels of lead in their drinking water.

3) If there has been a sufficient supply of water filters at the BCHD, the agency should have been willing to share unlimited filters and replacement cartridges with BHCWC, which has been and is willing to go door-to-door to distribute cartridges and educate residents about how to install and maintain the filters. Instead, BHCWC has never received filters for distribution to residents.

4) According to the U.S Census Bureau, only 58% of Benton Harbor residents had access to broadband internet between 2015 and 2019.[111]

5) For the 58% of residents with internet access, they must have the specific link included in Region 5's response letter to learn how to obtain access to a filter.

6) If the 58% of residents with internet access do not have the link, they must know there is a lead in drinking water emergency and know to visit the BCHD website. Once they find the site, they must review the selections then navigate to the Lead & Drinking Water link and click on City of Benton Harbor.

7) If residents know there is a lead in drinking water emergency and have internet access, they might learn where filters are available. If they have transportation, they could go pick up a filter or replacement cartridge. If they do not have transportation and know when to replace their cartridge, they can request one be mailed to them.

8) There is no filter installation or maintenance training. Residents are told to read the instructions included with the filter.

9) Neither the lead in drinking water emergency notification system nor the filter program takes into consideration language or literacy needs.

---

[110] Leonard A. Fleming, *Sixth lead alert raises urgency in Benton Harbor; Residents up pressure on officials to replace pipes* (Aug. 24, 2021), attached as Exhibit 43; Leonard A. Fleming, *Benton Harbor endures 3 years of high lead in water; With levels above those of Flint crisis, residents fear facing 'next epidemic'*, The Detroit News (Mar. 26, 2021), attached as Exhibit 44.

[111] U.S. Census Bureau, QuickFacts: Benton Harbor city, Michigan (2015-2019), (attached as Exhibit 45).

24

10) It is not clear that Benton Harbor, EGLE, or MDHHS has evaluated the filters to ensure they are producing the required lead reduction in the specific water quality delivered in the city of Benton Harbor.

11) It is not clear that both pitcher style and faucet mount filters are available to meet the needs of all residents.

While there are other serious problems with Region 5's response, the staff is endorsing a grossly inadequate program while relying on the volunteers at BHCWC to expand their partnership with BCHD to address the state's longest ongoing lead in drinking water emergency, rather than initiating and leading the crisis response with state emergency resources. This is incomprehensible in light of the role Region 5 played in the ongoing Flint Water Crisis, which took place under the jurisdiction of the same state environmental agency that is guiding Region 5's response to Benton Harbor.

Petitioners urge EPA to take all actions necessary to abate the endangerment presented by lead in Benton Harbor's drinking water, and to inform Benton Harbor residents about the potential hazards of drinking the City's tap water. At minimum, Petitioners request that EPA:

- Immediately order and provide the necessary technical assistance to the City to advise all Benton Harbor water customers not to consume unfiltered water from the City's water system. This and all other emergency notifications should be provided as an emergency notification by multiple methods including broadcast, print, mail, door hangers, and online, and in English, Spanish, Urdu, and Arabic to fully inform residents of the emergency and how to protect themselves and their families.[112]

- Immediately provide the technical and financial resources necessary to ensure Benton Harbor residents are provided with an alternative, free source of safe drinking water that meets EPA standards. This should include the delivery of emergency bottled water and/or water buffalos to residents' homes as well as filtered water pitchers and/or faucet mount filters certified to meet the ANSI/NSF standard 53 for lead reduction and ANSI/NSF 42 for particulate reduction. Extensive filter education must also be provided in homes to ensure proper filter installation and maintenance, and replacement filter cartridges certified as detailed above should also be distributed.

- Conduct a filter study to verify that NSF 53 certified filters are effective for reducing lead in Benton Harbor water treated with the blended polyphosphate corrosion inhibitor. A filter effectiveness study in Newark, NJ found that nanoparticles formed during treatment sometimes passed through point-of-use filter units.[113] The USEPA's Corrosion Control guidance manual states that polyphosphates can sequester lead and copper, keeping them in the water and potentially increasing the risk of exposure.[114] A study is necessary to

---

[112] U.S. Census Bureau, Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (2015), (attached as Exhibit 46).

[113] Darren A. Lytle et al., Lead Particle Size Fractionation and Identification in Newark, New Jersey's Drinking Water, Environmental Science and Technology (Oct. 12, 2020), (attached as Exhibit 51).

[114] U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems (March 2016) (attached as Exhibit 41).

EGLE_0019813

confirm that carbon block filters are effective for removing potential nanoparticulate lead that may be formed by the use of the blended polyphosphate inhibitor and are effective for the design life of the filter cartridge. The study must be conducted or overseen by EPA Office of Research and Development following the study design used in Flint, Michigan but also incorporating size fractionation sampling techniques used in Newark, New Jersey to quantify the impact of nanoparticles in filter breakthrough.

- Ensure that Benton Harbor has been brought into compliance and operating in accordance with 40 C.F.R. § 141.84(b) and Mich. Admin. Code R. 325.10604f(5) lead service line replacement requirements. Benton Harbor should be required to fully replace its lead service lines for all residents at the public water system's expense, as required by the Michigan rules. Given the community's financial and environmental justice status, the State of Michigan should pay for the replacement of all lead service lines, potentially with federal funding assistance, as quickly as possible.

- Pursuant to Section 1442(b) of the Safe Drinking Water Act and other available authorities, U.S. EPA Administrator Regan should provide technical assistance and make grants available to Benton Harbor to assist in responding to and alleviating the emergency situation affecting Benton Harbor's public water system, preventing additional infrastructure maintenance decisions that further delay the replacement and upgrade of failing equipment that contribute to the degradation of Benton Harbor's water quality (i.e., the elevated water storage tank).

- Provide an immediate source of safe drinking water in schools and child care facilities in Benton Harbor. If schools and child care centers utilize water filtration stations, a filter study must be conducted as described above.

- Use its authority under 40 C.F.R. §§ 142.19 and 141.82(i) to review EGLE's determinations concerning corrosion control requirements for the Benton Harbor water system and issue a federal order establishing the optimal corrosion control treatment requirements for the Benton Harbor water system and requiring Benton Harbor to immediately comply with the requirements of 40 CFR 141.81(c) and Mich. Admin. Code R. 325.10604f(2)(c).

- Order the City to conduct continued monitoring for lead and copper in six-month periods in accordance with the procedures set forth in Mich. Admin. Code R. 325.10710a. EPA should directly oversee the City's monitoring by ordering the City to submit a Quality Assurance Project Plan (QAPP) to ensure that all information, sample collection, analytical data and resulting decisions are technically sound, scientifically valid, and properly administered. EPA must approve the City's QAPP before the City conducts any additional monitoring. EPA should prohibit the City from conducting reduced monitoring under Mich. Admin. Code R. 325.10710a(4)(d) until 3 years after all lead service lines have been replaced and CCT has reduced lead in drinking water below Michigan's lead action level.

EGLE 0019814

- Order the City to Comply with the public education and supplemental monitoring requirements under MCL 325.1019 and Mich. Admin. Code R. 325.10410, including but not limited to immediately notifying consumers of the results of tests completed at their homes or places of business and providing the public education, monitoring, and notification established in those rules.

- Order Michigan EGLE to provide such technical and financial and other assistance to Benton Harbor as EPA determines may be necessary to enable the City to comply with this order, including assistance in providing free alternative sources of safe drinking water, funding and completing legally and technically compliant corrosion control studies, and funding replacement of lead service lines. This order to EGLE should be a contingency for EPA funding of EGLE under the Safe Drinking Water Act and other relevant authorities rather than being enforceable under SDWA 1431.

- Order any other additional relief that EPA determines is "necessary to protect" the health of Benton Harbor residents from lead contamination in drinking water.

## VII.   Conclusion

For the reasons described above, the Petitioners respectfully request that the EPA take actions necessary to abate the imminent and substantial endangerment to Benton Harbor residents' health from lead contamination in their drinking water.

