# UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

DARETHA BRAZIEL, *et al.*,

               Plaintiffs

v.

GOVERNOR GRETCHEN WHITMER, *et al.*,

               Defendants.

Case No.  1:21-cv-960

[Related to Case No. 22-000046-MM pending in the Michigan Court of Claims]

Hon. Janet T. Neff

## SECOND AMENDED CLASS ACTION COMPLAINT
## FOR DECLARATORY, INJUNCTIVE, AND EQUITABLE RELIEF;
## MONETARY DAMAGES; AND JURY DEMAND

## I.    INTRODUCTION

1.    Benton Harbor residents, including children and infants, have been exposed, through ingestion and other uses of water, to exceedingly high levels of lead and other contaminants that exceed those permissible under the state and national Safe Drinking Water Acts.  Through Defendants omissions, disregard, and failures, the residents of Benton Harbor, of whom 86% are African American and 27% are children, have been poisoned by their water supply and have experienced and will continue to experience devastating health effects.

2.    Daretha Braziel, individually and as Next Friend for minors RB, DB, DR; Keesha Jones, individually and as Next Friend for minors KJ, DJ, TC, TC, and KB; Ieasha Jones, Michael Brigham, Rebecca Branscumb, Stacey Branscumb, and Emma Kinnard, individually; on behalf of themselves and all others similarly situated, (collectively "Plaintiffs") allege the following against Governor Gretchen Whitmer, individually and in her official capacity; Michigan Department of the Environment, Great Lakes & Energy (EGLE, formerly Department of Environmental Quality (DEQ)); Liesl Clark, individually and in her official capacity as

Director of EGLE; Eric Oswald, individually and in his official capacity as Director of EGLE's

Drinking Water and Environmental Health Division (DWEHD); Robert Gordon and Elizabeth

Hertel, in their individual and official capacities as Directors of the Michigan Department of

Health and Human Services (DHHS); the City of Benton Harbor (City), a Municipal

Corporation, through the Benton Harbor Water Department; Marcus Muhammad, individually

and in his official capacity as Mayor of the City; Michael O'Malley, individually and in his

official capacity as Operator in Charge of City's public water system; Darwin Watson and Ellis

Mitchell, individually and in their official capacities as City Manager; Elhorn Engineering

Company ("Elhorn"); and F&V Operations and Resource Management, Inc. ("F&V"),

(collectively, "Defendants").

## II.      NATURE OF THE ACTION

3.      Just six years after the State of Michigan (State) declared a state of emergency in

Flint, this case exposes yet another water contamination and poisoning emergency within the

State. For the past four years, Defendants were deliberately indifferent, concealed, and

maintained known lead, bacteria, and other contaminants in the Benton Harbor public water

supply, disregarding the harm that these contaminants have inflicted on the health and safety of

Plaintiffs and Benton Harbor residents.

4.      As the Environmental Protection Agency ("EPA") has uncovered, in operating

and overseeing the Benton Harbor public water system, Defendants concealed and/or helped

maintain numerous ongoing violations against Plaintiffs and Benton Harbor residents, poisoning

them with the contaminated water.

5.      Defendants were first alerted to lead contamination in Benton Harbor's water

supply as early as June-September 2018, when water-testing results exceeded the legal lead limit

established by the EPA. This contamination triggered a legal duty for Defendants to act under the

federal and state Safe Drinking Water Acts, requiring Defendants to, *inter alia*, institute adequate corrosion control, warn residents that the water was unsafe to drink or use for hygiene, and teach residents how to mitigate or eliminate exposure to the toxic water. Defendants not only failed to act, but through a series of intentional actions caused substantial injury and damage to each Plaintiff Class Representative and to each Plaintiff Class Member's constitutional and legal rights.

6.     For the next three years, the lead in the City's tap water increased steadily. By the January-June 2021 testing period, some tests, including in Plaintiff Daretha Braziel's home, measured the amount of lead in Benton Harbor's tap water at nearly 60 times the legal limit. Tragically, from 2011 to June 2021, Benton Harbor was the only city in Michigan to have six consecutive monitoring periods where lead exceeded the legal limit.[1]

7.     Lead was not the only dangerous contaminant that Plaintiffs unknowingly ingested. On October 3, 2018, EGLE's Sanitary Survey report also identified E. coli bacteria in the Benton Harbor water supply.

8.     The City and State of Michigan have since admitted that municipal tap water is not safe for Plaintiffs to ingest, use for food preparation, or use for oral hygiene. However, these warnings came three years too late. Not until October 14, 2021, when Defendant Michigan Governor Gretchen Whitmer issued an executive declaration pronouncing the water unsafe to drink and authorizing the use of bottled water, did the residents of the City of Benton Harbor, Plaintiffs, and putative Class Members learn that the water was unsafe to drink, cook, wash, bathe, and/or brush their teeth with.

---

[1] Exhibit A, Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. §300(i) and 42 U.S.C. §300(j)(7)(b) to Abate the Imminent and Substantial Endangerment to Benton Harbor Residents from Lead Contamination in Drinking Water, p. 12 (September 9, 2021).

9. Contrary to previous public representations, on October 20, 2021, EGLE Director Liesl Clark admitted, during a Michigan State Legislative hearing, that the Benton Harbor drinking water, after three years of known statutory exceedances, is not safe to drink. In response to the question posed by a State Representative, "Is it safe to drink the water in Benton Harbor right now, or not?" Defendant Clark responded, "No, it's not. People should be drinking bottled water."

10. Benton Harbor residents were caught in the middle of the City and the State's ongoing failure to adequately address Benton Harbor's water crisis and their relentless attempts to shift responsibility to one another. Compounding this failure was the involvement of private engineering companies, Elhorn Engineering and F&V Operations and Resource Management, Inc., who similarly neglected to follow the federal and state statutes concerning anti-corrosion measures intended to prevent lead from leaching from service pipes into the tap water and failed to fulfill their notification obligations to the Benton Harbor community.

11. Defendants' cover up was fraudulent, illegal, callous, and inflicted significant harm on Benton Harbor residents. Through this action, Plaintiffs and the proposed Class seek to enjoin Defendants' ongoing failure to adequately address municipal water contamination and recover the economic damages it has caused.

## III. PARTIES

### A. Plaintiffs

12. Plaintiff **Daretha Braziel** (for the purpose of this paragraph, "Plaintiff"), a lifelong resident of the City of Benton Harbor, Michigan. Since February 2021, Plaintiff has lived with minor children, age 15 (minor 1), age 17 (minor 2); and grandson, age 4 months (minor 3), all of whom are African American. Prior to that, Plaintiff lived for over 8 years in a Benton Harbor home with her mother. Plaintiff and her minor children and grandson,

utilized Benton Harbor tap water until late October 2021, when publicly exposed to Plaintiff that the water was not safe to ingest, for food preparation or oral hygiene. At no time prior to late October 2021 was Plaintiff ever notified by any of the Defendants that the water she used was unsafe to drink or utilize in food preparation and for oral hygiene. Plaintiff's minor grandson, born in 2021, was fed formula made with tap water right up until Governor Whitmer declared a state of emergency on or about October 14, 2021, and the "news got out." In 2021, Plaintiff Daretha Braziel had her water tested, which showed a lead level of 889 parts per billion (ppb). The legal limit at the time for both the federal and State of Michigan, under the Lead and Cooper Rule, was 15 ppb. Plaintiff and her minor dependents have suffered a concrete injury as a direct and proximate result of Defendants' actions and customary decision making, including physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property, and economic loss from the exposure to contaminated tap water. Additionally, State Defendants and Benton Harbor Defendants did not notify Plaintiff that she and her children should stop ingesting the water from 2018 to 2021, as was required by provisions of the federal and state Safe Drinking Water Act. Plaintiff has also suffered injuries and damages from the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

13.   Plaintiffs **Keesha Jones** and **Ieasha Jones** (for the purpose of this paragraph, "Plaintiffs"), lifelong residents of the City of Benton Harbor, Michigan, utilized tap water from the Benton Harbor water system for drinking, cooking, bathing, sanitation and hygiene from 2018 through 2021. Plaintiff Keesha Jones lives with four children, ages 4 to 18 (minors 4, 5, 6 and 7), as well as one minor grandchild (minor 8) born in June 2021. Plaintiff Ieasha Jones is an adult who has lived with her mother, Keesha Jones, at all times pertinent. Plaintiff Keesha Jones, her children and  grandchild, including Plaintiff Ieasha Jones—all of

whom are African American—have suffered concrete injuries as a direct and proximate cause of Defendants' actions, and customary decision making, including physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water. Additionally, State Defendants and Benton Harbor Defendants did not notify Plaintiffs that both they and their children should stop ingesting the water from 2018 to 2021, as was required by provisions of the federal and state Safe Drinking Water Act. Plaintiffs have also suffered injuries and damages from the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

14.     Plaintiff **Emma Kinnard** (for the purpose of this paragraph, "Plaintiff"), has lived at the same address in Benton Harbor, Michigan since 1976 and is an African American business owner. Plaintiff asked Defendant Mayor Muhammad to test her water, approximately two years ago, because of the smell and look. Defendant, Mayor Muhammad, told Plaintiff he would "get back to [her]," but he never did. Plaintiff has suffered concrete injury as a direct and proximate cause of Defendants' actions, and customary decision making, including physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water. Additionally, State Defendants and Benton Harbor Defendants did not notify Plaintiff that she and her children should stop ingesting the water from 2018 to 2021, as was required by provisions of the federal and state Safe Drinking Water Act. Plaintiff has also suffered injuries and damages from the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

15.     Plaintiff **Michael Duane Brigham** (for the purpose of this paragraph, "Plaintiff") is a sixty-one year old African American man who has lived at his current

address in Benton Harbor, Michigan for eleven years. Plaintiff utilized the water coming from his tap for all purposes, including drinking and bathing, until October 2021, when Governor Whitmer issued an emergency announcement not to drink the Benton Harbor water. On October 28, 2021, Plaintiff Brigham was administered a blood lead test and found to have lead in his blood, even though he had not ingested the water for approximately two weeks. Plaintiff has suffered concrete injury as a direct and proximate cause of Defendants' actions and customary decision making, including physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and property and economic loss from the exposure to contaminated tap water. Additionally, State Defendants and Benton Harbor Defendants did not notify Plaintiff that he should stop ingesting the water from 2018 to 2021, as was required by provisions of the federal and state Safe Drinking Water Act. Plaintiff has also suffered injuries and damages from the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

16.     Plaintiff **Rebecca Branscumb** and **Stacey Branscumb, an African American man** (for the purpose of this paragraph, "Plaintiffs"), have lived with their two children in their home in Benton Harbor, Michigan for over twelve years. In 2021, test results from Plaintiffs' tap water revealed a lead level of **496 ppb**. At the time of the water test, the legal limit for lead in tap was **15 ppb.** Plaintiffs utilized the water coming from their tap for all purposes, including drinking and bathing, until October 2021, when Governor Whitmer issued an emergency announcement not to drink the Benton Harbor water. Defendants did not advise Plaintiffs to stop using the water prior to that time. Plaintiffs' family pet, a Great Dane, died after ingesting tap water in their home. Plaintiffs have suffered concrete injury as a direct and proximate cause of Defendants' actions, and customary decision making, including physical and emotional injuries, annoyance and discomfort, interference with the comfortable enjoyment of life and

property and economic loss from the exposure to contaminated tap water. Additionally, State Defendants and Benton Harbor Defendants did not notify Plaintiffs that both they and their children should stop ingesting the water from 2018 to 2021, as was required by provisions of the federal and state Safe Drinking Water Act. Plaintiffs have also suffered injuries and damages from the professional negligence of Elhorn Engineering and F&V Operations and Resource Management.

17.     All of the Named Plaintiffs are citizens of the United States and at all relevant times are residents of Benton Harbor, individuals, and Next Friends for minors, homeowners, renters, and a business owner who, since at least 2018, were and continue to be, exposed to highly dangerous lead, bacteria and other contaminants in their tap water.

### B.     <u>Defendants</u>

18.     Individual state Defendants are sued in their individual and/or official capacities as indicated below.

19.     Defendant **Gretchen Whitmer** is the Governor of the State of Michigan and is vested with executive power pursuant to Art. V, Section l, of the Michigan Constitution. Since January 2019, Governor Whitmer has been responsible for the management of the state government for the health and welfare of its citizens and residents. Plaintiffs sue Governor Whitmer in her individual and official capacity, for prospective equitable relief to correct the harm that was caused, maintained, and covered up by Defendants.

20.     Defendant **State of Michigan** (the "State") operates EGLE, which is responsible for the overall management of the state department that is responsible for the environmental safety and health of Michigan citizens and residents. EGLE made decisions that caused, maintained, and covered up the Benton Harbor water crisis. The State also operates the

Department of Health and Human Services ("DHHS"), which is responsible for overseeing the health policy for all residents.

21.     Defendant **Liesl Clark** is currently, and at all relevant times after January 2019 was, Director of EGLE. Plaintiffs sue Defendant Clark in her individual and official capacity. Defendant Clark was aware of and participated in the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis.

22.     Defendant **Eric Oswald** is, and at all relevant times was, the Drinking Water and Environmental Health Division Director of EGLE, both during the tenure of former Michigan Governor Richard D. Snyder and Defendant Governor Gretchen Whitmer. Plaintiffs sue Defendant Oswald in his individual and official capacity. Defendant Oswald was aware of and participated in, the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis.

