UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

DARETHA BRAZIEL, et al.,

      Plaintiffs,

v.

GOVERNOR GRETCHEN WHITMER,
  et al.,

      Defendants.

_____/

Hon. Hala Y. Jarbou
Hon. Phillip J. Green

Case No. 1:21-cv-0960

## **REPORT AND RECOMMENDATION**

Plaintiffs, Benton Harbor residents, seek redress for harm allegedly resulting from lead contaminants in their tap water.[1]  They have raised six claims and have named thirteen defendants, including State of Michigan agencies and officials, Benton Harbor municipal agencies and officials, and two private engineering firms. (Second Amended Complaint, ECF No. 82).  They seek class certification to represent all persons who regularly consumed contaminated water from June 2018 to present. (*Id.* at PageID.1159).

_____

[1] This is one of three related cases pending in this Court.  The other two are *Grant v. U.S. Environmental Protection Agency*, Case No. 1:22-cv-186, and *Mitchell v. Benton Harbor*, Case No. 1:22-cv-475.  The instant case and the *Grant* case are putative class actions, while *Mitchell* is not.  The Court ordered the parties in the instant case and in *Grant* to file motions simultaneously in each case.  (*Grant*, Case No. 1:22-cv-186, ECF No. 59; *Braziel*, Case No. 1:21-cv-960, ECF No. 130).  Unless otherwise noted, citations in this Report and Recommendation are from *Braziel*, Case No. 1:21-cv-960.

There are two federal claims and four state law claims.  In Count I, Plaintiffs claim that state and city officials violated their Fourteenth Amendment rights to bodily integrity and property interests.  In Count II, Plaintiffs bring a *Monell* claim against the City of Benton Harbor, alleging that city customs, policies and practices caused Plaintiffs' constitutional rights to be violated.  Count III is a claim for unjust enrichment.  Counts IV and V are professional negligence claims against the two engineering firms, respectively.  Count VI is a claim against the director of the Benton Harbor Water Department under a theory of government tort liability.

On January 13, 2023, and after the filing of the defendants' motions to dismiss, Plaintiffs voluntarily dismissed without prejudice their claims against the State of Michigan, the Michigan Department of Environment, Great Lakes & Energy ("EGLE"), and the Michigan Department of Health & Human Services ("MDHHS"). (ECF No. 157).  Accordingly, the remaining state defendants are Governor Gretchen Whitmer, EGLE Director Liesl Clark, EGLE Drinking Water and Environmental Health Division Director Eric Oswald, and MDHHS directors Robert Gordon and Elizabeth Hertel ("State Defendants").  The city defendants are the City of Benton Harbor, Mayor Marcus Muhammad, former City Manager Darwin Watson, City Manager Ellis Mitchell, and Benton Harbor Water Plant Director Michael O'Malley ("City Defendants").  Plaintiffs' claim in Count I is against the state and city defendants in their official and individual capacities.  The claim in Count II is solely against the City of Benton Harbor.

2

This matter is before the Court on the state and city defendants' motions to dismiss the federal claims:  Counts I and II.  (ECF No. 141, 145, 147, 150).  Plaintiffs responded (ECF No. 159, 160) and the defendants replied (ECF No. 163, 164, 165).

For the reasons outlined below, the undersigned judicial officer recommends that Plaintiffs' federal claims be dismissed with prejudice.  The undersigned further recommends that the Court decline to exercise supplemental jurisdiction over the state claims, dismissing them without prejudice.

### Introduction:  This is not Flint

Plaintiffs have made a concerted effort to equate the instant case to the "infamous government-created environmental disaster commonly known as the Flint Water Crisis." *Guertin v. State of Michigan*, 912 F.3d 907, 915 (6th Cir. 2019); *see also In re Flint Water Cases*, 960 F.3d 303 (6th Cir. 2020).  That crisis resulted from an ill-advised decision to switch the City of Flint's water supply from the Detroit Water and Sewerage Department (DWSD), which drew water from Lake Huron, to an outdated water treatment plant that drew water from the Flint River.  The water in the Flint River is nineteen times more corrosive than that in Lake Huron.  The deciding officials compounded this problem by using a water treatment plant they knew was ill-equipped to handle the contaminants, and without adding chemicals to treat the water's known corrosivity.

"The harmful effects were as swift as they were severe." *Guertin*, 912 F.3d at 915.  They included hair loss, skin rashes, a spike in deaths from Legionnaires' disease, and reports of dangerously high blood-lead levels in Flint children.  The same

officials twice turned down opportunities to reconnect to the DWSD after learning of the extent of the harm being visited on the consumers of the Flint water system.

The allegations in the Second Amended Complaint in this case paint a different picture from that of the Flint water crisis.  While Plaintiffs' complaint contains repeated bald assertions that the defendants "caused" the contamination of the Benton Harbor water supply (*see* Second Amended Complaint at ¶¶ 20-29, 148(a), ECF No. 82, PageID.1120-24, 1164), singularly missing is any allegation specifying what any defendant did to cause it.

Moreover, there is no allegation that any city or state official did anything to change the source of water or the way the water was being processed.  The city's water department has continuously used Lake Michigan as its source of the water, and has used the same water treatment plant it used prior to the elevated lead contamination.  Rather, the Benton Harbor water system was old and in need of repairs and upgrades.

In 2018, testing revealed for the first time lead levels exceeding that allowed by the U.S. Environmental Protection Agency (EPA).  Those levels continued to increase significantly, along with other contaminants.  The lead contamination was caused by corrosion from the city's lead service pipes.  (*Id.* at ¶ 71, PageID.1135). "[D]rastic layoffs" of Benton Harbor Water Department's employees during the period of 2010 to 2016 "severely compromised . . . the Water Department's ability to deliver clean, safe water to its residents."  (*Id.* at ¶¶ 47-48, PageID.1128).  The layoffs were done at the direction of Emergency Managers and a Receivership Transition Advisory Board (*id.*), none of whom are named defendants here.

4

The allegations in the second amended complaint certainly support the conclusion that some of the officials could have, and should have, done more to abate the contaminants, to warn the public of the dangers associated with drinking the water, and to educate the public regarding the best ways of handling the contaminated water.  The amended complaint includes allegations that certain officials were less than candid regarding the situation, and in fact, made false statements to regulators.  (Second Amended Complaint at ¶¶ 61, 82, 85, ECF No. 82, PageID.1132, 1137-38).   But there is sparse mention of statements any of the defendants purportedly made to the public falsely claiming the water was safe to drink.

The long and the short of it is this:  assuming the allegations are true, some of the city and state officials mishandled the lead contamination, and they failed in their statutory obligations to the public.  If true, this is unacceptable, and Plaintiffs and other consumers of the Benton Harbor water system have paid a high price.  No one should minimize the problems Plaintiffs face, given the elevated lead levels in their drinking water from 2018 to 2021.  This is a very serious matter with very serious potential consequences.  And the undersigned assumes nothing about who may be at fault, or who should have done what, when.  Plaintiffs may ultimately be successful in their efforts to hold certain individuals accountable under statutory or state common law.  But this Court must assess Plaintiffs' federal due process claims under the purposely high "shocks-the-conscience" standard.

In *Guertin*, the Sixth Circuit found egregious the alleged misconduct of those Flint officials whose actions caused the contamination of the water system and who compounded that misconduct with false statements encouraging the populace to drink the contaminated water. Accordingly, the court held that the substantive due process claims could proceed against them. But this is not Flint.

