UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

| | |
|---|---|
| DARETHA BRAZIEL, *et al.*, on behalf of herself and all others similarly situated, | Case No. 1:21-cv-00960-HYJ-PJG |
| Plaintiffs, | |
| v. | Hon. Hala Y. Jarbou |
| | Hon. Phillip J. Green |
| THE CITY OF BENTON HARBOR, *et al.*, | **Oral Argument Requested** |
| Defendants. | |

### *BRAZIEL* PLAINTIFFS' OBJECTIONS TO THE MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

### **\*\*ORAL ARGUMENT REQUESTED\*\***

## TABLE OF CONTENTS

**Page**

I.      FACTUAL BACKGROUND .......................................................................... 3

II.     LEGAL STANDARD ................................................................................. 10

III.    ARGUMENT .............................................................................................. 11

         A.     Plaintiffs Adequately Pled Substantive Due Process Claims. ............ 11

                1.      The R&R Applies an Improper Threshold for Pleadings, Ignoring
                        Controlling Precedent. ............................................................... 11

                        a.      The R&R Transforms an Element of Proof into a Pleading
                                Requirement, Contrary to Governing Law. ................................. 11

                        b.      The R&R Prematurely Weighed Credibility and Decided
                                the Facts. ................................................................................ 16

                2.      Defendants' Actions Plausibly Shock the Conscience. ........................ 19

                        a.      Section 1983 Liability Extends Beyond Primary Actors to
                                Officials Who Enable and Cover Up Dangerous
                                Misconduct. ............................................................................. 19

                        b.      Benton Harbor Officials Engaged in Conduct that was
                                Deemed Conscience Shocking in the Flint Litigation. ............... 24

         B.     The Court Should Exercise Supplemental Jurisdiction Over Plaintiffs'
                State Law Claims. ................................................................................... 28

IV.     CONCLUSION .......................................................................................... 29

# TABLE OF AUTHORITIES

**Page**

## CASES

*Ang v. Procter & Gamble Co.*,
    932 F.2d 540 (6th Cir. 1991) ..................................................................... 13

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) .................................................... 10, 11, 14, 15, 16

*B.L. v. Schuhmann*,
    380 F. Supp. 3d 614 (W.D. Ky. 2019) ...................................................... 14

*Bartynski v. City of Highland Park*,
    No. 21-10049, 2022 WL 390892 (E.D. Mich. Feb. 8, 2022) .................... 12

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) .......................................................... 10, 11, 14, 15

*Bradford v. Bracken Cnty.*,
    No. CV 09-115-DLB, 2010 WL 11520681 (E.D. Ky. Feb. 1, 2010) ..................... 13

*Caldwell v. City of Louisville*,
    120 F. App'x 566 (6th Cir. 2004) ......................................... 20, 21, 22

*Campanella v. Com. Exch. Bank*,
    137 F.3d 885 (6th Cir. 1998) ..................................................................... 29

*Cnty. Of Sacramento v. Lewis*,
    523 U.S. 833 (1998) ......................................................................... 15, 22

*DirecTV, Inc. v. Treesh*,
    487 F.3d 471 (6th Cir. 2007) ......................................................... 10, 11, 17

*Dominque v. Telb*,
    831 F.2d 673 (6th Cir. 1987) ............................................................... 13, 14

*Elliott v. Perez*,
    751 F.2d 1472 (5th Cir. 1985) ............................................................. 13, 15

*Est. of B.I.C. v. Gillen*,
    710 F.3d 1168 (10th Cir. 2013) ................................................................. 22

*Ewolski v. City of Brunswick*,
    287 F.3d 492 (6th Cir. 2002) ..................................................................... 12

*Farmer v. Brennan*,
    511 U.S. 825 (1994) ................................................................................... 21

*Franz v. Oxford Cmty. Sch. Dist.*,
    No. 21-cv-12871, 2023 WL 3431223 (E.D. Mich. May 12, 2023) ............... 11, 12, 16

## TABLE OF AUTHORITIES
### (continued)

Page

*Guertin v. Michigan*,
  912 F.3d 907 (6th Cir. 2019) .............................................. 11, 12, 14, 16, 20, 22, 24, 25, 26, 28

*Herndon v. Johnson*,
  No. 88-CV-70907-DT, 1992 WL 152713 (E.D. Mich. Apr. 7, 1992), *accepting report and recommendation* (May 11, 1992).................................................................................... 20, 23

*J.W. by & through Williams v. City of Jackson, Mississippi*,
  No. 3:21-CV-663-CWR-LGI, 2023 WL 2617395 (S.D. Miss. Mar. 23, 2023) ...................... 23

*Kammeyer v. City of Sharonville*,
  No. C-1-01-649, 2003 WL 25774000 (S.D. Ohio Feb. 13, 2003)........................................... 23

*M.S. by Covington v. Hamilton Cnty. Dep't of Educ.*,
  756 F. App'x 510 (6th Cir. 2018) ............................................................................................ 12

*Meyers v. Cincinnati Bd. of Educ.*,
  343 F. Supp. 3d 714 (S.D. Ohio 2018), *aff'd*, 983 F.3d 873 (6th Cir. 2020)................ 20, 21, 22

*Pearson v. Callahan*,
  555 U.S. 223 (2009)................................................................................................................. 14

*Range v. Douglas*,
  763 F.3d 573 (6th Cir. 2014) .............................................................................................. 12, 21

*Rivas v. City of Passaic*,
  365 F.3d 181 (3d Cir. 2004) .................................................................................................... 16

*Scott v. Ambani*,
  577 F.3d 642 (6th Cir. 2009) ................................................................................................... 11

*Solo v. United Parcel Serv. Co.*,
  819 F.3d 788 (6th Cir. 2016) .............................................................................................. 11, 16

*Stewart v. Metro. Transp. Auth.*,
  566 F. Supp. 3d 197 (E.D.N.Y. 2019) ............................................................................... 20, 23

*Terrance v. Northville Reg'l Psychiatric Hosp.*,
  286 F.3d 834 (6th Cir. 2002) ................................................................................................... 13

*Washington v. Hous. Auth. of City of Columbia*,
  58 F.4th 170 (4th Cir. 2023) .............................................................................................. 20, 22

*Wesley v. Campbell*,
  779 F.3d 421 (6th Cir. 2015) .......................................................................................... 1, 11, 14, 29

*Westlake v. Lucas*,
  537 F.2d 857 (6th Cir. 1976) ................................................................................................... 11

2804702.6

**TABLE OF AUTHORITIES**
**(continued)**

Page

*Westside Mothers v. Olszewski*,
  454 F.3d 532 (6th Cir. 2006) ................................................................ 16

*Wright v. City of Phila.*,
  Nos. CIV.A. 10-1102, et al., 2015 WL 894237 (E.D. Pa. Mar. 2, 2015) ................................ 23

**STATUTES**

28 U.S.C. § 636(b)(1)(C) ........................................................................ 10

42 U.S.C. § 1983 ............................................................ 1, 2, 11, 13, 14, 19, 20, 21, 29

**RULES**

Fed. R. Civ. P. 12(b)(6) ................................................................. 1, 3, 10, 11, 16

LCivR 72.3(b) ................................................................................ 10

**REGULATIONS**

40 CFR § 141.723(b) ........................................................................... 5

-iv-

Plaintiffs object to the recommendations to 1) dismiss Plaintiffs' federal substantive due process claims for failure to state a claim pursuant to Rule 12(b)(6), and 2) decline to exercise supplemental jurisdiction over Plaintiffs' related state law claims. The Report and Recommendation (ECF No. 173, "R&R") rests on four clear errors.[1]

First, the R&R oversteps the bounds of Rule 12(b)(6), incorrectly applying a heightened pleading standard for Plaintiffs' 42 U.S.C. § 1983 civil rights claims – which the Sixth Circuit has called a "critical threshold error." *Wesley v. Campbell*, 779 F.3d 421, 427–28 (6th Cir. 2015). Improperly raising the bar for § 1983 claims guts the statute's ability to allow citizens to hold government accountable for abuses of power. Further, the R&R attempts to resolve contested questions of fact based on an interpretation of the expected trial evidence, which is also inappropriate at this stage. Instead, on a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiffs, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiffs. A motion to dismiss should not be granted unless it appears beyond doubt that the plaintiffs can prove no set of facts in support of their claims. In short, the operative question is "*could* the plausibly alleged behavior shock the conscience of a reasonable juror;" the question is not "is there any construction of the alleged facts that doesn't shock the Court's conscience."

