UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DARETHA BRAZIEL, et al.,

    Plaintiffs,

v.

GRETCHEN WHITMER, et al.,

    Defendants.

_____/

Case No. 1:21-cv-960

Hon. Hala Y. Jarbou

**OPINION**

Plaintiffs are residents of Benton Harbor, Michigan, who allegedly consumed water containing lead, bacteria, and other contaminants from Benton Harbor's water supply. They brought this action against the City of Benton Harbor (the "City"), some of its present and former officials, the State of Michigan, several state agencies and officials, and two private engineering firms. The Court referred the case to Magistrate Judge Phillip J. Green. Defendants then filed motions to dismiss the federal claims in the complaint. (*See* ECF Nos. 141, 145, 147, 150.) On June 1, 2023, Magistrate Judge Green entered a report and recommendation ("R&R") which recommends that the Court grant most of the motions, deny another, and dismiss Plaintiffs' claims. (R&R, ECF No. 173.) Before the Court are Plaintiffs' objections to the R&R (ECF No. 174). For the reasons herein, the Court will adopt the R&R in part and reject in part. The Court will dismiss all Defendants other than Defendants O'Malley, Muhammad, and the City.

**I. STANDARD**

Under Rule 72 of the Federal Rules of Civil Procedure,

> the district judge must determine de novo any part of the magistrate judge's disposition that has been properly objected to. The district judge may accept, reject,

or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Fed. R. Civ. P. 72(b)(3).

## II. BACKGROUND

Plaintiffs' second amended complaint contains six claims. Count I asserts that the individual Defendants who worked for the State of Michigan or the City violated Plaintiffs' right to substantive due process under the Fourteenth Amendment.

Count II asserts that the City is liable for the unconstitutional conduct of its "official policymakers" under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (*See* 2d Am. Compl. ¶ 161.)

Count III asserts that the City is liable for unjust enrichment because Plaintiffs paid for contaminated water that was unfit for consumption.

Counts IV and V assert that Defendants Elhorn Engineering Company and F&V Operations and Resource Management, Inc. are liable for negligence because they failed to exercise due care when selecting or using anti-corrosion chemicals to treat the City's water problems.

Finally, Count VI asserts that Defendant Michael O'Malley, the former Manager of the City's Water Department, was grossly negligent in his duties when responding to the City's water problems.

## III. ANALYSIS

### A. Substantive Due Process Claims

#### 1. Pleading Requirements

Plaintiffs argue that the magistrate judge improperly applied a heightened pleading standard, requiring them to *prove* that Defendants' actions shock the conscience instead of

requiring Plaintiffs to plead sufficient facts to "state a claim to relief that is plausible on its face." *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The latter "standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*

The Court cannot find any instance in which the magistrate judge faulted Plaintiffs for failing to provide sufficient proof. Instead, it appears that the magistrate judge assessed Plaintiffs' allegations and determined that they were not sufficient to state a claim under the standard in *Iqbal* and *Twombly*. Contrary to Plaintiffs' objections, their complaint does not survive dismissal unless it is "beyond doubt that [they] can prove no set of facts in support of [their] claim[.]" (Pls.' Objs. 12-13.) The "no-set-of-facts" standard comes from *Conley v. Gibson*, 355 U.S. 41 (1957), and it was abrogated by the Supreme Court in *Twombly*. *See Twombly*, 550 U.S. at 563 (describing *Conley*'s no-set-of-facts standard as "an incomplete, negative gloss on an accepted pleading standard"). Thus, Plaintiffs' reliance on that standard is misplaced.

Plaintiffs insist that determining whether conduct shocks the conscience is a fact-specific determination that "should almost never occur" at the pleading stage. (Pls.' Objs. 12.) But while a substantive due process claim "'demands an exact analysis of the circumstances,' . . . there are doubtlessly some cases in which a court could determine that a state actor's actions did not shock the conscience at the motion-to-dismiss stage[.]" *M.S. ex rel. Covington v. Hamilton Cnty. Dep't of Ed.*, 756 F. App'x 510, 517 (6th Cir. 2018) (quoting *Sacramento v. Lewis*, 523 U.S. 833, 850 (1998)). The magistrate judge determined that this is one of those cases. Similarly, in *Guertin v. Michigan*, 912 F.3d 907 (6th Cir. 2019), the Court of Appeals upheld the dismissal of several

3

defendants because the allegations in the complaint failed to support a substantive due process claim against them.  *See Guertin*, 912 F.3d at 929-30.  The Court discerns no error in doing the same here.