Dated: September 9, 2021                    Submitted By:

/s/Reverend Edward Pinkney
Reverend Pinkney, President
**Benton Harbor Community Water Council**

/s/Nicholas Leonard
Nicholas Leonard, Executive Director
Erin Mette, Staff Attorney
**Great Lakes Environmental Law Center**
4444 Second Avenue
Detroit, MI 48201
313-782-3372

/s/Jeremy Orr
Jeremy Orr, Senior Staff Attorney
Cyndi Roper, Michigan Senior Policy Advocate
**NRDC**

/s/Nayyirah Shariff
Nayyirah Shariff, Director
**Flint Rising**

27

/s/Sylvia Orduño
Sylvia Orduño, Organizer
**People's Water Board Coalition**

/s/Maureen Taylor
Maureen Taylor, State Chair
**Michigan Welfare Rights Organization**

/s/Melissa Mays
Melissa Mays, Coordinator
**Water You Fighting For**

/s/Elin Betanzo
Elin Betanzo, Principal
**Safe Water Engineering, LLC**

/s/Marian Kramer
Marian Kramer, Chair
**Highland Park Human Rights Coalition**

/s/Michelle Martinez
Michelle Martinez, Executive Director
**Michigan Environmental Justice Coalition**

/s/Gail Philbin
Gail Philbin, Chapter Director
Rhonda Anderson
**Sierra Club Michigan Chapter**

/s/Mona Hanna-Attisha
Dr. Mona Hanna-Attisha, Director, Pediatric Public
Health Initiative; C.S. Mott Endowed Professor of
Public Health, Division of Public Health; Associate
Professor, Department of Pediatrics and Human
Development, Michigan State University College of
Human Medicine Hurley Children's Hospital at
Hurley Medical Center

/s/Mary Brady Enerson
Mary Brady Enerson, Michigan Director
**Clean Water Action**

/s/Mara Herman
Mara Herman, MPH, Health Policy Specialist
**Ecology Center**

28

EGLE_0019816

/s/Jill Ryan
Jill Ryan, Executive Director
**Freshwater Future**

/s/Daryl Jordan
Daryl Jordan, Co-Director
East Michigan Environmental Action Council

/s/Linda Campbell
Linda Campbell, MPH
**Detroit People's Platform**

/s/Yanna Lambrinidou
Yanna Lambrinidou, Co-Executive Director
Paul Schwartz, Co-Executive Director
**Campaign for Lead Free Water**

/s/Liz Kirkwood
Liz Kirkwood, Executive Director
**For Love Of Water (FLOW)**

/s/Mona Monroe-Younis
Mona Monroe-Younis, Executive Director
**Environmental Transformation Movement of Flint**

29

## Index for Exhibits

Link to Folder with Exhibits:

https://drive.google.com/drive/folders/1_uW6xbk1GLTL6HPnkEW59WRdudkCZ9JN?u
sp=sharing

1. Michigan Department of Environment, Great Lakes, and Energy, *Michigan Service Line Materials Estimates Preliminary Distribution System Materials Inventories,* last updated Dec. 2020
2. Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environmental Quality, to Darwin Watson, City of Benton Harbor,  *Re: Lead and Copper Monitoring - Action Level (AL) Exceedance* (Oct. 22, 2018)
3. Email from Ernest Sarkipato to EGLE Staff, *Re: Benton Harbor Follow Up Call* (Jan. 9, 2019)
4. Permit Application for Water Supply Systems, Received Jan. 24, 2019
5. Letter from Mike Enlow, Elhorn Engineering, to Mike O'Malley, Benton Harbor Water Superintendent (Nov. 21, 2018)
6. Email from Brian Thurston, EGLE Community Water Supply Section Manager, to EGLE Staff (Feb. 21, 2019)
7. Email from Brandon Onan, EGLE Corrosion Control Engineer, to Ernest Sarkipato, EGLE, (Feb. 25, 2019)
8. Administrative Consent Order; City of Benton Harbor; WSSN: 00600 (Mar. 8, 2019)
9. Email from Mike O'Malley, Benton Harbor Water Superintendent, to EGLE Staff (Mar. 27, 2019)
10. Elhorn Company, *Corrosion Control Treatment Plan and Study Proposal* (April 23, 2019)
11. Email from Ernest Sarkipato, EGLE Surface Water Treatment Specialist to Mike O'Malley, Benton Harbor Drinking Water Superintendent (April 30, 2019)
12. Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environmental Quality, to Darwin Watson, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (July 24, 2019)
13. Letter from Great Lakes Environmental Law Center to Eric Oswald, Drinking Water and Environmental Health Division Director (Nov. 6, 2019)
14. Letter from Eric Oswald to Nick Leonard, 2 (Nov. 26, 2019)
15. Lead and Copper Monitoring – Action Level (AL) Exceedance (Jan. 16, 2020)
16. Letter from Brandon Onan, EGLE Supervisor of Lead and Copper Unit, to Ellis Mitchell, Benton Harbor City Manager, 1 (Feb. 13, 2020)
17. Email from Bob London, EGLE Surface Water Treatment Specialist, to EGLE Staff (Feb. 3, 2020)
18. Letter from Mike O'Malley, Benton Harbor Drinking Water Superintendent, to EGLE Staff (May 19, 2020)
19. Email from Ernie Sarkipato, EGLE Surface Water Treatment Specialist, to Ellis Mitchell, Benton Harbor City Manager (Apr. 17, 2020)

EGLE 0019818

20. Letter from Ernie Sarkipato, EGLE Surface Water Treatment Specialist, to Mike O'Malley, Benton Harbor Drinking Water Superintendent (June 17, 2020)
21. Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (July 15, 2020)
22. *City of Benton Harbor Corrosion Study Plan* (July 28, 2020)
23. State of Michigan Department of Environment, Great Lakes, and Energy, Drinking Water and Environmental Health Division, *First Amended Administrative Consent Order* (Aug. 7, 2020)
24. Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (Feb. 4, 2021)
25. Email from David Koch, Black & Veatch, to Ernest Sarkipato, EGLE Surface Water Treatment Specialist (Mar. 24, 2021)
26. City of Benton Harbor Request for Proposal, Benton Harbor Corrosion Optimization Study (April 19, 2021)
27. Email from Jason Marquardt, Abonmarche on behalf of Benton Harbor, to Benton Harbor and EGLE Staff (May 13, 2021)
28. Letter from Jason Marquardt, Abonmarche, to Ellis Mitchell, Benton Harbor City Manager (Jun. 28, 2021)
29. Letter from Jeni Bolt and Brandon Onan, Michigan Department of Environment, Great Lakes, and Energy, to Ellis Mitchell, City of Benton Harbor, Re: Lead and Copper Monitoring – Action Level (AL) Exceedance (Aug. 3, 2021)
30. Centers for Disease Control and Prevention, *Blood Lead Levels in Children*.
31. U.S. EPA, Basic Information about Lead in Drinking Water
32. Ronnie Levin, et al., *Lead Exposures in U.S. Children, 2008: Implications for Prevention,* 116 Environ. Health Perspect. (1) 1285-93 (2008)
33. Andrew Marshall, et al., *Association of lead-exposure risk and family income with childhood brain outcomes,* Nature Medicine, Vol. 26, 91-97 (Jan. 2020)
34. United States Census Bureau, *Year Structure Built, Table B25034, Benton Harbor, Michigan, American Community Survey 5-Year Estimates 2015-2019*
35. David E. Jacobs, et al., *The Prevalence of Lead-Based Paint Hazards in U.S. Housing,* 110 (10) Environmental Health Perspectives A599, A601-A602 (Oct. 2002)
36. United States Census Bureau, *Selected Housing Characteristics, Table DP04, Benton Harbor, Michigan, American Community Survey 5-Year Estimates 2015-2019*
37. Tiffany Anne Loftus Butzbaugh, *A Socio-Historical Analysis of the Benton Harbor, Michigan Desegregation Case between 1967 and 1981* (Aug 2003)
38. *Berry v. School Dist.,* 442 F. Supp. 1280 (1977)
39. Evan Comen, *Detroit, Chicago, Memphis: The 25 most segregated cities in America,* USA Today (July 20, 2019)
40. Robert J. Sampson and Alix S. Winter, *The Racial Ecology of Lead Poisoning: Toxic Inequality in Chicago Neighborhoods, 1995-2013*, Du Bois Review: Social Science Research on Race (Winter 2016)
41. U.S. EPA, Optimal Corrosion Control Treatment Evaluation Technical Recommendations for Primacy Agencies and Public Water Systems (March 2016)

42. Email from Francie Kline, EGLE DWEHD FOIA Liaison, to Nicholas Leonard (Aug. 25, 2021).

43. Leonard A. Fleming, *Sixth lead alert raises urgency in Benton Harbor; Residents up pressure on officials to replace pipes* (Aug. 24, 2021).