23.     Defendant **Robert Gordon** was Director of Michigan Department of Health and Human Services from January 2019 through January 2021. Plaintiffs sue Defendant Gordon in his individual and official capacity. Defendant Gordon was aware of and participated in, the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis.

24.     Defendant **Elizabeth Hertel** has been Director of Michigan Health and Human Services from January 2021 to present. Plaintiffs sue Defendant Hertel in her individualy and official capacity. Defendant Hertel was aware of and participated in, the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis.

25.     Defendant **City of Benton Harbor** is a municipal corporation, authorized by the laws of the State of Michigan. The city, through its executives and contractors, owns and operates the Benton Harbor Public Water System and provides tap water and sanitary services to

its residents and property owners as part of its responsibilities and operation. The City of Benton Harbor is liable because the municipal corporation itself, through its policymakers, caused, maintained, and covered up and was deliberately indifferent to the Benton Harbor water crisis.

26.     Defendant **Marcus Muhammad** is, and from 2018 to present was, the Mayor of Benton Harbor. Plaintiffs sue Mayor Muhammad in his official and individual capacity. From 2018-2021, Defendant Muhammad approved of,  and participated in, the decisions that caused, maintained, and covered up the Benton Harbor water crisis. Further, from 2018-2021, Defendant Muhammad failed to notify and warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the state and federal Lead and Copper Rules under the respective Safe Drinking Water Acts. Although Defendant Muhammad was fully aware of the high lead levels, he did not follow the notice and public education required by federal and State Safe Drinking Water laws. In addition, as Mayor, Defendant Muhammad was chief policymaker for Benton Harbor. Therefore, his actions constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

27.     Defendant **Darwin Watson** was at all relevant times from 2014-2020 a City Manager for Benton Harbor. As City Manager, he approved of and participated in the decisions that deliberately caused, maintained, and covered up the Benton Harbor water crisis. Further, from 2018-2020, Defendant Watson failed to notify and/or warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the state and federal Lead and Copper Rule under the respective Safe Drinking Water Acts. Although Defendant Watson was aware of the high lead levels, he did not follow the notice and public education required by State and federal Safe Drinking Water laws. In addition, as City Manager, Defendant Watson was chief policymaker for Benton Harbor. Therefore, his actions

constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

28.     Defendant **Ellis Mitchell** is, and at all times relevant after 2020, was City Manager for Benton Harbor. As City Manager Mr. Mitchell approved of and participated in the decisions that caused, maintained, and covered up the Benton Harbor water crisis. Further, from 2018-2021, Defendant Mitchell failed to notify and/or warn the residents of Benton Harbor that the water in its lead lines continued to have high levels of lead that exceeded the State and national Lead and Copper Rule under the respective Safe Drinking Water Acts. Though Defendant Mitchell was aware of the high lead levels, he did not follow the notice and public education required by State and federal Safe Drinking Water laws. In addition, as City Manager, Defendant Mitchell was chief policymaker for Benton Harbor. Therefore, his actions constituted customs, policies and practices for Defendant Benton Harbor under the *Monell* legal doctrine.

29.     Defendant **Michael O'Malley** was Water Plant Director of the City of Benton Harbor Public Water System. Defendant O'Malley was charged with ensuring that the water services provided to Benton Harbor customers were safe and did not jeopardize their health and safety and was required to file a monthly report with the EGLE. Plaintiffs sue Defendant O'Malley in his official capacity and individual capacity.  Defendant O'Malley took a leave of absence in 2020, and his license was revoked in 2021 by the State of Michigan. Defendant O'Malley's actions caused, maintained, and covered up the Benton Harbor water crisis. Additionally, Defendant O'Malley failed to follow the notice and public education requirements of the state and federal Safe Drinking Water Acts. His actions also violated the Michigan Government Tort Liability Act in that he was grossly negligent and his actions were the proximate cause of the injuries and damages to each Plaintiff. Additionally,

Defendant O'Malley's actions violated each Plaintiffs bodily integrity and property interest under the Fourteenth Amendment.

30.    Defendant **Elhorn Engineering Company** ("Elhorn") is a Michigan corporation with its principal place of business in Mason, Michigan. Elhorn was an agent contractor for the City of Benton Harbor and was negligent in its acts and omissions related to its selection of anti-corrosive chemicals and implementation of its use, which failed to prevent lead from leaching into the Benton Harbor water supply. The use of a series of different anti-corrosive chemicals added more toxicity to the residents' water. As a result, of Elhorn's failed anti-corrosive treatment, lead contamination in the water supply increased. Further, Defendant Elhorn did not perform an adequate corrosion study prior to starting the use of an anti-corrosive. Nor did it propose an optimal corrosion control system or evaluate the overall stability of the Benton Harbor Water Plant as required by the federal Safe Drinking Water Act. Defendant Elhorn's professional negligence caused foreseeable injuries and damages to each Plaintiff.

31.    Defendant **F&V Operations and Resource Management, Inc.** ("F&V") is a Michigan corporation with its principal place of business in Grand Rapids, Michigan. Defendant F&V both was and is an agent contractor for Defendant City of Benton Harbor. Defendant F&V, an operator of the Benton Harbor Water Plant since mid-2020, was negligent in its acts and omissions related to its involvement in the Benton Harbor Public Water System. Through its employees, F&V failed to follow "best practices" to remove the lead in Defendant Benton Harbor's lead service lines. As operator of Benton Harbor's Water Plant, it has failed to provide competent staff or direction to Benton Harbor employees. In addition, F&V, failed to follow the requirements of the state and federal Safe Drinking Water Acts (SDWA), including but

not limited to CRF 40 § 141.85 Public Notice and its anti-corrosion practices. Defendant F&V's negligence caused foreseeable injuries and damages to each Plaintiff.

### IV.    JURISDICTION AND VENUE

32.    This is a civil action brought pursuant to 42 U.S.C. § 1983, seeking damages as well as injunctive and declaratory relief against the State of Michigan, Governor Gretchen Whitmer, and other State Defendants; Defendant City of Benton Harbor and its City Defendants; and Elhorn and F&V for violations of the Due Process Clause, of the Fourteenth Amendment of the United States Constitution.

33.    The Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, federal questions raised, 28 U.S.C. § 1343(a)(3) and (4) for Defendants failure to prevent violations to Plaintiffs' civil rights, and 28 U.S.C. § 2201, the Declaratory Judgment Act.

34.    The Court has personal jurisdiction over Defendants named herein as public officials and employees of the State of Michigan, sued in their official and individual capacities; public officials, employees of the City of Benton Harbor, sued in their official and individual capacities; and the City of Benton Harbor, for violations of Plaintiffs' constitutional rights. The Court has jurisdiction over the Governor of the State of Michigan, in her official capacity, for prospective relief, only.

35.    The Court has supplemental jurisdiction over both Engineering Defendants because each Plaintiff's negligence claim is so related to Plaintiffs' federal constitutional claims ". . . that they form a part of the same case or controversy under Article III of the United States Constitution. Such supplemental jurisdiction shall include claims that involve the joinder or intervention of additional parties." 28 U.S.C. § 1367.

36.    The amount in controversy in this suit exceeds $5,000,000.00 exclusive of interest and costs.

37.     Venue is proper in this Court as all Defendants conduct their business in the
Western District of Michigan and the majority of the acts giving rise to Plaintiffs' claims
occurred in this District. Further, Plaintiffs reside in this District and many also own property in
this District.

## V.     STATEMENT OF FACTS

38.     This litigation arises out of the public health emergency and crisis in the City of
Benton Harbor arising from lead, bacteria and other contamination in the water supply. From
2016 to 2020 there were approximately 9,615 residents in Benton Harbor, many of whom are
children.[2] At least since 2018, Benton Harbor residents have been exposed through ingestion and
other uses of water with high levels of lead and other contaminants that exceed the state and
national Lead and Copper rule of the Safe Drinking Water Act (SDWA) 40 CFR § 141 and the
Michigan Safe Drinking Water Act 399 of 1976.

39.     Benton Harbor is an environmental justice community, a community most
impacted by environmental harms and risks. There are approximately 85% African
American and 5% Hispanic residents.[3] Children make up 27% of Benton Harbor's
population.[4] The adverse social determinates of health for communities of color are publicly
known to create disproportionate harm, a fact known, or that should have been known, by
each Defendant.

40.     Plaintiffs, many of whom are children and infants, have been and continue to be
exposed to the extreme toxicity of lead and other contaminants, causing an "imminent and

---

[2] United States Census, Quick Facts, Benton Harbor,
www.census.gov/quickfacts/bentonharbormich.
[3] United States Census Bureau, *QuickFacts: Benton Harbor, Michigan*,
https://www.census.gov/quickfacts/fact/table/bentonharborcitymichigan/PST045219.
[4] *Id.*

substantial endangerment to their health." The acute, destructive health effects on children under age six has been widely known for many years.[5]

41.     Lead, one of the known and principal contaminants in this case, is a neurotoxin. It is known to cause severe injury and death.[6] Medical science has known for years that there is no safe exposure(?) level for lead, therefore exposure should be zero.[7]

42.     Adverse and devastating health effects from lead exposure are well documented. "Lead has been demonstrated to exert a broad array of deleterious effects on multiple organ systems."[8]

43.     Effects of lead exposure are particularly serious for children. As noted by the Centers for Disease Control and Protection: "Even low levels of lead in blood have been shown to effect IQ, ability to pay attention, and academic achievement" in a manner that is irreversible. "The scientific community has not identified **any** threshold of blood below which there are no adverse health effects."[9]

44.     The federal Safe Drinking Water Act has set a goal for the maximum containment level of lead at zero.[10]

---

[5] Centers for Disease Control and Prevention, *Blood Lead Levels in Children*, https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm.

[6] "Health effects associated with exposure to inorganic lead and compounds include, but are not limited to: neurotoxicity, developmental delays, hypertension, impaired hearing acuity, impaired hemoglobin synthesis, and male reproductive impairment. Importantly, many of lead's health effects may occur without overt signs of toxicity. Lead has particularly significant effects in children, well before the usual term of chronic exposure can take place." *See* Ex.A, Petition, at 13.

[7] Centers for Disease Control and Prevention, Blood Lead Levels in Children, https://www.cdc.gov/nceh/lead/prevention/blood-lead-levels.htm (last reviewed April 20, 2022).

[8] *Id.*, p. 12.

[9] *Id.*, p. 13.

[10] *Id.*, p. 13.

45.     The EPA has set an action limit whereby the level of lead present in a public water supply cannot exceed 15 parts per billion (ppb).[11] If sampling reveals lead levels in excess of the 15 ppb action level, statutes are triggered requiring the operating entity to jump into action by accomplishing tasks such as corrosion control treatment, source water treatment, lead service line replacement, and public education.[12]

**A.     Benton Harbor's Public Water System**

46.     Benton Harbor's public water system is owned by the City of Benton Harbor, and the raw water is sourced from Lake Michigan.[13] Benton Harbor uses a "conventional filtration treatment process including coagulation, flocculation, sedimentation, and filtration."[14]

47.     From 2010 to 2014, Defendant State of Michigan placed Defendant Benton Harbor under the authority of two (2) consecutive Emergency Managers. Thereafter, from 2014 to July 2016, Defendant State of Michigan placed Defendant Benton Harbor under the control of the Benton Harbor Receivership Transition Advisory Board. The members were selected by then-Governor Richard Snyder.

48.     During the years that Benton Harbor was under the direction of the State appointed Emergency Managers and the Advisory Board, the Managers ordered drastic layoffs that involved half of Benton Harbor's Water Department employees. These State ordered layoffs severely compromised Benton Harbor's Water Department's ability to deliver clean, safe water to its residents, including each Plaintiff as is required by federal and State of Michigan Safe Drinking Water Acts.

---

[11] U.S.C § 300g-1(b)(7)(A).
[12] 40 CFR § 141.80.
[13] Exhibit B, EPA Region 5 Enforcement and Compliance Assurance Division, SDWA Drinking Water Inspection Report (Sept. 20-27, 2021), at 4.
[14] *Id.*

49.     As seen below in its January 23, 2019 Regulatory Status Report, the City is well-aware of its track record violating the Michigan Safe Drinking Water Act, and failing in its duties to manage the water system and protect public health, continuing to be out of compliance:[15]

**2018 Violations**

The city also accrued a number of violations of Act 399 in the 2018 calendar year, suggesting a lack of ability to operate the water system in compliance with the law and remain protective of public health. *See the attached Compliance History timeline.*

Comment [KA(2): Is this phrase essential?  If not, can it be deleted and let the compliance record tell the story without us extending this opinion?

In a September 2021 PowerPoint presentation, the City lists trends in its history of non-compliance, including disinvestment/deferred maintenance, lack of organization, and inability to manage:[16]

**B.      The Benton Harbor Lead Crisis**

50.     Since at least 2018, Defendant State, its Defendant agencies, Directors and employees; and Defendant Benton Harbor, its Defendant officials and employees were publicly silent and denied that Benton Harbor's water supply was poisoned with high levels of lead and other contaminants. Further, each State Defendant ignored the misinformation that they knew was being partially disseminated to the public by Benton Harbor Defendants that the water supply was not poisonous and was safe to drink.