## Background of This Case

The following is taken from relevant statutory and regulatory authority, as well as exhibits submitted by the State Defendants in support of their factual challenge to the Court's subject matter jurisdiction and in support of their motion to dismiss for failure to state a claim. Plaintiffs have not objected to these exhibits. The undersigned has endeavored to limit this discussion to that which appears to be undisputed.

The Safe Drinking Water Act (SDWA) confers upon the Administrator of the EPA the authority to regulate "public water systems," including setting standards regarding harmful water contaminants. *See* 42 U.S.C. §§ 300f, 300g-1(b). The Act allows the EPA to confer upon the states the primary enforcement responsibility for these systems, including the authority to set standards that are at least as stringent as the national standards set by the EPA. *See* 42 U.S.C. § 300g-2(a)(1); 40 C.F.R. § 142.10(a). The State of Michigan has assumed this responsibility through EGLE. *See* MICH. COMP. L. 325.1003. EGLE implements Michigan's Lead and Copper Rule, which includes several provisions more stringent than the federal rule. *See* MICH. ADMIN. CODE R. 325.10604f.

6

Under the Lead and Copper Rule, a water supplier is required to test water samples periodically, and to take corrective action "if the ninetieth percentile lead level is more than 0.015 milligrams per liter (mg/l) in tap water samples collected during a monitoring period." MICH. ADMIN. CODE R. 325.10604f(1)(c).[2]  This is commonly known as the lead "action level."  Exceeding the lead action level is not a violation of the SDWA, nor does it necessarily constitute a public health emergency, but it requires the water supplier to take certain corrective actions, including notification, education, and remediation.  *See id.* at 325.10604(f)(1).  Among the remedial measures required are corrosion-control treatment and, if that is not effective, replacement of lead service lines.  *See id.* at 325.10604f(1)(d), (1)(f).  The notification requirement includes notice of the lead monitoring results.  *See id.* at 325.10604f(1)(g).  The educational requirements are spelled out in detail.  *See id.* at 325.10410(2)(a)(i)-(vi).

Pursuant to the requirements of the Lead and Copper Rule, Benton Harbor had been testing its water supply for elevated lead every three years. (Benton Harbor Drinking Water Advisory, ECF No. 142-7, PageID.1806).  Elevated lead levels were first detected in eight of the thirty water samples taken in the summer of 2018, with the ninetieth percentile of samples testing at 22 parts per billion.  (*Id.*).  Benton Harbor's water system operator notified EGLE of the action level exceedance on

---

[2] The parties have used the equivalent standard of fifteen parts per billion.  The Court will hereafter do the same.

October 10, 2018.  (*See* B. Onan Decl. at ¶ 5, ECF No.142-3, PageID.1772).  There had been no change in the city's water source (Lake Michigan) or its water treatment that would account for the action level exceedance.  (*See id*.).[3]

On October 18, 2018, EGLE hosted a meeting with staff from MDHHS and the Berrien County Health Department to discuss how to educate the public on the lead exceedance and to introduce the county health department to EGLE staff with expertise in testing for lead in school drinking water.  (*Id*.).  On October 22, 2018, EGLE formally notified Benton Harbor of the lead action exceedance, and it ordered the city to issue a public advisory notice and to send educational materials to the water system customers.  (Department of Environmental Quality Letter to Darwin Watson, Oct. 22, 2018, ECF No. 142-13).

Benton Harbor issued the notice on October 24, 2018, advising customers that the 90th percentile of water samples contained 22 ppb of lead, and noting that "[e]levated levels of lead in the drinking water can cause health concerns."  (*See* Drinking Water Advisory, ECF No. 142-7, PageID.1806).  This advisory provided advice on how to reduce the risk of lead exposure by running water for three to five minutes before drinking, and using bottled water for baby formula.  (*Id*.).  The advisory also provided websites for obtaining additional information regarding lead

---

[3] Several city water systems similar to Benton Harbor's have not experienced a lead action level exceedance even though they have lead components, use Lake Michigan as a water source, and use treatment protocols that do not include a corrosion control additive.  These include St. Joseph, Muskegon, and Holland.  (B. Onan Decl. at ¶ 6, ECF No. 142-3, PageID.1772).

in drinking water and a city hotline for questions about "water testing, health concerns, or getting [a] child's blood lead level tested." (*Id.*). City officials held a press conference, which resulted in a newspaper article reporting on the lead level exceedance. (*See Too much lead in Benton Harbor Water*, THE HERALD-PALLADIUM, Oct. 24, 2018, updated Oct.29, 2021, ECF No. 142-14). The city partnered with local health departments to provide lead education to at-risk consumers, and it distributed notices through schools (*See* Summary of Public Education Requirements, ECF No. 142-17).

On November 30, 2018, additional educational materials were mailed to Benton Harbor water customers alerting them to "IMPORTANT INFORMATION ABOUT LEAD IN YOUR DRINKING WATER." (ECF No. 142-15). This four-page document addressed the health effects of lead and steps customers could take to reduce their exposure to lead. (*Id.* at PageID.1909-10). Among the suggestions for reducing one's exposure to lead was running water to flush out the lead-containing water from the service lines, purchasing bottled water, and using a water filter approved to reduce lead. (*Id.* at PageID.1909-10). At least some water tests performed indicated a significant drop in lead levels in the drinking water following the water flushing procedure. (*See* EGLE Drinking Water Laboratory Report, ECF No. 142-9).

As a result of the lead action level exceedance, Benton Harbor was required to submit, within six months after the end of the monitoring period in which the exceedance occurred, a recommendation to EGLE regarding the "optimal corrosion

control treatment." *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(i).  The monitoring period in which the lead action level was exceeded ended September 30, 2018, so the deadline for making the recommendation was March 30, 2019.  (Onan Decl. at ¶ 10, ECF No. 142-3, PageID.1773).  EGLE encouraged the city to submit the recommendation sooner than the statutory deadline due to concerns that the number of water samples that tested above the action level had jumped from two to 26.  (*Id*.).  EGLE's stated strategy was to "get some form of corrosion control installed as soon as possible while also gathering short-term data collected by the City and pursuing a longer-term corrosion control study through [an] administrative consent order (ACO)."  (E. Oswald Decl. at ¶ 5, ECF No. 142-12, PageID.1882).[4]

EGLE allowed Benton Harbor to use grant money previously given the city for use in identifying and replacing lead service lines to implement a treatment protocol to address the lead action level exceedance, including the retention of a private consulting firm.  (Onan Decl. at ¶ 11, ECF No. 142-3, PageID.1773).  Benton Harbor retained the services of Elhorn Engineering.  (*Id*. at ¶ 12, PageID.1774).  Elhorn provided water samples to Carus, a company that manufactures water treatment chemicals, for analysis.  (*Id*.).  Based on its analysis, Carus recommended the use of its product, a 70% orthophosphate blend.  (*Id*. at ¶ 13).  Benton Harbor submitted

---

[4] EGLE is not required to order a corrosion control study under the statute.  *See* MICH. ADMIN. CODE R. 325.10604f(2)(e)(ii).  Rather, it has the discretion to order such a study within twelve months after the monitoring period in which the exceedance occurred.  If no study is ordered, EGLE must specify "optimal corrosion control treatment" within that twelve month period.  *See id*.

this corrosion control proposal to EGLE on November 21, 2018.  (ECF No. 142-19).