Second, the R&R relies on a false construct that the allegations in this case must be exactly like the Flint water crisis or else be dismissed. But that approach misconstrues what is required to be considered conscience-shocking behavior; the R&R mistakenly assumes that to be considered conscience-shocking, the relevant behavior must be only the primary decisions that

---

[1] Plaintiffs incorporate by reference as if fully stated herein those objections made in *Braziel v. Whitmer*, Case No. 1:21-cv-960, which address the R&R's erroneous recommendations as to the similar claims brought by Plaintiffs here.

-1-

trigger catastrophic events (*e.g.*, "flipping the switch" in Flint). But Sixth Circuit law is clear that "deliberate indifference," such as the allegations here – covering up and concealing, downplaying, doing nothing while knowing inaction would cause harm, lying to or misleading the public, willful ignorance, and failing to remediate – can also shock the conscience, sufficient to support a § 1983 claim. Flint presented one set of actionable facts related to poisoned water; different facts can also support actionable poisoned water claims. The R&R misconstrues the meaning of the Sixth Circuit's decision in *Guertin* and *In re Flint Water Cases*. Although those opinions discussed the dangerous decision to switch the City of Flint onto a riskier water source, they did not hold that flipping the switch – or any other facts – constituted a "floor," that future poisoned water cases had to meet or else face dismissal on the initial papers before any discovery and without trial.

Third, although it is not required to be, this case is more like Flint than the R&R allows. Indeed, much of the conduct by government officials that the Sixth Circuit found plausibly shocked the conscience in Flint – *e.g.*, covering up, downplaying, doing nothing while knowing residents were in danger, lying to the public, etc. – occurred in Benton Harbor as well.

For example, despite having clear information that there were increasing levels of lead in Benton Harbor's municipal water, State and City Defendants lied to residents that the tap water was safe and recommended remediation measures that they knew were ineffective. Second Amended Complaint ("Complaint"), ECF No. 82, PageID.1130, 1133-1134, 1152-1153 (Director O'Malley told residents that after the "first flush it was okay to drink and cook" with the tap water.), 1155-1156; *see also* PageID.1140 (internal email from state consultant dismissing remediation efforts and advising that "[b]ottled water should be delivered to all residents for drinking and cooking"). State Defendants chose to implement ineffective measures

despite the availability of measures that were known to be effective – recommending that residents use bottled water until the crisis abates. *See, e.g., id.*, PageID.1154-1155, 1158. Defendants later "admit[ted] that [during this period] municipal tap water [wa]s not safe for Plaintiffs to ingest, use for food preparation, or use for oral hygiene." *Id.*, PageID.1115, 1116. Both State and City Defendants also covered up and minimized the severity of the crisis, including lying to advocates who expressed concern about the corrosion control measures that were taken and even to the EPA. *Id.*, PageID.1166, 1132, 1137, 1177.

Finally, the R&R improperly declines to exercise supplemental jurisdiction over Plaintiffs' state law claims based on the erroneous dismissal of Plaintiffs' federal claims. Absent dismissal of the federal civil rights claims, none of the state law claims fall within the statutory exceptions to exercising supplemental jurisdiction; therefore, the R&R deviated from the default assumption to exercise supplemental jurisdiction.

Accordingly, Plaintiffs request the Court reject the R&R, deny Defendants' Rule 12(b)(6) motions to dismiss for failure to state a claim, and exercise supplemental jurisdiction over Plaintiffs' state law claims.

I.     **FACTUAL BACKGROUND**

As detailed in the Complaint, ECF No. 82, and in the oppositions to Defendant's motions to dismiss, ECF No. 159, PageID.4151-4153, 4156-4167; ECF No. 160, PageID.4186-4188, the Benton Harbor community was subjected to water poisoned with lead for no less than three years due to the reckless conduct of their State and local governments. The State officials responsible for causing, concealing, covering up, and prolonging the water crisis are Governor Gretchen Whitmer; Michigan Environment, Great Lakes & Energy (EGLE) Director Liesl Clark; EGLE Drinking Water Unit Director Eric Oswald; Michigan Department of Health and Human Services (MDHHS) Robert Gordon; and MDHHS Director Elizabeth Hertel. The City officials

responsible for causing, concealing, covering up, and prolonging the water crisis are Benton Harbor Mayor Marcus Muhammad; Water Plant Operator Michael O'Malley; City Manager Darwin Watson; and City Manager Ellis Mitchell. Plaintiffs bring their claims against each government official in both their individual and official capacities.

State and City officials knew that Benton Harbor's municipal water system was unfit for consumption at least as early as 2018. Complaint, ECF No. 82, PageID.1114-1115. This information came less than three years after Michigan issued an emergency declaration in the Flint water crisis, a water crisis with national notoriety for the significant harm suffered by residents due to the State and city government's glaring failures. *See id.*, PageID.1114.

Tests from Benton Harbor's June-September 2018 sampling period revealed water containing up to 60 parts per billion (ppb) of lead – well above the 15 ppb ceiling – for a 90th percentile measurement of 22 ppb. *Id.*, PageID.1134-1135. The crisis continued for over three years, with each sampling period revealing higher concentrations of lead. *Id.* In contrast, the Flint water crisis lasted 18 months.

From January to June 2021, the City of Benton Harbor discovered samples that contained up to 889 ppb of lead, with the 90th percentile reading at 24 ppb. *Id.* In 2019, the 90th percentile reading spiked at 32 ppb. *Id.* These numbers are estimated to be on par, if not greater, than the lead levels present during Flint's water crisis.

The first action level exceedance triggered requirements under the federal and state Safe Drinking Water Acts (SDWA), including directives for adequate notice to and public education for residents. Yet, despite their awareness of the elevated lead levels and their familiarity with the Flint water crisis, the officials responsible for operating, overseeing, and regulating Benton

Harbor's water system caused residents to continue consuming the tainted water by, *inter alia*, spreading false information and touting remediation measures they knew were ineffective.

Each Defendant engaged in conduct that caused Plaintiffs to consume lead. Prior to the crisis, City Defendants Director O'Malley, Mayor Muhammad, and Mr. Watson chose not to use corrosion control in the water system, despite knowing that the City's main line and service lines contained old lead pipes. In 2018, the treatment plant was cited for numerous "significant deficiencies"[2] by the EPA and, yet City Defendants chose not to correct them. *Id.*, PageID.1134-1140.

The City's known deficiencies included managerial decisions, such as failing to properly operate and treat the water supply system and deficiencies in its equipment and staffing. *Id.*, PageID.1129-1130. City Defendants knew that neglecting the water system directly risked residents' health, yet they chose to do so anyway. *Id.*, PageID.1168. Then, even with data of lead contamination in-hand, these officials lied to residents that the water was safe and failed to follow mandated notice and public education requirements. *Id.*, PageID.1118, 1122-1123, 1153-1154, 1168, 1177.