Plaintiffs critique the magistrate judge for referring to some of their allegations as "conclusory."  (R&R 26.)  For example, Plaintiffs make the same allegation against at least four Defendants.  Plaintiffs allege that these Defendants were "aware of and participated in the decisions and actions that caused, maintained, and covered up the Benton Harbor water crisis." (2d Am. Compl. ¶¶ 21-24, ECF No. 82.)  The magistrate judge rightly concluded that these allegations are conclusory.  They fail to identify the particular conduct that Plaintiffs believe is the basis for their claims.  Indeed, assertions about awareness, participation, causation, and covering up conduct are all conclusions that require a factual basis to support them.  It is not enough to simply assert that a defendant "participated" in a particular decision or "caused" a particular result without facts from which to infer such participation or causation.

The magistrate judge applied a corollary to the principle that "a plaintiff must plead that each Government official defendant, through the official's own individual actions, has violated the Constitution."  *Iqbal*, 556 U.S. at 676.  That requirement exists because government officials are not liable for the unconstitutional conduct of others.  *See id.*  Similarly, the Sixth Circuit "has consistently held that damage claims against government officials arising from alleged violations of constitutional rights must allege, with particularity, facts that demonstrate what *each* defendant did to violate the asserted constitutional right."  *Boxill v. O'Grady*, 935 F.3d 510, 518 (6th Cir. 2019) (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 564 (6th Cir. 2011)).  Plaintiffs disagree with that principle, but it is firmly established in binding precedent.  Thus, the magistrate judge did not err by applying it to Plaintiffs' boilerplate assertion that multiple defendants were

4

aware of and participated in unidentified actions and decisions that somehow caused, maintained, or covered up issues with the City's water.

Moreover, the magistrate judge did not focus on the foregoing allegations alone. Instead, he examined the more specific allegations against each Defendant to determine whether they sufficed to state a claim against them. (R&R 27-35.) That method is the proper one for analyzing Plaintiffs' constitutional claims. *See Guertin*, 912 F.3d at 926 (examining "each defendant's alleged actions individually").

### 2. Deciding Facts

Next, Plaintiffs accuse the magistrate judge of improperly deciding facts and weighing evidence in favor of Defendants. In particular, Plaintiffs focus on the magistrate judge's determination that Plaintiffs have plausibly alleged no more than negligence by several defendants, including Defendants Whitmer, Muhammad, Clark, and Hertel. Plaintiffs are correct that the Court's role at this stage does not involve weighing evidence or assessing credibility. Rather, the Court must accept Plaintiffs' allegations as true and draw reasonable inferences in their favor.

Nevertheless, Plaintiffs ignore that alleging a deliberate indifference claim is "a particularly high hurdle" and that "the Due Process Clause is a limitation only on government action." *Guertin*, 912 F.3d at 930. Consequently, alleging that particular defendants, like Governor Whitmer, Mayor Muhammad, EGLE Director Liesl Clark, and MDHHS Director Hertel, were aware of the City's water problems and failed to act does not state a substantive due process claim against them. *See id.* at 930 (dismissing defendants who allegedly "failed to protect and notify the public of the problems with Flint's water") (quotation marks omitted). That conclusion does not stem from an improper construction of Plaintiffs' allegations; instead, it stems from the law. Plaintiffs must allege facts from which to infer something more than negligence or a mere failure to act because neither of those circumstances gives rise to a constitutional claim. The Court

5

is not obligated to infer unconstitutional conduct from a lack of action or to infer deliberate indifference, let alone a violation of the right to bodily integrity, from a lack of due care. Indeed, to do so would risk making the provision of clean water a constitutional obligation, such that any government official who failed to take affirmative action to correct a contaminated water supply would violate the Fourteenth Amendment. The "high hurdle" of Plaintiffs' Fourteenth Amendment claim requires more.