44. Leonard A. Fleming, *Benton Harbor endures 3 years of high lead in water; With levels above those of Flint crisis, residents fear facing 'next epidemic'*, The Detroit News (Mar. 26, 2021).

45. U.S. Census Bureau, QuickFacts: Benton Harbor city, Michigan (2015-2019)

46. U.S. Census Bureau, Language Spoken at Home by Ability to Speak English for the Population 5 Years and Over (2015).

47. EPA Region III, Emergency Administrative Order. In the Matter of Clarksburg Water Board, Respondent. Docket No. CWA-03-2021-0110DS, July 14, 2021.

48. Letter from Benton Harbor Community Water Council to Eric Oswald, EGLE (Jul. 19, 2021)

49. Letter from Benton Harbor Community Water Council to Cheryl Newton, U.S. EPA Region 5 Acting Regional Administrator (Aug. 9, 2021).

50. Letter from Alan Walts, U.S. EPA, Region 5, Director of Tribal and Multi-media Programs Office, to Reverend Edward Pinkney, President, Benton Harbor Community Water Council (Aug. 30, 2021).

51. Darren A. Lytle et al., Lead Particle Size Fractionation and Identification in Newark, New Jersey's Drinking Water, Environmental Science and Technology (Oct. 12, 2020).

EGLE_0019820

EXHIBIT 3

EXHIBIT 3

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY**
**REGION 5**

| | |
|---|---|
| **In the Matter of:** | ) **UNILATERAL ADMINISTRATIVE** |
| | ) **ORDER** |
| City of Benton Harbor | ) |
| Public Water Supply, | ) **Proceeding under Section 1414(g)** |
| PWS ID MI0000600 | ) **of the Safe Drinking Water Act,** |
| | ) **42 U.S.C. § 300g-3(g)** |
| Benton Harbor, Michigan | ) |

WHEREAS, the Michigan Department of Environment, Great Lakes, and Energy ("EGLE") has primary responsibility for the implementation and enforcement of the public water supply program in Michigan, and on March 5, 2019, EGLE and the City of Benton Harbor ("Benton Harbor" or "City") entered into an Administrative Consent Order, ACO-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 ("2019 ACO"), to address violations and significant deficiencies of Michigan Safe Drinking Water Rules ("MSDWRs"). On August 7, 2020, EGLE and Benton Harbor agreed to amend the 2019 ACO ("2020 Amended ACO") to acknowledge completion of several activities required by the 2019 ACO and to require Benton Harbor to take additional actions to correct MSDWR violations and significant deficiencies, including developing a Capacity Study to address significant technical, managerial, and financial deficiencies.

WHEREAS, on August 19, 2021, EGLE requested that the United States Environmental Protection Agency ("EPA") participate in a joint Safe Drinking Water Act ("SDWA") inspection of the Benton Harbor Public Water System ("System") that the agencies scheduled for the week of September 20, 2021.

WHEREAS, between September 20-27, 2021, EPA and EGLE conducted the scheduled joint compliance inspection of the System to assess the SDWA compliance status of the System ("September 2021 Inspection").

WHEREAS, on October 14, 2021, Michigan Governor Gretchen Whitmer issued Executive Directive No. 2021-6 ("Executive Directive") that requires, among other actions, a whole-of-government response that directs Michigan departments and agencies to expeditiously take all appropriate action to ensure residents of Benton Harbor have immediate access to free bottled water for consumption through distribution sites and drop-off delivery until further notice.[1]

WHEREAS, the Executive Directive also requires, among other actions, that Michigan departments and agencies expeditiously take all appropriate action to leverage available state resources to support the City in replacing lead service lines.

---

[1] For additional information on Michigan's Benton Harbor drinking water response visit: https://www.michigan.gov/cleanwater/0,9779,7-411-98113_99988_109059---,00.html.

1

WHEREAS, on October 14, 2021, Michigan Governor Gretchen Whitmer announced an expedited timeline to replace 100 percent of lead service lines in Benton Harbor in the next 18 months.

WHEREAS, based on EPA's commitment to follow the best science to address lead in drinking water, EPA is conducting a confirmatory filter study, in coordination with community, local and state partners, to provide reassurance of filter effectiveness in relation to Benton Harbor's specific water chemistry.

WHEREAS, on October 19, 2021, the EPA Acting Regional Administrator, Region 5, issued a letter to EGLE Director Liesl Eichler Clark ("October 19, 2021 letter") indicating that EPA was considering its enforcement options to address any violations or deficiencies identified as a result of the September 2021 Inspection, and indicating that EPA expected to work with EGLE and the System to address such violations or deficiencies under a joint enforcement approach to maintain consistency of obligations and a better result.

WHEREAS, in the October 19, 2021 letter, EPA committed to continuing to exercise its independent oversight of Michigan's primary enforcement authority for the SDWA in the State, including continuing to provide technical assistance, pursue joint enforcement of the SDWA against the System, oversee EGLE's continuing enforcement against the System, "and if problems arise, [EPA] will . . . exercise [its] independent authorities to ensure that the residents of Benton Harbor are provided safe drinking water."

WHEREAS, in the October 19, 2021 letter, EPA further committed to continuing to be involved in Benton Harbor to support and monitor the effectiveness of the immediate interventions initiated by Michigan and the development of long-term solutions in Benton Harbor.

WHEREAS, the System's technical, managerial, and financial capacity is essential to the provision of drinking water that is compliant with the SDWA and is a critical component of ensuring corrosion control treatment is effective at reducing lead levels in the System's distribution system during and after lead service line replacement.

NOW THEREFORE, EPA FINDS and ORDERS:

## I.    STATUTORY AUTHORITY

1.    The Director of the Enforcement and Compliance Assurance Division, EPA Region 5, is issuing this Order ("Order") to the System, PWS Identification Number MI0000600, under Section 1414(g) of the SDWA, 42 U.S.C. § 300g-3(g).

2.    Section 1414 of the SDWA, 42 U.S.C. § 300g-3(g), authorizes EPA to order persons subject to SDWA to comply with all applicable requirements under the SDWA. Applicable

requirements include, among other things, the National Primary Drinking Water Regulations ("NPDWRs") promulgated at 40 C.F.R. Part 141 pursuant to Section 1412 of the SDWA, 42 U.S.C. §§ 300g-1, 300g-3(i).

3.   The Administrator of EPA has delegated the authority to take these actions to the Regional Administrator of EPA Region 5, pursuant to Delegation 9-32, who has, in turn, delegated the authority to the Director of the Enforcement and Compliance Assurance Division.

## II.   FINDINGS OF FACT AND CONCLUSIONS OF LAW

### General Findings

4.   The City ("Respondent") is the owner and/or operator of the System located at 200 East Wall Street, Benton Harbor, Michigan 49022.

5.   Respondent is a "person," as defined by Section 1401(12) of the SDWA, 42 U.S.C. § 300f(12), and 40 C.F.R. § 141.2.

6.   The System is a "public water system" ("PWS") within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 300f(4); and 40 C.F.R. § 141.2 that provides water from a surface water source.

7.   The System regularly serves at least twenty-five (25) year-round residents and is therefore a "community water system" ("CWS") within the meaning of Section 1401(15) of the SDWA, 42 U.S.C. § 300f(15), and 40 C.F.R. § 141.2.

8.   The System serves approximately 9,970 persons and has 3,335 active service connections.

9.   The System has an intake in Lake Michigan as its source of drinking water.

10.   Respondent's ownership and/or operation of the System makes it a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C. § 300f(5), and 40 C.F.R. § 141.2, and subject to the requirements of Part B of the SDWA, 42 U.S.C. § 300g, and the NPDWRs at 40 C.F.R. Part 141.

11.   Pursuant to SDWA Section 1413, 42 U.S.C. § 300g-2, EGLE has primary responsibility for the implementation and enforcement of the public water supply program in Michigan.