51.     On or about October 3, 2018**,** Defendant State of Michigan issued a citation against Defendant Benton Harbor for, among other things, its failures to both properly operate its water supply system, properly treat Benton Harbor's water supply to maintain safe

---

[15] City of Benton Harbor, Regulatory Status Update, 23 Jan. 2019, at 1.
[16] *Id.*, at 15.

drinking water and numerous failures in the equipment and inadequate staffing; all in violation of the Michigan Safe Drinking Water Act 399 of 1976.

52.     On January 11, 2019, Defendant Director Clark was asked by Jay Rising, Cabinet Secretary for Governor Whitmer of Benton Harbor, if Clark was aware of the "Benton Harbor Lead - Copper Rule exceedance." Defendant Clark responded "Yes, glad to discuss."

53.     On January 21, 2019, Defendant Clark received the joint press release regarding Benton Harbor which was drafted jointly by members of Defendant EGLE and the Michigan Department of Health and Human Services ("MDHHS"). The press release recommended the use of filters and flushing out the water before use, but did not advise the residents of Benton Harbor that the water was unsafe to drink because of lead and other contaminants.

54.     On or about January 27, 2019, Defendant Clark instructed Defendant Oswald, Director of EGLE's Drinking Water and Environmental Health Division, and Aaron Keating, Chief Deputy Director of EGLE to notify Defendant Governor Whitmer of the escalating lead exceedances in Benton Harbor's water supply that triggered action to protect the Benton Harbor public under the federal and State Safe Drinking Water Acts as follows:

> "Hi Aaron and Eric,
>
> We need to provide this information to the Governor's office. It needs to be put in the context, however. Eric, can you write up a few paragraphs (no more than a page) explaining what this means and how it relates to Benton Harbor?
>
> Thanks, Liesl"

55.     "Benton Harbor has stated that it has 5,877 total service lines; 51% of its service lines are either known to contain lead, are known to contain galvanized lines previously connected to lead, or are of unknown material but likely to contain lead; 47% of the service lines

are of unknown material with no information, which should be assumed to contain lead until proven otherwise; and only 2% of the service lines have been confirmed as containing no lead and not being galvanized lines previously connected to lead."[17]

56.     In 2018, the Operator in Charge of the Benton Harbor public water system, Defendant O'Malley, admitted that lead may come from the city's main pipelines. As he stated in his Consumers Confidence Report, "Lead in drinking water does not come from Lake Michigan; or the Water Treatment Plant in Jean Klock Park; or (*perhaps to a very small degree*) the water in the mains that move the water all around the City."[18] He went on to opine that, "It does come from lead individual service lines from the main to the house (underground), and including any lead piping in the house and the plumbing fixtures (faucets and such) in the house."[19]

57.     Defendant EGLE and its individual Defendant Department officials and employees, from at least September 2018 to September 2021, had leading oversight responsibility for the management of the water crisis and decided not to cite the Defendant City of Benton Harbor under the federal and state Safe Drinking Water Acts for many of its violations or seek enforcement. Instead, State Defendants repeatedly extended Benton Harbor Defendants' deadlines for compliance with federal and state law.

58.     In an email dated December 8, 2019, from Defendant EGLE's supervisor, Michael Bolf, to Defendant Oswald, EGLE Director, Drinking Water and Environmental Health Division, Supervisor Bolf stated as follows: "if we continue the pattern of allowing them

---

[17] Exhibit A**,** Petition for Emergency Action Under the Safe Drinking Water Act, 42 U.S.C. § 300(i) and 42 U.S.C. § 300(j)(7)(b) to Abate the Imminent and Substantial Endangerment to Benton Harbor Residents from Lead Contamination in Drinking Water, p. 1, footnote 64, (September 9, 2021).
[18] Exhibit E, OUR Water Quality 2018, City of Benton Harbor Services Department's 2018 Consumers Confidence Report, at 3.
[19] *Id.*

(Benton Harbor) to miss deadlines and request extensions (for compliance of the Safe Drinking Water Act), then the water system remains vulnerable and we are potentially culpable if a problem occurs."[20]

59.     Further, Defendant EGLE Director Oswald's knowing and conscious deliberate indifference to each Plaintiff's constitutional rights is evidenced by his untruthful responses when asked about the lead in Benton Harbor's water supply, on at least two occasions:

60.     On November 14, 2018, EPA Region 5 Chief Thomas Poy wrote a letter to Defendant EGLE Director Eric Oswald requesting "...updates on non-compliant drinking water systems in Michigan."

61.     On January 11, 2019, EGLE Director Oswald knowingly provided a false response to EPA Chief Thomas Poy. In this regard Defendant EGLE Director Oswald stated that:

> "Of the two CWSs (Community Water Systems):
>
> • 1 water system has returned to compliance
>
> • 1 water system is in compliance and a requested clarification has been provided . . ."

62.     As early as the second week of January 2019, Defendant Robert Gordon, Director of Michigan Department of Health and Human Resources, was made aware that Benton Harbor had "multiple high lead results." Joint conference calls were conducted between EGLE and DHHS.

63.     On January 10, 2019, Dr. Eden Wells, the Cabinet Level Chief Medical Executive for MDHHS, sent an email to numerous MDHHS executives and administrators stating an

---

[20] Exhibit F, Email from Michael Bolf to Eric Oswald, copying others (Dec. 18, 2019), REL_0000006849.

inconclusive ambiguous opinion on what plan of action should be taken to protect the Benton

Harbor citizens:

> An update to the Benton Harbor issue. Two + months ago Benton Harbor was one of two municipalities that were noted to have lead and copper rule exceedances. Benton Harbor expanded its sampling after their initial lead and copper rule testing.
>
> As a result: It is our understanding that there may be over 40 homes that exceed the 15 ppb level - which is considered elevated. The residents were advised by the city to flush their water taps for 3 to 5 minutes in the thought that this lead was likely coming from their own home's lead service lines.
>
> The local health department health officer and her team met on a call this afternoon with DEQ and DHHS. There will be an in-person meeting with the city of Benton Harbor Monday morning as well as the beginning of serial sampling next week which means taking multiple liters from a faucet in order to determine if lead is coming from the faucet fixtures, the led service line, or the water-main or further into the system.
>
> Because we do not have this serial sampling data now <u>we do not know</u> <u>of any further public health threat at this time.</u> However we will work with the city and the local health department to assure that homes have adequate protective measures to protect their health, whether it involves simply flushing faucets, obtaining alternate water sources, or obtaining water filters.
>
> DEQ and DHHS will continue to work in a coordinated fashion to assist Berrien County Health Department in this matter to assure public health protections and ongoing monitoring and management.

The plan of action was not subsequently updated to state there was a public health threat until

October 14, 2021, when Defendant Governor Whitmer made her announcement.

     64.    Director Gordon's DHHS employees performed sequential lead and copper

sampling of the same Benton Harbor homes that, in 2018, had lead exceedances. The testing

confirmed the presence of lead in the service line.

     65.    Defendant Director Gordon, despite knowing of the lead and other contaminants

in Benton Harbor's tap water, approved the use of "free filters'" for the homes of only some

Benton Harbor residents, in a random, non-urgent fashion, without performing an appropriate filter study to determine if such filters had efficacy to filter out the nanoparticles of lead, or the large amounts found in the Benton Harbor 2018 sampling. Defendant Gordon continued the free filter handout without knowing if it worked. In 2019, 2020 and 2021, Defendant Gordon continued his "free filter" giveaways without confirming who received the filters, how the filters were installed, and not advising that the water was unsafe to ingest.

66.     On September 9, 2021, because Defendant EGLE and Defendant City of Benton Harbor were not following the mandatory requirements of the federal and State of Michigan Safe Drinking Water Act to eliminate the public health emergency caused by lead, bacteria, and other contaminants in Benton Harbor's water supply, a coalition of community and environmental groups and citizens urgently submitted an Emergency Petition to the EPA.[21]

67.     At least since 2018 to present, testing performed by Defendants EGLE and its predecessor DEQ, reveal that water samples in Defendant Benton Harbor's water system show violations of the Lead and Copper Rule with lead exceedances as high as 889.[22]

68.      "Benton Harbor is the only water system in a Michigan city to have six (6) lead action level exceedances according to data beginning in 2011." *Id.,* p. 12.

69.     Table 1 in the Petition filed by the Benton Harbor Community and other supporters to the EPA, outlined the highly alarming lead contamination that was found in Benton Harbor water supply as follows:

| Table 1 - Reported Results of Lead Tap Samples in Benton Harbor by Sampling Period |
|---|

---

[21] Exhibit A, Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. § 300i and 42 U.S.C. § 300j-l(b).
[22] *Id.,* p.11.

| Sampling Period | 90th Percentile (in parts per billion) | Number of Sites Above Action Level | Range of Sample Results (in parts per billion) |
|---|---|---|---|
| 6/1 /20 I 8 - 9/30/2018 | 22 | 8 | 0-60 |
| 1/1/2019 - 6/30/2019 | 27 | 12 | 0-59 |
| 7/1/2019- 12/31/20 I 9 | 32 | 10 | 0-72 |
| 1/1/2020 - 6/30/2020 | 26 | 9 | 0-440 |
| 7/1/2020 - 12/31/2020 | 24 | 11 | 0-240 |
| 1/1/2021 - 6/30/2021 | 24 | 11 | 0-889 |

*Id.,* p. 11.

70.    Since 2012, Benton Harbor's own website publicly reported that the City's lead

levels since 2012 have increased incrementally.[23]

71.    These high lead levels are a result of corrosion from the city's lead service pipes.

**C.    Defendants Failed to Implement Required Corrosion Control**

72.    Once high lead levels are discovered, the federal and State Safe Drinking Water

Acts require the water system implement corrosion control to prevent lead leaching into the

water supply from lead pipes or pipes that contain lead fixtures.[24]

73.    Both Defendant State of Michigan and each Defendant State official and

employee, as well as each Defendant Benton Harbor and Defendant Benton Harbor official

and employee, were aware of the federal and Michigan Safe Drinking Water Act mandatory

requirements for the Benton Harbor water supply pipes to be properly treated with anti-

---

[23] Exhibit E, Defendant City of Benton Harbor website, in its "Consumer Confidence Report" shows in 2012, a 5 ppb, and by 2015, a 12 ppb lead increase.
[24] Exhibit A, Petition for Emergency Action under the Safe Drinking Water Act, 42 U.S.C. § 300i and 42 U.S.C. § 300j-l(b),  p. 4.

corrosion processes to prevent lead leaching into the water supply from corrosion after a lead exceedance occurred. *Id.*

74.     The Michigan Administrative Code provides two ways that a water supply such as Defendant Benton Harbor must follow when, as here, there are lead exceedances and anti-corrosion treatment is necessary. *Id.,* pp. 18-21.

75.     EGLE is required to have the water supplier perform a corrosion control study within 12 months after the end of the monitoring or sampling period during which a water supply exceeds the lead or cooper action level (15 ppb). In this case, June-September 2018. Mich. Admin. Code R 325.10604f(2)(e)(ii). Further, the Mich. Admin. Code s requires the evaluation of the effectiveness of its water supply treatments. Subdivision (c)(i). *Id.*

76.     The State (EGLE) "must specify optimal corrosion control treatment within 12 months after the end of the monitoring period during which the supply exceeds the lead and copper action level." Mich. Admin. Code R 325.10604f(2)(e)(ii). This section requires EGLE designate and approve "optimal control treatment," under subsection 3(d). *Id.*

77.     EGLE consciously, knowingly and deliberately refused to follow both Mich. Admin. Codes in ¶¶ 117-118.

78.     Benton Harbor contracted Private Defendant Elhorn Engineering to install anti-corrosion and other measures which would permit Benton Harbor to meet their legal obligations under federal and State of Michigan Safe Drinking Water Acts and the federal and State Lead and Copper rules to provide clean safe water to each Plaintiff and Benton Harbor resident.

79.     Defendant State of Michigan EGLE selected Defendant Elhorn Engineering to perform corrosion control and directly paid them.

80.     Defendant State of Michigan, EGLE directed Defendant Elhorn Engineering to use the corrosion control chemical polyphosphate blend Carus 8600, which was Elhorn's propriety product.

81.     Defendant EGLE knowingly and deliberately directed Defendant Elhorn Engineering perform the Benton Harbor water supply corrosion control procedures in violation of Mich. Admin. Code R. 325.10604f(3)(d) and (c)(i).

82.     When Great Lakes Environmental Law Center Executive Director Nicholas Leonard sent Defendant Oswald, State of Michigan EGLE Drinking Water and Environmental Health Division Director an email dated November 6, 2019, pointing out the fact that the corrosion control that EGLE directed Elhorn Engineering use in Benton Harbor to remove lead from the water supply did not follow Mich. Admin. Code R, 325.10604(f)(3)(c), in an email response dated November 26, 2019, Director Oswald "covered up" the fact that Elhorn Engineering's proprietary product, Carus 8600, was not working and falsely asserted in his reply to Nicholas Leonard that the Carus 8600 was working to reduce the documented lead contamination. However, the July to December 2019 sampling period recorded 32 ppb; this was the highest 90th percentile for lead samples for any Benton Harbor sampling period up to that time. *Id.,* p. 20.