The proposal also included the installation of "corrosion racks to monitor and verify

performance results are optimal."  (*Id.* at PageID.1986).  This proposed use of

orthophosphate for corrosion control was not unusual, as it had been used by other

water systems similar to Benton Harbor that drew water from Lake Michigan.  (Onan

Decl. at ¶ 13, PageID.1774).  The EPA reviewed the proposed corrosion control plan

and expressed no concerns.  (Oswald Decl. at ¶ 5, ECF No. 142-12, PageID.1882).

Benton Harbor submitted a formal permit application for corrosion control in January

2019.  (Permit, ECF No. 142-18).  EGLE approved the permit the following month.

(*Id.* at PageID.1927).

The city then had twelve months from the date of the permit approval to

implement the corrosion control treatment.  *See* MICH. ADMIN. CODE R.

325.1064f(2)(e)(iv).  The city began that process on March 25, 2019,[5] eleven months

before the statutory deadline.  EGLE required Benton Harbor to increase the

frequency and number of lead testing sites.  (*See* Onan Decl. at ¶ 22, ECF No. 142-3,

PageID.1777).  EGLE also required the city to submit a corrosion control study

proposal by the end of April 2019, a requirement the city met on April 23, 2019.  (*See*

*id.* at ¶¶ 20-21, 23, PageID.1777-78).  While the study proposal was less than ideal,

EGLE allowed its implementation due to the city's financial limitations and EGLE's

interest in getting some data quickly.  (*Id.* at ¶ 23, PageID.1778).  The results of this

---

[5] *See* O'Malley Email to DEQ, Mar. 27, 2019, *Grant v. U.S. Environmental Protection Agency*, Case No. 1:22-cv-186, ECF No. 101-22.

11

study were inconclusive, and EGLE ordered the city to submit a new study proposal in February 2020.  (*Id.*).

There was some evidence that Benton Harbor's initial corrosion control protocols were working.  (*See id.* at ¶ 26, PageID.1779; *see also Benton Harbor Drinking Water Lead Testing*, ECF No. 142-4, PageID.1784 (lead testing percentages)).[6]  But, by January 2020, EGLE staff were concerned that the corrosion control treatment was not working quickly enough.  (*See* Onan Decl. at ¶ 28, PageID.1780-81).  EGLE consulted with EPA and with an engineer who performed a corrosion control study in Flint.  The engineer recommended that Benton Harbor increase the orthophosphate to either 100% or a 90% blend at a higher rate of induction.  (*Id.* at ¶ 29, PageID.1781).  On February 13, 2020, EGLE directed Benton Harbor to increase its orthophosphate level to 90% at the rate of 3 mg/L no later than the end of that month, and to submit a third-party study proposal within the following six months.  (EGLE Letter to Ellis Mitchell, Feb. 13, 2020, ECF No. 142-21, PageID.1992-93).  While the lead levels declined over time, they continued to exceed

---

[6] Although the 90th percentile rose to 27 ppb in the first part of 2019, and 32 ppb in late 2019, the elevated levels were likely due to the fact that Benton Harbor was required to collect and test the fifth liter sample drawn from each site, and not simply the first.  (Onan Decl. at ¶ 26, ECF No. 142-3, PageID.1779-80).  "The change to collect fifth liter samples often results in finding more lead.  That is because the fifth liter collects water that is more likely to have been sitting in the building's service line, and if that line is made of lead, the fifth liter is more likely to have lead in it than the first liter." (*Id.*, PageID.1780).  In addition, the testing protocol required six to eight hours of stagnation, a greater level of stagnation than is typically encountered in residential use, which protocol "is designed to help identify the worst case scenarios."  (*Id.*).

the action level through the monitoring period ending in December 2021.  (*See* ECF No. 142-4, PageID.1784; ECF No. 142-5, PageID.1787 (lead sampling data)).  Water samples tested during the three six-month monitoring periods following 2021 showed lead levels below the action level.  (*See* EGLE Press Release, July 7, 2022, ECF No. 142-41).

In the beginning of the action level exceedance period, Benton Harbor made bottled water available for pickup at city hall, but did not provide water filters.  (Onan Decl. at ¶ 14, ECF No. 142-3, PageID.1774).  Upon learning this information in January 2019, EGLE worked with MDHHS and the Berrien County Health Department to ensure water filters were made available to all residents at no cost.  (*Id.* at ¶¶ 14-15, PageID.1774-75).

The EPA conducted a study of these filters, which were the same as used in Flint.  That study confirmed that the filters "consistently reduc[ed] the lead in tap water, in most cases to undetectable levels, and in all cases to levels that would not result in a significant increase in overall lead exposure."  (*See Flint, MI Filter Challenge Assessment*, ECF No. 142-54, PageID.2560; *see also Benton Harbor, Michigan, Drinking Water Study Results*, ECF No. 142-55, PageID.2566 ("[F]ilters, when properly installed and used, remove lead from drinking water as expected.").

### The Second Amended Complaint

The Second Amended Complaint contains the following six counts:

Count I:     The State and City Defendants violated Plaintiffs' Fourteenth Amendment Substantive Due Process Right to Bodily Integrity;

Count II:   The City of Benton Harbor, through its "customs, usages, policies and/or procedures," violated Plaintiffs' constitutional rights (*Monell* claim);

Count III:   The City of Benton Harbor was unjustly enriched by receiving payment for contaminated water;

Count IV:   Elhorn Engineering Company was professionally negligent regarding its water-treatment work for the City of Benton Harbor;

Count V:   F&V Operations and Resource Management, Inc., was professionally negligent regarding its water-treatment work for the City of Benton Harbor; and

Count VI:   Benton Harbor Water Department Director violated the Michigan Government Tort Liability Act.

## Procedural History

Plaintiffs filed their initial complaint on November 10, 2021. (ECF No. 1). The 63-page pleading included nine counts:  Count I – violations of substantive due process, state created danger (*id.* at ¶¶ 84-93); Count II – violations of substantive due process, bodily integrity (*id.* at ¶¶ 94-99); Count III – violations of federal and state safe water drinking statutes (*id.* at ¶¶ 100-14); Count IV – unjust enrichment (*id.* at ¶¶ 115-20); Count V – battery (*id.* at ¶¶ 121-30); Count VI – negligence against two private engineering firms (*id.* at ¶¶ 131-45; Count VII – negligence, failure to warn, against all defendants (*id.* at ¶¶ 146-52); Count VIII – trespass to real property (*id.* at ¶¶ 153-59); and Count IX private nuisance (*id.* at ¶¶ 160-65).  The complaint sought a declaratory judgment, equitable relief, compensatory damages, punitive damages, and attorneys' fees and costs.  (*Id.* at PageID.59-60).

On January 28, 2022, Plaintiffs filed an amended complaint.  (ECF No. 7).  It

dropped Counts I, III, IV, V, VII, VIII, and IX from the original complaint. It added a *Monell* claim against the City of Benton Harbor and a government tort claim against the Benton Harbor Water Department Manager, and it separated into two counts the claims of professional negligence against the two private engineering firms. With respect to the relief sought, the amended complaint added, among other things, "an immediate injunction . . . to stop all Benton Harbor residents, Plaintiff Class representatives, and Plaintiff Class Members from paying for the contaminated water," as well as the city's disgorgement of all payments received from Plaintiffs from January 2019 to the present. (*Id.* at PageID.179).

On June 17, 2022, the Court granted Plaintiffs' motion to file a second amended complaint. (ECF No. 81). This is the operative complaint for purposes of the pending motions to dismiss.