Once the water crisis was confirmed, EGLE Directors Clark and Oswald as well as MDHHS Directors Hertel and Gordon designed and implemented remediation measures that they knew would not protect residents. Despite knowing that bottled water was the only guaranteed solution, these officials lied to residents that the water was safe to drink if they flushed their tap water before use and recommended water filters of unknown efficacy. *Id.*, PageID.1130, 1132-1133, 1152-1153 ("residents were advised that the recommended

---

[2] "Significant deficiencies" are those that the "EPA determines to be causing, or ha[ve] the potential for causing the introduction of contamination into the water delivered to consumers." 40 CFR § 141.723(b).

flushing/running time before using the water was increased from 3 to 5 minutes"), 1158-1159; ECF No. 71-14, PageID.1058 (EGLE's consultant warning that telling residents to flush their pipes "is not acceptable[]in the middle of this lead crisis" and advising that "no one should be relying on filters"); *see also id.*, PageID.1153 (Director O'Malley told residents that after the "first flush it was okay to drink and cook" with the tap water.). Officials' recommendation that residents flush their tap water before drinking or cooking was not only impractical (especially for children who are most at-risk) and too expensive for low-income families, but was never shown to be an adequate primary mitigation tool. This was not mere mismanagement: Defendants made a deliberate choice to downplay and conceal the danger by the designing and implementing recommendations that caused residents to ingest lead.

Director Oswald also played a key role in covering up and downplaying the extent of the water crisis by spreading false information. He lied about the effectiveness of the corrosion control treatment to Nicholas Leonard, Executive Director of the Great Lakes Environmental Law Center. Despite knowing that the July to December 2019 sampling period showed the highest 90th percentile for lead samples for any Benton Harbor sampling period yet, at 32 ppb, Director Oswald told Mr. Leonard that the corrosion control being used by the City was effectively reducing corrosion rates. *Id.*, PageID.1137, 1166. Additionally, in January 2019, Director Oswald told EPA Chief Thomas Poy that Benton Harbor's public water system had returned to compliance when it had not. *Id.*, PageID.1132.

Defendants were fully aware that their decisions were likely to harm residents' health. For example, Defendant MDHHS Director Elizabeth Hertel, Defendant EGLE Director Liesl Clark, and Kara Cook, Senior Advisor on Energy & Environment to Defendant Governor Gretchen Whitmer received an email, included in full below, from EGLE consultant Andrew

Leavitt. It details the misconduct alleged in Plaintiffs' complaint against the State and City Defendants: the intentional ignorance of deficiencies in the water system, concealment of the extent of the lead crisis, intentional distribution of false information, and the promotion and enactment of remediation measure that were known to be inadequate. Complaint, Exhibit N, ECF No. 71-4, PageID.1057-1059.

The top of Leavitt's email contains three sentences rendered in Greek alphabet font (*i.e.*, each English letter replaced with its Greek-alphabet counterpart), which appears to be calculated to conceal the statements. Decoding the text (*i.e.*, by changing the font to a standard English font) reveals that the consultant prefaced his grave concerns about the water crises with a reference back to his prior warnings and the State and City Defendants' failure to learn from the Flint tragedy: "**Hot off the presses. As I warned there are some major red flags. It seems like we are back at square one having not learned from Flint.**" *Id.*

| From: | Clark, Liesl (EGLE) [/O=EXCHANGELABS/OU=EXCHANGE  ADMINISTRATIVE  GROUP |
| | (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=CB3B257F547249D9A0BC1A30E9CF922A-CLARK  LIESL] |
| Sent: | 9/30/2021 9:51:24 AM |
| To: | Hertel, Elizabeth (DHHS) [HertelE@michigan.gov] |
| Subject: | FW: BH |

**From:** Draheim, Andy (EGLE) <DraheimA@michigan.gov>
**Sent:** Thursday, September 30, 2021 8:29 AM
**To:** Clark, Liesl (EGLE) <ClarkL20@michigan.gov>
**Subject:** FW: BH

**From:** Cook, Kara <CookK14@michigan.gov>
**Sent:** Wednesday, September 29, 2021 10:46 PM
**To:** Draheim, Andy (EGLE) <DraheimA@michigan.gov>
**Subject:** Fwd: BH

A lot more.

Kara Cook
Senior Advisor on Energy & Environment
Office of Governor Gretchen Whitmer | Policy

Please excuse any typos / brevity, sent from mobile device

**From:** Andrew Leavitt <andy@kjlteam.com>
**Sent:** Wednesday, September 29, 2021 9:23:49 PM
**To:** Cook, Kara <CookK14@michigan.gov>
**Subject:** Re: BH

> **CAUTION: This is an External email. Please send suspicious emails to** abuse@michigan.gov

Ηοτ οφφ τηε πρεσσεσ. Ασ I ωαρνεδ τηερε αρε σομε μαφορ ρεδ φλαγσ. Ιτ φεελσ λικε ωε αρε βαχκ ατ σθυαρε ονε ηαθινγ νοτ λεαρνεδ μυχη φρομ Φλιντ.

☐ The pamphlet never says residents need to stop drinking the water because there is a lead emergency
  ☐ The pamphlet starts by describing the multiple sources of lead, not focusing on water, which is the purpose of this document
  ☐ The pamphlet does not identify lead service lines as an important source of lead in water – it only refers to pipes and faucets, implying that it is only materials inside the customer's home that are the source of lead in water. Lead service lines in Benton Harbor are the largest magnitude source of lead in drinking water. Very few homes tend to have lead pipes inside the home.

EGLE_0018707



☐ The pamphlet describes how water corrodes metal. This is not the urgent message residents need. They need to know their water is not safe to drink.

☐ "It is best to avoid swallowing water that contains lead." No. This needs to say "Do not drink the water because there is a lead emergency in Benton Harbor."

☐ The pamphlet says that actions to reduce lead in water are only necessary when water measures greater with than 15 ppb for lead. EPA, CDC, AAP and WHO are clear that there is no safe level of lead in water and 15 ppb is not a health protective level.

☐ The pamphlet goes on to discuss the health impacts of lead without communicating that the resident needs to stop drinking the water now.

☐ The pamphlet advises the reader to get tested for lead. Testing for lead in the blood is a distraction at this point and not a public health protective measure. Residents need to be told to stop drinking the water.

☐ The pamphlet emphasizes good nutrition before giving any information on reducing lead in water or telling the resident to STOP DRINKING THE WATER

☐ The pamphlet claims that "testing is the only way to know if lead is in your water." This is not a health protective stance. At this point, anyone in Benton Harbor should assume there is lead in their water, especially if they have a lead service line. No one should wait for lead data to stop drinking the water. If testing is to have any role, it should only be used to inform a resident that the water is safe to drink again after lead service lines have been replaced.

☐ The pamphlet asks the resident to find a certified filter. Given the high levels of lead in the water (up to 889 ppb have been measured) and filters are only certified to remove lead at 150 ppb and lower) and the unknowns about filter performance in Benton Harbor's water quality, no one should be relying on filters. Bottled water should be delivered to all residents for all drinking and cooking water. While filters should not be used at this time, no one should be asking a resident to find their own certified filter.

☐ Only bottled water should be used for reconstituted formula. I believe MDHHS has published this previously in lead outreach. This should not vary from previous protective guidance

☐ The second page of the pamphlet says that flushing pipes is sufficient for drinking and cooking. This is not acceptable in the middle of this lead crisis. Residents need to be told that the water is not safe to drink.