### 3. Comparison to Flint

Plaintiffs object to various statements that the magistrate judge made when distinguishing this case from *Guertin*, which involved the lead water crisis in Flint, Michigan. Among other things, the magistrate judge noted that, unlike that case, there is no allegation here that any Defendant caused the contamination of the City's water; they did not "change the source of water or the way the water was being processed." (*See* R&R 4.) Instead, according to Plaintiffs' complaint, "drastic layoffs [from 2010 to 2016] that involved half of Benton Harbor's Water Department employees . . . severely compromised Benton Harbor's Water Department's ability to deliver clean, safe water to its residents[.]" (2d Am. Compl. ¶ 48.) Defendants are not alleged to have been involved in those decisions; rather, they are being sued for their responses to contamination that was discovered in 2018. (*See id.* ¶ 50.)

The Court agrees with Plaintiffs that Defendants' lack of involvement in causing the initial contamination of the City's water does not necessarily preclude Plaintiffs from asserting substantive due process claims against them. However, it does put Plaintiffs' claims on a much weaker footing. Recklessly *causing* lead contamination in a city's water supply and then attempting to cover it up and conceal it from the public, as some of the defendants in *Guertin* are alleged to have done, is egregious and shocks the conscience in a way that simply delaying or mishandling a response to the contamination does not. Put another way, knowingly creating a

6

substantial risk of new lead contamination in the water supply looks more like deliberate indifference and a violation of the right to bodily integrity than simply failing to adequately address an existing contamination problem.

Indeed, in *Guertin*, *most* of the officials against whom the plaintiffs stated a substantive due process claim were those who were involved in the decision to switch Flint's water supply to a new source while not treating it. They were either "among the chief architects of Flint's decision to switch water sources" or they "played a pivotal role in authorizing Flint to use its ill-prepared water treatment plant to distribute drinking water[.]" *Guertin*, 912 F.3d at 926-27. In contrast, the Court of Appeals repeatedly noted that the defendants who were properly dismissed for failure to state a claim were not involved in those decisions. *See id.* at 929-32 (noting "[p]laintiffs do not plausibly allege Wyant personally made decisions regarding the water-source switch"; "[t]he complaint sets forth no facts connecting Lyon and Wells to the switch to the Flint River or the decision not to treat the water"; and "the allegations against Peeler and Scott relate not to the switch of water sources"). Here, Defendants did not create the City's water problem. In that respect they are more like the dismissed defendants in *Guertin* than the defendants against whom the Court of Appeals allowed substantive due process claims to proceed. The magistrate judge did not err by considering this distinction when concluding that Plaintiffs did not state a claim.

On the other hand, Plaintiffs are right to argue that this distinction is not necessarily dispositive. One official who the court in *Guertin* described as playing "a pivotal role" in creating Flint's water problem appears to have been responsible only for making false statements to the public after those problems arose. *See Guertin*, 912 F.3d at 927-28 (discussing defendant Wurfel). Wurfel "was instrumental in the coverup" of Flint's water problem; he "repeatedly lied to the public and assured them that Flint River water was safe." *In re Flint Water Cases (Waid v. Snyder)*,

7

960 F.3d 303, 329 (6th Cir. 2020). As discussed below, that defendant is like two Defendants in this case.

Similarly, in *Waid*, the Court of Appeals concluded that another defendant could be liable for concealing Flint's water problem instead of creating it. That official, Glasgow, was allegedly involved in "covering up the extent of lead contamination"; he "distorted water quality tests to downplay the extent of the lead contamination." *Id.* at 326.

In short, Plaintiffs are correct when they assert that, even if Defendants did not cause the initial contamination of the City's water, Defendants' actions in response to that problem could give rise to a substantive due process claim. However, context matters, as does the degree of a defendant's conduct. Repeatedly lying to the public by telling them that the water supply is safe, as Wurfel did, or intentionally altering water quality tests, as Glasgow did, suggests a level of arbitrary and egregious conduct that is more culpable than making a single false statement to a member of the public. The Fourteenth Amendment protects against specific kinds of particularly egregious government actions. It does not require that all statements by government officials about public health risks be truthful and accurate. Nor does it require that government officials make good decisions, exercise reasonable care, or intervene to correct the conduct of others.