12.   Between September 20–27, 2021, EPA and EGLE conducted a joint compliance inspection of the System pursuant to Section 1445(b) of the SDWA, 42 U.S.C. § 300j-4(b), and identified numerous violations of the NPDWRs identified in Paragraphs 15–104 below, including NPDWR violations related to the System's technical, managerial, and financial capacity.

13.   On October 29, 2021, EGLE referred the identified violations to EPA to require the System to comply with the associated applicable requirements under the SDWA.

14.   On October 26, 2021, EPA met with EGLE to confer on this Order, in conformance with Section 1414(g)(2) of the SDWA, 42 U.S.C. § 303g-3(g)(2).

<u>Lead and Copper Public Education</u>

15.   The System is classified as a medium-sized PWS (3,301 to 50,000 people served) under the Lead and Copper Rule ("LCR"), as defined at 40 C.F.R. §§ 141.2 and 141.81(a)(2), and as such, was required to conduct sampling, beginning with two (2) consecutive six-month monitoring periods during July 1 to December 31, 1992 and January 1 to June 30, 1993 to determine compliance with the LCR at 40 C.F.R. § 141.86(d).

16.   After meeting lead and copper action levels during the two (2) consecutive six-month monitoring periods, a medium-sized water system may reduce monitoring frequency to once per year.  40 C.F.R. §§ 141.86(d)(1)(ii)(B); 141.86(d)(4).

17.   After three (3) consecutive years of monitoring, a medium-sized water system in compliance may further reduce the frequency of monitoring from annually to once every three (3) years.  40 C.F.R. §§ 141.86(d)(4)(iii).

18.   An LCR compliance sample is a sample that has been collected and analyzed for lead and copper according to the requirements of the LCR at 40 C.F.R. § 141.86. The lead action level is exceeded if the concentration of lead in more than ten (10) percent of tap water samples collected during any monitoring period conducted in accordance with 40 C.F.R. § 141.86 is greater than 0.015 mg/L (i.e., if the "90th percentile" lead level is greater than 0.015 mg/L or 15 parts per billion ("ppb")).

19.   Between January 2016 and December 2018, the 90th percentile of the samples collected during this period was 22 ppb, which is a lead action level exceedance ("ALE") pursuant to the LCR at 40 C.F.R. § 141.80(c).

20.   Between January 2019 and June 2019, the 90th percentile of the samples collected during this sampling period was 27 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

21.   Between July 2019 and December 2019, the 90th percentile of the samples collected during this sampling period was 32 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

22.   Between January 2020 and June 2020, the 90th percentile of the samples collected during this sampling period was 23 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

4

23. Between July 2020 and December 2020, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

24. Between January 2021 and June 2021, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

25. A PWS that exceeds the lead action level based on tap water samples collected in accordance with 40 C.F.R. § 141.86 must comply with certain public education requirements at 40 C.F.R. § 141.85.

26. 40 C.F.R. § 141.85(a) regulates the content of written public education materials (e.g., brochures and pamphlets), while 40 C.F.R. § 141.85(b) regulates the delivery of such public education materials.

27. Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(A), a CWS that exceeds the lead action level must contact the local health department and deliver education materials that meet the content requirements of 40 C.F.R. § 141.85(a) to local public health agencies even if they are not located within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users.

28. 40 C.F.R. § 141.85(b)(3) requires contact with the local health department at least every twelve (12) months as long as the CWS exceeds the lead action level.

29. According to the System's February 2021 and August 2021 public education certifications, the System did not contact the local health department in the 12-month period between August 2020 and August 2021.

30. Respondent's failure to contact the local health department in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(A) and 141.85(b)(3).

31. Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(B), a CWS that exceeds the lead action level must contact customers who are most at risk by delivering materials that meet the content requirements of 40 C.F.R. § 141.85(a) to the following organizations within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users: public and private schools or school boards, Women, Infants and Children (WIC) and Head Start programs, public and private hospitals and medical clinics, pediatricians, family planning clinics, and local welfare agencies.

5

32.   40 C.F.R. § 141.85(b)(3) requires contact with the organizations identified in 40 C.F.R.
§ 141.85(b)(2)(ii)(B) at least every twelve (12) months as long as the CWS exceeds the
lead action level.

33.   According to the System's February and August 2021 public education certifications, the
System did not contact public and private hospitals, pediatricians, family planning clinics,
community centers, or adult foster care facilities in the 12-month period between August
2020 and August 2021.

34.   During the September 2021 Inspection, the inspectors asked the System to produce a
distribution list confirming that organizations identified in 40 C.F.R. § 141.85(b)(2)(ii)(B)
within the System's service area were contacted and delivered materials.

35.   During and after the September 2021 Inspection, the System did not produce the requested
distribution list.

36.   Respondent's failure to contact certain organizations identified in 40 C.F.R.
§ 141.85(b)(2)(ii)(B) in the 12-month period between August 2020 and August 2021 is a
violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(B) and 141.85(b)(3).

37.   Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(C), a CWS that exceeds the lead action level must
make a good faith effort to locate the following organizations within the service area and
deliver materials that meet the content requirements of 40 C.F.R. § 141.85(a) to them,
along with an informational notice that encourages distribution to all potentially affected
customers or users: licensed childcare centers, public and private preschools, and
obstetricians-gynecologists and midwives.

38.   40 C.F.R. § 141.85(b)(3) requires good faith effort to locate such organizations identified in
40 C.F.R. § 141.85(b)(2)(ii)(C) at least every twelve (12) months as long as the CWS
exceeds the lead action level.

39.   According to the System's February and August 2021 public education certifications, the
System did not make a good faith effort to locate and contact obstetricians-gynecologists in
the 12-month period between August 2020 and August 2021.

40.   Respondent's failure to make a good faith effort to locate organizations identified in 40
C.F.R. § 141.85(b)(2)(ii)(C) in the 12-month period between August 2020 and August
2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(C) and 141.85(b)(3).

41.   Pursuant to 40 C.F.R. § 141.85(b)(2)(iii), a CWS that exceeds the lead action level must
provide, no less often than quarterly, information on or in each water bill, including
verbatim text, notifying customers that the system has found high levels of lead, as long as
the system exceeds the lead action level.

42.  40 C.F.R. § 141.85(b)(3) requires provision of the information required under 40 C.F.R. § 141.85(b)(2)(iii) in each billing cycle.

43.  According to the System's February and August 2021 public education certifications, the System did not provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021.

44.  During the September 2021 Inspection, the System stated to the inspectors that no public education materials are sent with water bills delivered through the mail.

45.  Respondent's failure to provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(iii) and 141.85(b)(3).

<u>Performing Turbidity Measurements</u>

46.  Pursuant to 40 C.F.R. § 141.550, systems which serve populations fewer than 10,000, are required to filter, and utilize filtration other than slow sand filtration or diatomaceous earth filtration must meet the combined filter effluent turbidity requirements of 40 C.F.R. §§ 141.551 through 141.553.

47.  Pursuant to 40 C.F.R. § 141.551, the first combined filter effluent turbidity limit is a "95th percentile" turbidity limit that your system must meet in at least 95 percent of the turbidity measurements taken each month. Measurements must continue to be taken as described in 40 C.F.R. § 141.74(a) and (c). For systems using conventional filtration or direct filtration the 95th percentile turbidity value is 0.3 NTU. For systems using conventional filtration or direct filtration the maximum turbidity value is 1 NTU.

48.  Pursuant to 40 C.F.R. § 141.74(c)(1), turbidity measurements must be performed on representative samples of the system's filtered water every four (4) hours (or more frequently) that the system serves water to the public. A PWS may substitute continuous turbidity monitoring for grab sample monitoring if it validates the continuous measurement for accuracy on a regular basis using a protocol approved by the State.

49.  The System uses fifteen (15) Hach 1720E Turbidimeters to conduct continuous turbidity monitoring throughout the PWS. Twelve (12) of the fifteen (15) Hach 1720E Turbidimeters used to collect continuous turbidity measurements are on the System's filters.

50.  The manufacturer's recommendation for the Hach 1720E Turbidimeters is that meters should be recalibrated quarterly for accurate measurements. The manufacturer also recommends recalibration after any significant maintenance or repair and at least once every three (3) months during normal operation.