## D.     Benton Harbor's Bacterial Water Contamination

83.     In addition to lead, Defendants were also aware of, yet failed to mitigate, other worrisome contaminants in Benton Harbor's water supply. These contaminants, E. coli and other toxins, caused additional dangers to Benton Harbor consumers.

84.     As the EPA concluded in its March 29, 2022 Inspection Report of the Benton Harbor water treatment facility, bacteria has likely continued to contaminate Benton Harbor's water supply. This is because Benton Harbor's antibacterial station is located at the

wrong stage of the water treatment process. Specifically, the Benton Harbor Water Department has been mistakenly chlorinating its water downstream (or after) the water goes through the filters. As a result, the facility's "continuous chlorine analyzers are not an accurate representation of the residual disinfectant levels throughout the treatment process."[25] The misplacement of the antibacterial station means that Benton Harbor is not and cannot be appropriately testing its treated water for bacteria before it is distributed to homes in the city.

85.     Water officials used false technical excuses to cover up their failure to protect and deliver potable water to the people of Benton Harbor. "During the inspection EPA observed an increase of approximately 1 mg/L in the chlorine residual from the start of the inspection around 8:30 AM to around 10:00 AM." When the EPA asked Benton Harbor's Water Supply about this odd spike, Benton Harbor officials said that this discrepancy was usual. Benton Harbor officials told the EPA that the two readings were different because the Supervisory Control and Data Acquisition (SCADA) system updates the screens every fifteen minutes whereas the device reading for the primary finished chlorine analyzer does not. They also tried to explain away the spike by noting that the chlorine feed was only run during hours of operation, so the chlorine residual gradually drops overnight and rose is the morning when the plant is fully operational.

86.     Following its inspection, the EPA found these explanations to be inaccurate. The discrepancy between the morning and afternoon spike in chlorine residual was because "chlorine is being injected into the suction well and not upstream of the filters as previously stated."[26]

---

[25] Exhibit G, EPA, Region 5 Enforcement and Compliance Assurance Division, SDWA Drinking Water Inspection Report of the City of Benton Harbor, 29 March 2022, at p. 11.
[26] *Id.*

87.     The City was aware of the issue with the location and inadequacies of its antibacterial station well before 2022, and by 2019 at the latest. As far back as 2019, it compiled a "non-exclusive list of significant deficiencies for correction," which included "Move chemical feed point to proper location (design underway)," and "Install functioning chlorine analyzer at water plant."[27]

88.     These issues were also memorialized in a September 2021 PowerPoint where the City presented a history of its non-compliance with state and federal regulations. In the presentation, it cited 2019 issues of needing to move the alum feed and the SCADA and chlorine analyzer, as shown below:[28]



[29]

---

[27] Exhibit D, City of Benton Harbor Regulatory Status Update, 23 Jan. 2019, at 1.
[28] Exhibit H, City of Benton Harbor Water System, Water System History and Compliance and Enforcement Update (2 Sept. 2021) at 5.
[29] An Action Level Exceedance, or ALE, is regulatory term used to refer to when water is found to have more than 15 parts per billion (ppb) of lead requiring action to reduce lead levels.

89.     Defendants knew that, like lead contamination, there were severe problems with the public water system's ability to remove bacteria and other contamination from the water. Yet, despite this long-held knowledge, Defendants deliberately turned a blind eye and/or actively concealed the underlying issues with Benton Harbor's municipal tap water.

**E.     Defendants' Active Concealment of the Water Contamination Crisis**

90.     From September 2018 to October 14, 2021, each Defendant knew that the City of Benton Harbor water supply had exceeded the 15 ppb Lead and  Copper rule mandatory threshold, and as a result required immediate action under State and federal law because the water was poisonous and unsafe to drink or ingest. Yet, all Defendants "covered up" these significant findings and violations of both federal and State Safe Drinking Water statutes and the Lead and Copper rules.

91.     It was not until October 14, 2021, after a period of lead in Benton Harbor's tap water supply for over three years, that Defendant Governor Whitmer announced a State of Emergency, through the issuance of an Emergency Declaration. This was the first time that any of the Defendants provided any public notice that there was a public health emergency regarding lead in the City's tap water, and advised Benton Harbor residents that the water should not be ingested because it exceeded the Lead and Copper Rule 15 ppb and was unsafe.

92.     Internal emails dated September 29, 2021, among Kara Cook, coordinator to Governor Whitmer, EGLE consultant, Andrew Leavitt, and other EGLE employees confirms the sheer inadequacy of EGLE's public notices. In the email exchange, Mr. Leavitt advises EGLE of numerous deficiencies in its pamphlet including the following: "The pamphlet never says residents need to stop drinking the water because there is a lead emergency, "The pamphlet describes how water corrodes metal. This is not the urgent message residents need. They need to know their water is not safe to drink," "The pamphlet emphasizes good nutrition before giving

any information on reducing lead in the water or telling the resident to STOP DRINKING THE WATER."[30]

93.     Defendant Governor Whitmer does not deny that she has knowledge of the catastrophic health effects the ingestion of contaminated water can cause. On October 26, 2020:

> The Office of the Clean Water Public·Advocate was created through Governor Gretchen Witmer's Executive Order 2010-06. The Office operates as a type I agency within the Michigan Department of Environment, Great Lakes, and Energy, while having a connection to the Governor's Office to elevate concerns. The Office of the Clean Water Public Advocate ensures that drinking water concerns are investigated and that trends are analyzed. Based on trend analysis, recommendations to laws, rules, regulations, and procedures will be made to ensure that community concerns are addressed.[31]

94.     Yet, though Defendant Whitmer knew of the profound harm caused by contaminated drinking water she did not declare a State of Emergency until a year later.

95.     On October 27, 2021, as a result of the Emergency Petition by the environmental and community organization and individuals, the EPA conducted a joint inspection with Defendant EGLE of Benton Harbor's water system and issued an inspection report to Defendant Benton Harbor City Manager Ellis Mitchell, and copied EGLE State employees Ernest Sarkipalo and Michael Bolf, which read in pertinent part as follows:

> On September 20, 2021 through the 27th United States Environmental Protection Agency (EPA) conducted a compliance evaluation inspection of the Benton Harbor community water system (PWS ID MI0000600) Public Water System located in (Berrien County, Michigan). The purpose of the inspection was to make observations about the site conditions, operation, and monitoring of the System to evaluate compliance with the Safe Drinking Water Act (SDWA) and regulatory requirements. The inspection was conducted in coordination with the Michigan

---

[30] Exhibit N, Email Exchange Among EGLE Employees and Consultant, Andrew Leavitt (Sept. 29, 2021), EGLE 0018707-08.
[31] Exhibit I, Office of the Clean Water Public Advocate, at 1.

Department of Environmental, Great Lakes, and Energy (EGLE) and a copy is enclosed with this letter.[32]

96.     The extensive report, covering an inspection period last year, September 20-27, 2021, found numerous violations in the Benton Harbor Public Water System, including but not limited to deficiencies that had existed since at least 2018, and several prior to that time.

97.     The 2021 EPA Report, in its Summary of Previous Sanitary Survey (of year 2018), shows numerous and comprehensive failures at Defendant Benton Harbor's Public Water System, many of which had been previously inspected or evaluated for violation by the State government Defendants in January 2018. The EPA report found the following Benton Harbor water system violations from 2018 had not been "corrected" or the report states "unknown":

Summary of Previous Sanitary Survey 2018 Sanitation Survey Findings[33]

|  | 2018 Inspection | 2021 Inspection | Corrected |
|---|---|---|---|
| Source | Deficiency; need to inspect intake and restart mussel control | The intake was inspected July 2021. Repairs to the intake structure were made, but the mussel control system was not functional at the time of the inspection. | No |
| Treatment | Significant Deficiency: Coagulant feed needs ample mixing energy to be effective | Coagulate feed location was relocated to a mixing chamber at the plate settler basins. | |
| Treatment | Deficiency: Finished water meters not functioning, can't determine CT (Concentration Time) | Finish water meter is installed but is not being maintained Finish water meter is not being used for compliance monitoring. | No |

---

[32] Exhibit C, US EPA, October 27, 2021 Letter and Report "Region 5 Enforcement and Compliance Assurance Division SDWA Drinking Water Inspection Report, City of Benton Harbor, Berrien County, Michigan."
[33] *Id*. at 19-21.

|  | **2018 Inspection** | **2021 Inspection** | **Corrected** |
|---|---|---|---|
| Distribution System | Significant Deficiency: Formalize program to turn valves & flush hydrants. | Not Evaluated | Unknown |
| Distribution System | Significant Deficiency: Cross Connection Program needs complete overhaul | A new cross connection program was developed in 2020, but at the time of the inspection no actions had been taken to implement the 2020 plan. | No |
| Distribution System | Significant Deficiency: Many areas of low flow/no flow | Not Evaluated | Unknown |
| Distribution System | Deficiency: Aging water main replace is lacking | Not Evaluated | Unknown |
| Finished Water Storage | Deficiency: Reinspection of the elevated storage tank is overdue | At the time of the inspection, the tank was nearing a completion of a substantial rehabilitation. The underground storage at the water treatment plant had several missing screens on vent pipes, and could not be accessed to evaluate sanitary conditions. | Partial |
| Monitoring and Reporting | Significant Deficiency: Fix continuous chlorine analyzer | The continuous chlorine analyzer was offline at the time of the inspection | No |
| Monitoring and Reporting | Deficiency: MOR inaccurate information on treated water | The flow measurement method was inaccurate and based on a combination of uncalibrated depth sensors. | No |
| System Management & Operations | Significant Deficiency: Must commit to timeline for compliance | Benton Harbor is in the process of developing plans under an EGLE administrative order. Aspects of that order were addressed during the inspection | Ongoing |
| System Management | Significant Deficiency: Financial & Managerial | System was unable to provide financial | Ongoing |

|  | 2018 Inspection | 2021 Inspection | Corrected |
|---|---|---|---|
| & Operations | Capacity is not met | information at the time of the inspection | |
| System Management & Operations | Significant Deficiency: Hydraulic model calibration indicated areas of low flow | Not Evaluated | Unknown |
| Operator Compliance | Recommendation: Distribution & Treatment need more certified operators | Benton Harbor must determine the appropriate staffing level as a requirement of the EGLE administrative order. This item cannot be addressed until the staffing analysis is completed. | Ongoing |
| Financial | Significant Deficiency: Collection of rates is inefficient and ineffective | No records could be provided at the time of the inspection to evaluate this item. Bill collection is handled by a third-party contractor. | Unknown |
| Financial | Significant Deficiency: Rates insufficient to cover capital improvements | No records could be provided at the time of the inspection to evaluate this item. Benton Harbor was unable to provide a budget for water treatment activities. | Unknown |
| Other | Significant Deficiency: SCADA system needs additional functionality | Many continuous monitoring components and system automation functions were not working at the time of the inspection. The SCADA system was collecting inaccurate data. Alarm functions were unknown. | |

98.     Further, the EPA inspection report, under "Section 4, Areas of Concerns and

Observations," shows numerous Defendant Benton Harbor  Water System violations under 40

CFR 141, Lead and Copper Rule, of the Safe Drinking Water Act as follows:

1.      Records Maintenance;

2.      Requirements when making a significant change in disinfection practice;

3.      Disinfection;

4.      Emergency Response Plan, "During the inspection the Emergency Response Plan was not available since it had not yet been completed;"

5.      Revised Total Coliform Rule – General monitoring requirements for all public water systems. Plan is outdated (40 C.F.R. 141.853);

6.      Monitoring and Analytical Requirements (40 C.F.R. 141 Subpart C);

7.      Enhanced Filtration and Disinfection - Systems Serving Fewer Than 10,000 People (40 C.F.R. 141 Subpart T);

8.      Treatment;

9.      Potential Deficiencies;

10.     A number of potential cross connections were identified throughout the treatment system

11.     Monitoring Equipment Issues.[34]

99.     Of further significance, the EPA inspection report, under Section 4.2 Additional

Observations, found the following deficiencies:

1.      The room above the raw water wet well had severe paint flaking on the ceiling.

2.      The fluoride saturator was located outside of the containment for the day tanks.

3.      A lack of automation has led to overflowing chemical tanks and operating chemical injections to the treated water when the treatment system was not in operation.

4.      At the time of the inspection, the system was unable to identify which alarms had call out capability for the SCADA system.

---

[34] *Id.*, pp. 21- 23.

5.      Operation of the treatment plant is being conducted with both contract staff and employees of the City of Benton Harbor. It is unclear how the treatment plant operations staff is organized or supervised. A copy of the operations contact was not made available.

6.      There are no formal written agreements for the supply of emergency water through the system interconnects. The status of the valves to control those interconnects is also unknown.

7.      Benton Harbor was unable to provide a copy of the budget for the water treatment plant operations.

8.      Benton Harbor did not have records of customer complaints.

*Id.,* pp. 23-24.

100.    Thereafter, on November 2, 2021, the EPA, Region 5 issued a Unilateral Administrative Order, Proceeding under Section 1414(g) of the Safe Drinking Water Act, 42 U.S.C. § 300g-3(g), In the Matter of: City of Benton Harbor Public Water Supply, PWS ID MI0000600, Benton Harbor, Michigan, effectively immediately.[35] In relevant part the EPA Administrative Order reads as follows:

II.     FINDINGS OF FACT AND CONCLUSIONS OF LAW

4.      The City ("Respondent") is the owner and/or operator of the System located at 200 East Wall Street, Benton Harbor, Michigan 49022.