The Court conducted a status conference on August 30, 2022, to discuss with counsel in each of the three related Benton Harbor water cases how to efficiently coordinate the litigation. (*See* Minutes, ECF No. 113; Order, ECF No. 114, PageID.1276). The Court ordered counsel for all parties to confer for the purposes of developing proposals for consolidating discovery, as well as coordinating with any pending state case.[7] (ECF No. 114, PageID.1277-78).

---

[7] There are three known cases pending before Judge Douglas Shapiro in the Michigan Court of Claims: *Daretha Braziel v. EGLE*, Case No. 22-0046-MM; *Oliver Kavanaugh v. EGLE*, Case No. 22-0050-MM; and *Jennifer Janssen-Rogers v. EGLE*, Case No. 22-0246-MM. The *Daretha Braziel v. EGLE* case is related to the instant case. (*See* Second Amended Complaint, ECF No. 82, PageID.1113).

The Court conducted a second status conference on October 20, 2022. (Minutes, ECF No. 127). During that conference, the Court notified counsel that it may decline to exercise supplemental jurisdiction over the state claims in each of the related Benton Harbor water cases. (*See* Omnibus Order, ECF No. 130, PageID.1537). It issued Plaintiffs an order to show cause within 21 days why the Court should not decline supplemental jurisdiction, requiring Defendants to respond within fourteen days thereafter. (*Id.* at PageID.1538). The Court stayed Defendants' time for responding to the state claims pending the Court's decision on the issue of supplemental jurisdiction. (*Id.* at PageID.1539). The Court set a deadline of December 2, 2022, for filing motions to dismiss. (*Id.*).

All the defendants named in the two federal claims have filed motions to dismiss. The state defendants – Governor Whitmer, EGLE directors Liesl Clark and Eric Oswald, and MDHHS directors Robert Gordon and Elizabeth Hertel – have separately moved to dismiss the federal claims against them under Federal Rule of Civil Procedure 12(b)(1), asserting Eleventh Amendment immunity (ECF No. 141), and Rule 12(b)(6) for failure to state a claim. (ECF No. 145). The city defendants – the City of Benton Harbor, Mayor Marcus Muhammad, Water Plant Manager Michael O'Malley, and City Managers Darwin Watson and Ellis Mitchell – separately moved to dismiss the federal claims under Rule 12(b)(1) on the basis of sovereign immunity and qualified immunity (ECF No. 147) and under Rule 12(b)(6) for failure to state a claim (ECF No. 150).

16

On May 8, 2023, the Court conducted oral argument on the pending motions. (Minutes, ECF No. 168; Hrg. Tr., ECF No. 172).  The undersigned has taken into consideration all that was discussed during that hearing.

## STANDARDS

I.   <u>Motions to Dismiss for Lack of Subject Matter Jurisdiction</u>

If a challenge is asserted to the Court's subject matter jurisdiction, "the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Houchens v. Beshear*, 850 Fed. Appx. 340, 342 (6th Cir. 2021).  Moreover, the Court "must" consider a jurisdictional challenge first because Defendants' other arguments for relief are moot if the Court lacks jurisdiction.  *Ibid.*

Motions challenging subject matter jurisdiction may be based on a "facial" or a "factual" attack.  *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).  A facial attack challenges jurisdiction looking only to the allegations in a complaint, taking them as true, while a factual attack challenges "the factual existence of subject matter jurisdiction."  *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014).  In a factual attack, a court has broad discretion as to what evidence to consider, including evidence outside of the pleadings, and it "has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case."  *Id.* at 759-60 (citing *Ritchie*, 15 F.3d at 598).

II.  <u>Motions to Dismiss for Failure to State a Claim</u>

A complaint may be dismissed under Rule 12(b)(6) for failure to state a claim if it fails "to give the defendant fair notice of what the . . . claim is and the grounds

17

upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)).  While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions.  *Id.*; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").  The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570.

A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679.  Although this standard is not equivalent to a " 'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 556).  "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The burden to obtain relief under Rule 12(b)(6) rests with the defendant. *See, e.g., DirecTV, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007).  The Court must "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Ibid.* A motion to dismiss "should not be granted unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief." *Ibid.*

18

When resolving a motion to dismiss pursuant to Rule 12(b)(6), the Court may consider the complaint and any exhibits attached thereto, public records, items appearing in the record of the case, and exhibits attached to the defendant's motion to dismiss provided such are referenced in the complaint and central to the claims therein. *See Bassett v. National Collegiate Athletic Assoc.*, 528 F.3d 426, 430 (6th Cir. 2008); *see also*, *Continental Identification Products, Inc. v. EnterMarket, Corp.*, 2008 WL 51610, at *1 n.1 (W.D. Mich., Jan. 2, 2008) ("an exhibit to a pleading is considered part of the pleading" and "the Court may properly consider the exhibits . . . in determining whether the complaint fail[s] to state a claim upon which relief may be granted without converting the motion to a Rule 56 motion"); *Stringfield v. Graham*, 212 Fed. Appx. 530, 535 (6th Cir. 2007) (documents "attached to and cited by" the complaint are "considered parts thereof under Federal Rule of Civil Procedure 10(c)").

## ANALYSIS

The undersigned judicial officer will address the jurisdictional issues first. Then, the two federal claims will be analyzed as to whether they state a cognizable claim under Rule 12(b)(6). Finally, the issue of whether the Court should retain supplemental jurisdiction will be addressed.

I.    <u>State Defendants' Rule 12(b)(1) Motion to Dismiss</u>

The State Defendants – Governor Whitmer, EGLE directors Clark and Oswald, and MDHHS directors Gordon and Hertel – seek dismissal of the federal claims against them in their official capacities under Rule 12(b)(1) for lack of jurisdiction

due to Eleventh Amendment sovereign immunity.  (ECF No. 141).  For the following reasons, the undersigned recommends that the motion be denied.

A.     Eleventh Amendment Sovereign Immunity

The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."  U.S. CONST. AMEND. XI.  While it does not explicitly bar suits by a state's own citizens, the Supreme Court has extended the Eleventh Amendment's application to a state's own citizens.  *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 363 (2001) (citing other cases).  "The ultimate guarantee of the Eleventh Amendment is that nonconsenting States may not be sued by private individuals in federal court."  *Id.*

Plaintiffs do not challenge whether the State Defendants are "arms of the state" for purposes of Eleventh Amendment immunity.  Rather, Plaintiffs argue that the *Ex parte Young* exception to that immunity applies in this case.  (ECF No. 159, PageID.4154-56).

B.     The Ex parte Young Exception to Eleventh Amendment Immunity

The *Ex parte Young* doctrine avoids the Eleventh Amendment immunity to suit for actions against states and state offers in their official capacity for claims alleging an ongoing violation and which seek relief that is "properly characterized" as prospective.  *See Verizon Maryland, Inc. v. Public Service Commission of Maryland*, 535 U.S. 635, 645 (2002) (*citing Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261,

296, (1997) (J. O'Connor, J. Scalia, J. Thomas concurring in part and concurring in judgment)).  This is a "straightforward inquiry."  *Verizon Maryland*, 535 U.S. at 645.