---
Andy Leavitt
Khoury Johnson & Leavitt

**From:** Cook, Kara <CookK14@michigan.gov>
**Sent:** Wednesday, September 29, 2021 11:56:54 AM
**To:** Andrew Leavitt <andy@kjlteam.com>
**Subject:** BH


Kara Cook (she/her)
Senior Advisor on Energy and Environment

EGLE_0018708

Executive Office of Governor Whitmer | Policy Office
Michigan.gov/Whitmer

*\*\*This email and any associated documents may contain information that is privileged, confidential, and exempt from disclosure. It is intended for use only by the person to whom it is addressed. If you have received this in error, please (1) do not forward or use this information in any way; and (2) contact me immediately.*

Plaintiffs' Complaint details the lead poisoning of Benton Harbor residents, including infants and children, as a result of Defendants' misconduct, including the intentional ignorance of deficiencies in the water system, concealment of and lying about the extent of the problem,

2804702.6

intentional distribution of false information, and the promotion and enactment of remediation

that was known to be inadequate. Indeed, this same misconduct pled in the Complaint – the

failure to act to try to stop residents from ingesting the harmful chemicals in their water and

correct the contamination despite knowing that residents were being poisoned – was found

sufficient to shock the conscience in Flint. *See infra* at § III.A.2(b). Yet what makes the

Defendants' misconduct in Benton Harbor even more egregious is the fact that they "are back at

square one having not learned from Flint." Complaint, Exhibit N, ECF No. 71-4, PageID.1057-

1059.

## II.   <u>LEGAL STANDARD</u>

A district court reviews *de novo* a magistrate judge's recommendation to which objection

is made. 28 U.S.C. § 636(b)(1)(C); LCivR 72.3(b). The Court may "accept, reject, or modify, in

whole or in part, the findings or recommendations made by the magistrate judge." *Id.*

This R&R concerns a motion to dismiss under Rule 12(b)(6), which can only be granted

where a claim fails to "give the defendant fair notice of what the . . . claim is and the grounds

upon which it rests." *Bell Atl. Corp. v. Twombly, 5*50 U.S. 544, 555 (2007) (citation omitted).

While a complaint need not contain detailed factual allegations, a plaintiff's allegations must

include more than labels and conclusions. *Id*.; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The

Court must determine whether the complaint contains "enough facts to state a claim to relief that

is plausible on its face." *Twombly*, 550 U.S. at 570.

The burden to obtain relief under Rule 12(b)(6) rests with the defendant. *See, e.g.*,

*DirecTV, Inc. v. Treesh,* 487 F.3d 471, 476 (6th Cir. 2007). The Court must "construe the

complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all

reasonable inferences in favor of the plaintiff." *Id.* A motion to dismiss "should not be granted

unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her]

claim which would entitle [her] to relief." *Id.* And it is clear error for a district court to assess a motion to dismiss a § 1983 claim under a standard different from that of *Twombly* and *Iqbal*. *Wesley*, 779 F.3d at 427–28; *Franz v. Oxford Cmty. Sch. Dist.*, No. 21-cv-12871, 2023 WL 3431223, at *10–11 (E.D. Mich. May 12, 2023) (resolving whether defendants' conduct shocks the conscience at the pleading stage would be "problematic" given the fact specific determination that is required).

## III.    ARGUMENT

### A.    Plaintiffs Adequately Pled Substantive Due Process Claims.

#### 1.    The R&R Applies an Improper Threshold for Pleadings, Ignoring Controlling Precedent.

To *prove* a § 1983 claim, a plaintiff must show conduct that "shocks the conscience." But that is a highly fact intensive inquiry to be proven at trial, *not* a pleading standard. *Guertin v. Michigan*, 912 F.3d 907, 924–25 (6th Cir. 2019); *Franz*, 2023 WL 3431223, at *10–11. The pleading standard that applies to § 1983 claims is no different from any other claim under *Twombly* and *Iqbal*. *Wesley*, 779 F.3d at 427–28. The question for the Court is whether, if plaintiffs' allegations are true, defendant's conduct plausibly shocked the conscience. *See DirecTV*, 487 F.3d at 476. Assessments of disputed fact or applications of heightened pleading standards at the 12(b)(6) stage are errors. *Iqbal*, 556 U.S. at 678; *Wesley*, 779 F.3d at 427–28; *Solo v. United Parcel Serv. Co.*, 819 F.3d 788, 794 (6th Cir. 2016); *Scott v. Ambani*, 577 F.3d 642, 646 (6th Cir. 2009) (quoting *Westlake v. Lucas*, 537 F.2d 857, 858 (6th Cir. 1976)) ("Dismissals of complaints under the civil rights statutes are scrutinized with special care.").

##### a.    The R&R Transforms an Element of Proof into a Pleading Requirement, Contrary to Governing Law.

The determination of whether conduct "shocks the conscience" is a highly fact intensive inquiry that examines "a multitude of considerations . . . including the time for deliberation, the

nature of the relationship between the government and the plaintiff, and whether a legitimate government purpose motivated the official's act." *Guertin*, 912 F.3d at 924 (citation omitted). As the Sixth Circuit has recognized, there is often a "difficulty of determining where conscience-shocking behavior resides on the continuum of actions." *Range v. Douglas*, 763 F.3d 573, 590 (6th Cir. 2014).

Because a determination of whether conduct "shocks the conscience" is often difficult and involves an "exact analysis" of numerous facts, in context, granting a motion to dismiss on the basis that the alleged conduct fails to "shock the conscience" is extremely rare. In fact, many courts have found that dismissing a case on this basis at the pleading stage, without the benefit of discovery, should almost never occur. *Bartynski v. City of Highland Park,* No. 21-10049, 2022 WL 390892, at *4 (E.D. Mich. Feb. 8, 2022) (denying motion to dismiss substantive due process claim) (quoting *Ewolski v. City of Brunswick*, 287 F.3d 492, 510 (6th Cir. 2002) (explaining that the conscious-shocking analysis "depends upon the facts and circumstances of the individual case")); *M.S. by Covington v. Hamilton Cnty. Dep't of Educ.*, 756 F. App'x 510, 517 (6th Cir. 2018) (reversing grant of motion to dismiss shock-the-conscience claim because that inquiry "demands an exact analysis of circumstances") (citation omitted); *Franz*, 2023 WL 3431223, at *10–11 ("Resolving this issue at the pleading stage is problematic, given that 'the determination of whether conduct shocks the conscience is fact specific.'") (citation omitted).

Here, the R&R ignores this well settled law and manufactures a heightened pleading standard that requires Plaintiffs to allege all facts necessary to *prove* "conscience shocking" conduct before any discovery has occurred. This violates the rule that a complaint need only plead "enough facts to state a claim to relief that is plausible on its face" and should only be dismissed when it is "beyond doubt that a plaintiff can prove no set of facts in support of her

claim." *Bradford v. Bracken Cnty.*, No. CV 09-115-DLB, 2010 WL 11520681, at *2 (E.D. Ky.

Feb. 1, 2010) (citing *Ang v. Procter & Gamble Co.*, 932 F.2d 540, 544 (6th Cir. 1991)).

Specifically, the R&R determined that the "shocks the conscience" standard was not met because

the complaint only contained a "conclusory claim that the [State and City] defendant[s] w[ere]

aware of and participated in the decisions and actions that caused, maintained, and covered up

the Benton Harbor water crisis." R&R, ECF No. 173, PageID.4548 (internal quotation omitted).

The R&R relies, in significant part, on *Terrance v. Northville Reg'l Psychiatric Hosp.*,

286 F.3d 834, 842 (6th Cir. 2002). That case, however, is inapposite because *Terrance* does not

involve a motion to dismiss. Instead, it is an appeal from an order granting a motion for summary

judgment. And although the decision contains dicta implying there is a heightened pleading

requirement in § 1983 actions, the decision did not rely on these requirements.