Contrary to Plaintiffs' objections, the Court does not read the R&R as *requiring* them to allege that Defendants were responsible for the initial lead contamination in order to state a substantive due process claim. Instead, the magistrate judge used *Guertin* as a helpful comparator while examining the allegations against each Defendant individually. That individualized analysis would not have been necessary if the magistrate judge had believed that conduct causing the City's water problem was necessary to state a substantive due process claim against Defendants. The magistrate judge could have simply noted that Defendants were not responsible for the lead

8

contamination and then dismissed the substantive due process claim against them. Nevertheless, as discussed below, the Court disagrees with the magistrate judge's conclusions as to two Defendants.

### 4. Specific Defendants

Plaintiffs argue that the conduct of Defendants O'Malley, Watson, Hertel, Oswald, Whitmer, Muhammad, Clark, and Gordon shocks the conscience because they "contributed to causing the water crisis," "[c]overed up and downplayed danger," "[p]rolonged the water crisis," made "inadequate recommendations," and/or "lied" to "regulators, experts, and/or advocates[.]" (Pls.' Objs. 26-28.) For each of these Defendants, Plaintiffs cite specific pages of their complaint to support their assertions. (*Id.*)

The Court will examine Plaintiffs' allegations regarding each Defendant but will only discuss those allegations that mention the individual Defendants specifically or that otherwise make it clear what conduct a particular Defendant is accused of. Many of Plaintiffs' allegations group multiple Defendants together, making it unclear which one is responsible for what conduct. (*See, e.g.*, 2d Am. Compl. ¶ 50 (alleging that "each State Defendant ignored the misinformation that they knew was being partially disseminated to the public").) Such allegations are not sufficient to state a claim under § 1983. *See Boxill*, 935 F.3d at 518 ("Summary reference to a single, five-headed 'Defendants' does not support a reasonable inference that *each* Defendant is liable[.]").

### (a) Water Plant Director Michael O'Malley

Plaintiffs allege that O'Malley "caused, maintained, and covered up the Benton Harbor water crisis." (2d Am. Compl. ¶ 29.) He also "failed to follow the notice and public education requirements of the state and federal Safe Drinking Water Acts." (*Id.*) These allegations are vague and conclusory. Moreover, a failure to follow state and/or federal law is not equivalent to a violation of the Constitution.

9

Next, O'Malley allegedly "admitted that lead may come from the city's main pipelines." (*Id.* ¶ 56.) Specifically, he stated in a report that lead "does come from lead individual service lines from the main to the house" and, "*to a very small degree*," lead comes from "water in the mains that move water all around the City." (*Id.*) O'Malley's admission that there was some amount of lead in the City's water system does not itself support a constitutional claim.

In addition, O'Malley allegedly told a City resident, Izzy Murrah, that it was safe to drink water in homes with lead above the 15 ppb limit "after the first flush," because the City provided "clean water right to their spout." (2d Am. Compl. ¶ 106.) Plaintiffs allege that "[t]his was a conscious and deliberately false statement[.]" (*Id.*) Regardless, a single false statement to a City resident does not suggest deliberate indifference and does not shock the conscience. Also, Plaintiffs do not allege facts from which to infer that this statement personally impacted them.

Plaintiffs also allege that, from 2018-2020, O'Malley failed to follow state and federal guidelines for the selection and use of anti-corrosion measures. (*Id.* ¶ 204.) This allegation is vague. It does not indicate which guidelines O'Malley himself failed to follow. Also, it suggests negligence by O'Malley, rather than deliberate indifference.

Finally, from 2018 to 2020, Plaintiffs allege that the City's water supply was contaminated with "lead, bacteria and other contaminants" at levels that were above federal and state standards, but O'Malley "repeatedly denied, lied and covered up" this issue by "repeatedly telling [City] residents and the public that the water was safe to drink." (*Id.* ¶ 205.) Curiously, this allegation is located in a paragraph near the end of the complaint, in a section that supports Plaintiffs' state-law claim against O'Malley. Nevertheless, the Court must accept it as true. If true, it applies to Plaintiffs' federal claim as well.