51. During and after the September 2021 Inspection, the System did not demonstrate that it calibrates the twelve (12) turbidimeters on the filters every three (3) months and after significant maintenance activities, consistent with the manufacturer's recommendations.

52. Respondent's failure to calibrate the turbidimeters consistent with the manufacturer's recommendation is a failure to accurately measure turbidity, in violation of 40 C.F.R. § 141.74(c)(1).

Monitoring of Residual Disinfectant Concentration

53. Pursuant to 40 C.F.R. § 141.72(b), each PWS that provides filtration treatment must provide disinfection treatment consistent with requirements at 40 C.F.R. §§ 141.72(b)(1)– (3).

54. The System provides filtration treatment and is subject to the requirements at 40 C.F.R. §§ 141.72(b)(1)–(3).

55. Pursuant to 40 C.F.R. § 141.72(b)(2), the residual disinfectant concentration in the water entering the distribution system, measured as specified in 40 C.F.R. §§ 141.74(a)(2) and (c)(2), cannot be less than 0.2 mg/l for more than four (4) hours. The residual disinfectant concentration in the distribution system, measured as total chlorine, combined chlorine, or chlorine dioxide, as specified in 40 C.F.R. § 141.74(a)(2) and (c)(2), cannot be undetectable in more than five (5) percent of the samples each month, for any two (2) consecutive months that the system serves water to the public.

56. Pursuant to 40 C.F.R. § 141.74(a)(2), PWSs must measure residual disinfectant concentrations with specified analytical methods. If approved by the State, residual disinfectant concentrations for free chlorine and combined chlorine also may be measured by using DPD colorimetric test kits. Free and total chlorine residuals may be measured continuously by adapting a specified chlorine residual method for use with a continuous monitoring instrument provided the chemistry, accuracy, and precision remain the same. Instruments used for continuous monitoring must be calibrated with a grab sample measurement at least every five (5) days, or with a protocol approved by the State.

57. The System has numerous continuous chlorine analyzer devices installed throughout the PWS to perform continuous monitoring of chlorine residuals.

58. During the September 2021 Inspection, the System did not demonstrate that the continuous chlorine analyzers were calibrated every five (5) days with a grab sample when the chlorine analyzers were operating.

59. Respondent's failure to calibrate the chlorine analyzers every five (5) days with a grab sample when in operation is a violation of 40 C.F.R. § 141.74(a)(2).

60.  Pursuant to 40 C.F.R. § 141.74(c)(2), the residual disinfectant concentration of the water entering the distribution system must be monitored continuously, and the lowest value must be recorded each day. Grab sampling every four (4) hours may be conducted in lieu of continuous monitoring if the continuous monitoring equipment fails, but for no more than five (5) working days following the failure of the equipment.

61.  During the September 2021 Inspection, the inspectors observed that multiple continuous chlorine analyzer devices located on the raw water line, downstream of the plate settlers, at the point of entry station inside the PWS laboratory and at the high service pump were offline and had been offline for more than two (2) weeks. The point of entry station inside the PWS laboratory monitored the residual disinfectant concentration of the water entering the distribution system.

62.  Respondent's failure to repair the continuous chlorine analyzers monitoring the residual disinfectant concentration of the water entering the distribution system no more than five (5) working days following the failure of the equipment is a violation of 40 C.F.R. § 141.74(c)(2).

63.  During the September 2021 Inspection, the inspectors observed that the System was taking manual grab samples every two (2) hours during the six (6) to eight (8) hours daily that the treatment plant filters are in operation. At the time of the September 2021 Inspection, the water treatment plant was continuously pumping water to the distribution system. System personnel stated they were not taking residual disinfectant concentration grab samples during after hours outside of the six (6) to eight (8) hours a day when the water plant filters were in operation.

64.  Respondent's failure to maintain continuous monitoring of the residual disinfectant concentration is a violation of 40 C.F.R. § 141.74(c)(2).

<u>SCADA System</u>

65.  40 C.F.R. § 141.63(e) identifies the best technology, treatment techniques, or other means available for achieving compliance with the maximum contaminant level for total coliforms and for achieving compliance with the maximum contaminant level for *E. coli*, including: maintenance of a disinfectant residual throughout the distribution system; proper maintenance of the distribution system including appropriate pipe replacement and repair procedures, main flushing programs, proper operation and maintenance of storage tanks and reservoirs, cross connection control, and continual maintenance of positive water pressure in all parts of the distribution system; and filtration and/or disinfection of surface water, as described in 40 C.F.R. §§ 141.70 through 141.76 and 40 C.F.R. §§ 141.500 through 141.571.

66.  During the September 2021 Inspection, the inspectors observed that the System has a Supervisory Control and Data Acquisition (SCADA) system in place for monitoring and

operating the plant to, among other things, achieve proper disinfection. The SCADA system has the capability to set alarms and send out calls or alerts to operators 24/7 in the event a monitoring parameter falls out of a preset range or if there is an emergency at the PWS. At the time of the September 2021 Inspection, the System did not know what alarms had been set in place, and the SCADA system was in an unknown and inadequate working condition to continuously monitor residual disinfectant concentration of the water entering the distribution system. The inspectors observed that the depth sensor values being collected through the SCADA system were not consistent with the physical observations of the chlorine tanks. During the September 2021 Inspection, the System could not verify that the SCADA system is configured to issue alarms or call outs when water levels in the reservoir are low and/or there is a loss of positive pressure in the distribution system.

67. Respondent's failure to maintain alarms and/or alerts through the SCADA system is a violation of 40 C.F.R. § 141.63(e).

### Filter and Disinfection Profiling and Benchmarking

68. Pursuant to 40 C.F.R. § 141.530, if a system is a Subpart H CWS which serves fewer than 10,000 persons, the system must develop a disinfection profile unless the State determines that the system's profile is unnecessary. Pursuant to 40 C.F.R. § 141.500, the requirements of Subpart T (40 C.F.R. §§ 141.500 through 141.571), including the requirements regarding disinfection, constitute NPDWRs.

69. Pursuant to 40 C.F.R. § 141.533, to calculate a disinfection profile, a system must monitor the following parameters to determine the total log inactivation using the analytical methods in 40 C.F.R. § 141.74(a), once per week on the same calendar day, over twelve (12) consecutive months:

   (a) The temperature of the disinfected water at each residual disinfectant concentration sampling point during peak hourly flow;

   (b) If the system uses chlorine, the pH of the disinfected water at each residual disinfectant concentration sampling point during peak hourly flow;

   (c) The disinfectant contact time(s) ("T") during peak hourly flow; and

   (d) The residual disinfectant concentration(s) ("C") of the water before or at the first customer and prior to each additional point of disinfection during peak hourly flow.

70. Pursuant to 40 C.F.R. § 141.534, systems must use the tables in 40 C.F.R. § 141.74(b)(3)(v) to determine the appropriate CT99.9 value.

10

71.  During and after the September 2021 Inspection, the System did not demonstrate it calculates CT, which is needed to calculate a disinfection profile as described in 40 C.F.R. § 141.533.

72.  During the September 2021 Inspection, the inspectors observed that the flow meters for treated water were not functioning properly, as is needed to calculate a disinfection profile as described in 40 C.F.R. § 141.533.

73.  During the September 2021 Inspection, the inspectors observed that the continuous chlorine analyzers were not working, as is needed to calculate a disinfection profile as described in 40 C.F.R. § 141.533.

74.  Respondent's failure to calculate CT, failure to maintain a properly functioning flow meter, failure to maintain working continuous chlorine analyzers, all of which are needed to calculate disinfection profiles pursuant to the NPDWRs, is a violation of 40 C.F.R. § 141.533.

75.  Pursuant to 40 C.F.R. § 141.540, a system subject to Subpart H (40 C.F.R. §§ 141.70 through 141.76) that is required to develop a disinfection profile under 40 C.F.R. §§ 141.530 through 141.536, must develop a disinfection benchmark if it decides to make a significant change to its disinfection practice. A system must consult with the State for approval before it can implement a significant disinfection practice change.

76.  Pursuant to 40 C.F.R. § 141.541, significant changes to the point of disinfection include: changes to the point of disinfection, changes to the disinfectant(s) used in the treatment plant, changes to the disinfection process; or any other modification(s) identified by the State.