5.      Respondent is a "person"" as defined by Section 1401(12) of the SDWA, 42 U.S.C. § 300f(12), and 40 C.F.R. § 141.2.

6.      The System is a "public water system" ("PWS") within the meaning of Section 1401(4) of the SDWA, 42 U.S.C. § 141.2 that provides water from a surface water source.

7.      The system regularly serves at least twenty-five (25) year-round residents and is therefore a "community water system" ("CWS") within the meaning of Section 1401(15) of the SDWA, 42 U.S.C. § 300f(15), and 40 C.F.R. § 141.3.

---

[35] Exhibit J, US EPA Unilateral Administrative Order - Proceeding Under Section 1414(g) of the Safe Drinking Water Act, 42 U.S.C. § 300g-3(g), November 2, 2021.

8.      The System serves approximately 9,970 persons and has 3,335 active service connections.

9.      The System has an intake in Lake Michigan as its source of drinking water.

10.     Respondent's ownership and/or operation of the System makes it a "supplier of water" within the meaning of Section 1401(5) of the SDWA, 42 U.S.C. § 300f(5), and 40 C.F.R. §141.2, and subject to the requirements of Part B of the SDWA, 42 U.S.C. §300g, and the NPOWRs at 40 C.F.R. Part 141.

11.     **Pursuant to SDWA Section 1413, 42 U.S.C. §300g-2, EGLE has primary responsibility for the implementation and enforcement of the public water supply program in Michigan.**

12.     Between September 20-27, 2021, EPA and EGLE conducted a joint compliance inspection of the System pursuant to Section 1445(b) of the SDWA, 42 U.S.C. §300j-4(b), and **identified numerous violations of the NPDWRs identified in Paragraph 15-104 below, including NPDWR violations related to the System's technical, managerial, and financial capacity.**

13.     On October 29, 2021, EGLE referred the identified violations to EPA to require the System to comply with the associated applicable requirements under SDWA.

14.     On October 26, 2021, EPA met with EGLE to confer on this Order in confonnance with Section 1414(g)(2) of the SDWA, 42 U.S.C. § 303g-3(g)(2).

*Id.,* pp. 3-21.

101.    Further, the November 2, 2021 EPA Unilateral Order shows the deliberate indifference to the residents of the City of Benton Harbor, going back at least to January 2018; under an "Action Level Exceedance" ("ALE") trigger of 15 ppb as follows:

Lead and Copper Public  Education

15.     The System is classified as a medium-sized PWS (3,301 to 50,000 people served) under the Lead and Copper Rule ("LCR"), as defined at 40 C.F.R. §§ 141.81(a)(2), and as such, was required to conduct sampling, beginning with two (2) consecutive six-month monitoring periods during July 1 to December 31, 1992 and January 1 to June 30, 1993 to determine compliance with the LCR at 40 C.F.R. § 141.86(d).

16.     After meeting lead and copper action levels during the two (2) consecutive six-month monitoring periods, a medium-sized water system may reduce monitoring frequency to once per year. 40 C.F.R. § 141.86(d)(l)(ii)(B); 141.86(d)(4).

17.     After three (3) consecutive years of monitoring, a medium-sized water system in compliance may further reduce the frequency of monitoring from annually to once every three (3) years. 40 C.F.R. §§ 141.81(d)(4)(iii).

18.     An LCR compliance sample is a sample that has been collected and analyzed for lead and copper according to the requirements of the LCR at 40 C.F.R. § 141.86. The lead action level is exceeded if the concentration of lead in more than ten (10) percent of tap water samples collected during any monitoring period conducted in accordance with 40 C.F.R. § 141.86 is greater than 0.015 mg/L (i.e., if the "90th percentile" lead level is greater than 0.015 mg/L or 15 parts per billion ("ppb")).

19.     Between January 2016 and December 2018, the 90th percentile of the samples collected during this period was 22 ppb, which is a lead action level exceedance ("ALE") pursuant to the LCR at 40 C.F.R. § 141.80(c).

20.     Between January 2019 and June 2019, the 90th percentile of the samples collected during this sampling period was 27 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

21.     Between July 2019 and December 2019, the 90th percentile of the samples collected during this sampling period was 32 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

22.     Between January 2020 and June 2020, the 90th percentile of the samples collected during this sampling period was 23 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

23.     Between July 2020 and December 2020, the 90th percentile of the samples collected during this sampling period was 24 ppb, which is a lead ALE pursuant to the LCR at 40 C.F.R. § 141.80(c).

24.     Between January 2021 and June 2021, the 90th percentile of the samples collected during this sampling period was 24

ppb,[36] which is a lead ALE pursuant to the LCR at 40 C.F.R.
§ 141.80(c).

*Id.,* pp. 4-5.

102.    The EPA also found that the public education requirements under SWDA were

violated and were not met by any of the Defendants at any time from January 2018 to present,

under 40 CFR § 141.85. In this regard, the EPA's Order states the following failures of public

education:

> 25.    A PWS (Public Water System) that exceeds the lead
> action level based on tap water samples collected in accordance
> with 40 C.F.R. § 141.86 must comply with certain public
> education requirements at 40 C.F.R. § 141.85.
>
> 26.    40 C.F.R. § 141.85(a) regulates the content of written
> public education materials (e.g., brochures and pamphlets), while
> 40 C.F.R. § 141.85(b) regulates the delivery of such public
> education materials.
>
> 27.    Pursuant to 40 C.F.R. § 141.8S(b)(2)(ii)(A), a CWS that
> exceeds the lead action level must contact the local health
> department and deliver education materials that meet the content
> requirements of 40  C.F.R. § 141.85(a) to local public health
> agencies even if they are not located within the water system's
> service area, along with an informational notice that encourages
> distribution to all the organization's  potentially affected
> customers or CWS's users.
>
> 28.    40 C.F.R. § 141.85(b)(3) requires contact with the local
> health department at least every twelve (12) months as long as
> the CWS exceeds the lead action level.
>
> 29.    According to the System's February 2021 and August
> 2021 public education certifications, the System did not contact
> the local health department in the 12-month period between
> August 2020 and August 2021.
>
> 30.    Respondent's failure to contact the local health
> department in the 12-month period between August 2020 and

---

[36] This test must be scrutinized and is suspect. The initial result using the standard 63
samples was 33 ppb, but additional water samples were taken in homes to bring the ppb
number down to 24.

August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(A) and 141.85(b)(3).

31.    Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(B), a CWS (Community Water System) that exceeds the lead action level must contact customers who are most at risk by delivering materials that meet the content requirements of 40 C.F.R. § 141.85(a) to the following organizations within the water system's service area, along with an informational notice that encourages distribution to all the organization's potentially affected customers or CWS's users: public and private schools or school boards, Women, Infants and Children (WIC) and Head Start programs, public and private hospitals and medical clinics, pediatricians, family planning clinics, and local welfare agencies.

32.    40 C.F.R. § 141.85(b)(3) requires contact with the organizations identified in 40 C.F.R. § 141.85(b)(2)(ii)(B) at least every twelve (12) months as long as the CWS exceeds the lead action level.

33.    According to the System's February and August 2021 public education certifications, the System did not contact public and private hospitals, pediatricians, family planning clinics, community centers, or adult foster care facilities in the 12-month period between August 2020 and August 2021.

34.    During the September 2021 Inspection, the inspectors asked the System to produce a distribution list confirming that organizations identified in 40 C.F.R. § 141.85(b)(2)(ii)(B) within the System's service area were contacted and delivered materials.

35.    During and after the September 2021 Inspection, the System did not produce the requested distribution list.

36.    Respondent's failure to contact certain organizations identified in 40 C.F.R. 40 C.F.R. § 141.85(b)(2)(ii)(B) in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. 40 C.F.R. §§ 141.85(b)(2)(ii)(B) and 141.85(b)(3).

37.    Pursuant to 40 C.F.R. § 141.85(b)(2)(ii)(C), a CWS that exceeds the lead action level must make a good faith effort to locate the following organizations within the service area and deliver materials that meet the content requirements of 40 C.F.R. § 141.85(a) to them, along with an informational notice that encourages distribution to all potentially affected customers or

users: licensed childcare centers, public and private preschools, and obstetricians-gynecologists and midwives.

38.    40 C.F.R. § 141.85(b)(3) requires good faith effort to locate such organizations identified in 40 C.F.R. § 141.85(b)(2)(ii)(C) at least every twelve (12) months as long as the CWS exceeds the lead action level.

39.    According to the System's February and August 2021 public education certifications, the System did not make a good faith effort to locate and contact obstetricians-gynecologists in the 12-month period between August 2020 and August 2021.

40.    Respondent's failure to make a good faith effort to locate organizations identified in 40 C.F.R. §141.85(b)(2)(ii)(C) in the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(ii)(C) and 141.85(b)(3).

41.    Pursuant to 40 C.F.R. § 141.85(b)(2)(iii), a CWS that exceeds the lead action level must provide, no less often than quarterly, information on or in each water bill, including verbatim text, notifying customers that the system has found high levels of lead, as long as the system exceeds the lead action level.

42.    40 C.F.R. § 141.85(b)(3) requires provision of the information required under 40 C.F.R. § 141.85(b)(2)(iii) in each billing cycle.

43.    According to the System's February and August 2021 public education certifications, the System did not provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021.

44.    During the September 2021 Inspection, the System stated to the inspectors that no public education materials are sent with water bills delivered through the mail.

45.    Respondent's failure to provide information notifying customers that the System has found high levels of lead in each water bill during the 12-month period between August 2020 and August 2021 is a violation of 40 C.F.R. §§ 141.85(b)(2)(iii) and 141.85(b)(3)."[37]

---

[37] *Id.*, pp. 5-7.

103.    Plaintiffs never received any notice that their water was poisonous with lead exceedances and other contaminants nor whether ingestion of the water was harmful as required by the Safe Drinking Water Act.

104.    The Required Elements of Public Notice for Public Water Systems under the EPA are specific:

> There are 10 required elements in a public notice. Notices must contain the following:
>
> - "A description of the violation that occurred;
>
> - The potential health effects (including standard required language);
>
> - The population at risk, including subpopulations vulnerable if exposed to the contaminant in their drinking water;
>
> - Whether alternate water supplies need to be used;
>
> - What the water system is doing to correct the problem;
>
> - Actions consumers can take;
>
> - When the system expects a resolution to the problem;
>
> - How to contact the water system for more information; and
>
> - Language encouraging broader distribution of the notice."[38]

105.    Although on or about January 13, 2019, Defendant City of Benton Harbor and Berrien County Health Department did issue a joint press release announcing a scheduled Town Hall public meeting to discuss the October 2018 drinking water samples that had exceeded the 15 ppb Lead and Copper rule limit, residents were never informed that their tap water was

---

[38] EPA, Drinking Water Requirements for States and Public Water Systems - https://www.epa.gov/dwreginfo/required-elements-public-notice-public-water-systems.

poisonous and unsafe to drink or ingest. Instead, residents were advised that the recommended

flushing/running time before using the water was increased from 3 to 5 minutes and to place

water filters on their faucets. It is unknown who attended the Town Hall of the almost 10,000

residents of the City.[39]

106.    On or about January 9, 2019, State of Michigan Department of Environmental

Quality EGLE Director Defendant Oswald was notified in an email from Isabel (Izzy) Marrah

that Defendant Benton Harbor Water Plant and Distribution Director Michael O'Malleyhad told

her that even in the homes that tested above the 15 ppb limit for lead, after the **"first flush it was**

**okay to drink and cook" the tap water because "they (Benton Harbor water supply)**

**provide clean water right to their spout"** (emphasis added). This was a conscious and

deliberately false statement by O'Malley.

107.    However, despite having knowledge that, from 2018-2021, Benton Harbor

officials and employees, including Defendants Director Michael O'Malley, and Mayor Marcus

Muhammad, were falsely telling the public and Benton Harbor water supply users, and each

Plaintiff, that the tap water was safe to drink, EGLE Director Eric Oswald took no action to

correct this knowingly false information by Defendants O'Malley and Mayor Muhammad, and

comply with the requirements of the Safe Drinking Water Act.

108.    Emails between EGLE employees demonstrate the City's utter lack of compliance

with its public education and public notice obligations. For example, an email sent on January

26, 2021, from Ernie Sakipato to Brandon Onan, states: "For your reference, we are also finding

out that the distribution of [the August 2020] PE [public education] and likely other public

notices were likely not sent to all residences. . . . We'd like to give the City an opportunity to

---

[39] Exhibit K, Joint Press Release, Benton Harbor and Berrien County Health Department,
January 23, 2019.

show compliance with the PN [public notice] requirements. However, I'm skeptical there will be anything other than what we've got here."[40]

109.    Not until October 14, 2021, did State Defendants, including Governor Whitmer issue an Executive Declaration and begin to address the Defendants' constitutional bodily integrity and property interest violations and other legal violations to the harm that lead, bacteria and other contaminants were causing Benton Harbor residents, and each Plaintiff, as follows:

> WHEREAS, on October 14, 2021, Michigan Governor Gretchen Whitmer issued Executive Directive No. 2021-6 ('Executive Directive') that requires, among other actions, a whole-of-government response **that directs Michigan departments and agencies to expeditiously take all appropriate action to ensure residents of Benton Harbor have immediate access to free bottled water for consumption** through distribution sites and drop-off delivery until further notice.