The State Defendants advance two arguments for the proposition that the *Ex parte Young* doctrine does not apply here:  (1) that they have not, nor are they continuing to violate federal law, so no relief is appropriate (ECF No. 142, PageID.1750-58); and (2) that Plaintiffs' amended complaint does not seek prospective relief (*id.* at PageID.1759-60).  The first is inapposite, as the inquiry at this stage "does not include an analysis of the merits of the claim."  *Verizon Maryland*, 535 U.S. at 646 (citing *Coeur d'Alene*, 521 U.S. at 281)).  The second misreads the Second Amended Complaint.

The Second Amended Complaint explicitly seeks "injunctive relief," as well as prospective "equitable" relief.  (Second Amended Complaint, ECF No. 82, PageID.1178).  Among the injunctive and equitable relief sought includes "an immediate abatement of the lead service lines with replacement lines"; "a water supply delivered to each home of adequate water" pending replacement of the service lines; the "establishment of a medical monitoring process"; the appointment of "a monitor to oversee the water operations of Benton Harbor"; and "an immediate injunction" against the payment for contaminated water.  (*Id.*).  According to the Sixth Circuit, this is sufficient to invoke the *Ex parte Young* exception to Eleventh Amendment immunity.  *See In Re Flint Water Cases*, 960 F.3d 303, 333-34 (6th Cir. 2020) (complaint seeking repairs to private property, as well as the establishment of

medical monitoring and education programs sufficient to invoke *Ex parte Young* exception).

Accordingly, the State Defendants' Rule 12(b)(1) motion (ECF No. 141) should be denied.  For the reasons articulated below, however, the State Defendants' Rule 12(b)(6) motion should be granted, as the amended complaint fails to state a cognizable claim for constitutional violation.

## II.    The City Defendants' Rule 12(b)(1) Motion to Dismiss

In their Rule 12(b)(1) motion, the City Defendants claim that they are entitled to sovereign immunity.  (ECF No. 147, PageID.4027).  But the only potential discussion of this issue in their brief is the unsupported assertion regarding a putative equal protection claim that, "[a]bsent some showing of disparate treatment, the City Officials are entitled to government immunity."   (ECF No. 148, PageID.4058).  This is manifestly insufficient to warrant dismissal of any claim under Rule 12(b)(1).  Moreover, the courts have already ruled otherwise.  "Sovereign immunity 'does not extend to counties and similar municipal corporations,' such as the defendants associated with the City of Flint in these cases." *Boler v. Earley*, 865 F.3d 391, 410 (6th Cir. 2017) (quoting *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 280 (1977)).  Having failed to demonstrate an

entitlement to any government immunity, the undersigned recommends that the City Defendants' Rule 12(b)(1) motion (ECF No. 147) be denied.[8]

III.   <u>Plaintiffs' Substantive Due Process Claim (Count I) Fails to State a Claim</u>

Cognizant that a Rule 12(b)(6) motion tests the sufficiency of the factual allegations in a complaint, *see, e.g., Twombly*, 550 U.S. at 545, the undersigned will review the factual allegations in Count I, giving Plaintiffs the benefit of every reasonable inference.

In Count I, Plaintiffs claim that the named state and city officials "deliberately and knowingly violated" Plaintiffs' right to bodily integrity in that they "deliberately and knowingly caused, maintained, and covered up the Benton Harbor water supply system that contained [excessive] lead, bacteria and other contaminants."  (Second Amended Complaint at ¶¶148, 148(a), ECF No. 82, PageID.1164).  Plaintiffs further claim that the defendants "knew, and were aware, of the serious medical risks associated with exposure to [the] contaminated water" and "failed to take reasonable actions to protect" Plaintiffs.  (*Id.* at ¶¶ 148(b),(c)).  Plaintiffs contend that "[e]ach government Defendant's conduct . . . was so egregious and so outrageous, that it 'shocks the conscience'."  (*Id.* at ¶ 149, PageID.1165).  A review of the specific factual allegations do not support Plaintiffs' conclusions.  More specifically, the factual

---

[8] The City Defendants also argue that they are entitled to qualified immunity.  (ECF No. 147, 148).  The Court need not address this issue as Plaintiffs have failed to plausibly allege a constitutional violation against any of the City Defendants.

allegations in the Second Amended Complaint miss the mark for conduct that "shocks the conscience," as defined by the Sixth Circuit.

A.     Due Process Standards – Bodily Integrity Claims

The Due Process Clause of the Fourteenth Amendment significantly restricts government action. "[It] was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression.' " *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992) (quoting *DeShaney*, 489 U.S. at 196). "The touchstone of due process is protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558 (1974) (citing *Dent v. West Virginia*, 129 U.S. 114, 123 (1889)). This applies "whether the fault lies in a denial of fundamental procedural fairness, or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *County of Sacramento v. Lewis*, 523 U.S. 833, 845-46 (1998) (citations omitted)). "[Supreme Court] cases dealing with abusive executive action have repeatedly emphasized that only the most egregious official conduct can be said to be 'arbitrary in the constitutional sense'." *Id.* at 846 (quoting *Collins*, 503 U.S. at 129).

There are both procedural and substantive due process components in the Fourteenth Amendment. *See Range v. Douglas*, 763 F.3d 573, 588 (6th Cir. 2014). "Procedural due process generally requires that the state provide a person with notice and opportunity to be heard before depriving that person of a property or liberty interest." *Warren v. City of Athens*, 411 F.3d 697, 708 (6th Cir. 2005). A plaintiff must first demonstrate a deprivation of protected property or liberty interest before

24

the court will consider whether the process afforded the plaintiff was sufficient.  *See Hamilton v. Myers*, 281 F.3d 520, 529 (6th Cir. 2002).

Substantive due process, on the other hand, "bar[s] certain government actions regardless of the fairness of the procedures used to implement them."  *Daniels v. Williams*, 474 U.S. 327, 331 (1986).  It protects "fundamental rights and liberties," including the right to bodily integrity.  *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997).  It also protects against arbitrary and capricious government action " 'that shocks the conscience' and violates the 'decencies of civilized conduct.' "  *Lewis*, 523 U.S. at 846-47 (quoting *Rochin v. California*, 342 U.S. 165, 172-73 (1952)).  "[T]he central tenet of the Supreme Court's vast bodily integrity jurisprudence is balancing an individual's common law right to informed consent with tenable state interests, regardless of the manner in which the government intrudes upon an individual's body."  *Guertin*, 912 F.3d at 919 (citing *Cruzan v. Director, Missouri Department of Health*, 497 U.S. 261, 269-70 (1990)).

This Court is guided by the analysis in *Guertin*, in which the Sixth Circuit analyzed bodily integrity claims relating to the lead-contaminated water in Flint, Michigan.  "Upon a showing of a deprivation of a constitutionally protected liberty interest, a plaintiff must show how the government's discretionary conduct that deprived that interest was constitutionally repugnant."  *Guertin*, 912 F.3d at 922. The Sixth Circuit has adopted "the 'shocks-the-conscience' rubric to evaluate intrusions into a person's right to bodily integrity."  *Id.* (citing *Lillard v. Shelby County Board of Education*, 76 F.3d 716, 725 (6th Cir. 1996)).  Accordingly, to state a

25

substantive due process claim, Plaintiffs must plausibly allege both the "deprivation of a liberty or property interest" and "conscience shocking conduct." *Guertin* 912 F.3d at 922. "Stated differently, the shocks-the-conscience test is the way in which courts prevent transforming run-of-the-mill tort claims into violations of constitutional guarantees." *Id.* at 923.