Moreover, that *dicta* in *Terrance* is based on language from *Elliott v. Perez,* 751 F.2d

1472, 1483 (5th Cir. 1985), which also did not involve a situation where the plaintiff's complaint

"failed to state a claim." Rather, *Elliott* is a decision that only addresses the issue of whether the

defendants were entitled to qualified immunity and whether the complaint contained adequate

allegations that would allow the court to properly evaluate the immunity defense. *And* the

appellate court remanded the cases with instructions for the trial court to allow plaintiffs to come

forward with additional facts to defeat the immunity defense under Rule 12(e). *Terrance*, 286

F.3d at 849–50; *Elliott*, 751 F.2d at 1482. The rationale for this holding was that the evaluation

of an immunity defense without a sufficient factual record "would be not only arduous, but the

result would be suspect." *Elliott*, 751 F.2d at 1482.

The other case cited in *Terrance* is *Dominque v. Telb*, 831 F.2d 673, 676 (6th Cir. 1987).

There the court dealt exclusively with a claim of immunity and did not address whether alleged

conduct "shocked the conscience." Rather the court addressed whether a complaint contained

sufficient allegations to establish that the challenged conduct "violated clearly established law."

*Id*. Notably, in reaching its conclusion, the court expressly found that courts should provide

plaintiffs faced with an immunity defense an opportunity to come forward with additional facts

to defeat the defense. The decision did not create a heightened pleading requirement for § 1983

claims. As the court noted:

> [W]here as here plaintiff seeks damages from the defendant in his individual
> capacity for an act committed under color of law, we believe that he should
> normally include in the original complaint all of the factual allegations
> necessary to sustain a conclusion that defendant violated clearly established
> law. If he does not, however, and if a qualified immunity challenge is made
> to the complaint, then, we believe, *the court must accord the plaintiff an
> opportunity to come forward with such additional facts or allegations that
> show not only violations of his constitutional rights*, but also that these rights
> were so clearly established when the acts were committed that any officer in
> the defendant's position, measured objectively, would have clearly
> understood that he was under an affirmative duty to have refrained from such
> conduct.

*Id.* at 676 (citation omitted) (emphasis added).

To the contrary, controlling authority disfavors motions to dismiss § 1983 claims because

factual questions like shocking the conscience are rarely resolvable at the pleading stage, where

"the precise factual basis for the plaintiff's claim or claims may be hard to identify." *Pearson v.

Callahan*, 555 U.S. 223, 238–39 (2009) (explaining that determining "whether the relevant facts

make out a constitutional question" is "difficult" at the pleading stage). *See also Guertin*, 912

F.3d at 917. This dynamic is inherent in notice pleading, which is the standard for § 1983 claims.

Indeed, assessing § 1983 claims under any standard higher than *Twombly* and *Iqbal* is a "critical

threshold error." *See Wesley* 779 F.3d at 427–28, 433–34; *accord B.L. v. Schuhmann*, 380 F.

Supp. 3d 614, 655 (W.D. Ky. 2019) ("[t]here is no heightened factual showing that a plaintiff

must make to survive a motion to dismiss on qualified immunity grounds that differs from the plausibility standard established under *Iqbal.*") (citation omitted).

Here, rather than allow Plaintiffs leave to amend or the opportunity to develop facts through discovery, the R&R recommends dismissal of this case because the complaint does not contain sufficiently detailed factual allegations to *prove* conscience shocking conduct. But all that is required at this stage of the case is that the complaint contain "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. To be certain, there is no doubt that when government officials knowingly deliver poisoned water to residents, worsen the situation by failing to comply with State Regulations, and then cover up the problem by providing misleading information to residents, this is conduct that plausibly "shocks the conscience." But rather than evaluate these allegations as pled with respect to each Defendant, the R&R would require Plaintiffs to prove much more. Under the R&R's reasoning, Plaintiffs must allege in exact detail how, where, when, and why each Defendant engaged in the conduct alleged in the complaint. This is simply not required, nor is it possible prior to discovery. Requiring it would gut § 1983 and weaken its ability to serve as a check on government power and abuses of that power.

Additionally, although the Supreme Court has found that evaluating whether conduct "shocks the conscience" is complex and "demands an exact analysis of circumstances," the R&R is asking this Court to do that analysis without the benefit of any discovery or a complete factual record. *Cnty. Of Sacramento v. Lewis*, 523 U.S. 833, 850 (1998). There is little doubt that evaluating the allegations in such a vacuum and without the benefit of actual evidence "would be not only arduous, but the result would be suspect." *Elliott,* 751 F.2d at 1482.

2804702.6

**b.**     **The R&R Prematurely Weighed Credibility and Decided the Facts.**

The R&R also failed to comply with the well-settled principle that when considering a Rule 12(b)(6) motion the allegations in the complaint must be accepted as true, facts asserted outside of the complaint should not be considered, and all reasonable inferences should be drawn in favor of the plaintiffs. *Iqbal*, 556 U.S. at 678; *Solo*, 819 F.3d at 794. In fact, virtually the entire fact section of the R&R violates these principles as it is based almost entirely on extrinsic evidence and exhibits contained in a declaration submitted by Defendants in support of their motion. R&R at PageID.4528-4535.

Also, in the R&R's analysis of the factual allegations asserted against each of the Defendants, the R&R repeatedly weighs the evidence in favor of the Defendants. R&R, ECF No. 173, PageID.4549 ("At most, Plaintiffs' allegations suggest that some of the defendants may have been negligent in the exercise of their duties."). The Magistrate Court is improperly deciding questions of fact, assuming the role of the jury, and essentially granting a directed verdict in favor of Defendants. *See Franz*, 2023 WL 3431223, at *10–11; *Westside Mothers v. Olszewski*, 454 F.3d 532, 537 (6th Cir. 2006) ("Our function is not to weigh the evidence or assess the credibility of witnesses . . . but rather to examine the complaint and determine whether the plaintiff has pleaded a cognizable claim."). That approach would not even be appropriate at summary judgment, much less on a motion to dismiss. *Rivas v. City of Passaic*, 365 F.3d 181, 196, 200 (3d Cir. 2004) (denying summary judgment where a "jury could find, depending on whose testimony it credits, that [a policeman's] conduct shocks the conscience."). In doing so, the R&R falls into the trap that the Sixth Circuit has warned against, by selecting a "benign construction on the factual allegations and draw[ing] inferences so that the facts amount to [] negligent mismanagement . . . ." *Guertin*, 912 F.3d at 927 (holding that the allegations also

-16-

support a reasonable inference that Flint defendants acted with deliberate and reckless indifference to residents' health).

For example, the R&R rejects Plaintiffs' bodily integrity claim against Governor Whitmer, reasoning that, "At most, one can infer from the allegations against the governor that she could have, and should have, acted sooner to declare the Benton Harbor water unsafe." R&R, ECF No. 173, PageID.4550; *see also id.*, PageID.4551 ("Perhaps [EGLE Director Liesl Clark] could have, and should have, done more."). However, the Court is required to draw all reasonable inferences in favor of Plaintiffs. *DirecTV,* 487 F.3d at 476. The allegations support a reasonable inference that Governor Whitmer chose to avoid political backlash over the health of Benton Harbor residents, as she stood idly by during three years of escalated lead exceedances and reckless public relations efforts. *See* Complaint, Exhibit N, ECF No. 71-4, PageID.1057-1059 (advising Governor Whitmer's office and other State officials that "[t]his is not acceptable[ ]in the middle of this lead crisis. Residents need to be told that the water is not safe to drink."). Further, the R&R overlooks the unforgettable context in which this water crisis occurred – less than three years after Michigan declared a state of emergency in Flint. *See* Complaint, ECF No. 82, PageID.1114.

To take another example, the R&R construes the allegations against Mayor Marcus Muhammad in his favor rather than in the light in which Plaintiffs pled them. As an example of Mayor Muhammad's deliberate indifference, Plaintiff Emma Kinnard describes in the Complaint how she expressed her concern to Mayor Muhammad about the look and smell of her water and requested that he test it. He told her he would "'get back to [her],' but never did." *Id.*, PageID.1118. The R&R improperly weighs this fact in favor of Mayor Muhammad and determines that "[a]ssuming this allegation is true, it indicates that the mayor may have dropped

the ball, but it hardly constitutes conscience shocking conduct." R&R, ECF No. 173, PageID.4555.