10

As discussed above, repeatedly lying to City residents by telling them that their water was safe to drink is troubling, to say the least. This conduct is similar to that of Wurfel in the Flint water cases. There, the Court of Appeals expressly rejected the argument that "public statements cannot violate a person's right to bodily integrity." *Waid*, 960 F.3d at 330-31. In other words, O'Malley's lack of personal involvement in creating the City's initial water problems does not necessarily foreclose a substantive due process claim against him. Making false statements about that problem to the public might be enough, particularly where context plausibly suggests that the statements were deliberately misleading and were relied upon by Plaintiffs to their detriment. Construing all inferences in favor of Plaintiffs, O'Malley's repeated false statements to the public about the safety of the City's water meets these conditions. Accordingly, the Court concludes that Plaintiffs' allegations are sufficient to state a substantive due process claim against O'Malley.

### (b) City Manager Darwin Watson

Watson allegedly "approved of and participated in the decisions that deliberately caused, maintained and covered up the Benton Harbor water crisis." (2d Am. Compl. ¶ 27.) These allegations are vague and conclusory.

Watson also allegedly "failed to notify and/or warn" City residents about high lead levels in their water. (*Id.*) A failure to "protect and notify the public" does not state a claim because "the Due Process Clause is a limitation only on government action." *Guertin*, 912 F.3d at 930. Thus, Plaintiffs do not state a federal claim against Defendant Watson.

### (c) MDHHS Director Elizabeth Hertel

Michigan Department of Health and Human Services ("MDHHS") Director Hertel allegedly advised City residents to stop drinking or ingesting the City water on October 7, 2021. (2d Compl. ¶ 125.) And though her department had been involved in providing free waters filters to City residents, she admitted during an internal meeting that "she could not guarantee that the

11

filters were actually mitigating the lead." (*Id.* ¶ 127.) She did not tell the public about these concerns. Instead, MDHHS issued a press release announcing that it was increasing the availability of free bottled water and recommending that residents use it for "drinking, formula, and hygienic use." (*Id.*) None of these actions suggests deliberate indifference. Her failure to notify the public about her concerns is not sufficient to state a claim. *See Guertin*, 912 F.3d at 930.

Plaintiffs also point to an email from Andrew Leavitt, a consultant for EGLE, to state officials in September 2021 that critiqued a pamphlet EGLE had prepared for distribution to the public about the use of water filters. (*See* Leavitt Email, Ex. N to 2d Am. Compl., ECF No. 71-14.) Among other things, Leavitt stressed that "no one should be relying on filters" because of "unknowns about filter performance[.]" (*Id.*, PageID.1058.) Filters "are only certified to remove lead at 150 ppb and lower" but some residences were receiving water that contained up to 889 ppb of lead. (*Id.*) Leavitt believed that "residents need to be told that the water is not safe to drink." (*Id.*, PageID.1058.) Hertel received a copy of this email on September 30, 2021 (*id.*, PageID.1057), about a week before she advised City residents to stop drinking City water.

At most, the foregoing email indicates that Hertel was aware that water filters might not be effective for some residents. That awareness alone does not state a due process claim. Plaintiffs do not tie that awareness to affirmative conduct by Hertel that was deliberately indifferent to their safety.

### (d) EGLE Director Eric Oswald

Michigan Department of the Environment, Great Lakes & Energy ("EGLE") Director Oswald allegedly received notice that O'Malley had told a City resident that her tap water was "'okay to drink and cook' . . . after the 'first flush.'" (2d Am. Compl. ¶ 106.) Oswald took no action to correct this misstatement. Such inaction does not state a substantive due process claim. *See Guertin*, 912 F.3d at 930.

In November 2018, an official allegedly asked Oswald about "updates on non-compliant drinker water systems in Michigan." (*Id.* ¶ 60.) Oswald allegedly responded in January 2019, saying that "1 water system has returned to compliance" and "1 water system is in compliance and a requested clarification has been provided[.]" (*Id.* ¶ 61.) Plaintiffs allege that this statement is "false." (*Id.*) However, Plaintiffs "do not factually link [this statement] to causing [the City's] residents to consume (or continue to consume) lead-tainted water." *Guertin*, 912 F.3d at 932. Accordingly, the Court agrees with the magistrate judge that such a statement does not shock the conscience. (*See* R&R 31.) "Not every bad act or wrongful conduct will support a due process claim." (*Id.*)

After a member of the public, Nicholas Leonard, wrote Oswald in 2019 and asked him why EGLE was "departing from federal Safe Drinking Water statutory requirements and EPA guidelines concerning the use of anti-corrosive chemicals," Plaintiffs allege that Oswald "knowingly and untruthfully stated that the chemicals were working." (2d Am. Compl. ¶ 152.) At the time, Oswald "knew that the most recent water test . . . had the highest 90 percentile for lead samples for any . . . sampling period, 32 ppb up until that time." (*Id.*) In other words, Oswald misrepresented the effectiveness of the City's corrosion treatment to an individual with no direct involvement in treating the City's water and no apparent connection to Plaintiffs. That conduct does not shock the conscience. Thus, Plaintiffs do not state a federal claim against Oswald.