77.  On or about February 2017, the System ceased chlorine addition to the intake crib for the purposes of zebra mussel control. Later in 2017, the System altered chlorine addition from the raw line to the settled water feed. Such changes to the point of disinfection are considered a significant change to disinfection practice, as defined in 40 C.F.R. § 141.541. Therefore, according to 40 C.F.R. § 141.540, the System was required to develop disinfection benchmarks and notify the State prior to making the change.

78.  During and after the September 2021 Inspection, the System did not demonstrate that it develops disinfection profiles and disinfection benchmarks after changing the point of disinfection.

79.  Respondent's failure to develop disinfection profiles and disinfection benchmarks prior to making changes to the point of disinfection, in 2017, pursuant to the NPDWRs, is a violation of 40 C.F.R. § 141.540.

11

<u>Requirements for Disinfection</u>

80. Pursuant to 40 C.F.R. § 141.72, each PWS that provides filtration treatment must provide disinfection treatment.

81. Pursuant to 40 C.F.R. § 141.500, the requirements of Subpart T (40 C.F.R. §§ 141.500 through 141.571) constitute NPDWRs. These regulations establish requirements for filtration and disinfection that are in addition to criteria under which filtration and disinfection are required under Subpart H. The regulations establish or extend treatment technique requirements in lieu of maximum contaminant levels for the following contaminants: *Giardia lamblia,* viruses, heterotrophic plate count bacteria, *Legionella, Cryptosporidium,* and turbidity. The treatment technique requirements consist of installing and properly operating water treatment processes which reliably achieve:

   (a) At least 99 percent (2-log) removal of *Cryptosporidium* between a point where the raw water is not subject to recontamination by surface water runoff and a point downstream before or at the first customer for filtered systems, or *Cryptosporidium* control under the watershed control plan for unfiltered systems; and

   (b) Compliance with the profiling and benchmark requirements in 40 C.F.R. §§ 141.530 through 141.544.

82. Respondent's failures identified in Paragraphs 59, 62, 64, 67, 74, and 79, above, constitute Respondent's failure to demonstrate that the System provides adequate disinfection pursuant to the NPDWRs, in violation of 40 C.F.R. §§ 141.72 and 141.500.

<u>Operational Evaluation Level Calculations for Disinfectant Byproduct Monitoring</u>

83. A CWS that uses a primary or residual disinfectant other than ultraviolet light or delivers water that has been treated with a primary or residual disinfectant other than ultraviolet light is subject to monitoring and other requirements at Subpart V (40 C.F.R. §§ 141.620 through 141.629) of the NPDWRs for achieving compliance with maximum contaminant levels based on locational running annual averages ("LRAA") for total trihalomethanes ("TTHM") and haloacetic acids five ("HAA5").

84. 40 C.F.R. § 141.621(a) establishes routine monitoring requirements, including the frequency of and locations for routine monitoring.

85. Pursuant to 40 C.F.R. § 141.626(a), a CWS has exceeded the Operational Evaluation Level ("OEL") at any monitoring location where the sum of the two (2) previous quarters' TTHM results plus twice the current quarter's TTHM result, divided by four (4) to determine an average, exceeds 0.080 mg/L, or where the sum of the two (2) previous quarters' HAA5 results plus twice the current quarter's HAA5 result, divided by four (4) to determine an average, exceeds 0.060 mg/L.

12

86. During the September 2021 Inspection, the System did not demonstrate that it performs OEL calculations.

87. Respondent's failure to perform OEL calculations pursuant to the NPDWRs is a violation of 40 C.F.R. § 141.626.

<u>America's Water Infrastructure Act</u>

88. On October 23, 2018, the America's Water Infrastructure Act ("AWIA") of 2018 (Public Law 115-270) amended the SDWA.

89. Section 1433(a)(1) of the SDWA, 42 U.S.C. § 300i-2(a)(1), requires each CWS serving a population of greater than 3,300 persons to conduct a Risk and Resilience Assessment (RRA) of its system, including an assessment of:

   (a) The risk to the system from malevolent acts and natural hazards;

   (b) The resilience of the pipes and constructed conveyances, physical barriers, source water, water collection and intake, pretreatment, treatment, storage and distribution facilities, electronic, computer, or other automated systems (including the security of such systems) which are utilized by the system;

   (c) The monitoring practices of the system;

   (d) The financial infrastructure of the system;

   (e) The use, storage, or handling of various chemicals by the system; and

   (f) The operation and maintenance of the system.

90. Section 1433(a)(3)(A)(iii) of the SDWA, 42 U.S.C. § 300i-2(a)(3)(A)(iii), requires each CWS serving a population greater than 3,300 but less than 50,000 to submit a certification to the EPA Administrator that it has conducted an RRA prior to June 30, 2021.

91. Section 1433(b) of the SDWA, 42 U.S.C. § 300i-2(b), requires each CWS serving a population greater than 3,300 to prepare or revise, where necessary, an Emergency Response Plan (ERP) that incorporates the findings of the RRA and to certify to the EPA Administrator no later than six (6) months after completion of the RRA that the system has completed an ERP. The ERP shall include:

   (a) Strategies and resources to improve the resilience of the system, including the physical security and cybersecurity of the system;

13

(b) Plans and procedures that can be implemented, and identification of equipment that can be utilized, in the event of a malevolent act or natural hazard that threatens the ability of the community water system to deliver safe drinking water;

(c) Actions, procedures, and equipment which can obviate or significantly lessen the impact of a malevolent act or natural hazard on the public health and the safety and supply of drinking water provided to communities and individuals, including the development of alternative source water options, relocation of water intakes, and construction of flood protection barriers; and

(d) Strategies that can be used to aid in the detection of malevolent acts or natural hazards that threaten the security or resilience of the system.

92. Section 1433(d) of the SDWA, 42 U.S.C. § 300i-2(d), requires that each CWS shall maintain a copy of the RRA and the ERP (including any revised RRA or ERP) for five (5) years after the date on which a certification of such assessment or plan is submitted.

93. According to EPA's AWIA database, the System certified on June 29, 2021 that it had completed both an RRA and an ERP.

94. During the September 2021 Inspection, the System stated that it could not produce the ERP because it had not yet prepared the ERP.

95. Respondent's failure to retain a copy of the ERP pursuant to Section 1433(b) of the SDWA, 42 U.S.C. § 300i-2(b), is a violation of Section 1433(d) of the SDWA, 42 U.S.C. § 300i-2(d).

<u>Record Maintenance</u>

96. Any owner or operator of a PWS subject to the NPDWRs must comply with record maintenance requirements at 40 C.F.R. § 141.33.

97. Pursuant to 40 C.F.R. § 141.33(a), any owner or operator of a PWS subject to the NPDWRs shall retain, on its premises or at a convenient location near its premises, records of microbiological analyses and turbidity analyses made pursuant to the NPDWRs for not less than five (5) years and records of chemical analyses made pursuant to the NPDWRs for not less than ten (10) years.

98. During and after the September 2021 Inspection, the System did not produce analysis records for disinfectant byproducts ("DBP"), Total Organic Carbon precursor, turbidity, or residual chlorine that the inspectors asked Respondent to produce during and after the September 2021 Inspection.

14

99. Respondent's failure to retain records of microbiological, turbidity, and chemical analyses made pursuant to the NPDWRs is a violation of 40 C.F.R. § 141.33(a).

100. During the September 2021 Inspection, the inspectors requested the Total Organic Carbon precursor monitoring and DBP distribution system sampling. The System provided an incomplete set of records and did not provide the data from February 2018 to October 2020, and January and February 2021.

101. Respondent's failure to retain complete records of Total Organic Carbon precursor monitoring and DBP distribution system sampling made pursuant to the NPDWRs is a violation of 40 C.F.R. § 141.33(a).

102. Pursuant to 40 C.F.R. § 141.91, any system subject to the requirements of Subpart I (40 C.F.R. §§ 141.80 through 141.93) shall retain on its premises original records of all sampling data and analyses, reports, surveys, letters, evaluations, schedules, State determinations, and any other information required by 40 C.F.R. §§ 141.81 through 141.88. Each water system shall retain the records required by this section for no fewer than twelve (12) years.