> WHEREAS, the Executive Directive also requires, among other actions, that Michigan departments and agencies expeditiously take all appropriate action to leverage available state resources to support the City in replacing lead service lines.[41]

### F.    Defendants' Inadequate Water Filter Solution

110.    From approximately January 2019 to present, Defendants suggested and/or recommended water filters to Benton Harbor residents as a way to reduce the lead in their household water. For three years, Defendants only suggested or recommended filters for pregnant women and children; not until late 2021 did Defendants suggest or recommend filter use for everyone.

---

[40] Ex. O, January 26, 2021, email from E. Sarkipato to B. Onan (EGLE_0012604); see also January 26, 2021, email from E. Sarkipato to R. Jones and other Benton Harbor officials (EGLE_0012612) ("What is the plan for upcoming Public Notice and Public Education for lead? What can be done to recover the confidence of these residents, and inform them about their water system?").
[41] Exhibit J, EPA, Region 5 Unilateral Administrative Order (Nov. 2, 2021), at 1-2 (emphasis added).

111.    Defendants advised Benton Harbor residents to use filters, despite Defendants knowing that bottled water was the only safe recommendation to make. On September 29, 2021, EGLE consultant, Andrew Leavitt advised EGLE employees, "The pamphlet asks the resident to find a certified filter. Given the high levels of lead in the water (up to 889 ppb have been measured and filters are only certified to remove lead at 150 ppb and lower) and the unknowns about filter performance in Benton Harbor's water quality, no one should be relying on filters. Bottled water should be delivered to all residents for all drinking and cooking water. While filters should not be used at this time, no one should be asking a resident to find their own certified filter."[42]

112.    The suggestions and recommendations to use filters did not always specify which filters to use, even though not all filters are certified to remove lead and other contaminates, such as bacteria, from water. At times, DHHS recommended filter models NSF/ANSI 53 and NSF/ANSI 42 "if available."

113.    To be certified under NSF/ANSI 53, the filter must reduce lead (soluble and particulate) to 5 ppb or less. NSF/ANSI 42 is a non-health related certification for reduction of aesthetic-related problems, including particulates between .5 and 1 µg. For certification, it must reduce by 85% or more from a 10,000 particles/mL solution. The certification test solution does not contain lead particles, but because lead has been associated with other particles, the certification could "conceivably ensure reduction of Pb-containing class I particulates."

114.    The filters must be properly installed, used, and maintained to remain effective; however, Defendants failed to provide timely, adequate and appropriate information to residents about the installation, maintenance, and usage requirements or that a failure to comply with them

---

[42] Exhibit N, Email Exchange among EGLE Employees and Consultant, Andrew Leavitt (Sept. 29, 2021), EGLE_0018707-08.

would expose residents to high and unsafe lead levels. For example, filters must be regularly changed, they cannot be used with hot water, they must be installed correctly, and water must still be flushed through the pipes before a filter is used. Defendants did not and have not ensured that the filters were properly installed by a plumber or a technician or that they were properly maintained. For years, Defendants did not actually know whether the filters were effectively mitigating and/or eliminating the lead coming out of residents' taps, and residents would not have been able to tell.

115.    At least as early as February 2019, Defendants knew that some Benton Harbor homes had lead in their water well in excess of 150 ppb.  For example, in March 2019, one residence had 536 ppb of lead at the bathroom faucet, and in 2021, Plaintiff Braziel's home tested with 889 ppb of lead. Typically, Defendants' response was to recommend that the residents of these homes use a water filter to mitigate the lead.

116.    Neither the generic water filters Defendants recommended nor the specific NSF/ANSI 42 and 53 certified filters they at times recommended and distributed are certified to remove lead when levels are above 150 ppb. Defendants recommended and even distributed these filters to the community, knowing that (1) numerous Benton Harbor homes tested with lead levels much higher than 150 ppb, (2) numerous other homes were untested and thus were likely to contain lead levels above 150 pbb, (3) the filters were not certified or known to mitigate lead above 150 ppb, and (4) residents did not know that the filters were not proven to effectively reduce lead above a certain level.

117.    As early as November 2019, Defendants knew or should have known that the filters were not certified to adequately mitigate lead when concentrations exceeded 150 ppb. DHHS, working in coordination with EGLE and the City, prepared and provided fact sheets on the water filters for Benton Harbor residents, and the National Sanitation Foundation (NSF)

website and performance data sheets that accompany the filters they purchased provide this information. In November 2019, the City of Newark published a study in which three different filters were used to mitigate lead above 150ppb. All three filters failed. In October 2020, a study was published that found that filters are ineffective at reducing certain types of lead nanoparticles.

118.    Defendants knew that the filters they recommended and, indeed, considered a primary mitigation tool, *were not necessarily able to remove the lead from residents' water or render it safe.* They did not to tell Plaintiffs or the class members about this significant limitation and instead promoted and distributed the filters for years.

119.    In fact, Defendants chose to "double down" on filter use, instituting a filter "blitz" to try to distribute filters to as many residents as possible and offering to provide bottled water for two weeks until the filter campaign was concluded. Defendants failed to keep records on who received filters and replacement filters.

120.    The filters were not tested to ensure that they removed other dangerous contaminants from the water, including e coli and other bacteria, which Defendants also failed to communicate to residents.

121.    Plaintiffs and Class Members relied on Defendants for safe drinking water and to properly advise them about how to mitigate and/or eliminate the lead in their household water, including whether and which water filters would to do this. Plaintiffs also relied on Defendants for educational materials on how to install, maintain, and use the filters to ensure lead levels were properly mitigated or eliminated, but Defendants provided no technical support was provided to install the filter, nor monitoring of their maintenance or function. Defendants also knew that as late as 2021, many residents still did not even know that water filters were available and/or were having difficulty procuring them.

122.    On March 26, 2021, the Benton Harbor Water Outreach Task Force was created.

123.    At the time the Task Force was supported by Defendant EGLE and the MDHHS.

124.    The MDHHS was involved in providing "free filters" to residents through the Berrien County Health Department. The "free filters" given to Benton Harbor residents were not properly installed by a plumber or technician, and no scientific study had been performed by Director Hertel to know that lead and other contaminants coming out of the tap were effectively being captured by the "free filters." Only since the filing of the EPA Petition by community members and organizations did MDHHS begin a water filter "study" to determine the efficiency of a properly installed "free filter."

125.    It was not until October 7, 2021, that Elizabeth Hertel, Director of DHHS advised the residents of Benton Harbor to stop drinking, or ingesting, the water:

> Protecting the health and safety of Benton Harbor residents is a top priority" said Elizabeth Hertel, Michigan Department of Health and Human Services (DHHS) director. "We've listened to the community's concerns and **out of an abundance of caution,** we are recommending that residents use bottled water for cooking, drinking and brushing teeth. [43]

126.    This "abundance of caution" statement was not what the State and federal SDWA required.

127.    In an October 2021 internal briefing, DHHS Director Hertel finally admitted that Defendants could not guarantee that the filters were actually mitigating the lead. Yet Defendants still did not tell residents that the water was unsafe and that they should not drink it, or that Defendants could not guarantee filter efficacy. Instead, in an October 6, 2021 press release, DHHS (in partnership with EGLE and with knowledge by the City) merely said it was increasing the availability of free bottled water, which it "encouraged" or "recommended," "*out of an*

---

[43] Exhibit L, ABC-57, "Michigan Health Dept. Increases Availability of Bottled Water to Benton Harbor City Residents," posted October 6, 2021 by Maura Johnson.

*abundance of caution*," that residents use for drinking, formula, and hygienic use. This "abundance of caution" statement fell far short of what was needed and of what federal and state law required.

128.    Since at least 2018, Plaintiffs continue to be harmed by the State and Benton Harbor Defendants' constitutional bodily integrity and property interest violations and the other violations of law, as well as each Defendant Engineering company's violations of federal and state Safe Drinking Water statutes and negligence law.

## VI.    CLASS ALLEGATIONS

### A.    Class Definitions

129.    Pursuant to the provisions of Rules 23(a), (b)(2), (b)(3), and (c)(4) of the Federal Rules of Civil Procedure, Plaintiffs bring this action on behalf of themselves and a Benton Harbor Class (collectively, "the Class"), defined as:

> **Benton Harbor Class:**
>
> All persons who regularly consumed water from the City of Benton Harbor's water supply for more than two weeks from June 2018 to present.

130.    Excluded from the Class are are (1) the Defendants in this action (and their officers, directors, agents, employees, and members of their immediate families), and any entity in which the defendants have a controlling interest, and the legal representatives, heirs, successors and assigns of defendants, and (2) the judicial officers to whom this case is assigned, their staff, and the members of their immediate families.

131.    Plaintiffs reserve the right to revise the Class definition based upon information learned through discovery.

**B.      Class Certification Requirements: Federal Rule of Civil Procedure 23**

132.     This action has been brought and may be properly maintained on behalf of the

Class proposed herein under Federal Rule of Civil Procedure 23.

133.     ***Numerosity: Rule 23(a)(1).*** Benton Harbor is a city with approximately 10,000

residents. The number of individuals who have been exposed to lead in the Benton Harbor water

is in the thousands. The number of class members is sufficiently numerous to make class action

status the most practical method for each Plaintiff to secure redress for violations of their

constitutional rights, statutory rights and common law violations, for injuries sustained, including

to their bodily integrity and property interest, and class wide equitable relief.

134.     ***Commonality and Predominance: Rules 23(a)(2) and 23(b)(3).*** There are

questions of law and fact raised by Plaintiffs' claims common to, and typical of, those raised

by the Class they seek to represent against all the Defendants. These questions predominate

over any questions affecting individual Class members, including, without limitation:

        a.      Whether Defendants engaged in the conduct alleged herein;

        b.      Whether Defendants maintained, prolonged, or covered up lead, bacteria,

and other contaminants in the Benton Harbor public water supply;

        c.      Whether Defendants provided sufficient public education and notice about

lead, bacteria, and other contaminants in the Benton Harbor public water supply;

        d.      Whether Defendants response in recommending and providing water

filters was legally adequate;

        e.      Whether Defendants violated their obligations under federal and state Safe

Drinking Water Acts;

f.      Whether Defendants violated Plaintiffs and class members liberty interest to bodily integrity and property interest that is guaranteed by the Due Process clause of the Fourteenth Amendment to the United States Constitution

g.      Whether government Defendants acted pursuant to a policy or practice;

h.      Whether Defendants' conduct violated the Class's civil rights;

i.      Whether individual Defendants' conduct amounted to gross negligence;

j.      Whether Plaintiffs and other Class members are entitled to equitable relief, including but not limited to, declaratory and injunctive relief;

k.      Whether Plaintiffs and the other Class members are entitled to damages and other monetary relief, and, if so, in what amount.

135.    ***Typicality: Rule 23(a)(3).*** The violations of law including constitutional violations and resulting harm stated by the Named Plaintiffs are typical of the legal violations and harm suffered by all Class members, including but not limited to, non-economic injury and economic injury.

136.    ***Adequacy: Rule 23(a)(4).*** Plaintiffs will fairly and adequately protect the interests of the Class Members. Plaintiffs' counsel are not aware of any conflicts of interest between Plaintiffs and absent class members with respect to the matters at issue in this litigation; Plaintiffs will vigorously prosecute the suit on behalf of the Class; and Plaintiffs are represented by counsel with experience in class actions and experience in cases with environmental contamination, including lead. Plaintiffs are represented by attorneys with substantial experience and expertise in complex and class action litigation, including matters involving constitutional violations of bodily integrity and property interests.  Class counsel has identified and thoroughly investigated all claims in this action and has committed sufficient resources to represent the Plaintiffs and Class Members.

137. ***Superiority: Rule 23(b)(3).*** The maintenance of the action as a class action will be superior to other available methods of adjudication and will promote the convenient administration of justice. Moreover, the prosecution of separate actions by individual members of the Class could result in inconsistent, or varying adjudications, with respect to individual members of the Class and/or one or more of the Defendants.

138. Even if Class Members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments, and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

139. ***Declaratory and Injunctive Relief: Rule 23(b)(2).*** Defendants have acted or failed to act on grounds generally applicable to all Plaintiffs, necessitating a remedy which is overarching in its scope for declaratory, equitable and injunctive relief for the Plaintiffs and Class Members.

140. ***Issue Classes: Rule 23(c)(4)*** The claims of Class Members include common issues whose efficient adjudication in a class proceeding would materially advance the litigation and aid in achieving judicial economy and efficiency.

141. ***Designation: MCL § 600.6431(1).*** Plaintiffs designate the following institutions, "departments or officers" of the State "involved in connection" with this claim: Governor Gretchen Whitmer; The Michigan Department of Environment, Great Lakes and Energy (EGLE); Director Liesl Clark; Director Eric Oswald, Drinking Water and Environmental Health Division (DWEHD); Michigan Department Health and Human Services Director Robert Gordon and, after January 2021, Director Elizabeth Hertel, all acting in their official capacity and within the scope of their authority.

142.    ***Timing and Tolling of Statute of Limitations.*** Plaintiffs' November 10, 2021 Complaint provided notice to Defendants within one year of the accrual of Plaintiffs' claim and satisfies all timeliness requirements of MCL §§ 600.6431 and 600.6452, to the extent that they may apply to Plaintiffs' claims. All of Plaintiffs' claims arose in the City of Benton Harbor.