Governmental infliction of lead-contamination on an individual is unquestionably a "harm striking at the core of [that person's] bodily integrity." *Id.* at 925. The remaining issue, then, is whether Plaintiffs have alleged plausible facts, which if true, establish that any of the defendants engaged in conduct relating to the lead-contamination of the Benton Harbor water supply that "shocks the conscience." *See id.* at 925-32.

B.   Plaintiffs Fail to Allege Plausible Facts Showing That Any of the State Defendants Engaged in Conduct That Shocks the Conscience

With respect to each of the individual State Defendants, Plaintiffs repeat the same conclusory claim that the defendant "was aware of and participated in the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis." (Second Amended Complaint at ¶¶ 21, 22, 23, 24, ECF No. 82, PageID.1121). As for three of the individual City Defendants, Plaintiffs offer a somewhat similar conclusory assertion that each "approved of, and participated in, the decisions that caused, maintained, and covered up the Benton Harbor water crisis." (*Id.* at ¶¶ 26, 27, 28, PageID.1122-23). Finally, Plaintiffs claim that the Water Plant Director's "actions caused, maintained, and covered up the Benton Harbor

water crisis." (*Id.* at ¶ 29, PageID.1123).  Such talismanic invocations of liability are manifestly insufficient to state a claim for a due process violation.

The Sixth Circuit "has consistently held that damage claims against governmental officials alleged to arise from violations of constitutional rights cannot be founded upon conclusory, vague or general allegations, but must instead allege facts that show the existence of the asserted constitutional rights violation recited in the complaint and what *each* defendant did to violate the asserted right." *Terrance*, 286 F.3d at 842 (emphasis in original).  Plaintiffs cannot demonstrate that a particular defendant's actions shock the conscience without assessing each defendant's alleged actions individually.  *See Guertin*, 912 F.3d at 926.

A review of the specific allegations against each of the individual defendants reveals that the amended complaint falls well short of stating a constitutional violation against any of them.  At most, Plaintiffs' allegations suggest that some of the defendants may have been negligent in the exercise of their duties.  The following represents the specific allegations of misconduct with respect to each individual defendant.

1. *Governor Gretchen Whitmer*

Plaintiffs complain that Governor Whitmer waited until October 14, 2021, to issue a declaration that the Benton Harbor water was unsafe to drink and to authorize the provision of bottled water.  (Second Amended Complaint at ¶¶ 8, 91,

109, ECF No. 82, PageID.1115, 1140, 1154).[9]  A state official was told to inform the governor as early as the end of January 2019 that the contaminants in the water supply exceeded allowable limits (*id.* at ¶ 54, PageID.1130), and the Lieutenant Governor promised Benton Harbor community leaders in October 2019 that he would inform the governor of their request that she "do something about the lead poisoned water supply" (*id.* at ¶ 148(d)).  Plaintiffs note that the governor implicitly acknowledged the harmful effects the ingestion of contaminated water can cause through her establishment in 2020 of the Office of the Clean Water Public Advocate. (*Id.* at ¶ 93, PageID.1141).[10]

These allegations are patently insufficient to meet the "shocks-the-conscience" standard.  Even assuming that the governor had actual knowledge of the lead contamination as early as 2019 – something more than is actually alleged in the amended complaint – that knowledge does not support a finding that she engaged in such "egregious behavior that rises to the level of a substantive due process claim." *Guertin*, 912 F.3d at 923.  At most, one can infer from the allegations against the governor that she could have, and should have, acted sooner to declare the Benton Harbor water unsafe.  But such a failure to more timely act, without any indication of culpability for causing the lead contamination, falls well short of what is needed to

---

[9] Plaintiffs quote from Exhibit J, EPA Region 5 Unilateral Administrative Order, Nov. 2, 2021, at 1-2 (*see* Second Amended Complaint at ¶ 109 n.41, ECF No. 82, PageID.1154).

[10] Plaintiffs cite to Exhibit I, Office of Clean Water Public Advocate, at 1 (Second Amended Complaint at ¶ 93 n.31, ECF No. 82, PageID.1141).

meet the "particularly high hurdle" of showing "conscience shocking conduct." *Guertin* 912 F.3d at 922, 926.

### 2. *EGLE Director Liesl Clark*

Plaintiffs allege that EGLE Director Liesl Clark knew as early as January 2019 that the lead contamination in the Benton Harbor water supply exceeded the allowable limits (Second Amended Complaint at ¶ 52, PageID.1130), and that she admitted in October 2021 that Benton Harbor's water supply was not safe to drink (*id.* at ¶ 9, PageID.1116). Director Clark was copied on a press release in January 2019 recommending that Benton Harbor residents use filters and flush their waters lines before using the water, but which did not advise that the water was unsafe to drink. (*Id.* at ¶ 53, PageID.1130). She then instructed another official to notify the governor of the escalating lead levels in the water supply. (*Id.* at ¶ 54, PageID.1130).

Plaintiffs' allegations plausibly support the conclusion that Director Clark was on notice of the lead contamination in the Benton Harbor water system, and of the insufficient advice being given the residents regarding that contamination. There is nothing to suggest, however, that she was culpable in any way in causing the contamination of the water system, or that she took any action to encourage Benton Harbor residents to ingest contaminated water. Perhaps she could have, and should have, done more, but failure to take action, alone, is insufficient to violate substantive due process rights. *See Guertin*, 912 F.3d at 929-30 (noting that failure "to 'protect and notify the public' of the Flint water contamination was, alone, insufficient to state

a due process claim); *see also DeShaney*, 489 U.S. at 195 ("The [Due Process] Clause is phrased as a limitation on the State's Power to act, not as a guarantee of certain minimal levels of safety and security.").

### 3. *EGLE Drinking Water Director Eric Oswald*

Plaintiffs allege the EGLE Drinking Water Director Eris Oswald was instructed to notify Governor Whitmer of the escalating lead contamination in the Benton Harbor water system.  (Second Amended Complaint at ¶ 54, PageID.1130). In a December 2019 email, Director Oswald was advised:  " 'if we continue the pattern of allowing them (Benton Harbor) to miss deadlines and request extensions (for compliance of the Safe Drinking Water Act), then the water system remains vulnerable and we are potentially culpable if a problem occurs.' "  (*Id.* at ¶ 58, PageID.1131-32.[11]   Plaintiffs assert that Director Oswald made "untruthful" statements about the city's "non-compliant drinking water systems" in two responses to EPA queries  (*id.* at ¶¶ 59-61, PageID.1132), and that he "falsely asserted" in November 2019 that a private engineering firm's corrosion control product was working to reduce lead contamination (*id.* at ¶ 82, PageID.1137).[12]  Director Oswald

---

[11] Plaintiffs quote from Exhibit F, Email from Michael Bolf to Eric Oswald, Dec. 18, 2019 (Second Amended Complaint at ¶ 58 n.20, ECF No. 82, PageID.1132).

[12] As discussed above (*see* page 12 & n.5), the state defendants have provided evidence that supports the proposition that the Carus corrosion treatment was working, and that the increased lead levels were due to changes in the manner and number of tests being conducted.  Even if this information is inaccurate, it undermines the contention that Mr. Oswald's assertion regarding the efficacy of the Carus was a knowing false statement, as opposed to a mistake.  For purposes of the Rule 12(b)(6) motion, however, the Court will assume it was a knowingly false statement.

received an email in January 2019 from a Benton Harbor resident reporting that the city water department director had stated that the water was "okay" for drinking and cooking after flushing the water line because the water supply was "clean . . . right to their spout' " (*id.* at ¶ 106, PageID.1153), and he took no action to correct this misinformation (*id.* at ¶ 107).