Likewise, in its analysis of MDHHS Director Elizabeth Hertel's conduct, the R&R concludes that "[t]he allegations against Director Hertel suggest simply that she failed to take action Plaintiffs believe should have been taken." R&R, ECF No. 173, PageID.4554. Yet, Plaintiffs' allegations are not only based on what Plaintiffs think. Rather, the allegations state that Director Hertel took actions that that the State's own consultant advised should not be taken during a lead crisis, and the publicly available records that Plaintiffs had at the time the Complaint was filed support this construction of the facts. *See supra* Complaint, Exhibit N, ECF No. 71-4, PageID.1057-1059 (advising Director Hertel, among others that, "flushing pipes is insufficient for drinking and cooking," "[g]iven the high levels of lead in the water (up to 889 ppb have been measured and filters are only certified to remove lead at 150 ppb and lower) and the unknowns about filter performance in Benton Harbor's water quality, no one should be relying on filters").

The R&R in the parallel case, *Mitchell, et al. v. City of Benton Harbor, et al.*, No. 1:22-cv-00475, considers the allegations against Benton Harbor City Manager Darwin Watson, finding that "[t]he most that can be gleaned from these allegations is that Mr. Watson deceived the public for one month regarding the potential cause of the lead contamination." *Mitchell* R&R, No. 1:22-cv-00475, ECF No. 120, PageID.1859. Taking this allegation as true, as the Court must, suggests that Mr. Watson worked to prolong the water crisis and delay mitigation for one month despite being aware that this would increase residents' risk of being poisoned by lead. However, the R&R views these allegations in the light most favorable to Mr. Watson, concluding that "[p]racticing deception is hardly a virtue, but there is nothing here that suggests

-18-

conscience-shocking conduct." *Id.* Plaintiffs respectfully submit that a reasonable juror could conclude that a government official lying about a public health emergency – even for one month, given the extreme neurotoxicity of even small exposures to lead – is conscience shocking.

*    *    *

Erroneously applying a heightened pleading standard for a § 1983 claim, as the R&R did here, is a critical threshold error that alone is ground for the R&R to be rejected. Moreover, the R&R prematurely weighs Plaintiffs' allegations before the Court has allowed discovery to commence, erroneously drawing inferences in favor of Defendants.

**2.    Defendants' Actions Plausibly Shock the Conscience.**

The R&R relies on a false construct that this case must be like Flint or be dismissed. Not so. There are many examples in other cases of conduct that is not like Flint and yet was found to shock the conscience. Sixth Circuit law is clear that "deliberate indifference," misleading the public out of avoiding danger, and covering up misconduct can shock the conscience, critical to preserving § 1983's role as a check on abuse of power by the government.

That said, this case is more like Flint than the R&R allows. Indeed, much of the conduct by government officials that the Sixth Circuit found plausibly shocked the conscience in Flint – *e.g.*, covering up, downplaying, doing nothing while knowing residents were in danger, lying to the public, etc. – occurred in Benton Harbor as well.

**a.    Section 1983 Liability Extends Beyond Primary Actors to Officials Who Enable and Cover Up Dangerous Misconduct.**

The R&R's focus on Flint ignores significant relevant, and even controlling, precedent about how "deliberate indifference" and concealing misconduct can shock the conscience. Key examples (explained in more detail below) include:

- School officials lying to parents about how their child was hurt and concealing

-19-

evidence of aggressive bullying. *Meyers v. Cincinnati Bd. of Educ.*, 343 F. Supp. 3d 714, 719, 726 (S.D. Ohio 2018), *aff'd*, 983 F.3d 873, 885 (6th Cir. 2020).

- Corrections officers covering up each other's misconduct. *Herndon v. Johnson*, No. 88-CV-70907-DT, 1992 WL 152713, at *18–19 (E.D. Mich. Apr. 7, 1992), *accepting report and recommendation* (May 11, 1992).

- Housing authority mismanagement and refusal to address complaints about lack of maintenance causing carbon monoxide poisoning. *Washington v. Hous. Auth. of City of Columbia*, 58 F.4th 170, 181 (4th Cir. 2023) (*citing Guertin*, 912 F.3d at 926).

- A detective refusing to execute an arrest warrant against a serial domestic abuser. *Caldwell v. City of Louisville*, 120 F. App'x 566, 575–76 (6th Cir. 2004).

- Transportation officials failing to remediate and lying about health hazards from lead in public infrastructure. *Stewart v. Metro. Transp. Auth.*, 566 F. Supp. 3d 197, 210 (E.D.N.Y. 2019) (*citing Guertin*, 912 F.3d at 925).

The R&R contravenes this case law in several ways. First it improperly limits § 1983 liability solely to the initial actions of primary actors, *e.g.*, officials whose acts and decisions directly inflict harm on the public. It does this by emphasizing a factual variation between Benton Harbor and Flint; noting that only the latter involved local officials deciding to switch the public's water supply to a hazardous source. R&R at PageID.4526, 4528. It concludes that the absence of a comparable "flipping the switch" decision here, which so singularly "caused" so much harm, means that none of the misconduct in Benton Harbor can rise to the level of conscience shocking. That is not the law. Controlling § 1983 case law plainly establishes that

other actors who participate in, enable, and cover up dangerous misconduct – causing harm to the public – can be held liable for those consequences when their conduct shocks the conscience.

Liability under § 1983 is not limited to the single actor or decision which initially directly harmed Plaintiffs. That cannot be the law because numerous bedrock § 1983 cases arise from *private* criminal acts, which plaintiffs show resulted from a government official's conscience-shocking failure to stop them. *See, e.g.*, *Farmer v. Brennan*, 511 U.S. 825, 849 (1994) (holding that prison officials cannot disclaim liability for failing to stop inmates from abusing and harassing a prisoner); *Caldwell*, 120 F. App'x at 575–76 (same for detective's refusal to execute arrest warrant against serial domestic abuser who ultimately strangled his victim); *Meyers*, 343 F. Supp. 3d at 719, n.1, 726 (same for school officials' concealing bullying of elementary school student, which drove them to commit suicide).

This foundational principle is equally evident from controlling cases in which the government prevailed. For example, the Sixth Circuit's frequently-cited decision in *Range,* 763 F.3d at 591, arises from sexual misconduct by a morgue employee, who was not a party to the case. In considering claims against two of his supervisors, the court was unconcerned that neither of them abused any of the victims. *Id.* It focused on the salient legal analysis: were the supervisors aware of but ignoring "a substantial risk of" such conduct by the abusive employee, in a manner that shocked the conscience and caused harm. *Id.*

Such claims are well supported where defendants are deliberately indifferent to harm, or covered it up. The R&R concedes that Plaintiffs' allegations show that "officials could have, and should have done more to abate the containments, to warn the public of the dangers," and also "made false statements to regulators." PageID.4527. That is precisely the type of conduct that shocks the conscience and is legally sufficient for a § 1983 claim. When the health of citizens

that officials are charged with protecting is at risk, but they fail to act for months, their "deliberate indifference" can shock the conscience. *Lewis*, 523 U.S. at 834–35, 849–50, 853–54 (1998) (explaining that where officials' "extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking"). For example in *Caldwell*, the Sixth Circuit held that a detective's knowledge of the risk that a serial domestic abuser would attack his victim again, combined with ample opportunity to execute an arrest warrant that she refused to act on, constituted deliberate indifference that shocked the conscience. 120 F. App'x at 575–76.