### (e) Governor Gretchen Whitmer

Plaintiffs allege that Governor Whitmer was aware of the City's contaminated water as early as 2019 but did not declare a "State of Emergency" about it until October 14, 2021, when she directed state agencies to provide free bottled water to the City's residents. (*Id.* ¶¶ 91, 109.) The Court agrees with the magistrate judge that such a failure to act falls short of what is necessary to allege conduct that shocks the conscience. (R&R 28.)

13

Plaintiffs argue that Whitmer's role is comparable to that of Governor Snyder in the Flint water cases. Unlike Snyder, however, Whitmer was not "personally involved" in decisions that impacted the quality of the City's water. *See Waid*, 930 F.3d at 330. Snyder coordinated the city's switch to a new water source in spite of warnings about it. *Id.* And when problems arose, he "kept the crisis under wraps and stood by as the public continued to be poisoned." *Id.* at 331. In short, he "personally contributed to creating [the] crisis." *Id.* Plaintiffs do not make similar allegations about Whitmer. Rather, she is more like the defendants in *Waid* and *Guertin* who failed to protect and notify the public after learning about issues with Flint's water. *See id.* Those failures did not state a substantive due process claim in those cases and they do not state such a claim here.

### (f) Mayor Marcus Muhammad

Mayor Muhammad allegedly promised one of the Plaintiffs to "get back to [her]" after she asked him to test her water because of its "smell and look," but he failed to keep his promise. (2d Am. Compl. ¶ 14.) That failure to respond was simply a failure to act, which does not state a due process claim. *See Guertin*, 912 F.3d at 930.

Plaintiffs also allege that, from 2018-2020, both Muhammad and O'Malley were "falsely telling the public and Benton Harbor water supply users . . . that the tap water was safe to drink[.]" (2d Am. Compl. ¶ 107.) This allegation borders on conclusory. It identifies no particular statement by Defendant Muhammad. Also, it does not supply facts that would plainly suggest deliberate indifference or conscience-shocking conduct, such as an intent to deceive or cover up the City's water problem. The Court agrees with the magistrate judge that this allegation is "long on conclusions and short on specifics." (R&R 33.)

On the other hand, Plaintiffs are not necessarily obligated to identify particular statements in order to state a claim.[1]  The Court can infer from other allegations in the complaint that Muhammad was aware of the lead contamination in the City's water.  Despite that awareness, Plaintiffs apparently contend that he repeatedly misled the public about that danger.  These allegations are similar enough to those against Defendant O'Malley that the Court will allow the substantive due process claim against Muhammad to proceed.

### (g) EGLE Director Liesl Clark

At a legislative hearing in October 2021, Defendant Clark allegedly admitted that the City's water was not safe to drink.  (2d Am. Compl. ¶ 9.)  This statement does not shock the conscience.

Plaintiffs further allege that "EGLE and its individual Defendant Department officials" decided not to cite the City for violations of state and federal law with regard to the quality of its water or its treatment system.  (*Id.* ¶ 57.)  In addition, EGLE failed to perform a corrosion control study and identify an optimal control treatment as required by state law.  (*Id.* ¶¶ 75-76.)  These allegations do not identify any conduct by Defendant Clark, let alone conduct that would give rise to a substantive due process claim against her.  As far as Plaintiffs' constitutional claim is concerned, Clark is liable only for her own actions; she is not liable for the actions of other officials in her agency.  Also, a failure to comply with state law does not amount to a constitutional violation.