103. During and after the September 2021 Inspection, the inspectors asked the System to provide a distribution list with dates of public education materials provided to organizations and customers following each lead ALE, as required by 40 C.F.R. § 141.85. The System did not provide these records for the June 2018 through June 2020 time period.

104. Respondent's failure to retain complete lead and copper public education materials required by 40 C.F.R. § 141.85 is a violation of 40 C.F.R. § 141.91.

<u>Conclusions of Law</u>

105. Based on the findings above, EPA has determined that the System has numerous SDWA violations, including violations of the NPDWRs.

106. The NPDWR violations identified in the findings above represent significant technical, managerial, and financial deficiencies, as contemplated by 40 C.F.R. § 141.723.

## III.   ORDER

Based on the foregoing FINDINGS, and pursuant to the authority of Section 1414(g) of the SDWA, 42 U.S.C. § 300g-3(g), EPA is issuing this Order to comply with the SDWA and the NPDWRs, 40 C.F.R. Part 141. **EPA hereby ORDERS:**

107. <u>Lead and Copper Public Education Requirements.</u> Beginning no later than the Effective Date of this Order, Respondent shall comply with the following requirements:

15

(a) The System must provide, no less often than quarterly, the following information on or in each water bill when the System exceeds the action level for lead:

> "The Benton Harbor Public Water System found high levels of lead in drinking water in some homes. Lead can cause serious health problems. For more information, please call the Benton Harbor Public Water System."

The message on the water bill must include the above statement exactly as written except that the message or delivery mechanism can be modified in consultation with the State; specifically, the State may allow a separate mailing of public education materials to customers if the water system cannot place the information on water bills. The System must repeat this task every time the System exceeds the action level for lead.

(b) The System must contact the local health department and deliver education materials that meet the content requirements of 40 C.F.R. § 141.85(a) along with an informational notice that encourages distribution to all the organization's potentially affected customers. The System must repeat this task every twelve (12) months as long as the System exceeds the action level for lead.

(c) The System must contact customers who are most at risk by delivering materials that meet the content requirements of 40 C.F.R. § 141.85(a) to the following organizations that are located within the water system's service area, along with an informational notice that encourages distribution to each of the organization's potentially affected customers or CWS's users: (1) Public and private schools or school boards, (2) Women, Infants and Children (WIC) and Head Start programs, (3) Public and private hospitals and medical clinics, (4) Pediatricians, (5) Family planning clinics, and (6) Local welfare agencies. The System must repeat this task every twelve (12) months as long as the System exceeds the action level for lead.

(d) The System must make a good faith effort to locate the following organizations within the service area and deliver materials that meet the content requirements of 40 C.F.R. § 141.85(a) to them, along with an informational notice that encourages distribution to all potentially affected customers or users: (1) licensed childcare centers, (2) public and private preschools, and (3) obstetricians-gynecologists and midwives. The System must repeat this task every twelve (12) months as long as the System exceeds the action level for lead.

(e) The System must provide documentation to EPA that the requirements in Paragraph 107(a)–(d) have been met within seven (7) days of the System completing each Public Education requirement.

16

108.   Address the Non-Operable Continuous Monitoring Devices Throughout the System.

    (a) The System must repair and/or bring online the continuous flow meters the System currently utilizes in the drinking water treatment process to meet the monitoring standards of 40 C.F.R. § 141.533 within seven (7) days of the Effective Date of this Order.

    (b) The System must create a plan and schedule to repair and/or bring online all non-operable continuous monitoring devices which the System currently utilizes in the drinking water treatment process. The plan must include specific deadlines for repairing and/or bringing online the continuous chlorine analyzers to meet the monitoring standards of 40 C.F.R. § 141.74(c)(2), continuous flow meters to meet the monitoring standards of 40 C.F.R. § 40 C.F.R. § 141.533, and depth sensors in the chlorine tanks. The plan must also include a detailed description of how the System will connect and ensure all active continuous monitoring devices remain connected to the SCADA system as well as a specific deadline to complete this action. The System must submit the plan to EPA and EGLE for review and approval within thirty (30) days of the Effective Date of this Order.

    (c) Following EPA and EGLE's approval of the plan, the System must implement the plan according to the approved schedule. Any request for an extension to the approved schedule must be submitted in writing to both EPA and EGLE for review and approval.

    (d) The System must also develop a separate calibration schedule for all continuous monitoring devices, including, but not limited to, the chlorine analyzers, flow meters, turbidimeters, and depth sensors. The System must submit the calibration schedule to EPA and EGLE for review and approval within forty-five (45) days of the Effective Date of this Order.

    (e) Following EPA and EGLE's approval of the calibration schedule, the System must immediately implement the calibration schedule.

109.   SCADA Alarms.

    (a) The System must determine for which components of the PWS is the SCADA system currently configured to issue alarms and/or initiate calls to the operator when alarms are activated.

    (b) The System must configure the SCADA system to issue alarms for all appropriate situations including, but not limited to:

        i.   When chlorine levels are outside the regulatory limits of 40 C.F.R. § 141.72(b)(2);

17

    ii.   When turbidity levels are outside the regulatory limits of 40 C.F.R. § 141.73(a)(2); and

    iii.  When water levels in the reservoir are low such that the System's ability to maintain adequate disinfection and/or positive pressure in the distribution system, per 40 C.F.R. §§ 141.72(b) and 141.63(e) respectively, is adversely affected.

(c) The System must configure the SCADA system to initiate calls to the operator of record for all appropriate situations including, but not limited to:

    i.    When chlorine levels are outside the regulatory limits of 40 C.F.R. § 141.72(b)(2);

    ii.   When turbidity levels are outside the regulatory limits of 40 C.F.R. § 141.73(a)(2); and

    iii.  When water levels in the reservoir are low such that the System's ability to maintain adequate disinfection and/or positive pressure in the distribution system, per 40 C.F.R. §§ 141.72(b) and 141.63(e) respectively, is adversely affected.

(d) The System must demonstrate to EPA that the SCADA system has been configured to meet the requirements of Paragraph 109(a)–(c) within sixty (60) days of the Effective Date of this Order.

110. <u>Adequate Disinfection of Finished Water and Reducing Exposure to Disinfection Byproducts.</u>

(a) The System must develop a Disinfection Profile and Benchmarking Report by following the steps in the EPA guidance document, *"Disinfection Profiling and Benchmarking Technical Guidance Manual"*, June 2020, or an EPA-approved equivalent. The Disinfection Profile and Benchmarking Report must:

    i.    Identify disinfection segments;

    ii.   Collect relevant disinfection data, including, but not limited to:
        1.  Peak Hourly Flow;
        2.  Residual Disinfection Concentration;
        3.  Temperature; and
        4.  pH;

    iii.  Calculate CT;

    iv.  Calculate inactivation and required CT;

    v.   Develop the disinfection profile and benchmark; and

    vi.  Report and evaluate the disinfection profile and benchmark.

(b) The System must begin monitoring, at a frequency of at least once weekly, the necessary parameters to complete the Disinfection Profile and Benchmarking Report within thirty (30) days of the Effective Date of this Order.

(c) The System must deliver to EPA a preliminary report of the requirements in Paragraph 110(a)(i)–(iv) for the first four (4) weeks of monitoring within sixty (60) days of the Effective Date of this Order.

(d) If the System chooses to bring online the chlorine injection point at the intake as a zebra mussel control measure, this action would be considered a significant change to the point of disinfection. If the System brings online the zebra mussel chlorine injection point at the intake, the System must notify EPA of when this occurred and restart the monitoring and actions describe in Paragraph 110(a), (b), and (c).

(e) The System must deliver to EPA a completed Disinfection Profile and Benchmarking Report within four hundred and twenty-five (425) days of the Effective Date of this Order.

111.  Alternatives Analysis.

(a) The System shall complete an Alternatives Analysis of the PWS.

(b) The Alternatives Analysis must be completed with the assistance of an independent third-party approved by the Director of the Enforcement and Compliance Assurance Division, EPA Region 5. For purposes of this Order, the term "independent" shall mean a third party that has not been employed or contracted by Respondent within the last five (5) years, as well as any affiliates, subsidiaries, officers, shareholders, employees, or assigns of such entity. Respondent shall select an independent third-party and submit to EPA for approval within thirty (30) days of the Effective Date of this Order. The independent third-party selected by Respondent should consist of at least one licensed Professional Engineer.