143.    ***Notice to Defendants: MCL § 600.6401(2)(b).*** Plaintiffs provide this Complaint as their detailed statement of notice regarding the nature of their claims and, to the extent possible under the extenuating circumstances, the items of damages alleged to be sustained as the result of the State's actions.

144.    ***Verification and Certification: MCL § 600.6432(1).*** Plaintiffs certify that this Complaint is signed and verified by Plaintiffs before an officer authorized to administer oaths.[44]

## COUNT I
### U.S. Const., Fourteenth Amendment (42 U.S.C. § 1983)
### Substantive Due Process—Bodily Integrity
### All Plaintiffs Against All State of Michigan and City of Benton Harbor Government Defendants

145.    Named Plaintiffs and Class Members repeat, reallege and incorporate paragraphs 1-145, as fully though set forth herein.

146.    The due process clause of the Fourteenth Amendment includes a clearly established implied right to bodily integrity and property interest. In the present case each individual Plaintiff has a clearly established fundamental right under the substantive Due Process Clause of the Fourteenth Amendment to the United States Constitution to bodily integrity and property interest.

147.    Each and every State and Benton Harbor Defendant and Defendant government official, all while acting under color of law, violated Plaintiffs' liberty interest to

---

[44] Exhibit M, Plaintiffs' Notarized Sworn Statements.

bodily integrity and property interest that is guaranteed by the Due Process clause of the

Fourteenth Amendment to the United States Constitution.

148.    Defendant State and Benton Harbor and State and Benton Harbor government

officials, and each of them, deliberately and knowingly violated Named Plaintiffs' and

Plaintiff Class members' right to bodily integrity and property interest, insofar as:

a.    Defendants deliberately and knowingly caused, maintained, and covered up the Benton Harbor water supply system that contained lead, bacteria and other contaminants in the water supply that greatly exceeded the 15ppb federal and state Lead and Copper Rule from at least 2018 to 2021, and was and is an "imminent and substantial endangerment" to each Plaintiff and Benton Harbor resident;

b.    Defendants knew, and were aware, of the serious medical risks associated with exposure to contaminated water containing high levels of lead, bacteria and other contaminants when ingested into the human body, including brain regional damage, cognitive loss and development impairments to children and babies;

c.    Defendants failed to take reasonable actions to protect Named Plaintiffs and Plaintiff Class Members from the known risks associated with exposure to water contaminated by lead, bacteria and other contaminants from at least 2018 to 2021;

d.    On **October 2, 2019,** Michigan Lieutenant Governor Garlin Gilchrist attended a community meeting in Benton Harbor where he was told by the Reverend Edward Pinkney, and other community leaders about the lead poisoned, contaminated Benton Harbor water supply. Reverend Edward Pinkney, president of the Benton Harbor Community Water Council, and the other leaders, requested that Lieutenant  Governor Gilchrist promptly notify Governor Whitmer "do something about the lead poisoned water supply, including the State of Michigan providing bottled water until local and state officials could get the lead out of Benton Harbor's tap water."

At this **October 2, 2019** community meeting Michigan Lieutenant Governor Gilchrist promised Benton Harbor's community leaders that he would promptly deliver their message to Governor Whitmer so that the extraordinary high lead level exceedances that caused the public health emergency could be resolved.

However, water testing demonstrated that lead levels in the water supply continued eir horrific rise. It took over two (2) years after the meeting with Michigan's Lieutenant Governor Gilchrist for Governor Gretchen Whitmer to

issue the Emergency Declaration on **October 14, 2021,** directing each Plaintiff and Benton Harbor residents not to ingest the poisoned tap water.

e.   Defendants knew and were aware that their conduct would result in the deprivation of Plaintiffs' fundamental due process rights to bodily integrity and property interest;

f.   Named Plaintiffs and Plaintiff Class Members suffered bodily and emotional harm and property damages as a result of their exposure to lead, bacteria and other harmful contaminants in their water entering their bodies.

149.   Each government Defendant's conduct exposing Benton Harbor residents to water, containing substantial lead, bacteria and other contaminants, was so egregious and so outrageous, that it "shocks the conscience." For more than three (3) years of deliberation, and decision making, State of Michigan and Benton Harbor Defendants " …knew of the facts which they could infer a substantial risk of serious harm, that they did infer it, and that they acted with indifference toward the individual's rights". *Waid v. Earley,* 960 F.3d, 303 (6th Cir. 2020), J. Murphy, concurring, citing *Guertin v Michigan,* 912 F3d 907 (6th Cir. 2019).

150.   Further, the State of Michigan and EGLE Defendants, knowingly and consciously made the repeated decision not to cite Defendant Benton Harbor's water system with violations for not complying with the Safe Drinking Water Act (SDWA) CRF 40 § 141 and the State of Michigan Safe Drinking Water Act, 399 of 1976; instead, Defendant EGLE repeatedly extended deadlines for compliance. To date, Benton Harbor is not in compliance with the statutory federal and State Safe Drinking Water Acts.

151.   In addition each and all State of Michigan Defendants and City of Benton Harbor Defendants knowingly violated federal and State of Michigan Safe Drinking Water provisions concerning the use of anti-corrosion processes and chemicals. Each Defendant further violated the respective federal and State of Michigan statutes regarding notifying and warning each Plaintiff and the Benton Harbor public of the poisonous lead, bacteria and other

contaminants in their water, and each Defendant's decision, not to provide a warning that there had been six (6) consecutive tests of Benton Harbor's water supply and each test was above the 15 ppb limit for lead endangerment in the water supply, as a result Benton Harbor is the only Michigan city water system to have six (6) consecutive lead exceedances beginning in 2011-2021.[45]

152.    In 2019 Defendant EGLE had leading oversight responsibility for the management of the water crisis, including corrosion control to remediate the significantly high, dangerous lead levels in Benton Harbor's water supply. However, rather than follow the Safe Drinking Water Act requirements and direction for proper corrosion control EGLE directed that each Engineering Defendant experiment with formulas in search of a solution. When Nicholas Leonard, Executive Director, Great Lakes Environmental Law Center,  wrote Defendant Eric Oswald of Defendant EGLE, asking why EGLE was departing from federal Safe Drinking Water statutory requirements and EPA guidelines concerning the use of anti-corrosive chemicals, Defendant EGLE Director, Drinking Water and Environmental Health Division, Eric Oswald knowingly and untruthfully stated that the chemicals were working. However, Oswald knew that the most recent water test for the **July to December 2019** period had the highest 90 percentile for lead samples for any Benton Harbor sampling period, 32 ppb up until that time. *(Id.,* p. 20.)

153.    As a direct and proximate result of the unconstitutional acts of each State of Michigan and City of Benton Harbor government Defendants, as set forth herein and above, which violated Named Plaintiffs' and Class Members' liberty interest of bodily integrity and property interest, Plaintiffs suffered damages, including but not limited  to:

- Medical Expenses
- Life threatening and irreversible bodily injury;

---

[45] Ex. A, p.12.

- Economic losses from lost wages, lost income, lost earning capacity, lost business profits, and reduced property values, among others;

- Required to pay water bills for contaminated water;

- Pain and suffering;

- Embarrassment, outrage, mental anguish, fear and mortification, denial of social pleasures, and stress related physical symptoms.

154.    Named Plaintiffs and Plaintiff Class Members are also entitled to an award of all non-economic damages provided by and law for pain and suffering, embarrassment, outrage, mental anguish, fear, stress and mortification, denial of social pleasures.

- Each Plaintiff requires medical monitoring.

155.    Named Plaintiffs and Plaintiff Class Members are further entitled to an award costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

156.    The conduct of State of Michigan Defendants, and Defendant State officials, Defendant Benton Harbor and each Benton Harbor Defendant official demonstrates deliberate indifference that shocks the conscience.

157.    The State of Michigan and each State Defendant's conduct, knowing and deliberate decisions not to enforce federal and State law, including but not limited to, the federal and state Safe Water Drinking Acts (SDWA), specifically § 141 public notice provision, the federal and state Lead and Cooper rules and the anti-corrosion provisions, from minimally September 2018 through September 2021, evidences conduct that was outrageous and reckless in the extreme, entitling Named Plaintiffs and Plaintiff Class Members to an award of punitive damages.

158.    On or about **November 2, 2021,** the United States Environmental Protection Agency (EPA) issued an Unilateral Administrative Order against Defendant City of Benton Harbor for multiple statutory violations. **(Ex. 3.)**

**COUNT II**
***MONELL* CLAIM: BY ALL PLAINTIFFS**
**AGAINST THE CITY OF BENTON HARBOR**

159.    Named Plaintiffs and Class Members repeat, reallege and incorporate paragraphs 1-159, as though fully set forth herein.

160.    At all times herein, Defendant City of Benton Harbor, acting through its official policymakers, Defendant Mayor Marcus Muhammad, Defendant City Manager Darwin Watson and Defendant City Manager Ellis Mitchell, established and/or maintained the following customs, usages, policies and/or practices:

- Undertaking, making and/or approving decisions with regard to the public water system in the City of Benton Harbor, while at all times knowing that these decisions would likely result in the creation and maintenance of a public health crisis to its residents, including the infliction of harm and injury to each Plaintiff;

- Participating in the concealment of the above-described acts, injuries, and harms of which it was aware, through its supervisors and official policymakers;

- Approving, encouraging, authorizing, condoning, and acquiescing in the decisions and acts of concealment that were committed by its employees, agents, supervisors and policymakers, all under color of law and all in violation of Plaintiffs' rights under the Constitution;

- Failure to train, supervise, and/or discipline agents, employees, and officials of the City of Benton Harbor to:

  i.    Determine whether the water supplied to the public has received adequate corrosion control;

  ii.   If not, do not provide the Plaintiffs, residents and/or users of public water in Benton Harbor with

water which had not received proper and sufficient corrosion control;

iii.     To warn each Plaintiff and the public that the public water supply is unsafe and not to drink the water when, as here, the water supply samples far exceeded the l5ppb federal and state Lead and Cooper rules for the record setting six (6) consecutive monitoring periods.

161.    Each of the aforementioned customs, policies, and/or practices were affirmative decisions that were made by Defendant Benton Harbor officials policymakers, the failure to train, supervise, and/or discipline the individually named Defendants, was known to Benton Harbor, as highly likely and probable to cause violations of the constitutional rights of each Plaintiff and residents of Benton Harbor and members of the  public.

162.    The conduct of the individually named Defendants Mayor Marcus Muhammad, Benton Harbor City Manager Darwin Watson and City Manager Ellis Mitchell, was committed pursuant to the customs, policies, and/or practices of Defendant City of Benton Harbor.

163.    Each such custom, policy and/or practice, referenced above, was a driving force in the violations of each Plaintiffs constitutional rights, as set forth herein and above.

164.    As a direct and proximate result of the aforementioned violations of Named Plaintiffs' and Plaintiff Class Members' constitutional rights pursuant to Defendant City of Benton Harbor's customs, policies and practices, as stated herein and above, Named Plaintiffs and Plaintiff Class Members have suffered damages, including, but not limited  to:

- Medical Expenses

- Life threatening and irreversible bodily injury;

- Economic losses from lost wages, lost income, lost earning capacity, lost business profits, and reduced property values, among others;

- Required to pay water bills for contaminated  water;

- Pain and  suffering;

- Embarrassment,  outrage,  mental  anguish,  fear  and mortification, denial of social pleasures, and stress related physical symptoms.

- Each Plaintiff requires medical monitoring.

165.    Named Plaintiffs and Plaintiff Class Members are further entitled to an award

costs and reasonable attorney fees, pursuant to 42 U.S.C. § 1988.

166.    Named Plaintiffs and Plaintiff Class Members are also entitled to an award of

all non-economic damages provided by and law for pain and suffering, embarrassment,

outrage, mental anguish, fear, stress and mortification, denial of social  pleasures.

### COUNT III

**Unjust Enrichment**
**All Plaintiffs Against Defendant City of Benton Harbor**

167.    Plaintiffs incorporate by reference all foregoing and subsequent paragraphs as if

fully set forth herein.

168.    Plaintiffs and class members paid for and were sold toxic drinking water that was

unfit for human consumption instead of receiving clean drinking water, as promised.

169.    The City unjustly received the benefits of payments executed by Plaintiffs and

class members in exchange for contaminated water that was unfit for human consumption, and

used those payments for the operation of the City of Benton Harbor.  The City, acting through its

policymakers, including but not limited to O'Malley, Watson, Mitchell, and/or Muhammad,

intentionally supplied toxic drinking water to the community, including Plaintiffs, and mislead,

concealed, and failed to adequately advise the public, creating, escalating, and prolonging the

dangers of lead poisoning and other health hazards.

170.    The City retained a benefit by keeping the payments Plaintiffs and the class members made without providing them safe drinking water as promised, constituting unjust enrichment.

171.    As a direct and proximate result of these acts and omissions, Plaintiffs sustained injuries from the toxic water, including but not limited to the monthly payments they made in exchange for toxic and contaminated water not fit for human use and consumption, and seek restitution for the monies paid.