As with Director Clark, the import of the allegations against Drinking Water Director Oswald is that he failed to protect and notify the public regarding the problems associated with the contamination of the Benton Harbor water system. That is insufficient to state a claim for a due process violation. *See Guertin*, 912 F.3d at 930 ("[T]he Due Process Clause is a limitation only on government action."). The additional allegations regarding untruthful statements he made to the EPA are, if true, wrongful, but they do not rise to the particularly high level of conscience shocking conduct. Not every bad act or wrongful conduct will support a due process claim. *See id.* at 931 (allegations that MDHHS employees "participated in, directed, and/or oversaw the department's efforts to hide information to save face, and actively sought to obstruct and discredit the efforts of outside researchers" were insufficient to state a due process claim).

### 4. *DHHS Director Robert Gordon*

Plaintiffs allege that DHHS Director Robert Gordon was made aware as early as January 2019 that tests of the Benton Harbor water supply had shown multiple high readings, and he discussed this information with EGLE and MDHHS officials in conference calls. (Second Amended Complaint at ¶ 62, PageID.1132). Director

Gordon approved the use of water filters in randomly selected homes without performing an appropriate study to determine the efficacy of the filters, without determining how the filters were installed, and without advising residents that the water was unsafe to drink.  (*Id.* at ¶ 65, PageID.1133-34).

Giving Plaintiffs the benefit of every reasonable inference, the allegations against Director Gordon speak, at most, of negligence.  But this is "categorically beneath the threshold of constitutional due process."  *Lewis*, 523 U.S. at 849.

### 5.  *DHHS Director Elizabeth Hertel*

Plaintiffs allege that DHHS Director Elizabeth Hertel failed to perform a scientific study to determine whether the free water filters being distributed to Benton Harbor residents were effective in capturing lead and other contaminants. (Second Amended Complaint at ¶ 124, PageID.1158).  She did not recommend that Benton Harbor residents use bottled water until October 2021.  (*Id.* at ¶ 125).  During that same month, Director Hertel acknowledged within the DHHS that there was no guarantee that the water filters were mitigating lead.  (*Id.* at ¶ 127).

The allegations against Director Hertel suggest simply that she failed to take action Plaintiffs believe should have been taken.  But the simple failure to take action, even with knowledge of potential harm, falls short of establishing a due process violation.  *See Guertin*, 912 F.3d at 930.

### 6.  *Benton Harbor Mayor Marcus Muhammad*

Plaintiffs advance a number of conclusory claims against Mayor Marcus Muhammad, including that he "approved of" and "participated in" decisions that

caused the lead contamination, that he "failed to notify and warn residents" of high levels of lead in their drinking water, and that "he did not follow the notice and public education required by federal and State Safe Drinking Water laws." (Second Amended Complaint at ¶ 26, PageID.1122). Plaintiffs fail, however, to offer any specific allegation as to what the mayor did to cause the lead contamination in the water system. More to the point, Plaintiffs offer nothing to support the proposition that the mayor did anything that could plausibly be characterized as constitutionally repugnant.

Plaintiffs similarly offer cryptic claims that the mayor was falsely advising the public that the drinking water was safe to drink. (*See id.* at ¶ 107, PageID.1153 (alleging that the EGLE Drinking Water Director knew of some unspecified false statements by the mayor and other city officials)). But again, the amended complaint is long on conclusions and short on specifics. *Cf. Twombly*, 550 U.S. at 555 (A plaintiff's allegations must include more than labels and conclusions.); *Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

Finally, one of the individual Plaintiffs, Emma Kinnard, alleges that she asked Mayor Marcus Muhammad to test her water approximately two years before filing this action (the original complaint was filed in 2021) and that he told her "he would 'get back to [her],' but he never did." (Second Amended Complaint at ¶ 14, PageID.1118). Assuming this allegation is true, it indicates that the mayor may have dropped the ball, but it hardly constitutes conscience shocking conduct.

7. *Benton Harbor City Managers Darwin Watson and Ellis Mitchell*

There is a particular dearth of specific allegations in the amended complaint against the former and current city managers regarding any involvement they may have had in the contamination of the Benton Harbor water system.   The only allegations concerning either of them with respect to Count I are the boilerplate claims that each of them "approved of and participated in the decisions that caused, maintained, and covered up the Benton Harbor water crisis"; that they "failed to notify and/or warn the residents" of the lead contamination; and that each violated the notice and educational requirements of the state and federal Safe Drinking Water laws.  (Second Amended Complaint at ¶¶ 27, 28, PageID.1122-23).  As such, Plaintiffs fail to state a due process violation claim against either of them.[13]

8. *Benton Harbor Water Plant Director Michael O'Malley*

Plaintiffs allege that, in 2018, Water Plant Director Michael O'Malley admitted that lead contamination may – "*perhaps to a very small degree*" – come from the city's main water lines.  (*Id.* at ¶ 56, PageID.1131).  On some unspecified date, Director O'Malley allegedly told an individual named "Isabel (Izzy) Marrah" that, "after the

---

[13] The fact that Mr. Watson and Water Plant Director Michael O'Malley are no longer in office (*see* Second Amended Complaint at ¶¶ 27, 29, ECF No. 82, PageID.1122-23) constitutes an independent basis for dismissing the official-capacity claims against them.  *See O'Donnell v. Brown*, 335 F. Supp.2d 787, 815 (W.D. Mich. 2004) ("[O]fficial capacity suits 'generally represent only another way of pleading an action against the entity of which an officer is an agent' . . . 'the real party in interest is the entity.' " (quoting *Monell v. Department of Social Services of City of New York*, 436 U.S. 658, 690 n.55 (1978); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985)).

'first flush it was okay to drink and cook' the tap water because 'they [Benton Harbor water supply) provide clean water right to their spout.'" (*Id.* at ¶ 106, PageID.1153).[14]   The only other reference to an allegedly false public statement Director O'Malley made is a purely conclusory claim that he and other city officials "were falsely telling the public and Benton Harbor water supply users, and each Plaintiff, that the tap water was safe to drink." (*Id.* at ¶ 107, PageID.1153).  Notably, Plaintiffs provide no example of any allegedly false statement in that regard, including the statements that were allegedly made to Plaintiffs themselves.  Such conclusory allegations are insufficient to state a due process claim.  *See Guertin*, 912 F.3d at 930; c*f. Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678.

### 9.   *Comparison to the "Flint Water Crisis Case"*

The Sixth Circuit opinion in *Guertin* is instructive to the analysis of Plaintiffs' claims in the instant case.[15]   The Sixth Circuit held that the *Guertin* plaintiffs had adequately stated a claim for a due process bodily integrity claim against certain of the named defendants.  These included those who were among the "chief architects" of the decision to switch water sources and to use a plant they knew could not safely process the water, especially in light of "the Flint River's known environmental issues

_____

[14] Plaintiffs provide no information regarding who Ms. Marrah is or whether she was harmed by the ingestion of contaminated water.  She is not a named plaintiff.

[15] The state defendants filed a highlighted copy of the complaint filed in the *Guertin* case.  (ECF No. 171-1).  The undersigned has not considered this document.  This Court is guided by the Sixth Circuit's analysis of the allegations in that complaint, not the complaint itself.

and the problems associated with lead exposure." *Guertin* 912 F.3d at 926. Those defendants facing potential liability also included some officials from Michigan's Department of Environmental Quality, who "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water from a river they knew was rife with public-health-compromising complications." *Id.* at 927.