Other appellate courts have reached the same conclusion. *See, e.g.*, *Est. of B.I.C. v. Gillen*, 710 F.3d 1168, 1174 (10th Cir. 2013) (same for a social worker keeping a child in a dangerous home despite reports of bruising and possible child abuse). Notably, in *Washington*, 58 F.4th at 178–79, the Fourth Circuit upheld deliberate indifference claims in a carbon monoxide poisoning case against a housing authority. *Id*. There, as here, officials had been receiving reports of out-of-date maintenance for years, and "chose not to respond to these complaints, or at most took only half-measures to resolve them." *Id.* (finding a "pattern of mismanagement and poor maintenance" that shocked the conscience) (*citing Guertin*, 912 F.3d at 926).

Similarly, where officials lied about and covered up misconduct, amplifying its harm to the public, their actions can shock the conscience. In *Meyers*, the court found that the conduct of a school nurse, principal, and superintendent who "*concealed* information" and lied to parents about their eight-year-old being bullied at school and the severity of his injuries shocked the conscience. 343 F. Supp. at 723, 26. The school officials' cover-up led directly to harm because the misrepresentations robbed the parents of opportunities to take remedial action. *Id.; see also*

*Herndon*, 1992 WL 152713, at *18–19 (upholding claims where a "cover-up" shocked the conscience); *Kammeyer v. City of Sharonville*, No. C-1-01-649, 2003 WL 25774000, at *5 (S.D. Ohio Feb. 13, 2003) (same).

*Stewart*, 566 F. Supp. 3d at 209–10, serves as a poignant example of liability for covering up evidence of lead poisoning. There, the court held that transportation officials' "failure to remediate" and "false[] represent[ations] that no health hazard exists" shocked the conscience. *Id.* (*citing Guertin*, 912 F.3d at 925). Similarly, concealing and ignoring the true risks of lead poisoning was also the core conscience shocking behavior supporting similar § 1983 claims brought by residents of Jackson, Mississippi. As the district court judge in that case explained:

> What makes the allegations here conscience-shocking (and therefore unconstitutional) is the way the City and State governments handled the situation. Upon learning of the toxic levels of lead in the City's water supply, the Defendants did not move residents to a safer water system, allocate additional funding to fix the existing system, or even timely warn residents of the dangers lurking in their pipes. To the contrary, the City and State Defendants knowingly concealed, misled, and gaslit the City's residents for years. The allegations in the Amended Complaint suggest that these Defendants knew the truth and intentionally told the Plaintiffs just the opposite.

*J.W. by & through Williams v. City of Jackson, Mississippi*, No. 3:21-CV-663-CWR-LGI, 2023 WL 2617395, at *13 (S.D. Miss. Mar. 23, 2023). *See also Wright v. City of Phila.*, Nos. CIV.A. 10-1102, et al., 2015 WL 894237, at *10–11 (E.D. Pa. Mar. 2, 2015) (holding that a group supervisors who lied about toxic conditions in an apartment, covered up signs of the danger, and failed to take remedial action had engaged in conduct that shocked the conscience). These acts of concealing and covering up danger, in a conscience-shocking manner that prevents the public from minimizing its exposure from toxic substances, are indistinguishable from the facts alleged in Plaintiffs' complaint.

**b.** **Benton Harbor Officials Engaged in Conduct that was Deemed Conscience Shocking in the Flint Litigation.**

Notwithstanding that Flint is not the standard here, the conduct in Benton Harbor is more like the culpable conduct in Flint than the R&R allows. The R&R draws an incorrect distinction between culpable defendants' conduct in the Flint water crisis and Defendants' conduct at issue here. *See, e.g.*, R&R, ECF No. 173, PageID.4556-4559. As explained below with specific comparisons between Benton Harbor and Flint defendants, the core misconduct of the Flint water crisis was repeated in Benton Harbor. This misconduct includes intentional ignorance of deficiencies in the water system, concealment of the extent of the problem, intentional distribution of false information, and promotion and enactment of remediation that was known to be inadequate.

The R&R mistakenly reasons that in Flint, the Sixth Circuit held that "defendants who were not involved in the decision-making or the implementation of the decision to switch water sources," did not actually "[do] anything to cause the consumption of lead-contaminated water," and therefore, could not have engaged in conscience-shocking behavior. *Id.*, PageID.4558. In fact, the conduct that was found sufficient to shock the conscience in Flint is parallel to the conduct that Plaintiffs allege Defendants engaged in to "caus[e], maintain[], and covered up" the Benton Harbor water crisis. Complaint, ECF No. 82, PageID.1164.

The Sixth Circuit's determination did not turn on whether culpable officials were "the 'chief architects'" in the decision to switch the water source from Lake Huron to the Flint River. R&R, ECF No. 173, PageID.4557 (quoting *Guertin*, 912 F.3d at 926). That was only one piece of the calculation. *See, e.g.*, *In re Flint Water Cases*, 960 F.3d 303, 326 (6th Cir. 2020)[3] (holding

---

[3] The Sixth Circuit decided *In re Flint Water Cases* after *Guertin*. Yet, Section III of the R&R does not cite *In re Flint Water Cases* in its discussion of whether Plaintiffs have stated a bodily integrity claim.

that while Michael Glasgow's (Flint Utilities Administrator) "conduct in implementing the switch did not demonstrate deliberate indifference," his "later role in covering up the extent of lead contamination" did);[4] *Guertin*, 912 F.3d at 928–29 (concluding that false and misleading public statements can amount to a constitutional violation). Rather, a key aspect of defendants' conduct in the Flint crisis that shocked the Sixth Circuit's conscience was their failure to act to try to stop residents from ingesting the harmful chemicals in their water and correct the contamination despite knowing that residents were being poisoned. *In re Flint Water Cases*, 960 F.3d at 315–16 (". . . but did nothing, even as residents raised concerns about the water," "[s]till no action," "officials nonetheless failed to disclose the risks to Flint [r]esidents," "[t]he City and State did nothing."). Benton Harbor Defendants engaged in the same callous disregard for Benton Harbor residents.

Of great importance to the R&R was that in contrast to Flint, in Benton Harbor "[t]here had been no change in the city's water source (Lake Michigan) or its water treatment that would account for the action level exceedance."[5] R&R, ECF No. 173, PageID.4530; PageID.4556-4559. ("The allegations in Plaintiffs' Second Amended Complaint offer nothing close to what was alleged against the officials in *Guertin* who were directly involved in *causing* Flint residents

---

[4] *See also id.* at 329–31 (holding that Bradley Wurfel, MDEQ Director of Communications, who had no role in the decision to switch Flint's water source, was "instrumental in the coverup," and "reject[ing Wurfel's] attempt to reargue his position in *Guertin* that 'mere' public statements cannot violate a person's right to bodily integrity").

[5] The R&R also notes that Lake Michigan was used successfully by multiple other public water systems as if that suggests that Defendants could not have known of that Benton Harbor's century-old infrastructure was at-risk. *Id.*, PageID.4530, n.3. Yet, up until the 1960s Flint had used the Flint River as its water source. Had officials made the necessary updates to Flint's treatment plant, the switch to the Flint River could have gone off without a hitch. It was state and city officials' knowledge of the water treatment plant's deficiencies and their decision not to update it that initiated the Flint water crisis, not the water switch alone. *See In re Flint Water Cases*, 960 F.3d at 312.

to consume lead-contaminated water."). Yet, there is no requirement that defendants must have "flipped a switch" to find that they acted in callous disregard for a residents' bodily integrity. The constitutional inquiry is not whether defendants' action or deliberate indifference caused the water to be poisoned, but whether defendants' action or deliberate indifference caused residents to consume (or prolong their consumption of) contaminated water.