Clark allegedly told one of Governor Whitmer's cabinet officials that she was aware of the lead contamination in the City's water.  (*Id.* ¶ 52.)  She also received a press release drafted by EGLE and MDHHS in January 2019 which recommended that residents use filters and flush out

---

[1] Defendants do not contend that the heightened pleading requirements in Rule 9(b) of the Federal Rules of Civil Procedure apply here.

their water before using it. Plaintiffs believe that this press release was deficient because it did not state that the water was unsafe to drink "due to lead and other contaminants." (*Id.* ¶ 53.) A week later, Clark instructed Oswald to inform Governor Whitmer about the lead exceedances in the City's water. (*Id.* ¶ 54.) None of these allegations are sufficient to state a due process claim. At most, they suggest that Clark failed to do enough to inform residents about the contaminants in their water.

Plaintiffs compare Clark to Governor Snyder and Public Works Director Croft in the Flint water cases. However, the due process claims against those officials could proceed because they were personally involved in the decision to change the source of Flint's water despite awareness of the risks. *See Waid*, 960 F.3d at 326, 330. Clark did not participate in a similar decision here. She did not contribute to the City's water issues. Thus, Plaintiffs do not state a constitutional claim against her.

### (h) City Manager Ellis Mitchell

Most of the allegations against Defendant Mitchell are wholly conclusory. For instance, he allegedly "established and maintained" various customs and policies regarding the approval of "decisions with regard to the public water system in the City" and/or the concealment of its harms. (2d Am. Compl. ¶ 160.) He also "approved of and participated in the decisions that caused, maintained, and covered up the [City's] water crisis." (*Id.* ¶ 28.) These allegations do not state a constitutional claim because they fail to identify any specific conduct by Mitchell.

Mitchell also failed to properly notify residents of the high levels of lead in their water. (*Id.* ¶ 29.) This allegation of inaction also fails to state a substantive due process claim. *See Guertin*, 912 F.3d at 930.

### (i) MDHHS Director Robert Gordon

Defendant Gordon allegedly became aware of high lead levels in the City's water in January 2019.  (2d Am. Compl. ¶ 62.)  Further testing by MDHHS employees "confirmed the presence of lead in the service line" of homes that had returned high lead levels in tests performed in 2018.  (*Id.* ¶ 64.)  Gordon subsequently approved the use of "free filters" for "only some" City residents, without studying the filters to determine their efficacy.  (*Id.* ¶ 65.)  He continued giving free water filters to City residents in 2019, 2020, and 2021 "without confirming who received the filters, how the filters were installed, and not advising that the water was unsafe to ingest."  (*Id.*)  In other words, Gordon allegedly distributed water filters to mitigate the lead contamination even though he "did not actually know whether the filters were effectively mitigating and/or eliminating the lead coming out of residents' taps[.]"  (*Id.* ¶ 114.)  That lack of knowledge may indicate a lack of due care, but it does not suggest deliberate indifference.

### (j) City of Benton Harbor

The Court's conclusion that Plaintiffs state a plausible due process claim against Mayor Muhammad impacts the resolution of Plaintiffs' *Monell* claim against the City.  The magistrate judge dismissed this claim for two reasons: (1) "Plaintiffs fail[ed] to plausibly allege a constitutional violation by any city employee"; and (2) Plaintiffs "failed to plead any policy, practice or custom that purportedly *caused* the alleged constitutional violation."  (R&R 38.)

The Court's conclusion that Plaintiffs state a constitutional claim against the City's mayor defeats the first reason.  In addition, Plaintiffs allege that the mayor was the "official policymaker" for the City, which defeats the second reason.  (*See* 2d Am. Compl. ¶ 160.)  "[A] single unconstitutional act or decision, when taken by an authorized decisionmaker, may be considered a policy and thus subject a [municipal entity] to liability."  *Bible Believers v. Wayne Cnty.*, 805 F.3d 228, 260 (6th Cir. 2015).  It is plausible to infer that the mayor of a city is the final

17

decisionmaker with regard to its public statements and communications. Accordingly, Plaintiffs have alleged sufficient facts to state a *Monell* claim against the City.

### 5. Qualified Immunity

Defendants O'Malley and Muhammad moved for dismissal of the constitutional claims against them on the basis of qualified immunity. The magistrate judge did not address this issue because he concluded that Plaintiffs' complaint fails to state a claim. (*See* R&R 23 n.8.) The Court must now consider that issue as to these two Defendants.