(c) The Alternatives Analysis should use the information gathered to support development of the System's Capacity Study required under the 2020 Amended ACO to identify, at a minimum, the following potential alternatives in an Alternatives Analysis Report ("Report"):

    i.  Staffing and administrative changes to enable Respondent to be the direct majority provider of long-term technical, managerial, and financial capacity;
    ii.  Consolidation, restructuring, or regionalization, including:
        1.  Physical consolidation of the System with one (1) or more other systems;
        2.  Consolidation of significant management and administrative functions of the System with one (1) or more other systems; and
        3.  Transfer of ownership of the system that may reasonably be expected to improve drinking water quality;
    iii.  Entering into contractual agreements with third-party entities to provide significant management or administrative functions; and
    iv.  A combination or hybrid of alternatives in Paragraph 111(d)(i)–(iii), above.

19

(d) The System shall complete the Report within one hundred and eighty (180) days of approval of the independent third-party by EPA.

(e) After the Report is complete, the System must post the Report for public comment for at least thirty (30) days. The System must post the Report online and make hard copies available at the local public library, City Hall, the Berrien County Health Department, the Armory Community Center, and other locations that are accessible on weekends and outside working hours on weekdays, such as local schools, churches, and welfare agencies. The System must notify customers at least through local radio and local newspapers that the Report is available and provide clear instructions for how customers can review and comment on the Report.

(f) After the public comment period closes, the System must consolidate all public comments received by the System within seven (7) days of the end of the public comment period.

(g) The System shall submit the Report and the consolidated public comments to EPA immediately following the completion of the requirement in Paragraph 111(f) as well as post these documents online and make hard copies available at the local public library.

112.  <u>Water Treatment Plant Filter Repair</u>

(a) The System must immediately identify the number of filters necessary to produce the daily demand during the hours of plant operation along with adequate redundancy and prioritize repair of those filters. The approved filtration rate is 2 gpm/ft$^2$ over the entire filter run.

(b) Within fifteen (15) days of the Effective Date of this Order, the System must initiate repairs to return the full backwash functionality to the water treatment plant filters identified pursuant to Paragraph 113(a), above. Full backwash functionality includes, but is not limited to:

  i. Functioning mechanical surface washers, such as the existing sprayer arms;
  ii. Utilizing the filter to waste valves to enable a filter to waste step with each backwash cycle;
  iii. Monitoring for combined filter effluent using an appropriate location;
  iv. Adequate sludge monitoring and removal activities from the plate settlers;
  v. Regularly and properly testing backflow prevention devices;
  vi. Ability to accurately monitor flow through each filter;
  vii. Continuous turbidity monitoring;

20

      viii.  Fully functioning control panels with working indicator lights and accurate readouts. Repairs to Programmed Logic Controllers (PLCs) as necessary;

      ix.  Finalized Standard Operating Procedures for filters including the backwash procedures; and

      x.  All operations staff trained on the filter operation procedures.

(c) The System must ensure that volume through the filters over the course of each filter run cycle is evenly balanced between all combinations of filters used to comply with Paragraph 112(a).

(d) The System must notify EPA and EGLE once all repairs are complete, and the filters identified pursuant to Paragraph 112(a) have been returned to full functionality.

113.  <u>AWIA</u>: By December 31, 2021, Respondent shall provide written confirmation to EPA, that Respondent has met the requirements of Section 1433(b) of the SDWA, 42 U.S.C. § 300i-2(b), and that Respondent is in compliance with Sections 1433(b) and (d) of the SDWA, 42 U.S.C. § 300i-2(b) and (d). Respondent should not submit an ERP to the below addresses; the above referenced confirmation shall be submitted electronically via email to the staff identified in Paragraph 114.

114.  <u>Reporting</u>: Respondent must submit all submissions, including progress reports, required by this Order by electronic mail to EPA at r5weca@epa.gov, and the address identified in below. All electronically submitted materials must be in final and searchable format, such as Portable Document Format (PDF) with Optical Character Recognition (OCR) applied. Do not use the email address r5weca@epa.gov for submission of any information for which you intend to assert a claim of business confidentiality under 40 C.F.R. Part 2, Subpart B. If Respondent is unable to send a report or notification to these addresses due to email size restrictions, the confidential nature of the information, or another problem, contact the EPA case manager and send an email to r5weca@epa.gov to make alternative arrangements for the transmission of the report or notification.

    EPA points of contact:

        Taylor Girouard
        Water Enforcement and Compliance Assurance Branch
        U.S. EPA Region 5
        77 West Jackson Boulevard (ECW-15J)
        Chicago, IL 60604
        Email: girouard.taylor@epa.gov

        Victoria Anderson
        Water Enforcement and Compliance Assurance Branch
        U.S. EPA Region 5
        77 West Jackson Boulevard (ECW-15J)

Chicago, IL 60604
Email:  anderson.victoria@epa.gov

Matthew Russo
Office of Regional Counsel
U.S. EPA Region 5
77 West Jackson Boulevard (C-14J)
Chicago, IL 60604
Email: russo.matthew@epa.gov

EGLE point of contact:

Ernest Sarkipato
Drinking Water and Environmental Health Division
Michigan Department of Environment, Great Lakes, and Energy
Email:  sarkipatoe@michigan.gov

## IV.   PARTIES BOUND

115.  The provisions of this Order shall apply to and be binding upon Respondent, its officers, employees, agents, successors, and assigns.

## V.   GENERAL PROVISIONS

116.  This Order constitutes final agency action. Under Section 1448(a) of the SDWA, 42 U.S.C. § 300j-7(a), Respondent may seek federal judicial review.

117.  EPA may modify this Order. EPA will consider information provided by Respondent to modify this Order. EPA will communicate any modification(s) to Respondent in writing and the modification(s) shall be incorporated into this Order.

118.  Compliance with the terms and conditions of this Order does not constitute compliance with the SDWA or the NPDWRs nor any permits or orders issued thereunder. This Order shall not in any way be construed to relieve Respondent from its obligations to comply with all provisions of federal, state, or local law, nor shall it be construed to be a determination of any issue related to any federal, state, or local permit. Compliance with this Order shall not be a defense to any actions subsequently commenced for any violation of federal laws and regulations administered by EPA, and it is the responsibility of Respondent to comply with such laws and regulations.

119.  EPA reserves all rights against Respondent and all other persons to take any further civil, criminal, or administrative enforcement action pursuant to any available legal authority, and to exercise its information gathering and inspection authorities. Nothing in this Order shall preclude EPA from taking any additional enforcement actions, including modification

of this Order or issuance of additional Orders, and/or additional actions as EPA may deem necessary, and/or from requiring Respondent in the future to perform additional activities pursuant to the SDWA or any other applicable law. EPA further expressly reserves the right to disapprove work performed by Respondent.

120. Failure to comply with this Order may subject Respondent to a penalty up to $59,017 per day per violation for each day in which a violation occurs, as assessed by the United States District Court, under Section 1414(g)(3)(A) of the SDWA, 42 U.S.C. § 300g-3(g)(3)(A), (C), or up to $41,120 per violation, as assessed by the Administrator, under Section 1414(g)(3)(B) of the SDWA, 42 U.S.C. § 300g-3(g)(3)(B).

## VI.    EFFECTIVE DATE

121. This Order is effective on the date of signature by the Director of the Enforcement and Compliance Assurance Division, EPA Region 5, and will remain in effect until EPA has notified Respondent of termination of the Order pursuant to Section VII, below. If modifications are made by EPA to this Order, such modifications will be effective on the date on which the modification is signed by EPA.

## VII.    TERMINATION

122. The provisions of this Order shall be deemed satisfied when Respondent receives written notice from EPA that Respondent has demonstrated, to the satisfaction of EPA, that the terms of this Order, including any additional tasks determined by EPA to be required under this Order or any continuing obligation or promises, have been satisfactorily completed, and the written notice from EPA will state that this Order is terminated.

**United States Environmental Protection Agency**

Harris,        Digitally signed by Harris,
Michael       Michael
               Date: 2021.11.02
               10:15:50 -05'00'

Michael D. Harris
Director
Enforcement and Compliance Assurance Division
U.S. Environmental Protection Agency, Region 5