**COUNT IV**
**Professional Negligence –**
**Defendant Elhorn Engineering**

172.    Named Plaintiffs and Class Members repeat, reallege and incorporate paragraphs 1-172, as though fully set forth herein.

173.    Defendant Elhorn Engineering Company, through its contract relation with the City of Benton Harbor, owed Named Plaintiffs and Plaintiff Class Members, as third parties to its contract with Defendant Benton Harbor, a duty of ordinary care to avoid physical harm to foreseeable persons and property in performance of a contract.

174.    Defendant Elhorn Engineering failed to exercise the degree of care which a reasonable and prudent person would use under similar circumstances to protect the Named Plaintiffs and Plaintiff Class Members from injury and damages.

175.    That duty included fully understanding the toxicity of the anti-corrosive chemicals used to abate and sequester the high levels of lead in the water service lines and eliminating releases of toxic chemicals, identifying alternatives to toxic chemicals released while attempting to abate the lead, or understanding the mechanisms of release and transport of toxic chemicals through the water, and to investigate, mitigate and remediate the impacts of the chemicals released that were added to the water by this  Defendant.

176.    Defendant Elhorn Engineering had a duty, in particular, to: (1) identify the potentially harmful anti-corrosive chemicals used by their operations to attempt to abate the lead in the Named Plaintiffs' and Plaintiff Class Members' water; (2) investigate and understand the characteristics of the chemical byproducts of their operations before releasing those byproducts into the water; (3) conduct their operations in a manner that would not unreasonably endanger human health and the environment; (4) control, minimize, and eliminate releases of the corrosive materials so as not to further create a risk of harm to the Named Plaintiffs and Plaintiff Class Members; (5) investigate and remediate environmental releases that they knew posed a potential risk to human health and the environment; (6) follow the provisions of the Safe Drinking Water Act statute with regard to corrosion control; and (7) warn Named Plaintiffs and Plaintiff Class Members of the use of the anti-corrosive chemicals that created a probable risk to human health and contamination of Named Plaintiffs' and Plaintiff Class Members' property including, but not limited to, Named Plaintiffs' and Plaintiff Class Members' water, groundwater, and/or water systems, due to the persistence and toxicity of these substances; in addition to the high lead levels in the water.

177.    Defendant Elhorn Engineering failed to exercise ordinary care in the use of substances including, but not limited to anti-corrosive chemicals, which did not correct the problem of excessive lead in the water, but instead made the problem worse.

178.    Defendant Elhorn Engineering failed to provide a warning to Named Plaintiffs and Plaintiff Class Members that their tap water was unsafe to drink or ingest.

179.    Defendant Elhorn Engineering breached its duty of ordinary care to Named Plaintiffs and Class Members, as identified above, including but not limited to releasing and

allowing the release of known toxic chemicals into Defendant Benton Harbor's service lines, resulting in a devastating increase of lead in the water supply, which continues to this day.

180.    As a direct cause and consequence of Defendant Elhorn Engineering's professional negligence, each Plaintiff Class Representative and each Plaintiff Class Member has been exposed to and more likely than not has been contaminated with lead, bacteria and other harmful contaminants. Further, Named Plaintiffs' and Class Members' properties have been exposed and more likely than not has been contaminated by lead and other harmful contaminants.

181.    The harm to Named Plaintiffs and Plaintiff Class Members was reasonably foreseeable.

182.    Named Plaintiffs and Plaintiff Class Members require medical monitoring for their lifetime.

183.    As a direct and proximate result of Defendant Elhorn Engineering's negligence, Named Plaintiffs and Plaintiff Class Members have suffered injuries, damages and losses, including but not limited to, economic and non-economic damages. Defendant Elhorn Engineering is liable for compensatory and punitive damages to the Named Plaintiffs and Plaintiff Class Members for their negligent acts.

**COUNT V**
**Professional Negligence –**
**Defendant F&V Operations and**
**Resource Management, Inc.**

184.    Named Plaintiffs and Class Members repeat, reallege and incorporate paragraphs 1-184, as though fully set forth herein.

185.    Defendant F&V Operations and Resource Management, Inc., through its contract relation with Defendant City of Benton Harbor, owed Named Plaintiffs and Plaintiff Class Members, as third parties to each Defendants' contract with Defendant Benton

Harbor, a duty of ordinary care to avoid physical harm to foreseeable persons and property in performance of a contract.

186.     Defendant F&V Operations and Resource Management, Inc., failed to exercise the degree of care which a reasonable and prudent person would use under similar circumstances to protect the Named Plaintiffs and Plaintiff Class Members from injury and damages.

187.     That duty included fully understanding the toxicity of the anti-corrosive chemicals used to abate and sequester the high levels of lead in the water service lines and eliminating releases of toxic chemicals, identifying alternatives to toxic chemicals released while attempting to abate the lead, or understanding the mechanisms of release and transport of toxic chemicals through the water, and to investigate, mitigate and remediate the impacts of the chemicals released that were added to the water by this Defendant.

188.     Defendant F&V Operations and Resource Management, Inc. had a duty, in particular, to: (1) identify the potentially harmful anti-corrosive chemicals used by their operations to attempt to abate the lead in the Named Plaintiffs' and Plaintiff Class Members' water; (2) investigate and understand the characteristics of the chemical byproducts of their operations before releasing those byproducts into the water; (3) conduct their operations in a manner that would not unreasonably endanger human health and the environment; (4) control, minimize, and eliminate releases of the corrosive materials so as to not further create a risk of harm to the Named Plaintiffs and Plaintiff Class  Members; (5) investigate and remediate environmental releases that they knew posed a potential risk to human health and the environment; (6) follow the provisions of the Safe Drinking Water statute with regard to corrosion control; and (7) warn Named Plaintiffs and Plaintiff Class Members of the use of the anti-corrosive chemicals that created a probable risk to human health and contamination of

Named Plaintiffs' and Plaintiff Class Members' property including, but not limited to, Named Plaintiffs' and Plaintiff Class Members' water, groundwater, and/or water systems, due to the persistence and toxicity of these substances; in addition to the high lead levels in the water.

189.    Defendant F&V Operations and Resource Management, Inc., by contract in 2020, managed Defendant Benton Harbor's Water Plant through its employees and agents.

190.    The EPA's Unilateral Report in 2021 shows F&V Operations and Resource Management, Inc. employees were not competent to manage the Public Water System and, upon inspection by the EPA, were unable to respond to basic questions of procedure and substance.

191.    Defendant F&V Operations and Resource Management, Inc. failed to exercise ordinary care in the use of substances including, but not limited to anti-corrosive chemicals, which did not correct the problem of excessive lead in the water, but instead made the problem worse.

192.    Defendant F&V Operations and Resource Management, Inc. failed to provide a warning to Named Plaintiffs and Plaintiff Class Members that their tap water was unsafe to drink or ingest.

193.    Defendant F&V Operations and Resource Management, Inc. breached its duty of ordinary care to Named Plaintiffs and Class Members, as identified above, including but not limited to releasing and allowing the release of known toxic chemicals into Defendant Benton Harbor's service lines, resulting in a devasting increase of lead, bacteria and other contaminants in the water supply, which continues to this day.

194.    As a direct cause and consequence of Defendant F&V Operations and Resource Management, Inc.'s professional negligence, each Plaintiff Class Representative and each Plaintiff Class Member has been exposed to and more likely than not has been contaminated

with lead, bacteria and other harmful contaminants. Further, Named Plaintiffs' and Class Members' properties have been exposed and more likely than not has been contaminated by lead and other harmful contaminants.

195.    The harm to Named Plaintiffs and Plaintiff Class Members was reasonably foreseeable.

196.    Named Plaintiffs and Plaintiff Class Members require medical monitoring for their lifetime.

197.    As a direct and proximate result of Defendant F&V Operations and Resource Management, Inc.'s negligence, Named Plaintiffs and Plaintiff Class Members have suffered damages and losses, including but not limited to, economic and non-economic damages. Defendant F&V Operations and Resource Management, Inc. is liable for compensatory and punitive damages to the Named Plaintiffs and Plaintiff Class Members for each of their negligent acts.

**COUNT VI**
**Violation of Michigan Government**
**Tort Liability Act – Defendant**
**Michael O'Malley**

198.    Named Plaintiffs and Class Members repeat, reallege and incorporate paragraphs 1-198, as though fully set forth herein.

199.    From 2018-2020 Defendant Michael O'Malley was Manager of Defendant Benton Harbor's Water Department.

200.    During this period Benton Harbor's water supply contained lead that exceeded federal and State of Michigan Safe Drinking Water Act 15ppb and the Lead and Copper rule requirements.

201.    The lead in Benton Harbor's water supply caused a public health emergency and crisis for the approximately 10,000 Benton Harbor residents.

202.    In 2018, Defendant O'Malley did not attempt to stop the exceedingly high lead action level exceedances.

203.    Defendant O'Malley had a duty to protect the health of the Benton Harbor residents and each Plaintiff herein.

204.    From 2018-2020 Defendant Michael O'Malley failed to follow and violated the federal and State of Michigan Safe Drinking Water Acts requirements and guidelines for both selection and use of anti-corrosion measures to eliminate substantial lead leaching from the water pipes into the Benton Harbor water supply in levels that triggered action under the Safe Drinking Water Act.

205.    From 2018-2020, although Benton Harbor's water supply was contaminated with lead, bacteria and other contaminants and each testing and monitoring sample period revealed lead levels violated federal and State Safe Drinking Water Acts and the Lead and Copper rule. Although the water supply was unsafe to ingest, Defendant O'Malley repeatedly denied, lied and covered up this public health emergency and crisis by repeatedly telling Benton Harbor residents and the public that the water was safe to drink.

206.    Defendant O'Malley was fired from his position m 2020 for intentionally falsifying Water Department documents.

207.    Defendant Michael O'Malley's actions were grossly negligent.

208.    Defendant Michael O'Malley's actions were the proximate cause of each Plaintiff being harmed by lead contamination in their tap water from Benton Harbor's water supply.

209.    Each Plaintiff suffered non-economic and economic mJunes and damages because of the gross negligence of Defendant Michael O'Malley.

## VII.    RELIEF REQUESTED

Named Plaintiffs and Plaintiff Class Members request the following relief from the court:

a.      An Order certifying the class under Federal Rules of Civil Procedure 23(a), (b)(2),

(b)(3), and/or (c)(4), as appropriate; appoint Plaintiffs as representatives of the class; and appoint

the undersigned counsel as class counsel;

b.      An Order declaring the conduct of Defendants unconstitutional;

c.      An Order of equitable and/or injunctive relief to remediate the harm caused by

  (a)      repairs and compensation of property damage;

  (b)      an immediate abatement of the lead service lines with replacement lines;

  (c)      a water supply delivered to each home of adequate water until new lead service lines are replaced;

  (d)      establishment of a medical monitoring process, including funds and periodic medical testing;

  (e)      appointing a monitor to oversee the water operations of Benton Harbor, for a period of time deemed appropriate by the court;

  (f)      A Community Medical Center for the coordination of care for children who were exposed to the water with high levels of lead, who have learning impairments and/or other cognitive, educational or developmental injuries, requiring medical and for psychological expertise;

  (g)      ongoing water lead testing for each home; and

  (h)      Identifying diagnostic tools which can evaluate the presence of lead in the body organs and/or bones;

  (i)      Forgiveness of all Benton Harbor loans provided through the state and federal statutes for replacement of lead water pipes and other related structural infrastructure work;

  (j)      an immediate injunction entered to stop all Benton Harbor residents, Named Plaintiffs and Plaintiff Class Members from paying for the contaminated water; and Disgorgement, by the City of Benton Harbor, of all Defendant's payments received from Named Plaintiffs and Plaintiff Class Members, from January 2019 to present.

d.      An Order for an award of compensatory damages, economic and non-economic,

past and future;

e.      An Order for an award of punitive damages, past and future;

f.      An Order for an award of actual reasonable attorney fees and litigation expenses;

g.      An Order for all such other relief as the court deems equitable;

h.      An order for reasonable attorney fees and costs.


Dated:        May 20, 2022                        Respectfully submitted,


                                        */s/ Alice B. Jennings*
                                        Alice B. Jennings
                                        Carl R. Edwards
                                        **EDWARDS & JENNINGS, P.C**.
                                        3031 West Grand Blvd., Suite 435
                                        Detroit, MI 48202
                                        Telephone:    313.915.3475
                                        Facsimile:    313.961.5000
                                        ajennings@edwardsjennings.com
                                        cedwards&edwardsjennings.com


                                        Mark P. Chalos
                                        **LIEFF CABRASER HEIMANN &**
                                        **BERNSTEIN, LLP**
                                        222 2nd Avenue South, Suite 1640
                                        Nashville, TN  37201-2379
                                        Telephone:    615.313.9000
                                        Facsimile:    615.313.9965
                                        mchalos@lchb.com


                                        Annika K. Martin
                                        **LIEFF CABRASER HEIMANN &**
                                        **BERNSTEIN, LLP**
                                        250 Hudson Street, 8th Floor
                                        New York, NY  10013-1413
                                        Telephone:    212.355.9500
                                        Facsimile:    212.355.9592
                                        akmartin@lchb.com

Tiseme G.Zegeye
Amelia A. Haselkorn
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA  94111-3339
Telephone:   415.956.1000
Facsimile:   415.956.1008
tzegeye@lchb.com
ahaselkorn@lchb.com