On the other hand, the Sixth Circuit reversed the denial of motions to dismiss by those defendants who were not involved in the decision-making or the implementation of the decision to switch water sources. *See Guertin*, 912 F.3d at 929-32. Those who were dismissed from the case included individuals who allegedly knew about the lead contamination and who failed to "protect and notify the public" of it, i*d.* at 929-30; those who attempted to discredit a study showing the effects of the lead contamination, *id.* at 930-31; and those who, knowing of the lead contamination, withheld data requested by researchers, and sought to attribute the elevated contamination levels to other causes. *Id.* at 932.

Key to the failure to state a claim against the latter group of defendants was the absence of any allegation that these defendants did anything to cause the consumption of lead-contaminated water. As the Court noted: "plaintiffs do not factually link [the defendants'] *inaction* to causing Flint residents to consume (or at least continue to consume) lead-tainted water. Nor do plaintiffs identify a source of law for the proposition that an individual violates the right to bodily integrity just because he failed to 'blow the whistle.' " *Id.*

36

The allegations in Plaintiffs' Second Amended Complaint offer nothing close to what was alleged against the officials in *Guertin* who were directly involved in *causing* Flint residents to consume lead-contaminated water.  At most, the allegations here suggest the same level of culpability as those in *Guertin* whose alleged involvement was insufficient to state a due process claim.

IV.    The *Monell* Claim Against the City of Benton Harbor.

A Section 1983 claim asserted against a municipal officer in his official capacity is, in actuality, a claim against the municipality the officer serves.  *See, e.g., Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Monell v. New York City Department of Social Services*, 436 U.S. 658, 690 n.55 (1978) ("official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent").  In *Monell*, the Supreme Court held that "municipalities and other local government units [are] included among those persons to whom § 1983 applies."  436 U.S. at 690.  In what is now commonly referred to as "*Monell* claims," a plaintiff must demonstrate that the purported constitutional violation was caused by some official policy, practice, or custom.  *See id.* at 690, 694.  Accordingly, in order to succeed on a claim for municipal liability, Plaintiffs must demonstrate both:  (1) the violation of a constitutional right, and (2) that the City of Benton Harbor is responsible for the violation by virtue of a policy, practice or custom.  *See Ellis v. Cleveland Municipal School District*, 455 F.3d 690, 700 (6th Cir. 2006) (citing *Doe v. Claiborne County*, 103 F.3d 495, 505-06 (6th Cir. 1996)).

As noted above, Plaintiffs fail to plausibly allege a constitutional violation by any city employee.   Reading the Second Amended Complaint indulgently, the undersigned finds that the allegations support nothing more than negligence.

Without a plausible claim of constitutional violation against any of the City Defendants, Plaintiffs cannot sustain a *Monell* claim against the City of Benton Harbor.  *See Robertson v. Lucas*, 753 F.3d 606, 622 (6th Cir. 2014) ("There can be no liability under *Monell* without an underlying constitutional violation.").  But, even if Plaintiffs had plausibly alleged a constitutional violation, the outcome would be no different, as they have failed to plead any policy, practice or custom that purportedly *caused* the alleged constitutional violation.

V.    The Court Should Decline to Exercise Supplemental Jurisdiction
       Over the State Claims

The parties have submitted their respective views on whether the Court should entertain supplemental jurisdiction over the state claims.  (*See* ECF No. 134, 135, 136).  Having taken these views into consideration, the undersigned recommends that the Court decline to exercise supplemental jurisdiction over the state claims – Counts III-VI – and dismiss them without prejudice.

The doctrine of supplemental jurisdiction was originally established by the Supreme Court as a matter of federal common law under the term "pendent jurisdiction."  *See United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).  It is now largely codified at 28 U.S.C. § 1367.

Under that statute, "the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). The Court may decline to exercise supplemental jurisdiction over such a claim if:

    (1)    the claim raises a novel or complex issue of State law,

    (2)    the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

    (3)    the district court has dismissed all claims over which it has original jurisdiction, or

    (4)    in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c)(1-4).

District courts retain broad discretion in deciding whether to exercise supplemental jurisdiction over state law claims, discretion which "is bounded by constitutional and prudential limits on the use of federal judicial power. *See Musson Theatrical, Inc. v. Federal Express Corp.*, 89 F.3d 1244, 1254 (6th Cir. 1996). "As a rule of thumb . . . [w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims." *Id.* (citing *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 n.7(1988)).

In determining whether to exercise supplemental jurisdiction after the dismissal of the federal claims, the Court must take into consideration the basis for the dismissal of the federal claims. "Not all 'pretrial dismissals' affect supplemental claims in the same manner." *Musson*, 89 F.3d at 1255. Dismissals following

summary judgment do not affect the Court's ability to resolve supplemental claims. *Id.* But that is not in play here.

Appellate courts closely scrutinize, however, the retention of supplemental jurisdiction following the dismissal of claims under Rule 12(b)(6). *See id.* Dismissals under Rule 12(b)(6) trigger a "strong presumption in favor of dismissing supplemental claims." *Musson*, 89 F.3d at1255 (citing *Taylor v. First America Bank-Wayne*, 973 F.2d 1284, 1287 (6th Cir. 1992) (dictum); *Vild v. Visconsi*, 956 F.2d 560, 570 (6th Cir. 1992) (dictum); *Aschinger v. Columbus Showcase Co.*, 934 F.2d 1402, 1412 (6th Cir. 1991) (dictum); *Gaff v. Federal Deposit Insurance Corp.*, 814 F.2d 311, 319 (6th Cir. 1987) (reversing district court's decision to exercise supplemental jurisdiction after Rule 12(b)(6) dismissal)).  One of the reasons for this presumption is that the dismissal comes early in the case, before the court has expended time or resources on the state claims.  *See Musson*, 89 F.3d at 1255.  That presumption may be overcome by "unusual circumstances," *Gaff*, 814 F.2d at 318; for example, "some prejudice arising from relegating the case for trial in the state court." *Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d Cir. 1975).

The undersigned judicial officer can discern no circumstance that warrants a deviation for the presumptive practice.  Accordingly, the Court should dismiss the state law claims without prejudice.

## Conclusion

For all the reasons outlined above, the undersigned judicial officer recommends the following:

1. that the State Defendants' Rule 12(b)(1) motion to dismiss, asserting Eleventh Amendment immunity (ECF No. 141) be denied;

2. that the State Defendants' Rule 12(b)(6) motion to dismiss for failure to state a federal claim (ECF No. 145) be granted and that Count I of the Second Amended Complaint be dismissed with prejudice as to them;

3. that the City Defendants' Rule 12(b)(1) motion to dismiss (ECF No. 147) be denied; and

4. that the City Defendants' Rule 12(b)(1) motion to dismiss for failure to state federal claims (ECF No. 150) be granted and that Counts I and II be dismissed with prejudice as to them.

In addition, and for the reasons articulated above, the undersigned judicial officer recommends that the Court decline to exercise supplemental jurisdiction and dismiss all the state-law claims – Counts III-VI – without prejudice, and to close this case.

OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of the date of service of this notice.  28 U.S.C. § 636(b)(1)(C).  Failure to file objections within the specified time waives the right to appeal the District Court's order.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947 (6th Cir.1981).

Respectfully submitted,

Date: June 1, 2023

/s/ Phillip J. Green
PHILLIP J. GREEN
United States Magistrate Judge