As detailed below, the specific conduct of Benton Harbor officials alleged in Plaintiffs' Complaint is comparable to the Flint officials' conduct that was found to be conscience-shocking.

| Role/Malfeasance | Benton Harbor Defendants | Flint Defendants |
|---|---|---|
| Contributed to causing the water crisis | Water Plant Director Michael O'Malley, *see* ECF 82, PageID.1129, 1131-32, 1177. | Flint Utilities Administrator Daugherty Johnson, *In re Flint Water Cases*, 960 F.3d at 326. |
| | City Manager Darwin Watson, *see* ECF No. 82, PageID.1168. | MDEQ Chief of the Office of Drinking Water and Municipal Assistance, Liane Shekter-Smith, *see In re Flint Water Cases*, 960 F.3d at 327. |
| Covered up and downplayed danger | MDHHS Director Elizabeth Hertel, *see* ECF 82, PageID.140-41, 1158. | Flint Utilities Administrator Michael Glasgow, *In re Flint Water Cases,* 960 F.3d at 326. |
| | EGLE Director Eric Oswald, ECF No. 82, PageID.1153. | MDEQ Director of Communications Bradley Wurfel, *In re Flint Water Cases*, 960 F.3d at 329. |
| | Governor Gretchen Whitmer, *see* ECF No. 82, PageID.1130, 1140-1141, 1164-1165, 1154. | Governor Rick Snyder, *In re Flint Water Cases*, 960 F.3d at 330–31. |
| | Water Plant Director Michael O'Malley, *see* ECF 82, PageID.1177. | Flint's Public Works Director, Howard Croft, *see Guertin*, 912 F.3d at 927. |

| Role/Malfeasance | Benton Harbor Defendants | Flint Defendants |
|---|---|---|
| | Mayor Marcus Muhammad, *see* ECF 82, PageID.1168, 1118. | |
| Prolonged the water crisis | EGLE Director Liesl Clark, *see* PageID.1116, 1131, 1136, 1166. | Flint's Public Works Director, Howard Croft, *see In re Flint Water Cases*, 960 F.3d at 326. |
| | EGLE Director Eric Oswald, *see* ECF No. 82, PageID.1166, 1131-1132. | |
| | Governor Gretchen Whitmer, *see* ECF No. 82, PageID.1130, 1140-1141, 1164-1165, 1154. | Governor Rick Snyder, *In re Flint Water Cases*, 960 F.3d at 330–31. |
| | Water Plant Director Michael O'Malley, *see* ECF 82, PageID.1123, 1153-1154. | |
| | Mayor Marcus Muhammad, *see* ECF 82, PageID.1168. | |
| | City Manager Darwin Watson, *see* ECF No. 82, PageID.1168. | |
| | City Manager Ellis Mitchell, *see* ECF 82, PageID. 1168. | |

-27-

| Role/Malfeasance | Benton Harbor Defendants | Flint Defendants |
|---|---|---|
| Made specific, knowingly inadequate recommendations for remediation that endangered residents; chose not to tell them not to drink water | EGLE Director Liesl Clark, *see* ECF No. 82, PageID.1116, 1130, 1155. | Governor Rick Snyder, *In re Flint Water Cases*, 960 F.3d at 330–31. |
| | MDHHS Director Elizabeth Hertel, *see* ECF 82, PageID.1158, 1140-1141. | MDEQ Director of Communications Bradley Wurfel, *In re Flint Water Cases*, 960 F.3d at 329. |
| | MDHHS Director Robert Gordon, *see* ECF 82, PageID.1133-1134. | Flint's Public Works Director, Howard Croft, *see Guertin*, 912 F.3d at 927. |
| | Water Plant Director Michael O'Malley, *see* ECF 82, PageID.1123, 1153-1154, 1177. | |
| | Mayor Marcus Muhammad, *see* ECF 82, PageID.1168, 1153. | |
| | City Manager Darwin Watson, *see* ECF No. 82, PageID.1122. | |
| | City Manager Ellis Mitchell, *see* ECF 82, PageID.1123. | |
| Lied to or mislead regulators, experts, and/or advocates | EGLE Director Eric Oswald, *see* ECF No. 82, PageID.1131-1132. | MDEQ Direct Supervisor Stephen Busch, *In re Flint Water Cases*, 960 F.3d at 317, 328. |
| | Water Plant Director Michael O'Malley, *see* ECF 82, PageID.1153, 1177. | MDEQ Water Treatment Specialist Patrick Cook, *In re Flint Water Cases*, 960 F.3d at 328–29. |

**B.**     **The Court Should Exercise Supplemental Jurisdiction Over Plaintiffs' State Law Claims.**

Finally, as explained in detail in Plaintiffs' briefing (ECF No. 134, PageID.1639-1658), absent dismissal of the federal civil rights claims, the Court has supplemental jurisdiction over Plaintiffs' state law claims because they form part of the same case or controversy as Plaintiffs' federal claims, and none of the exceptions apply to warrant deviation from the default exercise of supplemental jurisdiction under Section 1367. *Campanella v. Com. Exch. Bank*, 137 F.3d 885,

892 (6th Cir. 1998) (quoting 28 U.S.C. § 1367(a)). Therefore, Plaintiffs respectfully request that if the Court denies Defendants' motion to dismiss as to Plaintiffs' federal claims, the Court also exercise supplemental jurisdiction over all Plaintiffs' state law claims.

**IV.    <u>CONCLUSION</u>**

Per the Sixth Circuit in *Wesley*, 779 F.3d at 427-28, the R&R commits a "critical threshold error" by erroneously applying a heightened pleading standard for Plaintiffs' § 1983 claims – grounds alone for rejecting the R&R. Yet the R&R also erroneously makes factual determinations – in Defendants' favor – in violation of black letter law on the standard at the pleadings stage.

Further, the R&R applies a false construct that because there was no "flipping the switch" in Benton Harbor like there was in Flint, the conduct in Benton Harbor cannot shock the conscience. But the culpable conduct in Flint – covering up, downplaying, doing nothing while knowing inaction would cause harm, lying to or misleading the public, willful ignorance – is the similar to the conduct alleged here.

Accordingly, the Court should reject the R&R, deny Defendants' motions to dismiss, and exercise supplemental jurisdiction over the state law claims.

Dated: June 15, 2023

Respectfully submitted,

/s/ Mark P. Chalos
Mark P. Chalos
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
222 2nd Avenue South, Suite 1640
Nashville, TN 37201-2379
Telephone: 615.313.9000
mchalos@lchb.com

Annika K. Martin
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
250 Hudson Street, 8th Floor
New York, NY 10013-1413
Telephone: 212.355.9500
Facsimile: 212.355.9592
akmartin@lchb.com

Tiseme G. Zegeye
Amelia A. Haselkorn
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
tzegeye@lchb.com
ahaselkorn@lchb.com

/s/ Alice B. Jennings
Alice B. Jennings (P29064)
Carl R. Edwards (P24952)
**EDWARDS & JENNINGS, P.C.**
3031 West Grand Blvd., Suite 435
Detroit, MI 48202
Telephone: 313.915.3475
Facsimile: 313.961.5000
ajennings@edwardsjennings.com
cedwards@edwardsjennings.com

/s/ Stuart C. Talley
Stuart C. Talley
**KERSHAW TALLEY & BARLOW P.C.**
401 Watt Ave. #1
Sacramento, CA 95864
Telephone: (916) 520-6639
stuart@ktblegal.com

-30-

## CERTIFICATE OF COMPLIANCE

I, Amelia A. Haselkorn, hereby certify pursuant to Local Rule 7.3(b)(ii) that the number

of words in the foregoing brief, as generated by Microsoft Office Professional Plus 2016, does

not exceed 10,800 words. The final word count is **8,072** words.

*/s/ Amelia A. Haselkorn*
Amelia A. Haselkorn
**LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP**
275 Battery Street, 29th Floor
San Francisco, CA 94111-3339
Telephone: 415.956.1000
Facsimile: 415.956.1008
ahaselkorn@lchb.com

2804702.6