As discussed above, the alleged conduct by Defendants O'Malley and Muhammad is similar to the conduct of Wurfel in *Guertin*. There, the Court of Appeals held that "providing a tainted life-necessity and falsely assuring the public about its potability . . . 'strip[ped] the very essence of personhood' from those who consumed the water," and was "an egregious violation of the right to bodily integrity[.]" *Guertin*, 912 F.3d at 935 (quoting *Doe v. Claiborne Cnty.*, 103 F.3d 495, 507 (6th Cir. 1996)). And at the time of Wurfel's conduct in 2015, this right was clearly established. Consequently, the Court of Appeals held that Wurfel was not entitled to qualified immunity at the dismissal stage. *Id.* The same logic applies here. "Should discovery shed further light on the reasons behind [Defendants'] actions . . . , they are free to raise the qualified immunity defense again at the summary judgment stage." *Id.*

### B. State-Law Claims

Finally, Plaintiffs object to the magistrate judge's recommendation to not exercise supplemental jurisdiction over Plaintiffs' state-law claims. The magistrate judge made that recommendation on the assumption that the Court would dismiss the federal claims. Because the federal claims against Defendants O'Malley, Muhammad, and the City will survive dismissal, the Court must consider anew whether to exercise supplemental jurisdiction over Plaintiffs' state-law claims, i.e., the unjust enrichment claim against the City in Count III, the negligence claims against

18

the engineering firms in Counts IV and V, and the gross negligence claim against Defendant O'Malley in Count VI.

When deciding whether to exercise supplemental jurisdiction, "a federal court should consider and weigh in each case . . . the values of judicial economy, convenience, fairness, and comity[.]" *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 350 (1988).  The Court can decline to exercise supplemental jurisdiction over a state-law claim if it "raises a novel or complex issue of State law" or if it "substantially predominates over the claim or claims over which the district court has original jurisdiction[.]"  28 U.S.C. § 1367(c)(1), (c)(2).

A state law claim can substantially predominate "in terms of proof, of the scope of the issues raised, or of the comprehensiveness of the remedy sought[.]" *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966). The Court can also consider "the likelihood of jury confusion in treating divergent legal theories of relief, that would justify separating state and federal claims for trial[.]" *Id.*

Here, Plaintiffs' remaining federal claims focus on false statements that Defendants O'Malley and Muhammad allegedly made about the City's water.  Those facts are somewhat removed from, and more limited in scope than, the facts that a jury would need to consider when assessing the engineering firms' role in addressing the City's water crisis under Counts IV and V, or when assessing Defendant O'Malley's overall response to the water crisis under Count VI. Plaintiffs allege that he failed to protect the City's residents from the City's contaminated water supply and that he did not follow the requirements of federal and state law when selecting and using anti-corrosion measures to treat the lead contamination.  Those allegations implicate many facts that have little to do with his alleged statements.

19

To be sure, there is some overlap between the federal claims against O'Malley and Muhammed and the state-law claims against O'Malley and the City, as all of them involve, at least in part, the allegation that O'Malley and/or Muhammad lied to or misled the City's residents by telling them that the City's water was safe to drink. However, the standard of liability for the federal claims is different from the standard applicable to the state-law claims. Negligence, or even gross negligence, is not sufficient for a constitutional violation, but it might be sufficient for Plaintiffs' claims under state law. Those differing standards would potentially confuse a jury that was considering the federal and state-law claims at the same time.

Finally, comity favors allowing a state court to resolve issues of state law, whereas judicial economy, convenience, and fairness do not weigh strongly in either direction.

Accordingly, the Court will decline to exercise supplemental jurisdiction over the state-law claims because those claims would substantially predominate over the federal ones.

## IV. CONCLUSION

In summary, on de novo review, the Court will adopt the R&R in part and reject it in part. The Court will adopt the R&R insofar as it recommends dismissal of Defendants other than Defendants O'Malley, Muhammad, and the City. The Court will reject its recommendation as to the latter three Defendants. In addition, the Court will decline to exercise supplemental jurisdiction over Plaintiffs' state-law claims, but for different reasons than those stated in the R&R.

The Court will enter an order in accordance with this Opinion.

Dated: September 28, 2023         /s/ Hala Y. Jarbou
                                  HALA Y. JARBOU
                                  CHIEF UNITED STATES DISTRICT JUDGE